# No. 25-841

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

GIDEON RAPAPORT, an individual,

*Plaintiff-Appellant,*

—against—

AJAY SRINIVASAN IYER, ZACHARY GEORGE
GARRETT, RICHARD ALLEN EPSTEIN, individuals,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Case No. 1:23-cv-06709-JGLC, Hon. Jessica G. L. Clarke

## APPENDIX OF PLAINTIFF-APPELLANT VOL. 1

GIDEON RAPAPORT, *pro se*
#627 1078 Summit Avenue
Jersey City, New Jersey 07307
Telephone: (862) 213-0895

1

TABLE OF CONTENTS

Amended Complaint Exhibit 1 – 3

Amended Complaint Exhibit 2 – 5

Amended Complaint Exhibit 3 – 7


Opinion and Order Appealed – 20


Operative First Amended Complaint – 51

Original Complaint - 72

Proposed Second Amended Complaint – 89


Defendant Epstein Motion to Dismiss  – 138

Plaintiff Opposition to Defendant Epstein's Motion to Dismiss – 175

Defendant Epstein Reply in Support of Motion to Dismiss – 208


Defendants Iyer and Garrett Motion to Dismiss  – 224

Plaintiff Opposition to Defendants Iyer and Garrett Motion to Dismiss – 252

Defendants Iyer and Garrett Reply in Support of Motion to Dismiss and Against Leave to Amend – 285

Plaintiff Reply to Consolidated Reply-Opposition of Defendants Iyer and Garrett – 314


Amended Notice of Appeal – 329

Notice of Appeal – 330


Plaintiff Motion to Disqualify Schaerr-Jaffe LLP  – 331

Defendants Iyer and Garrett Opposition to Motion to Disqualify – 343

Plaintiff Reply in Support of Motion to Disqualify - 362

Plaintiff Motion to Stay Consolidated Proceedings Pending Appeal - 375

# EXHIBIT 1



# EXHIBIT 2



# EXHIBIT 3

**Tuesday, March 5, 2024 at 19:31:35 Eastern Standard Time**

| | |
|---|---|
| **Subject:** | Re: Gideon Rapaport |
| **Date:** | Tuesday, August 2, 2022 at 3:24:29 PM Eastern Daylight Time |
| **From:** | Zach Garrett |
| **To:** | Peter Redpath, Kate Beer Alcantara |
| **Attachments:** | Security Desk Photo.jpeg, TopLawSchools Thread.pdf, Reddit LawSchool Thread.pdf |

Hello Peter and Kate,

As I mentioned to you over the weekend, my understanding is that Gideon Rapaport was fired from his summer associate position at Kirkland & Ellis NY last week for sexually harassing a practice assistant or an attorney. Please see the attached forum threads ("TopLawSchools Thread" and "Reddit LawSchool Thread"), each of which are in reference to Gideon's behavior and firing. Here are hyperlinks to the TopLawSchools thread and to the Reddit thread. While I cannot confirm the sexual harassment claim specifically, I do know that Gideon was fired and banned from entering the building. Please see the attached photo ("Security Desk Photo") taken by Ajay Iyer at Kirkland & Ellis's New York location at 601 Lexington Avenue on Thursday, June 28th, where Ajay worked with Gideon this summer.

After getting back from the conference, I spoke with Richard Epstein about this situation. He's understandably very upset by the news and feels that Lee Otis should be made aware, since Gideon is going to be participating in the James Kent Fellowship, for which Professor Epstein wrote Gideon a (complicated) letter of recommendation. I don't know Lee Otis, though, so I'm sharing with you two Professor Epstein's concerns. If you feel Lee Otis should know, could you please notify her? If not, I understand. I simply felt it would be more appropriate to come from one or both of you rather than myself.

If you'd like to discuss further, please let me know.

Thank you,
**Zachary G. Garrett**
J.D. Candidate | Class of 2023
New York University School of Law

RAPAPORT0001    1 of 1



r/LawSchool

Posts

Posted by u/Isa931 4 days ago

236

**Anyone wanna spill the tea on the summer at Kirkland NY that got fired?**

Give the people what they want!!

💬 22 Comments    ↱ Share    🔖 Save    👁 Hide    ⚑ Report    94% Upvoted

u/Meet_Tally · Promoted

If only this was the easiest way to get a *clean* credit statement. The next easiest? Tally. Tally combines the best parts of personal loans, balance transfers, and debt-management tools in one easy-to-use app to get you out of credit card debt. W...

meettally.com    **Learn More**

What are your thoughts?

B  *i*  🔗  S̶  <c>  A^  ⚠  ᵀT  ☰  ☷  99  ···   9  Comment

**About Community**

r/LawSchool

For current and former Law School Redditors. Ask questions, seek advice, post outlines, etc. This is NOT a forum for legal advice.

**271k**    **1.1k**
Gunners      Neglecting their readings

🎂 Created Oct 29, 2009

Join

RAPAPORT0003

Sort By: Best ▾

**Throaway9219749936** · 3 days ago

Can confirm that he is in fact banned from the building- security had a picture of him in the lobby. Also the bar where the last event of the summer was had a picture of him as well to make sure he didn't come back. Same guy who went around the office celebrating the Dobbs ruling.

⬆ **78** ⬇   💬 Reply   Share   Report   Save   Follow

**Isa931** **OP** · 3 days ago

Heard about the dobbs thing also! Damn this guy sounds like a menace.

⬆ **27** ⬇   💬 Reply   Share   Report   Save   Follow

**Continue this thread →**

**mroctober1010** · 4 days ago

👀 someone please respond to this comment if the tea is spilled

⬆ **154** ⬇   💬 Reply   Share   Report   Save   Follow

**aliceandskittles** · 4 days ago

JD

Could you please link the post? I can't find it lol

⬆ **37** ⬇   💬 Reply   Share   Report   Save   Follow

**stev3nguy** · 3 days ago

I'm out of the loop. What's this about?

⬆ **24** ⬇   💬 Reply   Share   Report   Save   Follow

RAPAPORT0004

**InarticulateL** · 4 days ago

Is this about the other poster? How do you know it was Kirkland?

⬆ **66** ⬇   💬 Reply   Share   Report   Save   Follow

**BrownComic** · 4 days ago

==Guy also sexually harassed an attorney. No longer allowed in the building.==

⬆ **49** ⬇   💬 Reply   Share   Report   Save   Follow

**Isa931** **OP** · 4 days ago

==Got it confirmed from someone inside but didn't get specifics. Just that they said racist shit==

⬆ **127** ⬇   💬 Reply   Share   Report   Save   Follow

**Continue this thread →**

**haikusbot** · 4 days ago

*Is this about the*

*Other poster? How do you*

*Know it was Kirkland?*

*- InarticulateL*

---

I detect haikus. And sometimes, successfully. Learn more about me.

Opt out of replies: "haikusbot opt out" | Delete my comment: "haikusbot delete"

⬆ **89** ⬇   💬 Reply   Share   Report   Save   Follow

**Continue this thread →**

**cvrline** · 4 days ago · *edited 4 days ago*

lol several NY big law summers didn't get offers, (I've heard of 4 in the past week, because of people being dumb, I'm sure there will be more) it happens every summer, don't get too drunk at summer events y'all, it happens all over

RAPAPORT0005

58   Reply   Share

**Isa931 OP** · 3 days ago

==Yeah but this guy didn't get no-offered. He got straight up fired.==

25   Reply   Share   Report   Save   Follow

**Time-Elephant92** · 3 days ago

2L

If you don't know your limits, a social networking event isn't the time to test it

8   Reply   Share   Report   Save   Follow

**Consistent-Career305** · 3 days ago

All at kirkland? Or more broadly

3   Reply   Share   Report   Save   Follow

**FightMilkDrinker** · 19 hr. ago

Can anyone send a link for some context?

2   Reply   Share   Report   Save   Follow

**Marginalimprovent** · 3 days ago

**New-Loan5393** · 3 days ago

---

More posts from the LawSchool community

Posted by u/ClassicalGrey 3 days ago

533   **My software cut out the rest of the gif, where Mr. Burns then throws the paper shreds out the window**

RAPAPORT0006

year and being instantaneously available and generating great work product. However, you were *not* present and accounted for for the Margarita Wednesday mixers in July and August. This is a serious black mark against your future career prospects here are Kirkland & Ellis. We demand participation in Margarita Wednesday mixers. Therefore, your bonus this year is $0. Thank you, however, for your millions in revenue. Long live Margarita Wednesdays."

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland  Megathread
🗋 by **Anonymous User** » Tue Jul 26, 2022 10:42 am

So it looks like they are monitoring, or there's a trend towards monitoring, in NYC, DC, and SF. But no, I'm sure it's an "urban legend" some of us are making up because we're just paranoid or incapable of reading social cues. ▪️

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland  Megathread
🗋 by **Anonymous User** » Thu Jul 28, 2022 5:18 pm

Rumors of a NY summer who got fired?

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland  Megathread
🗋 by **Anonymous User** » Fri Jul 29, 2022 3:49 pm

> 66 **Anonymous User** wrote: ↑          Thu Jul 28, 2022 5:18 pm
> Rumors of a NY summer who got fired?

I'm also checking in to see if the ny associates will spill

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland  Megathread
🗋 by **Anonymous User** » Fri Jul 29, 2022 4:40 pm

> 66 **Anonymous User** wrote: ↑          Fri Jul 29, 2022 3:49 pm
>> 66 **Anonymous User** wrote: ↑          Thu Jul 28, 2022 5:18 pm
>> Rumors of a NY summer who got fired?
>
> I'm also checking in to see if the ny associates will spill

Anon bc im a Kirkland summer but the guy apparently harassed his PA and also was the same person who purposely went to female SA to celebrate the Dobbs decision.

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11,

## Re: Kirkland  Megathread
🗋 by **Anonymous User** » Fri Jul 29, 2022 6:54 pm

RAPAPORT0007

**13**

Kirkland Megathread Forum - Page 20 - Top Law Schools          https://www.top-law-schools.com/forums/viewtopic.php?f=23&t=312...

(14 of 300), Page 14 of 300   Case: 25-841   06/05/2025, DktEntry: 39.1, Page 14 of 300
Case 1:23-cv-06709-JGLC   Document 38-3   Filed 05/24/24   Page 8 of 13



2009 8:32 am

### Anonymous User

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland Megathread

by **Anonymous User** » Sat Jul 30, 2022 12:13 am

Kirkland summers get PAs? For what lol

### Anonymous User

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland Megathread

by **Anonymous User** » Sat Jul 30, 2022 7:07 am

> **Anonymous User** wrote: ↑                        Sat Jul 30, 2022 12:13 am
> Kirkland summers get PAs? For what lol

Same Kirkland summer from above. It's literally just so we get the experience and begin getting used to having a PA. i only ever used mine to file expense reimbursements.

### Anonymous User

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland Megathread

by **Anonymous User** » Sat Jul 30, 2022 11:32 am

> **Anonymous User** wrote: ↑                        Sat Jul 30, 2022 12:13 am
> Kirkland summers get PAs? For what lol

the PAs are assigned summers so they can train with them before they get assigned 1st years in the fall

sidebar: the gifts given to summers this year were atrocious. almost everything went straight to goodwill

### thisismytlsusername

**BRONZE**

Posts: 192
Joined: Wed Dec 20, 2017 9:22 pm

## Re: Kirkland Megathread

by **thisismytlsusername** » Sat Jul 30, 2022 11:36 am

> **Anonymous User** wrote: ↑                        Sat Jul 30, 2022 11:32 am
> > **Anonymous User** wrote: ↑                        Sat Jul 30, 2022 12:13 am
> > Kirkland summers get PAs? For what lol
> the PAs are assigned summers so they can train with them before they get assigned 1st years in the fall
>
> sidebar: the gifts given to summers this year were atrocious. almost everything went straight to goodwill

What gifts?

| Post Reply ↰ | Post Anonymous Reply ↰ | 🔧 ▾ | ⇅ ▾ |

14

RAPAPORT0008



| | | Law School Student Forums | Law School Class Forums | Legal Employment Forums | Underrepresented Lawyers and Students | Legal Practice Forums | Legal Advice Forums |
|---|---|---|---|---|---|---|---|
| TLS Home | Law School Admissions | | | | | | |

Legal Job Board        **Get Started**

≡ Quick links   Active topics   View your bookmarks, subscriptions, or posts      pumpkinpoodin ▾
🔔 Notifications   🖂 Private messages

🏠  ‹ Le...  ‹ Legal Employment                                                    Q

# Kirkland Megathread Forum

**Forum rules**
**Anonymous Posting**

Anonymous posting is only appropriate when you are revealing sensitive employment related information about a firm, job, etc. You may anonymously respond on topic to these threads. Unacceptable uses include: harassing another user, joking around, testing the feature, or other things that are more appropriate in the lounge.

Failure to follow these rules will get you outed, warned, or banned.

Post Reply ↩   Post Anonymous Reply ↩   🔧 ▾   Search this topic...   Q ⚙

511 posts  ➡  ❮  1  ...  17  18  19  20  21



**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland Megathread                              !  66  66

📄 by **Anonymous User** » Sat Jul 30, 2022 11:36 am

> 66 **Anonymous User** wrote: ↑                          Fri Jul 29, 2022 4:40 pm
>
>> 66 **Anonymous User** wrote: ↑                         Fri Jul 29, 2022 3:49 pm
>>
>>> 66 **Anonymous User** wrote: ↑                        Thu Jul 28, 2022 5:18 pm
>>> Rumors of a NY summer who got fired?
>>
>> I'm also checking in to see if the ny associates will spill
>
> Anon bc im a Kirkland summer but the guy apparently harassed his PA and also was the same person who purposely went to female SA to celebrate the Dobbs decision.

Did you summer in NY? More context to your use of apparently please. Trying to figure out if there's anyone that can definitively say

RAPAPORT0009

> this occurred. Did you hear it from another summer or are there legitimate clues (E.g., this person's absence from an offer reception or events, comments from recruiting or associates, having witnessed this rumored note instructing security not to let him in)?

Last edited by **Anonymous User** on Sat Jul 30, 2022 11:39 am, edited 1 time in total.

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

### Re: Kirkland Megathread

☐ by **Anonymous User** » Sat Jul 30, 2022 11:38 am

> **Anonymous User** wrote: ↑                    Sat Jul 30, 2022 11:32 am
>
>> **Anonymous User** wrote: ↑                   Sat Jul 30, 2022 12:13 am
>> Kirkland summers get PAs? For what lol
>
> the PAs are assigned summers so they can train with them before they get assigned 1st years in the fall
>
> sidebar: the gifts given to summers this year were atrocious. almost everything went straight to goodwill

What office were you in? I agree. In Chicago we were given some clunky shoes from a company I had never heard of, a Kirkland cap, a black water bottle, and a tote bag from career link.

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

### Re: Kirkland Megathread

☐ by **Anonymous User** » Sat Jul 30, 2022 12:08 pm



> **Anonymous User** wrote: ↑                    Sat Jul 30, 2022 11:36 am
>
>> **Anonymous User** wrote: ↑                   Fri Jul 29, 2022 4:40 pm
>>
>>> **Anonymous User** wrote: ↑              Fri Jul 29, 2022 3:49 pm
>>>
>>>> **Anonymous User** wrote: ↑         Thu Jul 28, 2022 5:18 pm
>>>> Rumors of a NY summer who got fired?
>>>
>>> I'm also checking in to see if the ny associates will spill
>>
>> Anon bc im a Kirkland summer but the guy apparently harassed his PA and also was the same person who purposely went to female SA to celebrate the Dobbs decision.
>
> Did you summer in NY? More context to your use of apparently please. Trying to figure out if there's anyone that can definitively say this occurred. Did you hear it from another summer or are there legitimate clues (E.g., this person's absence from an offer reception or events, comments from recruiting or associates, having witnessed this rumored note instructing security not to let him in)?

RAPAPORT0010

I used "apparently" because the reason he was fired I only heard from a fellow summer. I did however personally see his picture in the lobby security and at the bar where the final summer event was held the door people had a photo of him as well with instructions not to let him in.

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland Megathread

by **Anonymous User** » Sat Jul 30, 2022 1:59 pm

> **Anonymous User** wrote: ↑                    Fri Jun 24, 2022 10:52 pm
>
> K&E partner here. Share partner, fwiw.
>
> We didn't fire Clement. We told Clement that he should not take on any more 2A representations going forward. I'm not aware of any particular client(s) demanding that the firm step away from these, but there are many of us here who believe the tragedy in Uvalde is a tipping point and we cannot in good faith as a firm continue to advocate for clients that contribute to this shit always happening in our country.
>
> Clement decided (as is his right) that he didn't want the firm telling him which clients, no matter how unpopular they or their goals might be, he could represent. He is a great lawyer and we aren't happy to see him go. But telling him that he couldn't do one specific type of representation is not "constructive firing", as much as K&E haters like "Kirkland Signature" would have you believe.
>
> Leadership in this firm still leans right. But this "Wal-mart of law firms" with no principles other than just making money has a collective belief that kids should not get gunned down in schools. There are many on the right who believe sensible gun control is the right thing to do, and as a firm we have decided we are not going to represent the 2A zealots who fight tooth and nail against any and all forms of it.

Regardless of the merits, K&E obviously knew that this was constructively firing Clement. After all, the exact same thing happened to King & Spalding. Especially since he was guaranteed free rein when Kirkland acquihired Bancroft.

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

## Re: Kirkland Megathread

by **Anonymous User** » Sat Jul 30, 2022 9:50 pm

> **Anonymous User** wrote: ↑                    Sat Jul 30, 2022 1:59 pm
>
> > **Anonymous User** wrote: ↑                    Fri Jun 24, 2022 10:52 pm
> >
> > K&E partner here. Share partner, fwiw.

RAPAPORT0011

> We didn't fire Clement. We told Clement that he should not take on any more 2A representations going forward. I'm not aware of any particular client(s) demanding that the firm step away from these, but there are many of us here who believe the tragedy in Uvalde is a tipping point and we cannot in good faith as a firm continue to advocate for clients that contribute to this shit always happening in our country.
>
> Clement decided (as is his right) that he didn't want the firm telling him which clients, no matter how unpopular they or their goals might be, he could represent. He is a great lawyer and we aren't happy to see him go. But telling him that he couldn't do one specific type of representation is not "constructive firing", as much as K&E haters like "Kirkland Signature" would have you believe.
>
> Leadership in this firm still leans right. But this "Wal-mart of law firms" with no principles other than just making money has a collective belief that kids should not get gunned down in schools. There are many on the right who believe sensible gun control is the right thing to do, and as a firm we have decided we are not going to represent the 2A zealots who fight tooth and nail against any and all forms of it.

Regardless of the merits, K&E obviously knew that this was constructively firing Clement. After all, the exact same thing happened to King & Spalding. Especially since he was guaranteed free rein when Kirkland acquihired Bancroft.

Yeah this mealy mouthed "we didn't fire him" is so cowardly, at least have the courage of your convictions.

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

### Re: Kirkland Megathread    ❗ 🔖 🔖

📄 by **Anonymous User** » Sat Jul 30, 2022 11:34 pm



> 🔖 **Anonymous User** wrote: ↑    Sat Jul 30, 2022 11:36 am
>
> > 🔖 **Anonymous User** wrote: ↑    Fri Jul 29, 2022 4:40 pm
> >
> > > 🔖 **Anonymous User** wrote: ↑    Fri Jul 29, 2022 3:49 pm
> > >
> > > > 🔖 **Anonymous User** wrote: ↑    Thu Jul 28, 2022 5:18 pm
> > > > Rumors of a NY summer who got fired?
> > >
> > > I'm also checking in to see if the ny associates will spill
> >
> > Anon bc im a Kirkland summer but the guy apparently harassed his PA and also was the same person who purposely went to female SA to celebrate the Dobbs decision.
>
> Did you summer in NY? More context to your use of apparently

RAPAPORT0012

please. Trying to figure out if there's anyone that can definitively say this occurred. Did you hear it from another summer or are there legitimate clues (E.g., this person's absence from an offer reception or events, comments from recruiting or associates, having witnessed this rumored note instructing security not to let him in)?

==This stuff gets around. I've seen a picture of the security note, much to my amusement (and I'm at a different firm in another market).==

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

### Re: Kirkland  Megathread

📄 by **Anonymous User** » Sun Jul 31, 2022 6:32 pm

There's a thread titled "Which partners at your firm are notoriously terrible to work for?" and I was hoping someone from K&E RX could chime in (here or in that thread). I've asked in that thread before but haven't gotten a response. Hopefully someone will chime in about NSPs/SPs that are notoriously terrible to work for. Thanks!

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

### Re: Kirkland  Megathread

📄 by **Anonymous User** » Mon Aug 01, 2022 9:42 am

What the fuck is this PTET bullshit? I just got an email from  Kirkland that I owe them $20k and I haven't worked there in over a year.

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

### Re: Kirkland  Megathread

📄 by **Anonymous User** » Mon Aug 01, 2022 9:47 am

> 📄 Anonymous User wrote: ↑                     Mon Aug 01, 2022 9:42 am
> What the fuck is this PTET bullshit? I just got an email from  Kirkland that I owe them $20k and I haven't worked there in over a year.

Wait - what is this? What is PTET? Is this like a signing bonus claw-back or something?

---

**Anonymous User**

Posts: 407167
Joined: Tue Aug 11, 2009 8:32 am

### Re: Kirkland  Megathread

📄 by **Anonymous User** » Mon Aug 01, 2022 11:26 am

> 📄 Anonymous User wrote: ↑                     Mon Aug 01, 2022 9:42 am
> What the fuck is this PTET bullshit? I just got an email from  Kirkland that I owe them $20k and I haven't worked there in over a year.

Got to get your accountant involved, show them your K1.

---

**Anonymous User**

Posts: 407167

### Re: Kirkland  Megathread

📄 by **Anonymous User** » Mon Aug 01, 2022 11:57 am

RAPAPORT0013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GIDEON RAPAPORT,

                              Plaintiff,

                    -against-                                          23-CV-6709 (JGLC)

AJAY SRINIVASAN IYER, et al.,                                  **OPINION AND ORDER**

                              Defendants.

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Gideon Rapaport, now proceeding *pro se*, is a former summer associate at the law firm of Kirkland & Ellis LLP, and a recent graduate of New York University School of Law ("NYU Law"). Plaintiff filed this action on July 28, 2023 against three John Does—a Reddit.com user, a Top-Law-Schools.com user, and a current or former NYU Law student. The original complaint alleged that the John Does engaged in a conspiracy to defame his character and ruin his professional reputation by spreading rumors on law school website forums. After conducting discovery to ascertain the identity of these individuals, Plaintiff, with the assistance of counsel, filed an Amended Complaint on May 24, 2024 amending the case caption to list the names of the John Doe defendants, and asserting similar causes of action premised on the same alleged defamatory statements and conspiracy.

Defendants now move to dismiss this action, asserting, among other things, that Plaintiff has failed to state any claims against them, and that his claims are barred by applicable statutes of limitation and legal immunities. Plaintiff subsequently filed a motion for leave to amend his complaint to survive dismissal to which he attached a proposed seconded amended complaint. For the reasons set forth below, Defendants' motions to dismiss are GRANTED in part and DENIED in part, and Plaintiff's motion for leave to amend is partially GRANTED. The Court

provides further directives to Plaintiff regarding amending his complaint in this case and a related case in the Conclusion Section. In addition, Plaintiff's application to disqualify counsel is DENIED because any potential conflict has been waived.

## BACKGROUND

The following facts are, unless otherwise noted, taken from the Amended Complaint and presumed to be true for the purposes of this Order. *See J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004).

During the summer of 2022, Plaintiff was a summer associate at the law firm Kirkland & Ellis, LLP ("K&E"). ECF No. 38 ("Amended Complaint" or "AC") ¶ 1. On July 15, 2022, Plaintiff attended a get together for members of the NYU Law Federalist Society. ¶ 31. Defendants Ajay Iyer and Zach Garrett (collectively, "Student Defendants") also attended. *Id.* At the get together, Plaintiff alleges he told Student Defendants that he would be attending the James Kent Academy in early August. *Id.* The James Kent Academy is a fellowship sponsored by the Federalist Society's faculty division. *Id.* ¶ 21. Defendant Richard Epstein wrote a recommendation letter for Plaintiff in support of his candidacy for the fellowship. *Id.* ¶ 60.

A few weeks later, on July 28, 2022, Defendant Iyer photographed a guard desk at the lobby of 601 Lexington Avenue (where Kirkland & Ellis is located). *Id.* ¶ 35. Defendant Iyer then digitally altered the photograph to replace it with a picture of Plaintiff's face and the following text:

DO NOT ADMIT
GIDEON RAPAPORT
KIRKLAND AND ELLIS

*Id.; see* ECF No. 38-1. Plaintiff alleges that Iyer then posted the altered image online on two internet sites: Reddit.com and Top-Law-Schools.com. *Id.* ¶ 37. These postings included

assertions, from anonymous users, that Plaintiff had been fired for sexual harassment and banned from the K&E building. *Id.* ¶ 38. Anonymous users on both websites also made assertions about Plaintiff's "personality, habits, mannerisms, modes of dress and pastimes"—namely, that he "celebrat[ed]" the *Dobbs* ruling (the 2022 Supreme Court decision overturning *Roe v. Wade*) and that he is a "racist." *Id.* ¶ 38; ECF No. 38-3 at RAPAPORT0004–05. On July 29, 2022, Defendant Garrett "presented" the online materials to Peter Redpath and Kate Alcantara, Directors of the Student Division at the Federalist Society. *Id.* ¶¶ 42–43. Garrett also presented the materials to Defendant Epstein around the same time. *Id.* ¶ 45. Neither Mr. Redpath nor Ms. Alcantara took any further action. *Id.* ¶ 44.

On July 29, 2022, Defendant Iyer returned to the guard desk at 601 Lexington Avenue to take another photograph, which he used to make a second image that was "more technically sophisticated." *Id.* ¶ 48; ECF No. 38-2. Iyer sent the second image to Garrett and Professor Epstein. *Id.* ¶ 50. On August 2, 2022, Defendant Garrett again contacted Mr. Redpath and Ms. Alcantara, writing "[a]s I mentioned to you over the weekend, my understanding is that Gideon Rapaport was fired from his summer associate position at Kirkland & Ellis NY last week for sexually harassing a practice assistant or an attorney." *Id.* ¶¶ 54, 55. Garrett also wrote Plaintiff had been "banned from entering the building" and included the manipulated photo Defendant Iyer had created in his correspondence. *Id.* ¶ 56. Again, neither Mr. Redpath nor Ms. Alcantara took any further action. *Id.* ¶ 61. Defendant Epstein, however, forwarded the email containing these statements to Lee Otis.[1] *Id.* ¶ 63.

---

[1] The Amended Complaint does not specify Lee Otis's occupation or position, but Otis appears to be Senior Vice President and Faculty Director of The Federalist Society for Law and Public Policy Studies. ECF No. 11 at 1.

That same day, Ms. Otis had a call with Defendant Iyer in which he repeated the statements from Garrett's August 2 email. *Id.* ¶ 64. On the evening of August 2, 2022, Otis had a telephone conversation with Plaintiff, in which Plaintiff came to learn about the photographs, online posts, and email statements for the first time. *Id.* ¶¶ 65–66. But, Plaintiff was unaware of who made the photographs, online posts and email statements. Plaintiff subsequently authorized K&E's Director of Human Resources, Steven Goldblatt, to disclose any information about his prior employment. Goldblatt informed Ms. Otis that Plaintiff had not been fired for sexual harassment or banned from the K&E building. *Id.* ¶¶ 67–69. On August 9, 2022, after Plaintiff completed the James Kent fellowship, Defendant Epstein called Plaintiff and told him, among other things, his career "was destroyed," that he would be removed from his forthcoming journal editorial position, and that Epstein would no longer associate with him in order to protect his reputation. *Id.* ¶ 71. Defendant Epstein also admitted to Plaintiff that he had forwarded the materials to Lee Otis, but warned Plaintiff not to pursue the matter further and that he would "not get a second chance" from anyone. *Id.* ¶ 84. Epstein subsequently told unnamed "others" that Plaintiff was "frequently absent from his classes." *Id.* ¶ 88. Plaintiff also contends, because of "disparagement" by Epstein, that he lost a paid contractor position and a position at the Manhattan Institute. *Id.* ¶¶ 140, 141.

On July 28, 2023, shortly before filing this suit, Plaintiff met with Defendant Epstein. He asked Defendant Epstein to review the complaint later filed in this case, and asked if Epstein had any corrections or changes to the proposed draft. *Id.* ¶¶ 80–82. Epstein maintained he did not want to be involved. *Id.* ¶ 83.

Plaintiff filed this action *pro se* on July 28, 2023 against three John Does—the people he alleges created the fake photographs and wrote the online posts—asserting claims for defamation

and other similar state law claims. ECF No. 1. On September 28, 2023, Plaintiff moved for a 90-day extension of time to effectuate service. ECF No. 7. On October 2, 2023, the Court granted this request and extended the service deadline to January 24, 2024. ECF No. 8.

On November 22, 2023, Plaintiff sought leave to conduct expedited discovery for the limited purpose of identifying and effectuating service on the John Doe defendants. ECF Nos. 10, 11. On January 2, 2024, the Court approved limited document subpoenas tailored to that purpose. ECF No. 21. In that same order, the Court also extended Plaintiff's deadline to serve the summons and complaint on Defendants to 45 days after Plaintiff received information from the third-party subpoenas. *Id.* On April 29, 2024, Plaintiff, who was then represented by counsel, informed the Court that he received responses to the subpoenas on March 15, 2024, stated his intention to file an amended complaint, and sought an extension to effectuate service of the amended complaint, which the Court granted. ECF Nos. 34, 35, 37. Plaintiff filed the Amended Complaint on May 24, 2024, and asserted claims for defamation, intentional infliction of emotional distress ("IIED"), injurious falsehood, false light and invasion of privacy, and civil conspiracy against all defendants (the "Omnibus Claims"). AC ¶¶ 90–127. Plaintiff also asserted claims for fraud and tortious interference with economic advantage against Defendant Epstein only. *Id.* ¶¶ 128–142. On May 27, 2024, and June 11, 2024, Plaintiff sent waivers of service to Student Defendants and Defendant Epstein, respectively. ECF Nos. 39, 42, 43. On June 17, 2024, Defendant Epstein executed a waiver of service of the Amended Complaint. ECF No. 39. Student Defendants also executed a waiver of service of the Amended Complaint on June 25, 2024. ECF Nos. 42, 43.

Defendant Epstein and Student Defendants filed the instant motions to dismiss on August 12 and August 16, respectively. ECF Nos. 50, 51 ("Epstein Mem."), 53, 54 ("Students Mem.").

On September 13, 2024, Plaintiff filed a motion to disqualify counsel for Student Defendants, arguing, among other things, that they would have differing interests and affirmative defenses in the litigation. ECF No. 66. On September 27, 2024, Plaintiff sought leave to file a second amended complaint, ECF No. 77, which the parties briefed jointly with Defendants' motions to dismiss. All these motions are ripe for the Court's consideration and will be resolved by this Order.

The Court notes that Plaintiff Rapaport has also commenced two related actions involving similar assertions and alleged tortious conduct, both of which remain pending. On August 5, 2024, Plaintiff filed an action against Abigail Finkelman as sole defendant, alleging claims for defamation and false light and invasion of privacy based on Finkelman allegedly retweeting and resharing the faked photographs at issue in this case. *See* Complaint, *Rapaport v. Finkelman*, No. 24-CV-5942 (S.D.N.Y. Aug. 5, 2024), ECF No. 1. And on September 27, 2024, Plaintiff filed an action against multiple individuals, including all of the Defendants in this case, alleging civil RICO violations and attempted monopolization in violation of the Sherman Act, arising out of substantially the same conduct asserted in this case. *See* Complaint, *Rapaport v. Epstein, et al.,* No. 24-CV-7439 (S.D.N.Y. Sept. 27, 2024), ECF No. 1.

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

*Pro se* complaints "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (internal citation omitted). "Such a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hughes v. Rowe*, 449 U.S. 5, 10 (1980) (internal citation omitted); *see also Boykin v. KeyCorp.*, 521 F.3d 202, 216 (2d Cir. 2008) ("[D]ismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). Because Plaintiff is proceeding *pro se*, the Court must liberally construe his Amended Complaint[2] and interpret it "to raise the strongest claims that it suggests." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (internal quotation marks omitted).

## DISCUSSION

The Court first considers whether New York or New Jersey law applies to Plaintiff's claims, concluding that choice of law rules require the Court to apply the former. Second, the

---

[2] While Plaintiff filed the Amended Complaint with the assistance of counsel, he has proceeded *pro se* for the vast majority of this action, including in filing the original complaint and opposing the Defendants' motions to dismiss. Accordingly, the Court finds it appropriate to apply this more lenient standard.

Court assesses whether Plaintiff's claims against Student Defendants are timely, and concludes that his claims are not time-barred and "relate back" to the original complaint within the meaning of Federal Rule of Civil Procedure 15, but only to the extent they rely on the online internet posts (the fake photograph and website statements). Third, the Court concludes that Plaintiff has failed to state a claim for defamation because his allegations are contradicted by exhibits to the Amended Complaint, and because he does not plead, with specificity, whether and which Student Defendant made which statements on the online forums. Fourth, the Court dismisses Plaintiff's IIED, civil conspiracy, and injurious falsehood claims as duplicative. Fifth, the Court finds that neither Section 230 of the Communications Decency Act ("CDA") nor the common interest privilege, immunizes Defendant Epstein from liability for Plaintiff's remaining fraud and tortious interference claims against him. Sixth, the Court considers Plaintiff's independent claims against Epstein for fraud and tortious interference, concluding that neither has been adequately pled. Finally, the Court denies Plaintiff's motion to disqualify Student Defendants' counsel, and also *sua sponte* consolidates this action with a related action (*Rapaport v. Epstein, et al.,* No. 24-CV-7439) in the interest of judicial economy and efficiency.

Notwithstanding the Court's dismissal of the claims, the Court will allow Plaintiff, in accordance with the Second Circuit's broad and liberal reading of Rule 15 (especially as to *pro se* litigants), to file an amended complaint to address the deficiencies with certain of his claims.

## I. New York Law Applies to This Action and Plaintiff's False Light and Invasion of Privacy Claim Is Dismissed with Prejudice

Plaintiff purports to rely on New York law for the majority of his claims. However, he attempts to invoke New Jersey law solely with respect to his false light and invasion of privacy claim. AC ¶¶ 115–116. According to Plaintiff, New Jersey "redresses the violation of a right of privacy which is not afforded by the State of New York to its citizens, but which pertains to

protecting private figures from intrusion into their lives by publicity that places them in a false light." *Id.* ¶ 116. Plaintiff therefore argues New Jersey law applies to this specific claim and asks this Court to apply the doctrine of dépeçage—the practice of applying different states' substantive law to different issues in the same action. ECF No. 79 ("Students MTD Opp.") at 23–25. As set forth below, the Court disagrees and will only apply New York law.

"When a federal court sits in diversity, it applies the choice of law rules of the forum state . . . ." *Chau v. Lewis,* 771 F.3d 118, 126 (2d Cir. 2014). In New York, a choice of law analysis is only required "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir. 1998). "In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York is among the relevant choices, New York courts are free to apply it." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.,* 363 F.3d 137, 143 (2d Cir. 2004). Here, a conflict plainly exists with respect to the false light and invasion of privacy claim, because New York does not recognize this claim as cognizable. *Satz v. Org. for Resol. of Agunot Inc.*, No. 23-CV-36 (MKV), 2024 WL 1330011, at *10 (S.D.N.Y. Mar. 28, 2024) (collecting cases). The Court must therefore conduct a choice of law analysis.

"In general, under New York choice of law principles 'the law of the place of the tort governs.'" *Fisher v. APP Pharms*., *LLC*, 783 F. Supp. 2d 424, 428 (S.D.N.Y. 2011) (quoting *Padula v. Lilarn Prop. Corp.,* 84 N.Y.2d 519, 522 (1994)). A court must endeavor to apply the law of the jurisdiction having the "most significant" relationship to the transaction and parties *Press v. Primavera*, 685 F. Supp. 3d 216, 226–27 (S.D.N.Y. 2023). In short, a court should give effect to the "law of the jurisdiction with the strongest interest in the resolution of the particular

issue presented." *Fed. Hous. Fin. Agency v. Ally Fin. Inc.*, No. 11-CV-7010 (DLC), 2012 WL 6616061, at *5 (S.D.N.Y. Dec. 19, 2012) (internal citation omitted).

Here, New York has the "strongest interest" in the resolution of this matter. According to the Amended Complaint, Student Defendants (NYU Law students) and Defendant Epstein (a resident of New York and a professor at NYU Law) conspired to ruin Plaintiff's reputation with allegedly defamatory statements regarding his employment at K&E's New York office, which were purportedly distributed to members of the NYU Law Federalist Society, and disseminated online more broadly. Moreover, Plaintiff concedes New York law should apply to all but one of his claims (false light). Students MTD Opp. at 24.

Still, Plaintiff claims that New Jersey law should apply to the false light and invasion of privacy claim because it is his "local community." *Id.* To be sure, courts have generally instructed that in a defamation action, the choice of law analysis can be resolved by reference to the plaintiff's domicile. *See*, *e.g., Catalanello v. Kramer*, 18 F. Supp. 3d 504, 512 (S.D.N.Y. 2014). However, this "presumptive rule" does not apply where "some other state has a more significant relationship to the issue or the parties." *Id.* (cleaned up). Here, Plaintiff has conceded that New York law should apply to his defamation claim and brings a slew of other claims also under New York law. It is clear that Plaintiff views New York as having the most significant relationship to the issues and parties in this case.

Plaintiff's position thus makes clear that he merely wishes to avail himself of a cause of action that New York does not recognize. Indeed, if Plaintiff truly believed New Jersey had the greatest interest in the allegations from the Amended Complaint, he would advocate that it should apply across the board because the same conduct underlies all his claims. The Court therefore concludes that New York law applies. *See Satz*, 2024 WL 1330011, at *10 (S.D.N.Y.

Mar. 28, 2024) (dismissing false light claim, even though Plaintiff resided in New Jersey, because the parties were deemed to have consented to New York law); *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 98 (2d Cir. 2000) (applying New York law where parties "clearly" and "tacitly" agreed it governed).

For substantially similar reasons, the Court declines to invoke the doctrine of dépeçage, which allows a Court to apply the law of different states to distinct issues. *See Seidel v. Houston Cas. Co.*, 375 F. Supp. 2d 211, 219 n.13. (S.D.N.Y. 2005). "The [d]epacage doctrine recognizes that in a single action different states may have different degrees of interests with respect to different operative facts and elements of a claim or defense." *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 200 (S.D.N.Y. 2015) (quoting *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 75 (E.D.N.Y. 2000)). This case, however, does not involve, for instance, multiple overlapping issues and parties from multiple jurisdictions. As discussed above, the conduct at issue almost exclusively occurred in New York. *Cf. Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 75 (E.D.N.Y. 2000) (applying dépeçage in nationwide class action on numerous overlapping issues of damages and liability). Accordingly, and because Plaintiff does not cite any authority requiring a different result, the Court will apply New York law, and therefore dismisses Plaintiff's claim for false light and invasion of privacy with prejudice. *See Satz*, 2024 WL 1330011, at *10.

## II.    Plaintiff's Omnibus Claims Are Timely with Respect to Certain Defamatory Statements

Student Defendants argue that Plaintiff's claims for defamation, injurious falsehood, IIED, and civil conspiracy (the Omnibus Claims) are time-barred because he did not file the Amended Complaint until May 24, 2024, far outside the applicable one-year statute of limitations which ended by September 1, 2023 at the latest. Students Mem. at 3–6. Plaintiff

disagrees, arguing that statute of limitations is an affirmative defense, and so a complaint need not affirmatively negate or challenge such defenses. Students MTD Opp. at 11–12. Plaintiff also asserts that the Amended Complaint "relates back" to the original complaint pursuant to Federal Rule of Civil Procedure 15 and New York Civil Practices Law and Rules §§ 203(f) and 1024. *Id.* at 13–14. The Court considers these issues below.

### A. Affirmative Defenses at Motion to Dismiss Stage

As an initial matter, the Court rejects Plaintiff's argument concerning affirmative defenses. He argues that Defendants' invocation of the applicable statute of limitations constitutes an affirmative defense, and a complaint need not anticipate and affirmatively plead facts in avoidance of such defenses. Students MTD Opp. at 11 (citing *Michael Grecco Prods., Inc. v. RADesign, Inc*., 112 F.4th 144, 149–50 (2d Cir. 2024)). This argument misconstrues applicable law. To be sure, "[t]he lapse of a limitations period is an affirmative defense that a defendant must plead and prove." *Staehr v. Hartford Fin. Servs. Grp*., 547 F.3d 406, 425 (2d Cir. 2008) (citing Fed. R. Civ. P. 8(c)(1)). "However, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Id*. Here, it is clear from the face of the Amended Complaint that Plaintiff filed it outside the applicable statute of limitations for the Omnibus Claims, and the Court therefore must conduct a relation back analysis to ascertain whether they ought to be dismissed as to all Defendants.[3]

---

[3] While Defendant Epstein did not specifically raise timeliness in his motion to dismiss, the Court may nonetheless consider, and if applicable, dismiss the claims as untimely as against all Defendants. *See Narayanan v. Garland*, No. 22-CV-5661 (EK), 2023 WL 6307872, at *4 (E.D.N.Y. Sept. 28, 2023) (dismissing untimely claims even where the defense was not raised by certain defendants); V.*E.C. Corp. of Delaware v. Hilliard*, No. 10-CV-2542 (VB) 2011 WL 7101236, at *11 (S.D.N.Y. Dec. 13, 2011) (sua sponte dismissing untimely conversion claim) (collecting Second Circuit cases).

### B.  "Relation Back" Analysis

In New York, a one-year statute of limitations period applies to claims for defamation, IIED, and injurious falsehood. *See Conte v. Cnty. of Nassau*, 596 F. App'x 1, 4–5 (2d Cir. 2014) (summary order). New York does not recognize an independent tort of civil conspiracy, and so this claim adopts the statute of limitations applicable to the underlying tort, meaning it would also be one year. *See Deans v. Bank of Am.*, No. 10-CV-9582 (RJH), 2011 WL 5103343, at *3 (S.D.N.Y. Oct. 27, 2011) (internal citation omitted). Because Plaintiff alleges the relevant conduct occurred in July and August of 2022, *see generally* AC ¶¶ 31–71, the limitations period expired by September 1, 2023 at the latest.

Even though Plaintiff arguably filed the *original* complaint within the limitations period, the Amended Complaint requires its own timeliness analysis because it adds new claims and parties. The Amended Complaint updated the caption with the actual identities of the John Does, and courts have observed that replacing a "John Doe" with a named party in effect constitutes a change in the party sued. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). As this Circuit has made clear, "John Doe" pleadings "cannot be used to circumvent statutes of limitations." *Chinese Am. Citizens All. Greater New York v. New York City Dep't of Educ.*, No. 20-CV-8964 (LAK), 2024 WL 1795390, at *3 (S.D.N.Y. Apr. 25, 2024) (citing *Hogan*, 738 F.3d at 517).

Instead, "John Doe" substitutions may only be accomplished when all the specifications for "relation back" under Rule 15 are met. *Id.* A plaintiff can demonstrate "relation back" under Rule 15 in at least two ways. *Id.* First, under Rule 15(c)(1)(C), relation back requires that the basic claim arose out of the conduct set forth in the original pleading, and, "within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment (i) received such notice of the action that it will not be prejudiced in defending on

the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the party's proper identity." FED. R. CIV. P. 15(c)(1)(C). Second, Rule 15(c)(1)(A), permits "relation back" when the "law that provides the applicable statute of limitations allows" it—which would be New York law in this case. FED. R. CIV. P. 15(c)(1)(A). The Court analyzes both portions of Rule 15 below.

### i.    Rule 15(c)(1)(C)

With respect to Rule 15(c)(1)(C), this Circuit has interpreted Rule 15 to "preclude relation back for amended complaints that add new defendants, where the newly added defendants were not named originally because the plaintiff did not know their identities." *Hogan*, 738 F.3d at 517. This is because lack of knowledge of a John Doe defendant's name does not constitute a "mistake of identity." *Id.* at 518 (citing *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466, 470 (2d Cir. 1995)). As a result, courts have routinely held where, as here, an amended complaint identifies a John Doe defendant *after* the applicable statute of limitations, it does not relate back to the original complaint under Rule 15(c)(1)(C). *See Chinese Am. Citizens All.*, 2024 WL 1795390, at *5 (collecting cases). Accordingly, relation back under Rule 15(c)(1)(C) is not available to Plaintiff here.

### ii.    Rule 15(c)(1)(A)

Plaintiff can, however, establish the necessary requirements under Rule 15(c)(1)(A), which permits "relation back" when the law providing the applicable statute of limitations (here, New York law) allows it. *See Hogan*, 738 F.3d at 518. Plaintiff has pointed to Sections 203(f) and 1024 of the New York Civil Practice Law and Rules. Under CPLR § 1024, a party may seek relation back for a newly added defendant when the party originally lacked knowledge of their identity. N.Y. C.P.L.R. § 1024 (McKinney 2024). Relatedly, pursuant to CPLR § 203(f), "[a]

claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading." N.Y. C.P.L.R. § 203(f) (McKinney 2024).

Section 203 can be summarily rejected because the Court has already concluded the requirements for Rule 15(c)(1)(C) have not been meet. CPLR Section 203 "closely tracks" Rule 15 (c)(1)(C) of the Federal Rules of Civil Procedure, and a plaintiff may only add a new defendant under Section 203 if "the new party knew or should have known that, but for an *excusable mistake* by plaintiff as to the identity of the proper parties, the action would have been brought against him as well." *Cooper v. City of New York*, No. 17-CV-1517 (NGG), 2019 WL 3642996, at *19 (E.D.N.Y. Aug. 5, 2019) (internal citation omitted and emphasis added). As explained above, Plaintiff's failure to identify the John Does by name cannot be characterized as a mistake, and thus Section 203 similarly does not apply. *Vasconcellos v. City of New York*, No. 12-CV-8445 (CM), 2014 WL 4961441, at *8 (S.D.N.Y. Oct. 2, 2014) (concluding that plaintiff failed to satisfy Rule 15(c)(1)(C) and therefore "fail[ed] to satisfy the state's corollary [Section 203]" as well).

The Court next considers CPLR § 1024. To take advantage of this section, a party must (1) exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name; and (2) describe the John Doe party in such form as will fairly apprise the party that she is the intended defendant. *Jones v. City of New York*, 571 F. Supp. 3d 118, 130 (S.D.N.Y. 2021) (citing *Bumpus v. New York City Transit Auth*., 66 A.D.3d 26, 29–30 (2d Dep't 2009)). In addition, because of the interaction between CPLR § 1024 and CPLR § 306-b, as a third requirement, a party must ascertain the identity of the unknown John Doe parties and

effectuate process upon them within 120 days from filing the action. *Bumpus*, 66 A.D.3d at 31. However, the deadline may be extended, upon motion, for good cause or in the interest of justice. *Id.*; *see* N.Y. C.P.L.R. § 306-b (McKinney 2024).

With respect to the first element, a plaintiff must exercise due diligence before designating a defendant as "John Doe" by showing that he made diligent efforts to ascertain the identity of the unknown defendant *prior* to commencement of the action and up to and including the expiration of the applicable statute of limitations. *See Bumpus*, 66 A.D.3d at 29. As Plaintiff conceded in his original complaint, he had no idea who the John Does were at the time he filed the original complaint. AC ¶ 81. And in the Amended Complaint, Plaintiff does not allege sufficient steps he took prior to filing the original complaint in order to ascertain the identities of the John Does, aside from a single conversation with Defendant Epstein in August 2022 (*id.* ¶ 84) and a lunch meeting with Epstein (*id.* ¶¶ 80–83) the day he filed the original complaint on July 28, 2023. Students MTD Opp. at 12–13. Indeed, even after filing the original complaint, Plaintiff waited nearly four months before seeking leave of this Court to serve subpoenas to identify the John Does to effectuate service. *See* ECF Nos. 10, 11.

Plaintiff now asserts—for the first time in his motion for leave to amend reply brief—that he made "six total inquiries" to Defendant Epstein and also spoke with Lee Otis and other "rank and file members" of the Federalist Society. ECF No. 96. at 12–13. While the Court is not *required* to consider these new allegations, it nonetheless opts to do so given the importance of these additions to the potential survival of the Omnibus Claims. *See Atadzhanov v. City of New York*, No. 21-CV-5098, 2022 WL 4331304, at *1 (S.D.N.Y. Sept. 19, 2022) (exercising discretion to consider new factual allegations brought by the *pro se* plaintiff in his opposition brief and sur-reply). These new allegations, while not extensive, are sufficient to demonstrate adequate

diligence prior to expiration of the limitations period. *See DeMarzo v. Cuba Hill Elementary Sch.*, 198 N.Y.S.3d 570, 572 (2d Dep't 2023) (finding adequate diligence where plaintiff conducted online searches).

Construing the allegations in the light most favorable to Plaintiff, who filed this action *pro se*, the original complaint can be read so as to satisfy the second element as well, but only with respect to defamation as it related to the faked photographs and online posts. The original complaint alleged that around July 30, 2022, John Does 1-3 conspired to perpetrate an "internet hoax," which included the forged document allegedly placed in the lobby of Kirkland and Ellis. ECF No. 1 ¶¶ 6–9. The original complaint described the forged document and internet posts with particularity, and therefore could be read to have fairly apprised Student Defendants they were the intended parties. *See Kennedy v. City of New York*, No. 12-CV-4166 (KPF), 2015 WL 6442237, at *5 (S.D.N.Y. Oct. 23, 2015) ("Courts have found that where a plaintiff provides specific contextual information, that may satisfy the description requirement of [CPLR] 1024.").

However, Student Defendants could not have been fairly apprised as to the other alleged defamatory statements, because they were not mentioned in the original complaint, which focused only on the "anonymous internet posts." *See, e.g.,* AC ¶¶ 13, 14, 16. "The main inquiry under Rule 15(c) is whether adequate notice has been given to the opposing party 'by the general fact situation alleged in the original pleading.'" *Pruiss v. Bosse*, 912 F. Supp. 104, 106 (S.D.N.Y. 1996) (quoting *Rosenberg v. Martin*, 478 F.2d 520, 526 (2d Cir. 1973)). And so where, as here, a Plaintiff sets forth "new instances of defamation," it will not relate back for the purposed of Rule 15(c), because it would essentially allow a plaintiff to circumvent the statute of limitations. *Id.* Indeed, the original complaint contains a myriad of allegations about the John Doe defendants (for instance, that they filed a false Title IX report and solicited false sexual harassment reports

from other K&E summer associates) that were removed from the Amended Complaint which also calls into question whether Student Defendants could have been reasonably apprised they were the intended targets. ECF No. 1 at ¶¶ 20–24. Accordingly, only the alleged defamatory statements posted on the internet (and any conduct relating to it) "relate back" under Rule 15. *See Cojocaru v. City Univ. of New York*, No. 19-CV-5428 (AKH), 2020 WL 5768723, at *4 (S.D.N.Y. Sept. 28, 2020) (collecting cases, and concluding no relation back, even though text messages concerned same general subject matter, because they were, among other things, a "separate publication [and] directed toward a different recipient.").

Finally, regarding the third element, Plaintiff consistently sought, and received, extensions to effectuate service. To satisfy the 120-day requirement, Plaintiff initially had to effectuate service of the original complaint by November 25, 2023. However, Plaintiff first sought, and received, in September 2023, an extension from this Court to effectuate service of the original complaint on or before January 24, 2024. *See* ECF Nos. 7, 8. Then, on January 2, 2024, the Court again extended Plaintiff's deadline to serve the summons and complaint on Defendants to until 45 days after Plaintiff received information from the third-party subpoenas. ECF No. 21. On April 29, 2024, Plaintiff, who was then represented by counsel, informed the Court that he received responses to the subpoenas on March 15, 2024, stated his intention to file an amended complaint, and sought an extension to effectuate service of the amended complaint. ECF No. 35. Plaintiff filed the Amended Complaint on May 24, 2024, and all Defendants effectuated waivers of service as to the Amended Complaint. Plaintiff thus satisfies the 120-day requirement in light of the Court's continued grant of extensions to effectuate serve in this action. ECF Nos. 38, 39, 42, 43.

Accordingly, Plaintiff has complied with the requirements under CPLR Section 1024, and his claims are not untimely, but only to the extent they arise from, or relate to, the faked photographs published online and any related online statements regarding Plaintiff being fired for sexual harassment. The other alleged defamatory statements are time-barred.

### III.    Plaintiff Fails to State a Claim for Defamation

As an initial matter, and as mentioned above, the Court will only consider Plaintiff's defamation claim based on the alleged fake photographs and internet posts. Because only Student Defendants are alleged to have engaged in this conduct, the defamation claim is dismissed as against Defendant Epstein with prejudice.

Proceeding to the merits, Plaintiff asserts that the fake photograph published online, and the related statements purportedly made by Student Defendants on those online posts, are defamatory *per se*, and that he has suffered "special damages" by loss of economic opportunities and reputation. AC ¶¶ 90–100. Student Defendants argue that a review of Exhibit 3 to the Amended Complaint makes clear that the online posts did not actually contain the faked photograph, and that the Amended Complaint otherwise fails to allege the requisite factual specificity as to the other online statements. Student Defs. MTD at 14–20. The Court agrees.

"Defamation is 'the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of plaintiff in the minds of right-thinking persons, and to deprive plaintiff of their friendly intercourse in society." *3P-733, LLC v. Tawan Davis*, 135 N.Y.S.3d 27, 29–30 (1st Dep't 2020) (cleaned up). "There are two categories of defamation under New York law: libel, for written statements, and slander, for spoken statements." *Carroll v. Trump*, 650 F. Supp. 3d 213, 225 (S.D.N.Y. 2023). The Amended Complaint does not specify whether the alleged defamation is libel or slander, but does specify the following allegedly defamatory statements which the Court has not dismissed: (1) the faked

19

photograph from June 2022 purportedly published on the internet; and (2) statements made accompanying the online posts regarding the circumstances of Plaintiff's termination and certain of his alleged beliefs and political ideologies. AC ¶¶ 37–41. The Court thus understands that Plaintiff intended to assert a libel *per se* claim with respect to these statements.

Under New York law, a claim for libel requires a plaintiff to allege (1) a written defamatory statement of fact concerning the plaintiff, (2) publication to a third-party, (3) the applicable level of fault, (4) falsity, and (5) special damages or a showing of libel *per se*. *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). A plaintiff can make a showing of "libel per se" if "it tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or to induce an evil opinion of him in the minds of right-thinking persons." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379 (1977); *see also Nolan v. State,* 158 A.D.3d 186, 195, 69 N.Y.S.3d 277 (2018) ("A defamation plaintiff must plead special damages unless the defamation falls into any one of four per se categories: (1) statements charging the plaintiff with a serious crime; (2) statements that tend to injure the plaintiff in her trade, business or profession; (3) statements that impute to the plaintiff a 'loathsome disease'; and (4) statements that impute unchastity to a woman.").

The Court first considers the July 29, 2022 faked photograph attached as Exhibit 1 to the Amended Complaint. Plaintiff contends this fake photograph was posted online by Defendant Iyer on Reddit and Top-Law-Schools.com. AC ¶ 37; ECF No. 38-3. But while the Amended Complaint alleges Defendant Iyer posted the fake photograph to these websites, Exhibit 3 of the Amended Complaint—which Plaintiff refers to as the relevant internet posts for his claims—does not reflect that the fake photograph was actually ever posted. ECF No. 38-3 at RAPAPORT0002–13. Further, the email attached to the Amended Complaint (which is similarly

included in Exhibit 3) from Defendant Garrett to members of the Federalist Society links to the same Top-Law-Schools.com and Reddit.com threads. ECF No. 38-3 at RAPAPORT0001. The fact that the email attached to the Amended Complaint links to the same webpages further indicates that the "internet posts" Rapaport complains of are solely those contained in Exhibit 3.

"Allegations in the complaint that are 'contradicted by more specific allegations or documentary evidence' are not entitled to a presumption of truthfulness." *KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 365 (S.D.N.Y. 2014) (quoting *Kirkendall v. Halliburton*, 707 F.3d 173, 175 n. 1 (2d Cir. 2013)). Accordingly, because the Amended Complaint's exhibits contradict Plaintiff's allegations that the fake photograph was posted to the two websites, Plaintiff has not adequately alleged the photographs were published to a third party, and therefore fails to state a claim for defamation with respect to the faked photograph. *See Koulkina v. City of New York*, 559 F. Supp. 2d 300, 329 (S.D.N.Y. 2008) (where allegations were contradicted by documents attached to complaint, they were insufficient to defeat a motion to dismiss); *see also Richards v. Sec. Res.*, 133 N.Y.S.3d 12, 14 (1st Dep't 2020) (dismissing defamation claim where plaintiff failed to allege that the statements were made to a third party). To the extent Plaintiff alleges that other posts exist beyond those identified in Exhibit 3, as discussed later in this Order, he will be given leave to amend so as to cure this deficiency.

Considering next the statements by anonymous users on the internet posts, Plaintiff alleges the "postings were accompanied by false and defamatory statements that the plaintiff was fired for sexual harassment, was banned from the building and was accompanied by a significant amount of material about his personality, habits, mannerisms, modes of dress and pastimes." AC ¶ 38. The text of the posts also allegedly mentioned "plaintiff's political, ideological and jurisprudential beliefs." *Id.* ¶ 39. But Plaintiff does not allege which individual Defendant made

which statement. Indeed, Plaintiff does not directly allege that Student Defendants made these statements *at all*. Plaintiff states that the postings "were accompanied" by false and defamatory statements, yet only alleges the Student Defendants "produce[ed] two fake photographs" and "twice present[ed] them as genuine." AC ¶¶ 38, 94. This failure is fatal to Plaintiff's claim: to succeed on a claim for defamation, "[a] plaintiff must plead the defamatory statements with some particularity," which requires "a plaintiff to identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Unlimited Cellular, Inc. v. Red Points Sols. SL*, 677 F. Supp. 3d 186, 197 (S.D.N.Y. 2023) (cleaned up). At most, the Amended Complaint, read in the light most favorable to Plaintiff, could raise an inference that the Student Defendants anonymously authored the statements. But without being able to ascertain which Defendant made which statement, the Court cannot conduct the remaining analysis: for instance, the "fault" question would need to be analyzed differently as between Defendant Iyer and Defendant Garrett, and the Court is prevented from doing so given the inadequacy of Plaintiff's allegations.

In light of the foregoing, Plaintiff's defamation claim must therefore be dismissed. *See BCRE 230 Riverside LLC v. Fuchs*, 874 N.Y.S.2d 34, 36 (1st Dep't 2009) (dismissing defamation counterclaim where party failed to allege what false statements were and who made them).

## IV. Plaintiff's Remaining Omnibus Claims Are Dismissed

Plaintiff's remaining Omnibus Claims can be summarily dismissed. Plaintiff's claim for civil conspiracy fails because he has failed to plead any defamation, and without an underlying tort, there can be no conspiracy claim. *See Williams v. Williams*, 53 N.Y.S.3d 152 (2d Dep't 2017) (concluding where plaintiff could not maintain underlying causes of action for fraud, unjust enrichment, or negligent and intentional infliction of emotional distress, plaintiff could similarly not maintain cause of action alleging civil conspiracy); *Arvanitakis v. Lester*, 44

N.Y.S.3d 71, 73 (2d Dep't 2016) ("A cause of action alleging conspiracy to commit a tort stands or falls with the underlying tort.").

In addition, Plaintiff's claims for IIED and injurious falsehood are dismissed as duplicative, given that they rely on the same allegations and conduct as the defamation claim. For example, with respect to Plaintiff's claim for injurious falsehood, he claims the "fake photographs and statements" caused him damages, which is the exact same conduct underlying his defamation claim. AC ¶ 102. And while Plaintiff tries to assert the IIED claim "is not duplicative" because "the faked photographs and false statements were only part of the defendants' campaign of destruction," he then goes on to state they are "evidence of their malicious intentions and sheer malevolence." AC ¶¶ 112. This allegation, too, makes clear the alleged tortious conduct underlying the IIED claim is identical to the defamation claim. Both claims are therefore dismissed as duplicative. *See Perez v. Violence Intervention Program*, 984 N.Y.S.2d 348, 349 (1st Dep't 2014) ("The remaining claims of injurious falsehood, tortious interference with prospective contractual/business relations, and intentional infliction of emotional distress should have been dismissed as duplicative of the defamation claim, as they allege no new facts and seek no distinct damages from the defamation claim."); *LoanStreet, Inc. v. Troia*, No. 21-CV-6166 (NRB), 2022 WL 3544170, at *8 (S.D.N.Y. Aug. 17, 2022) (dismissing injurious falsehood claim as duplicative where it related to same set of statements and alleged harm giving rise to the defamation claims).

## V.    Plaintiff's Remaining Claims Against Defendant Epstein Are Not Barred by Section 230 or the Common Interest Privilege

Defendant Epstein argues he is immune, under Section 230 of the Communications Decency Act, from liability for "defamation, false light, IIED, injurious falsehood, and any other claim premised on him having allegedly forwarded emails received from others." Epstein Mem.

23

at 7. Second, Epstein argues that he is immune from suit for the defamation claim by invoking the common interest privilege and New York's Anti-SLAPP law, both of which require a finding of actual malice. *Id.* at 5–14. As an initial matter, the Court need not address Epstein's argument regarding the common interest privilege because Epstein only intended this argument as a defense to defamation, and Plaintiff's defamation claim has now been dismissed with prejudice as untimely as against Epstein.

The Court also need not address whether Section 230 immunity applies, because any conferred immunity would not bar Plaintiff's claim for fraud and tortious interference, which are the only remaining claims against Epstein. Section 230 of the Communications Decency Act provides that "[n]o . . . user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C § 230(c)(1). Section 230 further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent" with it. *Id.* § 230(e)(3). Plaintiff alleges Epstein engaged in defamation by "further circulating" an email from Student Defendants (which contained allegedly defamatory statements) to other members of the Federalist Society which Epstein "knew to be false." AC ¶ 95. But while Epstein's forwarding of the relevant emails may have been relevant to Plaintiff's defamation claim, this conduct does not form the basis for Plaintiff's fraud and tortious interference claims. Rather, Plaintiff alleges Epstein "knowingly lied" about the identities of Student Defendants when asked, and that he "repeated his disparagement at every possible opportunity to anyone who would listen." AC ¶¶ 130–131, 139.

Because these allegations embrace and depend on conduct beyond just Epstein's emails, Section 230 would not prevent liability, because doing so would not be "inconsistent" with the

24

statute. The Court therefore must consider Plaintiff's remaining claims against Defendant Epstein on the merits.

## VI.    Plaintiff Fails to State a Claim for Tortious Interference

To state a claim for tortious interference with economic advantage under New York law, a plaintiff must prove that (1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured. *See Dardashtian v. Gitman*, No. 17-CV-4327 (LLS), 2017 WL 6398718, at *8 (S.D.N.Y. Nov. 28, 2017) (citing *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).

Plaintiff does not plead sufficient facts to support this claim. Plaintiff merely alleges, in conclusory fashion, that Epstein "repeated his disparagement at every possible opportunity to anyone who would listen." AC ¶ 139. But the Complaint does not identify the substance of any "disparagement" aside from an assertion that Epstein told unnamed and unspecified "others" that Plaintiff was "frequently absent from his classes." *Id.* ¶ 88. Nor does Plaintiff allege Epstein had any awareness of Plaintiff's "contractor position" or his position with the Manhattan Institute, *id.* ¶¶ 140– 141, let alone that Epstein intentionally sought to interfere with those relationships. Plaintiff also provides no information about these positions, mentioning them only in two sentences in the Amended Complaint.

Even assuming Epstein spoke to any entities or individuals associated with these positions—a fact which the Amended Complaint does not allege—Plaintiff does not allege what Epstein communicated to them. *See Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *2 (S.D.N.Y. Dec. 30, 2020) (dismissing tortious interference claim because, among

other things, plaintiff failed to allege what defendant stated to third parties). Accordingly, because the Amended Complaint contains little more than "unadorned, the defendant-unlawfully-harmed-me accusations," Plaintiff has failed to state a claim for tortious interference, and the claim is dismissed. *Id.* at *2 (cleaned up) (citing *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110–11, 115 (2d Cir. 2010)).

## VII.    Plaintiff Fails to State a Claim for Fraud

Plaintiff has also failed to state a plausible fraud claim against Defendant Epstein. Under New York law, Plaintiff must allege: (1) a material misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3) intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff. *Skyline Risk Management, Inc. v. Legakis*, 733 F. Supp. 3d 316, 329–30 (S.D.N.Y. 2024) (citing *Structured Cap. Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 836 (S.D.N.Y. 2016)). "A plaintiff may bring a fraud claim based on an omission rather than an affirmative misrepresentation only 'if the non-disclosing party has a duty to disclose.'" *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 241 (S.D.N.Y. 2022) (quoting *Remington Rand Corp. v. Amsterdam-Rotterdam Bank*, N.V., 68 F.3d 1478, 1483 (2d Cir. 1995)). In addition, Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

Plaintiff has not pleaded sufficient facts to satisfy these elements. Here, the gravamen of Plaintiff's fraud claim is that Epstein failed to disclose something to him and thereby omitted a material fact: the identities of Student Defendants. As a result, Plaintiff must allege some duty to disclose by Defendant Epstein, which the Amended Complaint fails to do. Instead, Plaintiff merely insists no "fiduciary duty" is necessary to substantiate his claim. ECF No. 76 ("Epstein

MTD Opp.") at 27–28. Moreover, the Amended Complaint also does not allege, beyond

conclusory assertions, that Epstein had any intent to defraud Plaintiff or harm him (or hinder his

ability to file suit).

The fraud claim also fails because Plaintiff does not allege compensable damages as a

result of the fraud. To sustain a fraud claim, Plaintiff must allege he sustained some pecuniary

loss as a result. *Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d

358, 369 (S.D.N.Y. 2020) (internal citation omitted). Indeed, a plaintiff can only recover the

actual pecuniary loss sustained as a direct result of the alleged fraud. *Joseph v. Mobileye, N.V.*,

225 F. Supp. 3d 210, 218 (S.D.N.Y. 2016) (internal citations omitted). Here, Plaintiff only alleges

Defendant Epstein "knowingly lied" about the identities of Student Defendants, which

"delay[ed]" his investigation "to determine and identify the true and proper defendants . . . ." AC

¶¶ 130, 133. But Plaintiff did not suffer any actionable injury: Defendant Epstein's failure to

disclose the identities of Student Defendants left Plaintiff in the exact same situation as he began,

and similarly left him free to exhaust other options to identify Student Defendants. Epstein's

non-disclosure did not inhibit or otherwise prevent Plaintiff from proceeding as he eventually did

by filing subpoenas. The Amended Complaint does not allege, for example, that Epstein sent

Plaintiff on a wild-goose chase by giving him incorrect names or that he falsely promised, in an

effort to string Plaintiff along, that he would eventually inform Plaintiff the identities of Student

Defendants and failed to do so.

Nonetheless, Plaintiff argues a delay in exercising legal rights is cognizable for a fraud

claim, citing *Lawrence v. Houston,* 172 A.D.2d 923 (3d Dep't 1991). Epstein MTD Opp. at 28.

But *Lawrence* is plainly distinguishable: there, the defendant advised plaintiff he should not

retain a lawyer because he would settle with plaintiff directly when the plaintiff (who was then

then 15) turned 21. 172 A.D. 2d at 923. Plaintiff rejected the eventual settlement offer as too low, and ended up filing a lawsuit, alleging that the delay caused him damages because evidence was not preserved in the interim which impacted his ability to prevail at trial. *Id.* Here, in contrast, Plaintiff could have filed this action and sought expedited discovery (as he eventually did) at any point. Plaintiff has thus failed to adequately plead a fraud claim against Defendant Epstein, and it therefore must be dismissed.

## VIII.   Plaintiff's Motion to Disqualify Student Defendants' Counsel Is Denied

The Court denies Plaintiff's request to disqualify Schaerr Jaffe LLP, counsel for Student Defendants, based on the potential for any adverse and conflicting interests. ECF No. 68. The Court need not address the underlying substance of Plaintiff's assertions because any conflict that may exist between Defendants Garrett and Iyer are waived, given both have consented to be represented by Schaerr Jaffe. Indeed, Student Defendants each filed sworn declarations to this effect. ECF Nos. 75-1, 75-2. Accordingly, Plaintiff's motion for disqualification is denied.

## IX.   Plaintiff's Motion for Leave to Amend Is Granted in Part and Denied in Part

Plaintiff's motion for leave to amend is partially granted. "Leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that [he] has a valid claim." *Atherley v. N.Y.C. Dep't of Educ.*, No. 23-CV-383 (JGLC), 2024 WL 1345741, at *13 (S.D.N.Y. Mar. 29, 2024) (internal citation omitted). The Second Circuit interprets Rule 15 of the Federal Rules of Civil Procedure liberally "consistent with [its] strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation marks and citation omitted); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded

an opportunity to test his claim on the merits."). However, "[l]eave may be denied 'for good

reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'"

*TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun*

*& Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

      The Court finds that permitting Plaintiff to amend the complaint would not be futile,

overly prejudicial, or cause undue delay. *Loc. 3599, N.Y.C. Dep't of Env't Prot. Tech. Pro. Emps.*

*v. City of New York*, No. 23-CV-1035 (JGLC), 2024 WL 966077, at *16 (S.D.N.Y. Mar. 6, 2024).

Although Plaintiff amended his complaint once, he has not previously had an opportunity to cure

the deficiencies of which he is now on notice. And based on a cursory review of his proposed

SAC, some pleading deficiencies have already been addressed, including, for example, more

allegations relevant to his tortious interference claim against Defendant Epstein. *See* ECF No. 78

¶¶ 101–104. Accordingly, the Court will permit Plaintiff to file a second amended complaint with

respect to the defamation (based on the internet postings), civil conspiracy, fraud, and tortious

interference claims only. Further directives with respect to this amended complaint are in the

Conclusion Section.

## X.    The Court *Sua Sponte* Consolidates This Action with its Related Action

      Finally, the Court *sua sponte* consolidates this action with *Rapaport v. Epstein, et al.,* No.

24-cv-7439 (the "Related Action") for all purposes. By order dated March 5, 2025 in the Related

Action (ECF No. 54), the Court noted that it was inclined to consolidate these two matters given

the overlapping parties, issues, and claims, and stated that it would provide further instructions

with respect to consolidation in this Order. The Court now does so.

      Rule 42 of the Federal Rules of Civil Procedure permits a court to consolidate cases that

"involve a common question of law or fact." Fed. R. Civ. P. 42(a)(2). "In assessing whether

consolidation is appropriate in given circumstances," a court "should consider both equity and

judicial economy." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999). District courts enjoy substantial discretion in deciding whether and to what extent to consolidate cases and may even consolidate cases *sua sponte*. *See Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990). Here, the Court sees no concern regarding, potential confusion, prejudice, or risks to impartiality of a trial, and as noted, consolidation would promote efficiency. *Id.* Because the Court has granted Plaintiff leave to amend certain claims in this action, and Plaintiff has been given an opportunity to elect to file another complaint in the Related Action, in the interest of efficiency and economy, the Court determines consolidation is appropriate. *See Stauffer v. Trump*, No. 24-CV-5698 (LTS), 2024 WL 3876307, at *3 (S.D.N.Y. Aug. 19, 2024).

While the Court finds consolidation of this matter with the Related Action promotes judicial efficiency and economy, the Court does not, at this time, consolidate this action with the *Finkelman* action. However, the Court may consider consolidation as to that action at a later time.

## CONCLUSION

For the reasons stated above, the Court GRANTS Student Defendants' motion to dismiss, and GRANTS in part and DENIES in part Defendant Epstein's motion to dismiss. Plaintiff's false light and invasion of privacy, injurious falsehood, and IIED claims are DISMISSED with prejudice, and the other claims are DISMISSED without prejudice as set forth in this Order. Plaintiff's motion to disqualify Student Defendants' counsel is also DENIED.

The Clerk of Court is respectfully directed to consolidate this action with the Related Action (*Rapaport v. Epstein, et al.,* No. 24-CV-7439) and to designate that action as the lead case given all the parties have been named therein. Plaintiff is directed to file a single, amended complaint (which Plaintiff shall title the "First Consolidated Amended Complaint") that may (1)

address any deficiencies with respect to his defamation claim based on the internet posts, his claim for civil conspiracy, and his tortious interference and fraud claims against Defendant Epstein as set forth herein; and (2) amend or otherwise correct the claims raised in the Related Action. Defendants in both actions will then have an opportunity to renew any motions to dismiss they intend to file thereafter. For the avoidance of doubt, the Court emphasizes this First Consolidated Amended Complaint must include all allegations and claims that Plaintiff seeks to raise related to the conduct at issue against the Defendants in both actions (including, for instance, his civil RICO and antitrust claims, even if Plaintiff does not intend to amend those claims or allegations). Plaintiff shall file the First Consolidated Amended Complaint, consistent with this Order, on or before **May 2, 2025**. In light of the motions to dismiss in both actions, the Court warns Plaintiff that further amendments are unlikely to be granted.

The Clerk of Court is further, and respectfully, directed to terminate ECF Nos. 50, 53, and 77.

Dated:  March 31, 2025
        New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
GIDEON RAPAPORT,

                     Plaintiff,          **FIRST AMENDED COMPLAINT**

        -against-               Case No. 23-cv-6709 (JGLC)

AJAY SRINIVASAN IYER,            Plaintiff demands trial by jury
ZACHARY GEORGE GARRETT, and   of all claims so triable.
RICHARD ALLEN EPSTEIN,

                 Defendants.
--------------------------------------------------------x

Plaintiff Gideon Rapaport, by his attorneys, Law Office of Richard A. Altman, for his First

Amended Complaint, alleges as follows:

### THE PARTIES

1. Plaintiff Gideon Rapaport is a former employee of the law firm of Kirkland & Ellis LLP,

and a graduate of the New York University School of Law. He is a citizen of Canada, and was

lawfully admitted to the United States at the time of the filing of the original complaint as a

nonresident alien, and that is his current status as well.

2. Defendant Ajay Srinivasan Iyer is a former employee of Kirkland & Ellis LLP, and a

graduate of the New York University School of Law, where he served as the President of the

Federalist Society chapter for the academic year of 2021/2022. He is a resident of the City and State

of New York and is a U.S. citizen.

3. Defendant Ajay Srinivasan Iyer is, on information and belief, presently a judicial law clerk

for Justice Jay Mitchell of the Supreme Court of Alabama, and a member of the bar of the State of

New York.

-1-

4.  Defendant Zachary George Garrett is a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2022/2023.

5.  Defendant Garrett is, on information and belief, currently a judicial law clerk for Judge Carlos Bea of the U. S. Court of Appeals for the Ninth Circuit

6.  Defendant Richard Allen Epstein is a professor of law at the New York University School of Law, where he also serves as the faculty advisor to the Federalist Society chapter.

7.  On information and belief, defendant Epstein is a resident of the City and State of New York and is a U.S. citizen.

8.  On information and belief, defendant Epstein is a member of the bar of the State of California.

## JURISDICTION AND VENUE

9.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are a nonresident alien and United States Citizens, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10.  This Court has personal jurisdiction over the defendants because they are either domiciled in the State of New York, or have transacted business within the State of New York during the course of their presence, education and employment in the state, or have committed non-defamatory tortious acts in New York within the meaning of NY CPLR 302(2) and (3).

11.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

-2-

## <u>INTRODUCTION</u>

12.  The gravamen of this action is a series of actions by defendants Iyer and Garrett which consisted of the repeated making of vicious, false and career-ending defamatory statements and actions. The statements were of and concerning the plaintiff, and the actions were creating digitally manipulated images containing plaintiff's name and face, and false words about him.

13.  Defendant Epstein is a defendant based upon his actions in supporting and repeating the defamatory statements of defendants Iyer and Garrett, and because of his actions in preventing plaintiff from commencing a promised–and definite–appellate clerkship, and possibly one with the U.S. Supreme Court.

14.  As a direct result of these false and defamatory statements and actions, plaintiff has not yet sought admission to the New York bar, despite having passed the bar examination, due to his fear of the adverse effect of these statements upon the Committee on Character and Fitness. He brings this action to clear his name so that he can pursue his chosen career

15.  These digitally manipulated faked images of plaintiff were created by defendants Iyer and Garrett. Copies are attached as Exhibits 1 and 2.

16.  There is also a letter which defendant Garrett compiled from pseudonymous online posts by defendant Iyer, and sent to the Federalist Society. A copy of the letter is attached as Exhibit 3.

17.  Defendants Iyer and Garrett convinced defendant Richard Epstein into believing the authenticity of the faked images and veracity of the defamatory claims.

18.  Defendant Epstein then joined with defendants Iyer and Garrett, and provided his approval, assistance and authority in achieving their aims of generally destroying the career and future of the plaintiff, as well as his relationship with the Federalist Society.

-3-

19. Defendant Epstein has a reputation in the legal community of being an important source of recommendations of law students for clerkships in Federal District Courts, Courts of Appeals and the U. S Supreme Court, and has in fact been such a source.

20. The defendants' forgeries and defamatory statements were initially discredited by Kirkland & Ellis, and its Director of Human Resources, Steven Goldblatt, and the plaintiff was then allowed to attend a summer program at the James Kent Academy.

21. Defendants Iyer and Garrett then continued their campaign to destroy plaintiff's reputation and status with Kirkland & Ellis, the Federalist Society, and the James Kent Academy (which is a program of the Society's faculty division).

22. Defendants Iyer and Garrett prepared and submitted a false complaint about plaintiff to New York University Law School. But the complaint was so inherently incredible that it was rejected out of hand and not even formally investigated.

23. Prior to the incidents alleged herein, defendant Epstein had taken a positive interest in assisting plaintiff with his career, and had agreed to undertake his best efforts to secure a clerkship for him.

24. However, he later joined and acted in concert with them, and took fraudulent and deceptive actions to prevent the plaintiff from learning the truth–and legal significance–about the transactions, occurrences and events herein described.

25. On information and belief, defendant Epstein took those actions to protect himself and students whom he had already recommended for prestigious positions, and who were presidents of the law school Federalist Society chapter he was responsible for. He thus had an interest in

-4-

concealing their actions, since it would have called into question his judgment in recommending them.

26.  All three defendants have individually repeated the defamatory statements on several occasions after they were disproved, and prior to the commencement of this case on July 28th, 2023.

27.  Moreover defendant Epstein has continuously tortiously interfered with plaintiff's legal employment prospects, as recently as March 2024.

28.  Although he no longer repeats the defamatory statements originally made, he has sought to discourage potential employers from considering plaintiff.

29.  The defendants' actions have been all too successful. He lost one paid position, and a position with the Manhattan Institute was withdrawn after he had accepted it.

30.  The following paragraphs set forth the background facts in more detail.

## BACKGROUND FACTS

31.  On or about July 15, 2022, defendant Garrett organized a last-minute get-together for members of the NYU Law Federalist Society. During a discussion about plans after summer jobs, which typically end in July, the plaintiff shared with defendants Iyer and Garrett that he would attend the James Kent Academy in early August.

32.  It was shortly after this time that these defendants began their plan to destroy the life and end the career of the plaintiff by defamation and forgery.

33.  They had come to believe that plaintiff was going to be the law student from NYU whom defendant Epstein would recommend for a clerkship at the U.S. Supreme Court, and were apparently motivated by professional jealousy.

-5-

34. Plaintiff had not told anyone besides his immediate family members about his acceptance to the James Kent Academy although it was listed on his resume, to which defendant Iyer and Defendant Garrett did not have access.

35. On July 28, 2022, defendant Iyer surreptitiously photographed a guard desk at the lobby of 601 Lexington Avenue (the address of Kirkland & Ellis) (Exhibit 1). He then used digital image manipulation software to erase the actual contents of a page posted at that desk and replace them with a picture of the plaintiff's face, and the text:

DO NOT ADMIT
GIDEON RAPAPORT
KIRKLAND AND ELLIS

36. The fake image thus created the false and defamatory implication that plaintiff had been barred from entry for some kind of misconduct.

37. This false image was then posted online by defendant Iyer on two internet sites, Reddit.com and Top-Law-Schools.com.

38. The postings were accompanied by false and defamatory statements that the plaintiff was fired for sexual harassment, was banned from the building and was accompanied by a significant amount of material about his personality, habits, mannerisms, modes of dress and pastimes. A copy of the accompanying statements is annexed as Exhibit 3.

39. The text of the posts accompanying the forgery also mentioned plaintiff's political, ideological and jurisprudential beliefs.

40. The publication of the forgery and defamatory claims were intended to coincide with the presence of defendant Garrett at the Federalist Society Student Leadership Conference for incoming law school chapter presidents, hosted from July 29 to 31, 2022.

-6-

41.  This fake photograph was of poor quality, as may be seen by the lack of wrinkles on the photographic image. As may be seen, there are no wrinkles whatsoever on the plaintiff's image, although the image on the rest of the page is thoroughly wrinkled. The wrinkles end entirely where the rectangular image file of the plaintiff digitally inserted begins.

42.  On or about July 29, 2022, defendant Garrett presented the online materials, created and posted pseudonymously by defendant Iyer, to Peter Redpath and Kate Alcantara, the Director and Deputy Directors of the Student Division respectively.

43.  It was obvious to both of them (Redpath and Alcantara) that the image was a faked image created by digital manipulation techniques, although there remained for them the question of whether the false statement that plaintiff was fired for sexual harassment was true or not.

44.  In any event, Mr. Redpath and Ms. Alcantara refused to get involved in the civil conspiracy of defendants Iyer and Garrett.

45.  At about this time, defendant Garrett also presented the fake image and defamatory statements to defendant Epstein, thus defaming plaintiff to Epstein. This caused Epstein concern about his own credibility, because of his having previously recommended plaintiff.

46.  Thereafter, because the image was suspected of being a fake by those who saw it, defendant Iyer apparently determined to make another image, and removed the first image from the internet so as to prevent comparison between the two.

47.  On information and belief, at some point during the late night hours of July 29, 2022 or in the early hours of July 30, 2022, defendant Iyer returned to the scene of his first malfeasance and took a closer-up and higher resolution photograph of the guard desk at 601 Lexington Avenue.

-7-

48.   He then proceeded to produce his second forgery using digital image manipulation techniques that were more technically sophisticated. This second forgery (Exhibit 2) was apparently intended and designed to address the initial concerns raised by the Student Division of the Federalist Society about the first one.

49.   On this second forgery, images of wrinkles on the paper are clearly visible on that portion featuring an image of the plaintiff.

50.   Defendant Iyer then sent  the second fake image to defendants Garrett and Epstein, and both students continued attempting to persuade the latter to become an unwitting instrument of their civil conspiracy.

51.   The defendants' next act in furtherance of their civil conspiracy was a telephone call from defendant Garrett to the plaintiff.

52.  On or about July 29, 2022, perhaps at the prompting of defendant Epstein or the Student Division of the Federalist Society, defendant Garrett called the plaintiff and started a discussion about a variety of topics including work and legal careers. He never said anything about the fake images posted online, or the accompanying allegations, and plaintiff was not aware of them at that time.

53.   During their twenty-minute conversation, defendant Garrett expressed some dissatisfaction with his placement and work at the Pillsbury firm, which Plaintiff had not previously known about.  Plaintiff attempted to console him, suggesting that working at any large law firm was more similar than different, regardless of the firm's ranking. Plaintiff further suggested that he (Garrett) would have opportunities afterward, because defendant Epstein would probably be able to recommend him for a clerkship.

-8-

54.  On August 2, 2022, defendant Garrett sent the email attached as Exhibit 3 to Mr. Redpath and Ms. Alcantara. In that email he made two false and defamatory statements.

55.  The first one was that plaintiff was fired for sexual harassment. Defendant Garrett says, "As I mentioned to you over the weekend, my understanding is that Gideon Rapaport was fired from his summer associate position at Kirkland & Ellis NY last week for sexually harassing a practice assistant or an attorney."

56.  The second false and defamatory statement was that the plaintiff was fired and banned from the building. He said "I do know that Gideon was fired and banned from entering the building. Please see the attached photo ('Security Desk Photo') taken by Ajay Iyer at Kirkland & Ellis's New York location at 601 Lexington Avenue on Thursday, June 28th [sic; it was July], where Ajay worked with Gideon this summer."

57.  In fact, plaintiff was not fired from the firm for sexual harassment, and was never banned from entering the building.

58. The August 2, 2022 email was the second attempt to involve the Student Division, which again rejected the authenticity of the forgery and veracity of the claims.

59.  By this time defendant Epstein had chosen to join with defendants Iyer and Garrett, and he was mentioned in it as a collaborator.

60.  The email says, "[a]fter getting back from the conference, I spoke with Richard Epstein about this situation. He's understandably very upset by the news and feels that Lee Otis should be made aware, since Gideon is going to be participating in the James Kent Fellowship, for which Professor Epstein wrote Gideon a (complicated) letter of recommendation."

-9-

61. Mr. Redpath and Ms. Alcantara of the Student Division of the Federalist Society thus saw through these forgeries and defamatory claims, and refused to participate in the character assassination campaign of defendants Iyer and Garrett.

62. But defendant Epstein, for whatever reasons, signed on to the campaign. After all, he was and remains a successful recommender of law students for judicial clerkships throughout the Federal Courts, including the U.S. Supreme Court.

63. Defendant Epstein forwarded the defamatory statements based upon the fake photographs and in the email to Lee Otis. Defendant Epstein did not at any time prior to doing so contact either the plaintiff or Kirkland & Ellis to find out whether the allegations were true or false.

64. On or about August 2, 2022, upon receiving the second fake photo and defamatory claims from defendant Epstein, Lee Otis began investigating. On information and belief, she had a long telephone phone call with defendant Iyer, where the latter lied, saying that he knew that the plaintiff was fired for sexual harassment and that the second forgery was a picture he had taken himself in the lobby of Kirkland & Ellis at 601 Lexington Avenue.

65. In the evening of August 2, 2022, one day before the beginning of the Fellowship, Lee Otis had a telephone conversation with the plaintiff. During this conversation, plaintiff learned of these online posts, fake photographs and defamatory statements for the first time.

66. He was understandably shocked and dismayed at learning of them. Over the course of the call, plaintiff denied the false allegations, and persuaded Lee Otis to check with the firm regarding their falsity.

67. Plaintiff then authorized Kirkland & Ellis's Director of Human Resources, Steven Goldblatt, to disclose any information about him in the firm's employment records.

68. Following his receiving that authorization, Mr. Goldblatt informed Ms. Otis that there was absolutely no truth to the statements that plaintiff was fired for sexual harassment or banned from the premises of 601 Lexington Avenue.

69. Mr. Goldblatt further told Ms. Otis that such a poster would never have been created or displayed by the firm, and that to best of his knowledge no such poster was ever displayed in the lobby of 601 Lexington Avenue, or anywhere else on the premises.

70. On or about August 9, 2022, after the conclusion of plaintiff's time at the James Kent Academy, defendant Epstein called the plaintiff and engaged in an uninterrupted and prepared monologue.

71. Defendant Epstein told plaintiff that his (plaintiff's) career was destroyed, that he will not become a clerk, that he will be removed from his upcoming position as Senior Articles Editor of the New York University Journal of Law and Liberty (for which defendant Epstein is the faculty sponsor), and that he will not associate with the plaintiff anymore, in order to protect his own reputation and his ability to recommend and place students in the future.

72. Thus, defendants Iyer and Garrett destroyed the formerly excellent relationship which plaintiff had enjoyed with his favorite professor, while at the same time benefiting themselves from his recommendations and their status with the Federalist Society.

73. During the telephone call, defendant Epstein chose to address the transactions and occurrences which are described in the initial *pro se* complaint, which plaintiff had made known.

74. He talked at length about the extent of harm which was to befall the plaintiff, and lied about his participation in the transactions and occurrences which gave rise to this action.

-11-

75. In so doing, he attempted to cover up by fraud and deceit the tortious actions of himself and his students, defendants Iyer and Garrett, not only in order to avoid legal liability, but also to protect his own reputation.

76. Obviously, a public revelation about the defamation and fakery, perpetrated by students whom he had successfully recommended to prestigious clerkships at the U. S. Court of Appeal for the Ninth Circuit, and the Supreme Court of Alabama, would reflect poorly on him.

77. This was just one of the overt acts by which he participated in the civil conspiracy with the co-defendants, to defame plaintiff and destroy his reputation and career prospects.

78. During his long and uninterrupted monologue, defendant Epstein deceived the plaintiff by engaging in multiple material lies, including by omission, that were intended to and did actually result in plaintiff's mistaken beliefs and ignorance of the true facts, upon which plaintiff relied, to his significant detriment.

79. For example, defendant Epstein specifically lied about not knowing which members of the New York University Federalist Society Chapter sent the defamatory statements and fakes to the Federalist Society, the manner by which he himself learned about the defamatory statements and fakes, and his own role in sending these materials himself and instructing others to do so.

80. On July 28, 2023, defendant Epstein invited plaintiff to lunch. At that time, plaintiff showed him a copy of the original complaint which he had intended to file that day in this action, and asked him if he had any corrections or additions to it.

81. This was the original *pro se* John Doe complaint, in which plaintiff was completely ignorant of the identities of the defendants, including defendant Epstein. Thus, while he knew full well what had happened to him, he had no idea who was responsible.

-12-

82. Defendant Epstein did not offer a single correction or addition, despite knowing full well of the tortious actions, false statements, and the two fake photographs perpetrated by defendants Iyer and Garrett, as well as his own tortious actions.

83. Defendant Epstein stated that he did not want to be involved in any way, but the plaintiff told him that it was too late, because he was a key witness and so much of the measure of the damages revolves around him.

84. On August 9, 2022, plaintiff pressed defendant Epstein again by email. He responded by admitting that he had sent the compiled materials to Otis, and warned plaintiff not to pursue the matter further, because it would be a mistake, and that plaintiff would not "get a second chance" from anyone.

85. It was only after plaintiff filed his complaint, and enforced the subpoenas which the Court had issued, that he was able to learn the identities of the John Does who had been the original defendants, and realized how defendants had betrayed his trust and confidence in them.

86. As a result of defendant Epstein's deceit and fraud, justice was significantly delayed, and could have been permanently obstructed if expedited discovery had not been granted, thanks to which plaintiff was then able to learn the true identities of the defendants.

87. Since the transactions and occurrences which gave rise to this action, and continuously after the commencement of this action until now, defendant Epstein has tortiously interfered with the attempts of the plaintiff to obtain and retain employment relating to the law.

88. After the commencement of this action, for example, defendant Epstein told others that plaintiff was frequently absent from his classes. But plaintiff had perfect attendance in defendant Epstein's classes, prior to being betrayed by him; only thereafter was he occasionally absent.

-13-

89.   The ongoing campaign of personal destruction by these defendants, wielding their combined power and influence in the rarefied and elite legal world they inhabit, has devastated plaintiff's professional and personal life, resulted in a loss of actual and prospective employment, devastating emotional and physical distress, and the destruction of what was a highly promising legal career. Only this Court can restore that which has been wrongfully and tortiously taken from him, and it is respectfully asked to do so.

## FIRST CLAIM
### (Defamation)

90.  Plaintiff re-alleges paragraphs 1 through 89.

91.  The faked photographs and statements contain false assertions or implications of fact, including the false statements and implications set forth above.

92.  They are defamatory *per se*, in that they falsely accused plaintiff of sexual harassment, and of conduct incompatible with being an honorable member of the legal profession.

93.   Defendants either knew, or had reason to know, that many of the allegations of and concerning plaintiff were false, but published them anyway, with constitutional and common-law malice.

94.  The willful actions of defendants Iyer and Garrett, in producing two fake photographs of plaintiff, and then twice presenting them to others as genuine, is conclusive evidence of their malice.

95.  The willful actions of defendant Epstein, in further circulating to others the statements he knew to be false, is conclusive evidence of his malice.

96. As a consequence of the faked photos and subsequent statements relating to his former employment, plaintiff has also suffered special damages as further set forth below.

-14-

97.  The faked photos and subsequent statements constitute defamation *per se* because they (I) falsely accuse plaintiff of committing illegal acts constituting a serious crime, or serious sexual misconduct; (ii) contain allegations that would tend to injure plaintiff in his trade, business, profession or office; (iii) contain allegations by implication from the language employed such that the reader would understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter, and (iv) by natural consequence would cause plaintiff damages.

98.  The defamatory acts described herein have caused special damage to plaintiff, and continue to do so, in that he has suffered and continues to suffer loss of economic opportunities as well as loss of reputation.

99.  In addition to the foregoing, plaintiff has suffered, and will continue to suffer, mental pain and anguish, emotional distress, harassment, anxiety, embarrassment and humiliation.

100.  Defendants are jointly and several liable for publishing and republishing the defamatory statements and acts described herein, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

### SECOND CLAIM
### (Injurious Falsehood; Special Damages)

101.  Plaintiff re-alleges paragraphs 1 through 89.

102.  The above-described fake photographs and statements are false statements and have directly caused plaintiff special damages, due to his loss of the promised clerkship, his loss of the opportunity to become a member of the New York bar, and his entire career prospects.

103.  Defendants are jointly and severally liable for the special damages caused plaintiff as a direct result of above-described fake photographs and false statements, and plaintiff is entitled to recover those damages.

-15-

104. Defendants acted with actual malice and a criminal state of mind consisting of the intent to harm plaintiff professionally through, among other things, creating and publishing the faked document and subsequent statements which falsely claimed that plaintiff was fired for sexual harassment.

105. Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

### THIRD CLAIM
### (Intentional Infliction of Emotional Distress)

106. Plaintiff re-alleges paragraphs 1 through 89.

107. The above-described actions and conduct of the defendants were extreme and outrageous.

108. They are especially extreme and outrageous, because they were actions and conduct of members of the bar, who are expected to conduct themselves according to somewhat higher standards of decency towards their colleagues.

109. The facts and motivations of defendants' action demonstrate their intent to cause, or their indifference to the likelihood of causing, severe emotional distress to the plaintiff.

110. It is not an exaggeration to conclude that the facts and motivations of defendants' action demonstrate their intent to destroy plaintiff's career, and so far they have succeeded.

111. As a result of defendants' conduct, plaintiff has suffered and continues to suffer loss of economic opportunities, scorn, derision, harassment, emotional distress, and anxiety.

112. This claim is not duplicative of the defamation and false statement claims, because the faked photographs and false statements were only part of the defendants' campaign of destruction,

-16-

and the threats of defendant Epstein–and the lies of the other defendants–are evidence of their malicious intentions and sheer malevolence.

113. Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## FOURTH CLAIM
### (False Light and Invasion of Privacy)

114. Plaintiff re-alleges paragraphs 1 through 89.

115. This claim is alleged under the laws of the State of New Jersey where plaintiff resided during the events complained of herein.

116. This claim is not duplicative of the defamation and false statement claims because it redresses the violation of a right of privacy which is not afforded by the State of New York to its citizens, but which pertains to protecting private figures from intrusion into their lives by publicity that places them in a false light.

117. The above-described fake photographs and statements are false statements that present the plaintiff under a false light to the world, including his immediate neighbors and members of his local community in the State of New Jersey.

118. This false light exposes the plaintiff to scorn, derision, harassment, emotional distress, anxiety, loss of privacy and excess notoriety in a manner that shocks the conscience and is intolerable in society.

119. Defendants are jointly and severally liable for compensatory and punitive damages caused plaintiff as a direct result of above-described fake photographs and false statements, and plaintiff is entitled to recover those damages.

-17-

120.  Defendants acted with actual malice and with the intent to harm plaintiff through, among other things, creating and publishing the faked photographs and statements which falsely claimed that plaintiff was fired for sexual harassment.

121.  Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## FIFTH CLAIM
## (Civil Conspiracy)

122.  Plaintiff re-alleges paragraphs 1 through 89.

123.  The three defendants were engaged in a civil conspiracy to defame the plaintiff, and to spread their defamatory accusations and images as widely as possible.

124.  By their joint actions, the three defendants agreed to use their influence with numerous contacts in the community to destroy the plaintiff's reputation and future employability.

125.  The above-described actions demonstrate the defendants' creation and circulation of the defamatory statements and fake photographs to third parties.

126.  The above-described actions allege the overt acts in furtherance of the defendants' agreement, and their intentional participation in the campaign of defamation, as the primary tort underlying the conspiracy.

127.  Defendants are therefore jointly and severally liable for civil conspiracy in furtherance of their intentional defamation of the plaintiff, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

-18-

## SIXTH CLAIM
### (Fraud against Defendant Epstein)

128.  Plaintiff re-alleges paragraphs 1 through 89.

129.  Defendant Epstein engaged in fraud and deceit intended to interfere, delay and obstruct the plaintiff's exercise of his legal rights through the actions described above.

130.  For example, he knowingly lied about the identities of defendants Iyer and Garrett as the transmitters of the faked photographs and defamatory statements when he stated to the plaintiff that it was not they who had done so.

131.  He also falsely and deceitfully stated that he did not know which students transmitted the faked photographs and defamatory statements, while at other times he falsely and deceitfully stated that no student transmitted the faked photographs and defamatory statements, and that he did so himself.

132.  He fully intended that plaintiff rely upon his false and deceitful statements, because he was protecting both himself and his co-defendants.

133.  The plaintiff did actually, and justifiably, rely upon the lies and deceptions of defendant Epstein to his detriment, by delaying plaintiff's investigation to determine and identify the true and proper defendants, until after this Court granted the requested subpoenas and the plaintiff enforced them.

134.  Defendant Epstein became fully aware of plaintiff's detrimental reliance, and had a final chance to mitigate the damage caused by his fraud, when plaintiff presented him with the original John Doe complaint hours before it was filed on July 28, 2023.

135.  But defendant Epstein chose not to do so.

-19-

136.  Defendant Epstein is liable for the delay and expense caused by his fraud, and for any loss of legal right or cause of action that is or may have been obstructed or frustrated as a result of his fraud, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## SEVENTH CLAIM
### (Tortious Interference with Prospective Economic Advantage, against Defendant Epstein)

137.  Plaintiff re-alleges paragraphs 1 through 89.

138.  Defendant Epstein tortiously interfered with prospective economic advantages earned or reasonably expected by plaintiff when he repeatedly disparaged him to many employers and prospective employers.

139.  Defendant Epstein repeated his disparagement at every possible opportunity to anyone who would listen.

140.  As a direct result of his disparagement, plaintiff lost a paid contractor position in the legal field, which was his only active employment.

141.  Plaintiff also lost a position with the Manhattan Institute, which he had been offered and had accepted, but had not started.

142.  Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

-20-

WHEREFORE, plaintiff demands relief as follows:

1. On his First and Second Claims, a judgment declaring that the statements contained therein which are of and concerning plaintiff are false and defamatory, that the photos are inauthentic fakes, for a preliminary and permanent injunction requiring that the defendants remove the photos and statements from anywhere that they have published them, and compensatory and punitive damages against defendants in such sums as may be awarded by a jury and the Court;

2. On the Third, Fourth, and Fifth compensatory and punitive damages against all defendants jointly and severally, in such sums as may be awarded by a jury and the Court;

3. On his Sixth and Seventh Claims, compensatory and punitive damages against defendant Epstein, in such sums as may be awarded by a jury and the Court.

Together with the costs and disbursements of this action, and such other relief as may be just.

Dated: New York, New York
       May 24, 2024

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
150 East 56th Street, Suite 12B
New York, NY 10022
212.633.0123
altmanlaw@earthlink.net

-21-

In the United States District Court, of the Southern District of New York.

Gideon Rapaport, Plaintiff,

v.

John Doe #1, a Reddit.com user, John Doe #2, A Top-Law-Schools.com user, John Doe #3 a current or former NYU Law student, Individually, Defendants.

No. 23-cv-_____-_____.

July 28, 2023.

Gideon Rapaport, pro se,
45 River Drive S #2308, Jersey City NJ, 07310
GideonRapaportLaw@outlook.com
          -

## Complaint and Jury Demand

Plaintiff Gideon Rapaport  "Plaintiff" , pro se, complains and states as follows as to all matters:

## THE PARTIES

1. Plaintiff is a former employee of Kirkland & Ellis LLP and a graduate of the New York University School of Law. He is a nonresident alien lawfully admitted to the United States.

2. Defendant Does 1 through 3, upon information and belief, are former or current employees of Kirkland & Ellis LLP.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over this action pursuant to 28 U.S. Code § 1332 because the parties are a nonresident alien and United States domiciliaries, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

4. This Court has personal jurisdiction over Does 1 through 3 because they are domiciled in the State of New York, or alternatively have transacted in business within the State of New York within the meaning of NY CPLR § 302(1) during the course of their employment in the state, have committed non-defamatory tortious acts within the meaning of NY CPLR § 302(2) and (3), and have appointed an agent for service of process as required by N.Y. Comp. Codes R. & Regs. Tit. 22 § 520.13.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

# BACKGROUND FACTS

### A. Forged Document Fabricated And False Claims Are Disseminated Via Anonymous Internet Posts

6. On or about July 30, 2022, defendant Does 1 through 3 conspired to and did perpetrate a libelous internet hoax and character assassination against the Plaintiff accompanied by a word-of-mouth slander campaign. These posts were made on Reddit.com and Top-Law-Schools.com.

7. Defendants forged a document by affixing to it, without proper authorization or permission to so and outside of the scope of their employment, the name of their employer, Kirkland & Ellis LLP, which had employed Plaintiff at the same time as Defendants. This document was in the style of a "wanted" or "public enemy" poster as would be produced by law enforcement and consisted of the aforementioned name, a corporate headshot style photograph of the Plaintiff obtained from an internal website created by the employer to facilitate social interaction among employees, and the bolded and capitalized text "**DO NOT ADMIT**".

8. A photograph of this forged document was presented as evidence in support of the false claims made in the accompanying libelous posts, which centered on the false and baseless assertion that the Plaintiff was fired for sexual harassment and misconduct.

9. In being so presented as evidence for the false claim, the photograph of the forged document was falsely asserted to have been taken at the guarded security gate at 601 Lexington Avenue, New York when in fact it was staged in a cubicle of the kind that was assigned to summer associates at that address, as is plainly visible from the background captured around the forged document.

### B. Forgery Identified And False Claims Are Disproven By Firm Director of Human Resources

10. On or about August 3rd 2022, Lee Otis, the director of the James Kent Summer Academy, which Plaintiff was expecting to attend that same day, spoke via telephone with Steven Goldblatt, the Director of Human Resources of Kirkland & Ellis LLP to ascertain the veracity of the claims made by the internet posts supported by the forged document.

11. During that telephone conversation, Mr. Goldblatt declared to Mrs. Otis that he and his department could locate no record of any allegation or complaint of sexual harassment or misconduct made against Plaintiff and that they were aware of no such wrongful conduct by the Plaintiff.

12. Mr. Goldblatt also asserted in that call that he and his department could locate no record of any such document as the forged document described in 7 *infra* being created or issued by the firm, that they would not create a document like that, that the forged document was not currently displayed anywhere on the premises and they had no knowledge of that document was ever displayed at the security gate or anywhere else.

13. This provided sufficient proof to Mrs. Otis that the claims made by the anonymous internet posts were false, resulting in authorization of Plaintiff to participate in the program later that day.

14. Upon information and belief, on or about August 6th, after failing to obtain the removal of Plaintiff from the James Kent Summer Academy, the initial anonymous internet posts that published the vast majority of the false claims were deleted or edited to remove all of their content except for the single period "." required by computer systems that do not allow users to completely empty posts of all text during an edit or to delete them.

15. On or about August 8th 2022, Plaintiff spoke via phone with Steven Goldblatt, the Director of Human Resources of Kirkland & Ellis LLP. During that conversation Mr. Goldblatt declared to Plaintiff the same facts as he did to Mrs. Otis in 11-12 *infra*.

### C. Anonymous Internet Posts Contain Obsessive Discussion Of Skewed Personal Details Irrelevant To Defamatory False Claims

16. Although the anonymous internet posts centered on the false assertion that the Plaintiff was fired for sexual harassment and misconduct, the posts, digressed wildly into describing the purported personal opinions of the Plaintiff as to the correctness of judicial opinions published by the United States Supreme Court during the summer of 2022, his habit of dressing relatively formally in the workplace by wearing at least a two piece suit and a necktie every work day, his stylistic choices in menswear with a particular fixation on his occasional wearing of button suspenders, his rumored enthusiasm to participate in class discussions at law school, his extracurricular activities at law school, his general political views, his invitations as a formal escort in the debutante ball circuit of New York City, his acceptance into exclusive social circles and private social clubs in Manhattan, and baseless speculation about his family life and circumstances.

17. By noticing, researching, recording, compiling and ultimately publishing all of these personal and irrelevant details in the anonymous internet posts, an obsessive state of mind is evidently manifest in Defendants in addition to the malicious state of mind manifest by the false claims and act of forgery in support of them.

18. The focus of the anonymous internet posts on the personal opinions about the law and political views alleged to be held by Plaintiff also indicate an ideological or political motive for the attempt at character assassination, specifically revolving around the opinion of the United States Supreme Court in Dobbs v. Jackson Women's Health Organization which Plaintiff was alleged to have celebrated.

19. Although Plaintiff believed that Dobbs v. Jackson Women's Health Organization was correctly decided, he did not celebrate it on or after June 24, 2022 in the workplace, as was incorrectly alleged and emphasized in the anonymous internet posts, for multiple reasons. Plaintiff already believed in the veracity of credible rumors he personally received in early February, 2022 that the opinion would turn out as it eventually did, and the widely reported leak of May 2, 2022 greatly supported that conclusion. Furthermore, Plaintiff was not particularly interested in the *Dobbs* case and was still celebrating the New York State Rifle & Pistol Association, Inc. v. Bruen opinion that was published the day prior. It was also at this time that upon his reflection on the effective removal during the day prior of Paul Clement and Erin Murphy from the firm, the two partners who had successfully litigated the *Bruen* case, who were personally known to Plaintiff alongside some of the partners that orchestrated their effective removal, upon information and belief, in breach of contract and assurances made to Clement and Murphy upon

their joining the firm that they would be free to litigate cases at the Supreme Court of the United States on a side that some may find controversial (presumably due to the necessity of having at least two sides to every case or controversy in the adversarial system, it would be almost impossible to litigate any matter without someone finding the position of one side controversial, if this principle were uniformly applied which Plaintiff does not believe that it was or is), Plaintiff decided that he would not want to continue his association with the firm after graduating law school.

### D. Motive and Timing Of Forged Document And Defamatory Anonymous Internet Posts

20. Upon information and belief, Defendants solicited multiple women summer associates to file false complaints of sexual harassment or misconduct against Plaintiff but could not find one willing to do so. This necessitated that the character assassination rely on the creation of the forged document to obtain credibility beyond a mere anonymous internet post.

21. Upon information and belief, Defendants timed the publication and forwarding of the anonymous internet posts very closely to the start of the James Kent Summer Academy in order to prevent the Plaintiff's attendance at the latest possible time so as to deny him the opportunity to marshal sufficient facts to prove the falsehood of the hoax, and thereby cause him direct and specific injury.

22. Selection for the James Kent Summer Academy was listed in the Plaintiff's resume that was provided to fellow employees by employer, and a public web page provided the dates of the program for 2022.

### E. Further Attacks And False Complaints

23. Upon information and belief, one or more of the Defendants, who were enrolled at the New York University School of Law alongside the Plaintiff, filed or caused to be filed a false complaint to New York University under Title IX of the Education Amendments of 1972 to the Civil Rights Act in August of 2022 before classes for the following academic year had begun. This false complaint was made, upon information and belief, in order to provide cover and a degree of credibility for the failed and discredited attempt to assassinate the character and derail the career of Plaintiff with the forged document and anonymous internet posts.

24. Upon information and belief, the goal of Defendants in filing this false complaint was not only to prevent Plaintiff from obtaining his Juris Doctor in the following academic year and realizing any return from the investment of time and money in his legal education, but also to exclude him from the fora and social environments in which he may defend his reputation, repair the harm already done by the false and baseless claims made by Defendants and prevent future attacks. In other words, Defendants had to get Plaintiff out of sight so they could continue to assassinate his character after isolating him.

25. Upon information and belief, the false Title IX complaint filed by Defendants was so lacking in plausibility and/or any allegation of wrongdoing that it did not meet the very low standard required to commence an investigation by the relevant authorities at the New York University.

26. Plaintiff never received any official or unofficial notice of the false Title IX complaint from the administration or authorities of New York University because, upon information and belief, an investigation was never commenced.

27. Upon information and belief, persons within the New York University administration were aware, absent any discussion or contact with Plaintiff, of the false nature of the character assassination and anonymous internet posts made by Defendants, and correctly connected the initial attack against Plaintiff in the context of the workplace with the subsequent attempt made at the law school.

28. Plaintiff is unaware of any other complaint being made against him made by anyone in any academic or educational institution, and to the best of his knowledge has never been the subject of any investigation for academic or sexual misconduct nor has he engaged in any such conduct at any time.

### F. Oral Component Of Character Assassination Campaign

29. Upon information and belief, Defendants chose for strategic reasons to not provide in the written internet posts any identifying information about the non-existent person or persons they falsely claimed Plaintiff sexually harassed, and instead left this to the oral slander campaign. Providing any such identifying information published in writing would have made it easier for Plaintiff to disprove the defamatory hoax by proving that no such person existed because there had never even been any complaint let alone any wrongful conduct.

30. Upon information and belief, in the oral slander campaign, Defendants experimented with a few different fictional victim characters with a wide range job descriptions including personal assistant (secretary), legal assistant (paralegal), summer associate, associate and even partner. Defendants eventually chose to continue to orally promote the personal assistant sexual harassment hoax, and it is this version of the oral slander about him that Plaintiff encounters most frequently across the United States and internationally.

### G. Harm To Reputation And Relationships Of Plaintiff

31. Plaintiff has suffered profound and far-reaching harm in his personal life as well as a significant reduction in the apparent trajectory of his career, as the character assassination was performed during the critical time immediately preceding the final year of law school.

32. Plaintiff has suffered severe emotional distress as a result of the defamatory hoax and character assassination made against him by Defendants including the subsequent failed attempt to have him suspended or removed from his law school.

33. The forged document, anonymous internet posts falsely claiming that Plaintiff was fired for sexual harassment and misconduct were meant to, and do, tend to injure Plaintiff in his ability to practice his trade and profession.

34. Beyond the severe but diffuse harms arising from the forged document 7-9 *infra*, anonymous internet posts 16-18 *infra*, subsequent false complaint made to remove him from law school 23-25 *infra*, ongoing oral slander campaign 30 *infra* Plaintiff suffered particular harm to his valued relationship with Professor Richard A. Epstein, of New York University and the University of Chicago.

Page **5** of 17

35. Plaintiff had first encountered the lectures and works of Professor Epstein in the field of law and economics on or about May, 2009 due to his childhood interest in economics. These lectures and works encouraged in Plaintiff an interest in law generally, the American system of government, Roman law and the common law of the 18th to late 19th centuries. It was at this time that Plaintiff set the personal goal of gaining admission to the University of Chicago Law School where Professor Epstein was tenured at the time. From that time until the present, Plaintiff has revered Professor Epstein above all other living academics or intellectuals due to his brilliant mind, extraordinary intellectual breadth, consistent commitment to first principles, comprehensive legal theory and kindness.

36. On or about May 2013, Plaintiff obtained special permission in his jurisdiction to study economics at the University of British Columbia prior to completing high school, with a professor who was also a lawyer and incorporated law and economics into his courses. After completing high school, Plaintiff went on to obtain special permission, on or about December, 2014, to take the upper-level course of Roman Law during his first full year as an undergraduate business student.

37. After beginning his studies at the New York University School of Law, Plaintiff met Professor Epstein for the first time on or about September 10, 2019. The appreciation of Plaintiff for the Professor would be increasingly reciprocated over the course of the years as Plaintiff took Constitutional Law from Professor Epstein and maintained a consistent interest in his lunch debates, academic works and events. The opportunity to meet, discuss the law with and take courses from Professor Epstein represented the successful achievement of a major life aspiration for Plaintiff.

38. Upon information and belief, Professor Epstein taught Property in the Fall 2022 Term in addition to the light three credit course he had initially planned to limit himself to for personal health reasons which were eventually fully resolved, in order to entice Plaintiff to not go through with his plan to study abroad and/or at a different American law school for the 2022/2023 academic year due to the environment at the law school, which Plaintiff had shared with him in writing on or about April 13, 2022.

39. In early May 2022, Professor Epstein called Plaintiff and notified him that he would be teaching Property in the fall in addition to the previously scheduled course, that he wanted Plaintiff to take both courses from him, and that he wanted Plaintiff to serve in the capacity of Senior Article Editor on the law journal for which he is the faculty adviser, the New York University Journal of Law and Liberty, to which the Plaintiff had not applied. Plaintiff was deeply moved by these gestures, and for fear of disappointing Professor Epstein, who at the time was suffering from health issues from which he eventually fully recovered, abandoned his plans to spend that academic year abroad and/or visiting elsewhere, and assumed the risk of remaining where he was threatened.

40. Plaintiff initially planned to spend this final year of law school abroad as an exchange student, and/or a visiting student at a different law school in the United States (while still graduating from New York University) on account of an air of persecution and threats personally directed towards Plaintiff. These targeted threats were made against a background of rampant and unpunished anti-Semitism at the law school, including public and widely reported on calls for the destruction of the State of Israel, which is the country of birth of the Plaintiff, and murder of the Jewish citizens that live within it, which would include close relatives of the Plaintiff. These widely reported on public calls for the destruction of Israel

and the murder of Jews were accompanied by public threats to students who would disagree with the antagonists or complain.

41. These public calls for genocide and threats against students at the law school who would express disagreement or complain brought no punishment for the antagonists, but did result in the shutting down of the email list-serv sponsored by the law school on or about, August, 2022. Upon information and belief, the list-serv was shut down due to concerns that continued publication of anti-Semitic calls to genocide and threats against particular Jewish students in a school-sponsored forum, which the school was for some reason unwilling to punish, would clearly violate the consent order entered into on or about, September 30, 2020, which the university had entered into to settle a lawsuit brought by the federal government under Title VI of the 1964 Civil Rights Act alleging failure to punish racially and religiously motivated abuse of Jewish students.

42. Plaintiff was already warned, and sincerely believed in early May 2022 when he spoke with Professor Epstein, that something terrible would happen to him if would return to New York University in the 2022/2023 academic year, and that he would also be in danger during his period of summer employment in New York City prior to the start of that academic year. Plaintiff accepted this danger, which he believed carried a serious risk of preventing him from completing his legal education, because Professor Epstein had requested his presence at the law school that upcoming year, and he believed that shirking his duty to Professor Epstein and the law school in the face of danger would be a moral failure, especially considering the valuable opportunity he had received to study under Professor Epstein at the New York University School of Law, which is reputed to be an elite law school, and that he strove for that opportunity for approximately half of his life. Plaintiff understood that beyond his help as a loyal staff member on his law journal and a student, Professor Epstein also wanted his contribution as an informal teaching assistant to help him with the full and mandatory Property class he had undertaken to teach.

43. Having chosen this course of action, Plaintiff resolved to personally suffer the consequences of any harm that would come his way, and that if he were somehow prevented from completing his legal education, as Defendants would eventually unsuccessfully attempt as described in 23-25 *infra*, he would join the bar without a law degree after office study pursuant to Rule 520.4 of the Court of Appeals of New York. At this time, Plaintiff believed, as a matter of personal faith, that events would transpire beyond his control, that the execution of the threats already made against him would lead him to his destiny, that it would be a good destiny if he remained fearless and maintained faith, and that through the adversity which was in store for him he would obtain a clearer understanding of the truth of life and this world.

44. The early concerns about the air of persecution and threats directed towards Plaintiff described in 38-43 *infra* unfortunately proved to be well-founded, as seen in the causes of action arising from the forged document 7-9 *infra*, anonymous internet posts 16-18 *infra*, subsequent false complaint made to remove him from law school 23-25 *infra* and ongoing oral slander campaign 30 *infra*.

45. Plaintiff never requested help from Professor Epstein in obtaining a federal clerkship in the United States out of concerns of conscience, specifically that self-interest or the appearance of it would limit or change his genuine appreciation for and intellectual relationship with his favorite professor. Upon

information and belief, Professor Epstein has successfully recommended hundreds of law students to federal clerkships, and during the October Term of 2022 successfully recommended four former students to clerkships at the Supreme Court of the United States thus representing four of thirty six positions. Plaintiff maintained a belief that help from Professor Epstein in the aspiration to serve as a clerk for a federal judge would be volunteered if it would be deserved.

46. Following Plaintiff"s first year of law school, Professor Epstein repeatedly offered and promised to help Plaintiff obtain a federal clerkship, assured him that he was eminently qualified and that best efforts would be made even for the most difficult "feeder" clerkships. During one such conversation on this topic, on or about late January, 2022, Plaintiff shared that beyond the moral satisfaction of public service and associated professional prestige, he also desired the valuable experience and intellectual development because it could be used by him at some distant date in service of the law and the public from the bench. Professor Epstein told Plaintiff that he has sufficient talent and intellectual breadth to one day serve as a strong federal appellate judge if he would be willing to suffer a significant decrease in income and the abusive confirmation process. Plaintiff responded that he was not particularly materialistic so as to be concerned with the predicted sacrifice of income and was already used to extraordinary public abuse at law school. Plaintiff then lamented to Professor Epstein, that on account of the time of his birth, he could not have the opportunity to be publicly attacked and moralized to on the subject of women"s rights by a drunk who drowned a woman by driving his car off a bridge and continued his next day as if nothing happened and integrity by "Senator Joe „10% for the Big Guy" Bribem", as Justice Thomas was in October, 1991. Professor Epstein assured Plaintiff that his generation and the generation immediately preceding it would also produce miscreant politicians capable of creating similar irony.

47. Although Plaintiff never requested any help in obtaining a federal clerkship from Professor Epstein, Plaintiff did notify him of his desire to clerk for the Supreme Court of Canada and participate in the James Kent Summer Academy, and a letter of recommendation was offered in both cases. Upon information and belief, the letter written by Professor Epstein to the James Kent Summer Academy was the most enthusiastic and impressive letter ever received by the program. Plaintiff was also invited to apply for the Bradley Fellowship which required a vision statement that was tendered by the applicant.

48. After the publication of the defamatory materials and filing of false claims, and on or about August 9th, 2022, in an exceptionally one sided phone call, during which Plaintiff hardly spoke and did not raise any objections or disagreement, Professor Epstein declared to Plaintiff that he had decided that as a result of the recent "shipwreck", and despite the forgery and falsity of the allegations, that Plaintiff will not have a federal clerkship, will not serve as Senior Article Editor of the Journal of Law and Liberty and that he will limit his association with Plaintiff because of his "tsuris" (which means "trouble" in Yiddish), that Plaintiff is a tax upon people who associate with him, and that if he has any complaints he should hire a psychiatrist to complain to if he does not have one already. Perhaps as a planned consolation, Professor Epstein then continued to inform Plaintiff that although his vision statement for the Bradley Fellowship was the best he had ever read, had the piercing insight and sweeping intellectual breadth that exemplifies the Plaintiff"s abilities and was more than what could be expected even from a junior member of a faculty on tenure track at a good law school, he believed that it was not beneficial for the fellowship to be associated with the Plaintiff, even considering the forgery and the falsity of the defamatory allegations and that the motive for the defamation was the holding of the Plaintiff of similar

Page **8** of 17

beliefs and values as championed by the fellowship. The monetary value of the fellowship was $5,000 with greater value in prestige. Professor Epstein concluded by telling Plaintiff that he was the most fearless man he had ever met and it is unclear if this meant as a compliment.

49. At the time, Plaintiff found humor in the dry, awkwardly paced and overly serious monologue delivered by Professor Epstein, enjoyed hearing him make use of his limited Yiddish vocabulary pronounced in his iconic Brooklyn accent, saw the amusing irony in referring a law student focused on tax law as a tax himself, and wondered if such one-sided monologues were similar in kind to the biographically accepted stories about how Justice Douglas would calmly inform his wives of divorce after summoning them to Goose Prairie, Washington State, or rural Oregon, and before ridding them from his cabin into the wilderness.

50. Plaintiff  initially believed that the sudden change in his treatment by Professor Epstein was a temporary precautionary measure in case of further publicity, and a teaching moment to help Plaintiff understand the importance of not being the subject of controversy, which the Plaintiff accepted as a good lesson, as well as a reaction to the controversy raised thus far. Although Professor Epstein is keen to vehemently disagree about ideas and hold intellectual positions that are radical in comparison to the mainstream of the academy, he is highly averse to interpersonal conflict and controversy on non-ideological matters.

51. Plaintiff was reluctant to believe that Professor Epstein would throw him under the bus because of a hoax that was proven to be false and based on a forged document, and which could not even hold up for a week, especially when the clear motive for the tortious behavior of Defendants was in part political and ideological. Upon information and belief, a major part of the reason for why Plaintiff was targeted in the first place was Plaintiff"s sharing values and associating himself with Professor Epstein, such as by organizing in mid June 2022, a lunch with fellow employees who were keen to meet the famous professor whose academic work they had each encountered in multiple courses during law school.

52. In the fall of 2022, Plaintiff attended the two courses he had previously been requested to stay at the law school for by Professor Epstein, and over the course of approximately one month, during his typical after-class conversations and walks with the professor, Plaintiff waited for him to express any change in his priorly assumed position or regret at his treatment of Plaintiff. Plaintiff did not believe that he needed the help or support of Professor Epstein to succeed or obtain what he wanted in life, and was not motivated by the narrow self-interest of wanting career help. Instead, Plaintiff found it important to reestablish a good relationship with Professor Epstein as he was the main intellectual influence on Plaintiff, who aspired to represent the ideas and values of Professor Epstein and one day continue his intellectual work and advance it in new directions according to the perspective, abilities and best efforts of Plaintiff.

53. Over the course of this month Plaintiff tried to delicately communicate to Professor Epstein that the defamatory materials were a primarily ideologically driven attack, that the professor had a generational gap in understanding the persecution that young people with his ideas face in part due to being a tenured law professor since approximately 1973, that being attacked for unapologetically holding unpopular beliefs is not a "shipwreck" and that Plaintiff was subject to relatively extraordinary attack for the same

reasons of talent and ideological commitment that caused the professor to so enthusiastically support him before.

54. After waiting for and encouraging any showing to the contrary by Professor Epstein for approximately one month, Plaintiff became forced to accept that he had been betrayed and kicked while already down by someone he had revered for so long and who had been such a profound teacher, causing immense emotional distress far in excess of the broad effects of the other wrongs committed against Plaintiff by Defendants. On or about September 28th 2022, Plaintiff raised the issue with Professor Epstein in his office at the New York University School of Law and it became clear to Plaintiff that Professor Epstein would not admit to any wrongdoing or mistake in this matter. Plaintiff then told Professor Epstein that even if he will teach for many years to come he will not have another student like the Plaintiff, that because of his moral failure he does not deserve to have Plaintiff as a student, and that he betrayed his most devoted and innocent student to protect the image of his own legacy in a manner that would probably backfire.

55. Upon hearing this, Professor Epstein became extremely agitated, and uncharacteristically screamed at the Plaintiff to get out of his office. As Plaintiff was leaving Professor Epstein told Plaintiff that he has no idea what betrayal is and was shameless, to which the Plaintiff responded that on account of the age and health of Professor Epstein, Plaintiff had been very restrained in waiting approximately one month for him to do the right thing on his own while being provided with ample opportunities to do so, especially in light of how he is the author of a Torts casebook that covers defamation. This was the first and only time that Plaintiff ever heard Professor Epstein scream in anger.

56. Subsequently, Plaintiff would avoid and hardly ever speak to Professor Epstein except in unavoidable circumstances when a simple greeting was expected such when meeting in close proximity at a speaker event. Professor Epstein would occasionally glare at Plaintiff with an uncharacteristic, piercing look of intense hate, such as when Plaintiff was seated roughly across from Professor Epstein at a speaker event on or about November 17. 2022 at the law school. Plaintiff noticed this glare from the corner of his eye and was deeply unsettled to see it linger for several seconds even after he had turned to look directly at Professor Epstein. Plaintiff received further long and unsettling glare a few other times at speaker events also attended by the professor, when he was engaged in positive social interactions with other people while ignoring Professor Epstein for the duration of a particular event.

57. Had Plaintiff received such hateful and intense glares from a younger man he may have feared imminent physical attack, and if from a man capable of or inclined to malice, which Plaintiff believes that Professor Epstein is not, he may have feared a vendetta of some kind. Plaintiff had never seen Professor Epstein look at anyone else with such hate, although he did come approximately halfway in the case of a speaker who was defending the morality and constitutionality of the contemporary federal administrative state.

58. The next time that Plaintiff communicated with Professor Epstein, well after the conclusion of the fall term, on or about February 3, 2023, was to wish him in writing a good outcome on a major surgery he was about to undergo, and did not receive a response. Plaintiff next saw and briefly spoke with Professor Epstein at the Journal of Law and Liberty Symposium on February 8, 2023 in order to express support for him before his imminent surgery. During the dinner hosted after the symposium, Plaintiff

Page **10** of 17

was seated in a table adjacent to that of Professor Epstein, and upon the return of Professor Epstein from the speaking platform at the front of the room, noticed that his chair, which was of a folding type that did not provide support unless it was fully locked open, was not so locked open, apparently since when he rose from his seat previously to speak. Plaintiff then locked open the chair for Professor Epstein, who had not noticed this, in order to avert his injury. Professor Epstein then loudly announced in the presence of approximately twenty students affiliated with the journal, several distinguished law professors from New York University and elsewhere, and two federal court of appeals judges, that that was all Plaintiff was good for. At the conclusion of the dinner, guests either left the group or moved together to socialize at a nearby bar which had a floor reserved for the symposium crowd. Plaintiff was joining the group heading to the bar when he saw Professor Epstein alone in the hallway of the law school, and asked him if he was going to join the group, and Professor Epstein responded that he was going home. Plaintiff then offered to walk with him to the subway on account of it being very late, and then set out with him. There was a feeling that it was time to let bygones be bygones, especially considering the imminent surgery and that Plaintiff would be completing law school in a few months, and the past was not spoken of.

59. Subsequently, Plaintiff would attempt to review his Property exam with Professor Epstein for four months and would continuously be ignored in this matter after repeatedly attempting to contact both of Professor Epstein"s assistants and him personally regarding the exam. Eventually the request was partially granted when Plaintiff was given the raw text of his submission without any grading markings and a few top-scoring exams to compare with.

60.Plaintiff believes that his numbered exam was identified by his distinctive writing style and frequent citations of Professor Epstein"s own works and theories and marked down far beneath the grade deserved. Plaintiff has read Professor Epstein"s major works cover to cover as well as every Supreme Court or appellate brief signed by Professor Epstein that is in the public record. Upon information and belief, Professor Epstein often bases exam questions on cases he has litigated himself or filed amicus briefs for both intentionally in some cases and unconsciously in others. Plaintiff developed the ability to resolve these questions by relating the law generally and the legal briefs of Professor Epstein to his more theoretical writings in books and law review articles on the same topics, while providing Plaintiff"s own analysis and critiques of the law and scholarship of Professor Epstein as original contributions derived from his contemplation of the former materials.

61. Although still being ignored on the matter of the Property exam at that time, Plaintiff wished in writing for Professor Epstein to have a happy birthday on or about April 10, 2023, and was pleased to subsequently be invited to the celebration of his 80th at the Yale Club of Manhattan on or about April 13, 2023, organized as a conference on classical liberalism with ten speakers on two panels and designated speaking slots after each panel for Professor Epstein to comment on the panels. There was no hostility or glaring during the combined birthday party and law conference.

62. The events which transpired as described in 48-61 *infra* have led to significant emotional distress and suffering for the Plaintiff including by causing him to have deep concerns that even if he were able to someday have an academic career fractionally as successful as Professor Epstein or otherwise rise significantly in the world, that something, perhaps a selfish concern with prestige, legacy accumulating after tenure or material comfort, would cause him to have an equivalent moral failure of betraying a

Page **11** of 17

loyal and innocent student such as Plaintiff. Plaintiff believes that when much is given, much is required, and witnessing such an action by someone so revered turned his understanding of the moral order of the world upside down.

63. Plaintiff lives according to and is motivated by moral code which could be described as stoic and he places honesty, integrity and loyalty in the pursuit for greater justice according to natural law above material reward or punishment, and due to these convictions, suffered severe emotional distress from witnessing Professor Epstein, an otherwise moral and exemplary man who benefits from tenure and great wealth suffer such a profound moral failure, resulting from the machinations of Defendants in this matter, "rise above principle", a phrase he often uses, to betray and kick a man who was already down.

64. Plaintiff also suffered severe emotional distress on account of the events which transpired described in 48-61 *infra* leading to a crisis of faith and cultural identity for Plaintiff. Specifically, this occurred due to the shock experienced in witnessing Professor Epstein, a Jewish man born during the Holocaust, who upon information and belief overcame anti-Semitic quotas, was fortunate enough to attend the finest universities in the world such as Columbia, Oxford and Yale and was invited to join the legal academy immediately after law school, discard, betray and denigrate a young man who was so devoted to him and who he knew to be innocent as described in 48 *infra*.

# COUNT I

## DEFAMATION AND DEFAMATION BY IMPLICATION

65. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

66. Defendants published the forged document and subsequent statements, as alleged herein.

67. The forged document and subsequent statements contain false assertions or implications of fact, including the false statements and implications set forth above.

68. Defendants acted without any privilege or authorization when they published the forged document or subsequent statements.

69. As a consequence of the forged document and subsequent statements relating to the former employment, he has also suffered special damages as further set forth below.

70. The defamatory acts described herein have caused special damage to Plaintiff, and continue to do so, in that he has suffered and continues to suffer loss of economic opportunities as well as loss of reputation in an amount to be proven at trial.

71. In addition to the foregoing, Plaintiff has suffered, and will continue to suffer, mental pain and anguish, emotional distress, harassment, anxiety, embarrassment and humiliation in an amount to be proven at trial.

72. Defendants acted with actual malice and a criminal state of mind consisting of the intent to harm Plaintiff professionally through, among other things, forging and publishing the forged document and subsequent statements which falsely claimed that Plaintiff was fired for sexual harassment or misconduct.

73. Alternatively, Defendants' forged document and their subsequent statements were made with the knowledge that the statements were false or with reckless disregard as to their truth or falsity, and for the purpose of defaming Plaintiff. To wit, Defendants knew that the forged document was inauthentic because they forged it, and that their subsequent statements were false because Defendants knew or should have known of the true state of affairs relating to Plaintiff.

74. This count is alleged under the Laws of the State of New York.

Page **13** of 17

## COUNT II

## DEFAMATION PER SE

75. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

76. Defendants published the forged document and published subsequent statements thereafter as set forth above.

77. Defendants acted without any privilege or authorization when they published the forged document and subsequent statements.

78. The forged document and subsequent statements contain false assertions of fact that Plaintiff was fired for sexual harassment or misconduct, which are serious crimes and would tend to injure him in his trade or profession, including the false statements set out above.

79. Defendants made the statements with malice, with knowledge that the statements were false or with reckless disregard as to their truth or falsity, and for the purpose of defaming Plaintiff. To wit, Defendants knew that the forged document was inauthentic because they forged it, and that their subsequent statements were false because Defendants knew or should have known of the true state of affairs relating to Plaintiff.

80. The forged document and subsequent statements constitute defamation *per se* because the Statement: (i) falsely charges Plaintiff with committing illegal acts constituting a serious crime, or serious sexual misconduct; (ii) contains allegations that would tend to injure Plaintiff in his trade, business, profession or office; (iii) contain allegations by implication from the language employed such that the reader would understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter, and (iv) by natural consequence would cause Plaintiff damages.

81. Defendants published the forged document and subsequent statements willfully and maliciously with the intent to harm Plaintiff.

82. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer loss of economic opportunities, scorn, derision, harassment, emotional distress, anxiety as well as loss of reputation in an amount to be proven at trial.

83. This count is alleged under the Laws of the State of New York.

# COUNT III

## INVASION OF PRIVACY/FALSE LIGHT

84. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

85. Plaintiff is a private person, who during all relevant periods to this action, lived as a lawfully admitted nonresident alien in New Jersey and under the protection of the Laws of New Jersey.

86. The digressions from the primary defamations resulting in Counts I & II of this complaint into personal and intimate details of Plaintiff's life as set forth above, particularly as described in 16 *infra*, as part of the exposé-style defamatory publications about him, which whether they are or are not defamatory or defamatory *per se*, whether they are true or false, invade the privacy of the Plaintiff and place him under a false light before the world.

87. Defendants intentionally invaded and intruded upon Plaintiffs privacy, solitude and seclusion by publishing the forged document and statements that portray Plaintiff under a false light.

88. Defendants knowingly disregarded the truth or falsity of the publicized matter and the false light it would place upon Plaintiff.

89. Defendants conduct in publishing the forged document and statements was offensive and outrageous, and would be viewed as highly offensive to a reasonable person.

90. The harm alleged from the tort of invasion of privacy and false light is different in kind and extent, and represents a separate amount of harm from that alleged in Counts I & II.

91. Defendants acted without any privilege or authorization when they published meticulously researched private and intimate details about Plaintiff and his affairs.

92. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer loss of economic opportunities, scorn, derision, harassment, emotional distress, anxiety as well as loss of reputation in an amount to be proven at trial.

93. This count is alleged under the Laws of the State of New Jersey.

Page **15** of 17

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

95. Defendants knowingly and intentionally orchestrated the events as described herein to cause plaintiff emotional distress in a manner that would shock the reasonable person and the public.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants and award the following relief to Plaintiff:

A. Presumed, actual, special and/or compensatory damages of seven million dollars for economic loss and an amount to be proven at trial for non-economic losses and harms;

B. Punitive damages;

C. The costs, disbursements and expenses of this action;

D. Pre- and post-judgment interest on the sum of any presumed, actual, special or compensatory damages; and

E. Such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Gideon Rapaport, demands trial by jury in this action of all issues so triable.

Respectfully submitted,

/s/ Gideon Rapaport
*Pro se*
45 River Drive S #2308, Jersey City, NJ 07310
GideonRapaportLaw@outlook.com
                     -
July 28, 2023

Page **16** of 17

# APPENDIX A

## COVENANT AND RELEASE

Gideon Rapaport, the undersigned person and Plaintiff in this case, enters into a covenant, with this court and in general, that he will not bring before this court, or in any court, tribunal or similar body, in any jurisdiction anywhere in the world, any claim which may have arisen on or before July 28, 2023 against Kirkland & Ellis LLP. This includes any claim or suit under a respondeat superior, vicarious liability, or any other theory of employer liability for the conduct of employees.

Gideon Rapaport, the undersigned person and Plaintiff in this case, releases Kirkland & Ellis LLP from any and all liability for any conduct, whether intentional or not or, and from any obligation to him that may exist as of July 28, 2023.

The above covenant and release are severable from each other, both given and meant to remain in effect should the other for any reason be invalid or improper.

/s/ Gideon Rapaport
*Pro se*
45 River Drive S #2308, Jersey City, NJ 07310
GideonRapaportLaw@outlook.com
-
July 28, 2023

Page **17** of 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
GIDEON RAPAPORT,

                plaintiff,

      -against-

AJAY SRINIVASAN IYER,
ZACHARY GEORGE GARRETT
MITCHELL KEVALLA PALLAKI, and
RICHARD ALLEN EPSTEIN,

                Defendants.
-------------------------------------------------------x

**SECOND AMENDED COMPLAINT**

Case No. 23-cv-6709 (JGLC)

**Plaintiff demands trial by jury**

**of all claims so triable.**

Plaintiff Gideon Rapaport, *pro se*, for his Second Amended Complaint, alleges as follows:

## THE PARTIES

1. Plaintiff Gideon Rapaport is a former employee of the law firm of Kirkland & Ellis LLP, and a graduate the New York University School of Law. He is a citizen of Canada, and was lawfully admitted to the United States at the time of the filing of the original complaint as a nonresident alien, and that is his current status as well.

2. Defendant Ajay Srinivasan Iyer is a former employee of Kirkland & Ellis LLP, and a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2021/2022. He is a resident of the City and State of New York and is a U.S. citizen.

3. Defendant Ajay Srinivasan Iyer is, on information and belief, presently an associate of the law firm Kirkland & Ellis in Washington D.C., and a member of the bar of the State of New York.

4. Defendant Zachary George Garrett is a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2022/2023.

1

5. Defendant Garrett is, on information and belief, currently a judicial law clerk for Judge Carlos Bea of the U. S. Court of Appeals for the Ninth Circuit.

6. Defendant Mitchell Kevalla Pallaki, is a graduate of the New York University School of Law, where he served on the board of the Federalist Society chapter for the academic years of 2020/2021 and 2021/2022 as Treasurer, and is a U.S. citizen.

7. Defendant Pallaki is, on information and belief, presently a judicial law clerk for Judge Douglas R. Cole in the U.S. District Court for the Southern District of Ohio, and a member of the bar of the State of Ohio.

8. Defendant Richard Allen Epstein is a professor of law at the New York University School of Law, where he also serves as the faculty advisor to the Federalist Society chapter.

9. On information and belief, defendant Epstein is a resident of the City and State of New York and is a U.S. citizen. On information and belief, defendant Epstein is a member of the bar of the State of California.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction over this action pursuant to 28 U.S. C. § 1332 because the parties are a nonresident alien and United States Citizens, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11. This Court has personal jurisdiction over the defendants because they are either domiciled in the State of New York, or have transacted business within the State of New York during the course of their presence, education and employment in the state, or have committed non-defamatory tortious acts in New York within the meaning of NY CPLR 302(2) and (3).

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

2

## INTRODUCTION

13.  The gravamen of this action is a series of actions by defendants Iyer, Pallaki and Garrett which consisted of the repeated of originating and spreading vicious, false and career-ending defamatory statements. The statements were of and concerning the plaintiff, and these defendants forged digitally manipulated images containing plaintiff's name and face, and false words about him, meant to appear as coming from his former employer, the law firm Kirkland & Ellis LLP.

14.  These actions represent the most significant act in a long train of abuses and attempts at career sabotage aimed at the plaintiff from a group of students who have controlled the New York University Chapter of the Federalist Society. These students have used control over this organization to sabotage competition by other students and monopolize the significant resources and connections of defendant Epstein to the detriment of many other students.

15.  Defendant Epstein is a defendant based upon his actions in supporting and repeating the defamatory statements of defendants Iyer, Pallaki and Garrett, and because of his actions in preventing plaintiff from commencing a promised–and definite– federal appellate clerkship, and possibly one with the U.S. Supreme Court. Defendant Epstein covered up for these defendants, and ratified the long train of abuses they and their associates wrought upon the plaintiff over multiple years leading up to the most significant set of actions that give rise to this action.

16.  As a direct result of these false and defamatory statements and actions, plaintiff has not yet sought admission to the New York bar, despite having passed the bar examination, due to his fear of the adverse effect of these statements upon the Committee on Character and Fitness. He brings this action to clear his name so that he can pursue his chosen career.

17.  These digitally manipulated faked images of plaintiff were created by defendants Iyer and Garrett. Copies are attached as Exhibits 1 and 2.

3

18. There is also a letter which defendant Garrett compiled from some pseudonymous onlineposts by defendant Iyer, and sent to the Federalist Society. A copy of the letter is attached as Exhibit 3.

19. Defendants Iyer and Garrett, at the front of the initially three-party conspiracy, convinced defendant Richard Epstein into believing the authenticity of the faked images and veracity of the defamatory claims, and attempted to convince many others in the Federalist Society, and the world at large.

20. Defendant Epstein then joined with defendants Iyer and Garrett, and provided his approval, assistance and authority in achieving their aims of generally destroying the career and future of the plaintiff, as well as his relationship with the Federalist Society. Upon information and belief, he was and may still be unaware of the involvement of defendant Pallaki in the conspiracy, as he may have only interacted with defendants Iyer and Garrett in relation to it.

21. Defendant Epstein has a reputation in the legal community of being an important source of recommendations of law students for clerkships in Federal District Courts, Courts of Appeals and the United States Supreme Court.

22. This reputation is well deserved, as defendant Epstein publicly claims to and does in fact send approximately four clerks to the Supreme Court of the United States every year, representing four out of thirty-six positions, or one ninth. Upon information and belief, he is involved in placing approximately one hundred people every year in clerkships with the district and circuit courts that he sources from the New York University and University of Chicago law schools, the Hoover Institute, the Classical Liberalism Institute and many other organizations that he is involved with.

23. The defendants' forgeries and defamatory statements were initially discredited by

4

Kirkland & Ellis, and its Director of Human Resources, Steven Goldblatt, and the plaintiff was then allowed to attend a summer program at the James Kent Academy, although he was differentially treated afterwards and was the only fellow excluded from any follow-up activities.

24.  Defendants Iyer and Garrett continued their campaign to destroy plaintiff's reputation and status with Kirkland & Ellis, the Federalist Society and defendant Epstein.

25.  As current students, defendants Iyer and Garrett prepared and submitted a false complaint about plaintiff to New York University Law School. But the complaint was so inherently incredible that it was rejected out of hand and not even formally investigated.

26.  The Dean of the Law School, Troy McKenzie, became aware of these defamations and actions of the defendants, and their falsity, and became involved to ensure that no abuse of process would occur, and add further injury to the plaintiff as the defendants intended with their false complaint to the law school.

27.  Prior to the incidents alleged herein, defendant Epstein had taken an exceptionally positive interest in assisting plaintiff with his career, and had agreed to undertake his best efforts to secure a clerkship for him. Defendant Epstein had asked the plaintiff to draw up a ranked list of the "feeder" judges he was most interested in clerking for after law school, in contemplation that defendant Epstein would be able to pair a first clerkship from that list with a United States Supreme Court Clerkship to follow.

28.  However, after the defamations and tortious actions of the other defendants, defendant Epstein later joined and acted in concert with them, and took fraudulent and deceptive actions to prevent the plaintiff from learning the truth –and legal significance– about the transactions, occurrences and events herein described.

29.  On information and belief, defendant Epstein took those actions to protect himself and

5

students whom he had already recommended for prestigious positions, and who were presidents of the law school Federalist Society chapter he was responsible for. He thus had an interest in concealing their actions, since it would have called into question his judgment in recommending them. He had in fact recommended defendant Iyer to the Supreme Court of Alabama, defendants Garrett and Pallaki to the same United States Ninth Circuit Court of Appeals judge.

30. All four defendants have individually repeated the defamatory statements on several occasions after they were disproved, and prior to the commencement of this case on July 28th, 2023.

31. Moreover defendant Epstein has continuously tortiously interfered with plaintiff's legal employment prospects, as recently as March 2024.

32. Although he no longer repeats the defamatory statements originally made, he has sought to discourage potential employers from considering plaintiff by means that are not as obviously defamatory.

33. The defendants' actions have been all too successful. The plaintiff lost one paid position with the America Fund, and a position with the Manhattan Institute was withdrawn after he had accepted it. Considering the vile nature and massive scale of the defamations, he has struggled to find other work.

34. The following paragraphs set forth the background facts in more detail.

6

**BACKGROUND FACTS**

The Summer of 2022 Defamation

35.  On or about July 15, 2022, defendant Garrett organized a last-minute get-together for members of the NYU Law Federalist Society. During a discussion about plans after summer jobs, which typically end in July, the plaintiff shared with defendants Iyer and Garrett that he would attend the James Kent Academy in early August.

36.  It was shortly after this time that these defendants began their plan to destroy the life and end the career of the plaintiff by defamation and forgery. Defendants Iyer and Garrett involved defendant Pallaki due to his seniority over them, relative degree of success with prior defamations against the plaintiff, and intense personal animus against the plaintiff, which arose for both personal and professional reasons in the academic year of 2020/2021, as described *infra* ¶ 116.

37.  These three defendants had come to believe that plaintiff was going to be the law student from NYU whom defendant Epstein would recommend for a clerkship at the U.S. Supreme Court for the 2024/2025 term, and were determined to ensure he would not occupy the only slot that defendant Epstein allocates to NYU. This was a slot that they were all competing for, even defendant Pallaki, because although having already recently graduated, defendant Pallaki did not succeed in obtaining a clerkship at the United States Supreme Court as his second clerkship, and hoped to succeed in doing so for his third clerkship, as many others do.

38.  The seniority of defendant Pallaki over defendants Iyer and Garrett arises not only from preceding them by one year in law school, but also from his position in and control over the NYU chapter of the Federalist Society. He used this power to make defendant Iyer the nominal president for the academic year of 2021/2022, even as he sent himself to the Student Leadership Conference

7

normally reserved for incoming presidents instead of defendant Iyer. Defendant Pallaki rewarded defendant Garrett for doing his dirty work by arranging a clerkship for defendant Garrett, relatively late in the process, with his judge at the Ninth Circuit after defendant Garrett did not succeed elsewhere.

39. Plaintiff had not told anyone besides his immediate family members about his acceptance to the James Kent Academy although it was listed on his resume, to which defendant Iyer and Defendant Garrett did not have access.

40. On July 28, 2022, defendant Iyer surreptitiously photographed a guard desk at the lobby of 601 Lexington Avenue (the address of Kirkland & Ellis) (Exhibit 1). He then used digital image manipulation software to erase the actual contents of a page posted at that desk and replace them with a picture of the plaintiff's face, and the text:

DO NOT ADMIT
GIDEON RAPAPORT
KIRKLAND AND ELLIS

41. The fake image thus created the false and defamatory implication that plaintiff had been barred from entry for some kind of misconduct.

42. This false image was then posted online by defendant Iyer on two internet sites, Reddit.com and Top-Law-Schools.com.

43. The postings were accompanied by false and defamatory statements that the plaintiff was fired for sexual harassment, was banned from the building and was accompanied by a significant amount of material about his personality, habits, mannerisms, modes of dress and pastimes. A copy of the accompanying statements is annexed as Exhibit 3.

44. The text of the posts accompanying the forgery also mentioned plaintiff's political, ideological and jurisprudential beliefs.

8

45.   The publication of the forgery and defamatory claims were intended to coincide with the presence of defendant Garrett at the Federalist Society Student Leadership Conference for incoming law school chapter presidents, hosted from July 29 to 31,  2022.

46.  This fake photograph was of poor quality, as may be seen by the lack of wrinkles on the photographic image. As may be seen, there are no wrinkles whatsoever on the plaintiff's image, although the image on the rest of the page is thoroughly wrinkled. The wrinkles end entirely where the rectangular image file of the plaintiff digitally inserted begins.

47.  On or about July 29, 2022, defendant Garrett presented the online materials, created and posted pseudonymously by defendant Iyer, to Peter Redpath and Kate Alcantara, the Director and Deputy Directors of the Student Division respectively.

48.  It was obvious to both of them (Redpath and Alcantara) that the image was a faked image created by digital manipulation techniques, although there remained for them the question of whether the false statement that plaintiff was fired for sexual harassment was true or not.

49.  Mr.  Redpath  and  Ms.  Alcantara  were  very  well  aware  of  the  long  history  of mistreatment of the plaintiff by the students in control of the NYU chapter, and the long litany of defamations and falsehoods previously perpetrated against him by them.

50.  Defendant Pallaki in particular, who this time did not serve as the face or communicator of the defamations as he had in the past, even tried in 2021 to deceive the Student Division of the Federalist Society into believing that the plaintiff no longer attended NYU because he transferred to the Northwestern University Law School, and was older than 30, thus making him ineligible for the greater investment dedicated towards students at T6 law schools, and less preferred due to being a mature student. Even now, years later, the plaintiff has not reached 30.

51.  Because of their knowledge of the characters involved at the NYU chapter, Mr. Redpath

9

and Ms. Alcantara subjected these claims to higher level of scrutiny, and refused to get involved, despite repeated and desperate attempts to involve them as shown in Exhibit 3.

52. At about this time, defendants Garrett and also presented the fake image and defamatory statements to defendant Epstein, thus defaming plaintiff to Epstein. This caused Epstein concern about his own credibility, because of his having previously recommended plaintiff.

53. Thereafter, because the Exhibit 1 image was suspected of being a fake by those who saw it, defendant Iyer apparently determined to make another image, and removed the first image from the internet so as to prevent comparison between the two.

54. On information and belief, at some point during the late night hours of July 29, 2022 or in the early hours of July 30, 2022, defendant Iyer returned to the scene of his first malfeasance and took a closer-up and higher resolution photograph of the guard desk at 601 Lexington Avenue.

55. He then proceeded to produce his second forgery using digital image manipulation techniques that were more technically sophisticated. This second forgery (Exhibit 2) was apparently intended and designed to address the initial concerns raised by the Student Division of the Federalist Society about the first one.

56. On this second forgery, images of wrinkles on the paper are clearly visible on that portion featuring an image of the plaintiff. Still, the technical quality of the forgery is far from perfect, because it is obvious that the letters, such as the "G" of "Gideon" are not affected by the severe unevenness of the physical page they are supposedly printed on, and cut sharp corners and perfect curves.

57. Defendant Iyer then sent the second fake image to defendants Garrett and Epstein, and both students continued attempting to persuade the latter to become an unwitting instrument of their civil conspiracy.

58.  The defendants' next act in furtherance of their civil conspiracy was a telephone call from defendant Garrett to the plaintiff.

59.  On or about July 29, 2022, perhaps at the prompting of defendant Epstein or the Student Division of the Federalist Society, defendant Garrett called the plaintiff and started a discussion about a variety of topics including work and legal careers. He never said anything about the fake images posted online, or the accompanying allegations, and plaintiff was not aware of them at that time.

60.  During their twenty-minute conversation, defendant Garrett expressed some dissatisfaction with his placement and work at the Pillsbury firm, which plaintiff had not previously known about. plaintiff attempted to console him, suggesting that working at any large law firm was more similar than different, regardless of the firm's ranking. plaintiff further suggested that he (Garrett) would have opportunities afterward, because defendant Epstein would probably be able to recommend him for a clerkship.

61.  On August 2, 2022, defendant Garrett sent the email attached as Exhibit 3 to Mr. Redpath and Ms. Alcantara. In that email he made two false and defamatory statements.

62.  The first one was that plaintiff was fired for sexual harassment. Defendant Garrett says, "As I mentioned to you over the weekend, my understanding is that Gideon Rapaport was fired from his summer associate position at Kirkland & Ellis NY last week for sexually harassing a practice assistant or an attorney."

63.  The second false and defamatory statement was that the plaintiff was fired and banned from the building. He said "I do know that Gideon was fired and banned from entering the building. Please see the attached photo ('Security Desk Photo') taken by Ajay Iyer at Kirkland & Ellis's New York location at 601 Lexington Avenue on Thursday, June 28th [sic; it was July], where Ajay

11

worked with Gideon this summer."

64.  In fact, plaintiff was not fired from the firm for sexual harassment, and was never banned from entering the building.

65.  The faked image itself, was a third defamation due to its inherently defamatory meaning conveyed to any reasonable person as a result of its text and context.

66. The August 2, 2022 email was the second attempt to involve the Student Division, which again rejected the authenticity of the forgery and veracity of the claims.

67.  By this time defendant Epstein had chosen to join with defendants Iyer and Garrett, and he was mentioned in it as a collaborator.

68.  The email says, "[a]fter getting back from the conference, I spoke with Richard Epstein about this situation. He's understandably very upset by the news and feels that Lee Otis should be made aware, since Gideon is going to be participating in the James Kent Fellowship, for which Professor Epstein wrote Gideon a (complicated) letter of recommendation."

69.  Mr. Redpath and Ms. Alcantara of the Student Division of the Federalist Society thus saw through these forgeries and defamatory claims, and refused to participate in the character assassination campaign of defendants Iyer, Pallaki and Garrett.

70.  But defendant Epstein, because he did not care about truth or falsity, rather only about reputational optics, signed on to the campaign. After all, he was and remains a successful recommender of law students for judicial clerkships throughout the Federal Courts, including the U.S. Supreme Court.

71.  Defendant Epstein forwarded the defamatory statements based upon the fake photographs and in the email to Lee Otis. Defendant Epstein did not at any time prior to doing so contact either the plaintiff or Kirkland & Ellis to find out whether the allegations were true or false.

72. On or about August 2, 2022, upon receiving the second fake photo and defamatory claims from defendant Epstein, Lee Otis began investigating. On information and belief, she had a long telephone phone call with defendant Iyer, where the latter lied, saying that he knew that the plaintiff was fired for sexual harassment and that the second forgery was a picture he had taken himself in the lobby of Kirkland & Ellis at 601 Lexington Avenue.

73. In the evening of August 2, 2022, one day before the beginning of the Fellowship, Lee Otis had a telephone conversation with the plaintiff. During this conversation, plaintiff learned of these online posts, fake photographs and defamatory statements for the first time.

74. He was understandably shocked and dismayed at learning of them. Over the course of the call, plaintiff denied the false allegations, and persuaded Lee Otis to check with the firm regarding their falsity.

75. Plaintiff then authorized Kirkland & Ellis's Director of Human Resources, Steven Goldblatt, to disclose any information about him in the firm's employment records.

76. Following his receiving that authorization, Mr. Goldblatt informed Ms. Otis that there was absolutely no truth to the statements that plaintiff was fired for sexual harassment or banned from the premises of 601 Lexington Avenue.

77. Mr. Goldblatt further told Ms. Otis that such a poster would never have been created or displayed by the firm, and that to best of his knowledge no such poster was ever displayed in the lobby of 601 Lexington Avenue, or anywhere else on the premises.

78. On or about August 9, 2022, after the conclusion of plaintiff's time at the James Kent Academy, defendant Epstein called the plaintiff and engaged in an uninterrupted and prepared monologue.

79. Defendant Epstein told plaintiff that his (plaintiff's) career was destroyed, that he will

not become a clerk, that he will be removed from his upcoming position as Senior Articles Editor of the New York University Journal of Law and Liberty (for which defendant Epstein is the faculty sponsor), and that he will not associate with the plaintiff anymore, in order to protect his own reputation and his ability to recommend and place students in the future. Defendant Epstein explicitly told the plaintiff that he will not be awarded a Bradley Fellowship, worth at least $5,000 which he had already applied for and informed he would receive, despite presenting an excellent vision statement that defendant Epstein rated among the best he had seen.

80. Defendant Epstein's defamations and tortious interference directed towards the Bradley Foundation would injure the plaintiff again in the Summer of 2023. Despite performing an entire summer of *pro bono* work at a top state policy think tank and being allocated by it its Bradley Foundation stipend of between $10,000 and $15,000 to help him cover his expenses, an order came from the top of the foundation to prevent the plaintiff from receiving anything. This was the first time any such thing had happened to that state policy think tank, whose managers sympathized with the plaintiff, who was not himself surprised.

81. Defendant Epstein's remark were not limited to the matter of his recommendation or allocation of a Bradley fellowship, and were in fact declarations with broad and general effect, which he made good on by actively crushing the plaintiff's career prospects by making sure that word of his condemnation of the plaintiff, who was innocent of any wrongdoing, would travel far and wide.

82. Thus, after years of concerted effort, defendants Iyer, Pallaki and Garrett finally succeeded in destroying the formerly excellent relationship which plaintiff had enjoyed with his favorite professor, while at the same time benefiting themselves from his recommendations and their status with the Federalist Society.

83. During the telephone call, defendant Epstein chose to address the transactions and occurrences which are described in the initial *pro se* complaint in ¶ 48.

84. He talked at length about the extent of harm which was to befall the plaintiff, and lied about his participation in the transactions and occurrences which gave rise to this action. He also inspired fear in the plaintiff by telling him that due a false and baseless complaint filed against him, somehow related to Title IX, he was almost expelled from law school. Defendant Epstein claimed that only the private involvement of the Dean of the Law School, Troy McKenzie, stopped an abusive and unjust Title IX "kangaroo court".

85. In so doing, he attempted to cover up by fraud and deceit the tortious actions of himself and his students, defendants Iyer, Pallaki and Garrett, not only in order to avoid legal liability, but also to protect his own reputation.

86. Obviously, a public revelation about the defamation and fakery, perpetrated by students whom he had successfully recommended to prestigious clerkships at the U. S. Court of Appeal for the Ninth Circuit, and the Supreme Court of Alabama, would reflect poorly on him.

87. This was just one of the overt acts by which he participated in the civil conspiracy with the co-defendants, to defame plaintiff and destroy his reputation and career prospects.

88. During his long and uninterrupted monologue, defendant Epstein deceived the plaintiff by engaging in multiple material lies, including by omission, that were intended to and did actually result in plaintiff's mistaken beliefs and ignorance of the true facts, upon which plaintiff relied, to his significant detriment.

89. For example, defendant Epstein specifically lied about not knowing which members of the New York University Federalist Society Chapter sent the defamatory statements and fakes to the Federalist Society, the manner by which he himself learned about the defamatory statements and

15

fakes, and his own role in sending these materials himself and instructing others to do so.

90. On July 28, 2023, defendant Epstein invited plaintiff to lunch. At that time, plaintiff showed him a copy of the original complaint which he had intended to file that day in this action, and asked him if he had any corrections or additions to it.

91. This was the original *pro se* John Doe complaint, in which plaintiff was completely ignorant of the identities of the defendants, including defendant Epstein. Thus, while he knew full well what had happened to him, he had no idea who was responsible.

92. Defendant Epstein did not offer a single correction or addition, despite knowing full well of the tortious actions, false statements, and the two fake photographs perpetrated by defendants Iyer and Garrett, as well as his own tortious actions.

93. Defendant Epstein stated that he did not want to be involved in any way, but the plaintiff told him that it was too late, because he was a key witness and so much of the measure of the damages revolves around him. Defendant Epstein reaffirmed that he would not offer any information. After this the two left the restaurant and began walking towards defendant Epstein's subway station.

94. Although he did not offer any correction or addition to the original complaint, defendant Epstein could not resist commenting on the overall situation, and told the plaintiff in a self-satisfied manner that because he could not serve John Does, the case would automatically be dismissed within 120 days [the rule that used to require service within 120 days has been amended to require 90]. The plaintiff then humorously told him that whoever taught him civil procedure should be fired, because it was not so simple.

95. On the way to the subway stop, the plaintiff, who was quite familiar with the academic theories and works of defendant Epstein, told him that despite careful study, he could not understand

16

his moral theory or conduct. Specifically his contradictory utilitarian and deontological natural law positions. Defendant Epstein enthusiastically referred the plaintiff to his 1989 article *The Utilitarian Foundations of Natural Law*, which the plaintiff had already read and responded with a brief critique. Defendant Epstein then told the plaintiff was referring to "basic matters", and that in such matters he was taught by his parents some decades ago to "tell the truth and be kind to those are weaker than me".

96.  The plaintiff then asked defendant Epstein whether he had told the truth and been kind to those weaker than him in the matter contemplated by the draft complaint. Defendant Epstein was conspicuously silent and did not speak for the length of two Manhattan short blocks after which he abruptly announced that he remembered had to go to the bank and turned into a branch.

97.  On August 9, 2022, plaintiff pressed defendant Epstein again by email. He responded by admitting that he had sent the compiled materials to Otis, and warned plaintiff not to pursue the matter further, because it would be a mistake, and that plaintiff would not "get a second chance" from anyone.

98.  It was only after plaintiff filed his complaint, and enforced the subpoenas which the Court had issued, at a cost of $510 paid to process servers, that he was able to learn the identities of the John Does who had been the original defendants, and realized how defendants had betrayed his trust and confidence in them.

99. As a result of defendant Epstein's deceit and fraud, justice was significantly delayed, and could have been permanently obstructed if expedited discovery had not been granted, thanks to which plaintiff was then able to learn the true identities of the defendants.

100.   Since the transactions and occurrences which gave rise to this action, and continuously after the commencement of this action until now, defendant Epstein has tortiously interfered with the

attempts of the plaintiff to obtain and retain employment relating to the law.

101.   After the commencement of this action, for example, defendant Epstein would enthusiastically tell others that plaintiff was frequently absent from his classes, and described him as delinquent, unreliable and untrustworthy. The plaintiff had perfect attendance in defendant Epstein's classes, prior to being betrayed by him; only thereafter was he occasionally absent.

102.   Defendant Epstein also made these remarks to small crowd of people at an exclusive Christmas party conspicuously attended by the right-of-center political, media and intellectual elites of New York. This particular private Christmas party is hosted annually by an eminent and wealthy New York family, and defendant Epstein chose to make the plaintiff a topic of disparaging discussion in both the 2022 and 2023 instances. This was witnessed by a close personal friend of the plaintiff who attended both years, and who confirmed the presence of the ultimate decision maker at the plaintiff's place of first employment that he lost as a result of defendant Epstein's interference both times. The plaintiff also heard about these comments through work prior to being terminated, but he did not discuss defendant Epstein's comments or their context due to this pending litigation.

103.   Defendant Epstein denied the plaintiff the ability to earn a living once again when he demanded that the Manhattan Institute assign the project that the plaintiff was hired to work on to him as assisted by one of his research assistants from one of the organizations that supply him with them, and not take on the plaintiff despite already extending him an offer. Defendant Epstein's demand was one made from a position of power, because he influences significant amounts of funding, recommends talent to the Manhattan Institute and also recommends *from* the Manhattan Institute through his various initiatives to clerkships and other positions.

104.   Defendant Epstein presented the research on the topic that the plaintiff was specifically hired for instead of the plaintiff publicly and also provided more private materials to the Manhattan

Institute as part of the engagement. This also included a video lecture on the subject with a question and answer period that was removed from the internet after the filing of the First Amended Complaint.

<u>Defendant Epstein's Persuasion of the Plaintiff to Pursue a Clerkship and Remain at NYU for 2022/2023</u>

105.   As the result of continued hostility, defamation and sabotage from the students in control of the NYU chapter, and fearing that a major move would be made against him in the third year (as occurred in the Summer of 2022, leading to the gravamen of this action), the plaintiff initially decided to spend his third year of law school split between an exchange term abroad and a term at a different domestic law school, while still graduating from NYU.

106.   These concerns were felt in addition to a background of rampant antisemitism which resulted in threats being made against Jewish students, and the law school listserv being shut down for everyone, because the law school refused to punish those particular violations of the student code of conduct and federal law, but could not tolerate the legal liability, especially considering the Consent Order entered with the federal government in 2020.

107.   The plaintiff informed defendant Epstein of his decision in an April 10 email Exhibit 4, which detailed these reasons, and added some humor to make light of what felt like a cowardly retreat. The plaintiff also and made a point to remind defendant Epstein that, contrary to what the board members of the chapter, particularly defendant Pallaki said about his social skills and their ugly defamations about him consorting with prostitutes because he could not succeed with women, he was socially succeeding well enough outside the law school. The still image included is of the film *My Name is Nobody* and references one character telling the other that he was going to have to face the "wild bunch" alone.

19

108.    A few days later, defendant Epstein called the plaintiff and pleaded with him to remain, and offered him a "feeder" federal appellate clerkship from a ranked list the plaintiff would draft himself, to be followed by a Supreme Court clerkship as available, and a top position on his journal, the Journal of Law and Liberty. Defendant Epstein also informed the plaintiff that he would teach Property in addition to Food and Drug Law. Previously, the plaintiff specifically mentioned to defendant Epstein that he wanted to take Property from him because it was mandatory and an area of his expertise, but defendant Epstein expressed uncertainty of whether he would feel up to teaching such a heavy course.

109.    During this general time, defendant Epstein was facing a health issue that was later resolved. Above all of the career incentives and flattery, the plaintiff was moved by his conscience, which could not let him refuse such a sincere request from an elderly man who had been such a good friend and mentor to him. The plaintiff agreed and canceled his plans for spending the third year away from NYU.

110.    Because defendant Epstein was aware of the animosity that defendant Iyer had towards the plaintiff, who was constantly trying to sabotage the plaintiff including with respect to his relationship with defendant Epstein, he instructed defendant Iyer to personally extend the offer of the senior journal position that the plaintiff had not even applied for. Defendant Iyer did so, and presented it as an invitation to apply for the position of Senior Article Editor (the position is now referred to as Senior Executive Editor) because the journal was "short-staffed".

111.    Defendant Iyer had just a few weeks prior refused to interview the plaintiff for a minor role on the board of the school chapter, that the plaintiff hoped he could fulfill to reconcile with the group of students in control of the chapter. The grounds for this refusal was an amendment to the chapter constitution, introduced by defendant Pallaki, that would prevent anyone who served as

president of the chapter from holding any board position again. At the same time and throughout that year, in a contradictory fashion, defendants Iyer and Pallaki excluded the plaintiff from events hosted for former officers, which would include former presidents.

112.    The plaintiff served as president of the chapter briefly before being ousted by a coup led by defendant Pallaki in the academic year of 2020/2021.

113.    The plaintiff then verified with both defendant Iyer and defendant Epstein, separately and in writing, that it was defendant Epstein's wish that the plaintiff take this particular position, Exhibit 5. Upon learning it was so he accepted the position from defendant Iyer.

114.    Defendant Epstein called the plaintiff again and discussed the list of judges that the plaintiff had sent the plaintiff and what particular ones were most compatible, promising and realistic, and what groundwork could already be laid. The plaintiff followed up with another email, thanking defendant Epstein for the call and sent him more information about his own efforts undertaken thus far.

115.    Throughout further conversations with defendant Epstein, including two lunches in the Summer of 2022, defendant Epstein continuously affirmed his definite and imminent placement of the plaintiff with a judge from the list that the plaintiff drafted and sent to defendant Epstein, and always tried to sell the plaintiff on the idea of clerking for Justice Gorsuch, even if a strategy in pursuit of that position would reduce the odds of clerking for Justice Thomas.

116.    Incidentally, both defendant Epstein and the plaintiff were informed by separate sources about the imminent purging of the partners at the Washington office of Kirkland & Ellis involved in the high profile Second Amendment case adjudicated that term. The discussion turned to whether or not association with Kirkland & Ellis could attract ire from either the potential "feeder" judges or a justice themselves, similar to how, notoriously, Yale Law School became a toxic brand

with some members of the judiciary. Defendant Epstein warned the plaintiff that it was possible, but that as a tax summer associate in the New York office his exposure was less.

The September 2020 Coup at the NYU Federalist Society

117.   For the 2020/2021 academic year, the NYU Chapter's board was nominated by the previous board, and consisted of a large number of students, all of whom were second year students, and who did not know each other in some cases as the result of the Covid-19 pandemic-induced remote learning environment imposed since March 2020.

118.   Almost immediately at the beginning of the academic year, a trio of students, consisting of defendant Pallaki, William Weinberg and Andrew Nelms, joined together to assert their power over the organization, other students, and eventually upon defendant Epstein's resources more generally.

119.   They formulated a plan to capture the chapter, and divided its implementation among themselves according to their individual wiles and social posture at the law school for maximum success of capture as a first consideration, and damage to be inflicted upon the Plaintiff as their main obstacle in second consideration, by motive of malice as demonstrated most clearly in the leader, defendant Pallaki.

120.   Defendant Pallaki, who already had an established relationship with defendant Epstein, and the National Organization, took responsibility for sowing seeds of doubt and undermining the reputation of the Plaintiff with those higher authorities, and did in fact do so in a number of phone calls and emails that month.

121.   William Weinberg was assigned the responsibility of taking all actions facing the Plaintiff directly, in order to exploit the closer relationship, and greater personal trust that the plaintiff had in him. He would eventually take the President role as the face of the captured organization, and the exemplary punishment from defendant Epstein for the foul business on behalf of the whole group

22

described infra ¶ 151.

122.   Andrew Nelms was assigned responsibility facing the NYU Law Administration and obtaining collaboration other students who were outside of the ideological orbit of the Chapter.

123.   Upon information and belief, on or about September 12, 2020, Andrew Nelms filed a false and meritless to the NYU Law Administration about the plaintiff's leadership of the Chapter which did not result in any formal investigation or punishment, but rather provided notice that there was a subversive element at work.

124.   Because the operation of a Federalist Society chapter at a law school is an inherently risky and delicate operation, and many law school administrations are actively hostile, such a false complaint is an especially treacherous betrayal.

125.   The first attempt to effect a coup against the plaintiff, and acquire control of the organization, was a provocation that did not unseat him due to his support on the board, popularity with defendant Epstein and confidence of the national organization.

126.   On or about September 16, 2020, the plaintiff drafted a Constitution Day statement for the membership, and sent the draft to Weinberg. The plaintiff wanted Weinberg's opinion because as an international student happy to share and celebrate Constitution Day, he wanted a local opinion. Weinberg did not make substantive changes, and while formatting the draft into a final version, introduced errors in spelling and punctuation that were not extant in the draft.

127.   On September 17, 2020, out of trust and confidence in the abilities of defendant Weinberg, the plaintiff sent out the statement without a close review. By this time Andrew Nelms had recruited an international law student from a non-English-speaking country, Luiza Leao, and prepared a redline for her of all of the errors introduced by Weinberg, that was in excess of her own linguistic familiarity.

128.   Luiza Leao was more than happy to distribute this, in order or to humiliate the Plaintiff, as the sender of the holiday greeting, in violation of the student code of conduct which prohibits "Displays or electronic transmission of derogatory, demeaning, or hostile materials".

129.   Luiza Leao was one of the handful students at the law school who could almost always be counted to obsessively respond to every email advertising a Federalist Society event with hatred and vitriol against every visiting speaker, including judges.

130.   Realizing these typographical and stylistic errors, the plaintiff humorously advertised a position for proof-reader as a *mea culpa*, and as a private joke with Weinberg, who he did not suspect as being malicious but rather just sloppy.

131.   Within just hours, the trio had already informed defendant Epstein, who called the plaintiff to ask him what it was he had heard about the Plaintiff hiring a "Research Assistant", and complained to the National Organization over this tempest in a teapot, of a single humorous and modest response to almost a month of voluminous abuse.

132.   This provocation was the first known overt act, following the false complaint, but was not sufficient for the intended result.

133.   On or about September 20, 2020 the Chapter held a meeting to confer about offering a free advanced screening by streaming to *Created Equal: Clarence Thomas in His Own Words (2020)*, a documentary about the life of Justice Clarence Thomas. The screening was offered at minimal cost to the Chapter and was a popular idea except for one dissenting vote.

134.   Sarah Winslow, who missed the previous meeting at which this idea was first raised, was the only member opposed to the idea, on the reasoning that Justice Thomas was a "rapist", likely in reference to the controversy during his confirmation hearing in which Anita Hill accused then-Judge Clarence Thomas of sexual harassment, and that sending a free viewing link for the

documentary would promote "rape culture". Sarah Winslow expressed her belief, to the amazement of all present, that being associated with Justice Thomas would tarnish the image of the Federalist Society, and that despite not having seen the documentary, she was sure it was unfairly positive of him.

135.   Sarah Winslow then announced that this was a 'women's issue', and for that reason, that as the only woman on the board she was going to veto the initiative sending of a free viewing link to members of Chapter, and threatened bad publicity and a smearing of the organization if she did not get her way.

136.   The Plaintiff immediately opposed this, but as discussion continued, Nelms identified an opportunity, and after initially opposing Sarah Winslow as well for being patently unreasonable, he abruptly changed course, and interrupted resolution of this issue in order to save this point of contention for later use by the trio in their acquisition of control.

137.   In the following days, two members of the board contacted the Plaintiff and were concerned about Sarah Winslow's threats, and that because she had a very "big mouth" she would cause embarrassment to the board, and threaten their careers by affecting their reputations at a critical hiring time.

138.   At roughly the same time, Nelms and Weinberg worked in tandem to create a confrontation serving as a pretext to stage a coup against the Plaintiff to take control of the Chapter. As Nelms called Sarah Winslow to assure her that the Plaintiff would call her to apologize to her for not granting her veto, which she eventually revealed herself to the Plaintiff during the call, Weinberg called the Plaintiff to suggest the need for communicating to her that she could not veto the rest of the board or threaten the reputations of other members when she did not get her way.

139.   The phone call between the plaintiff and Sarah Winslow resulted in no common ground

being found, as exacerbated by the setting up of different expectations by defendants, and resulted in the decision that Sarah Winslow could not be allowed to continue to hold the organization hostage and threaten the reputation of students, especially while subverting the legitimate aims and values of the chapter.

140. The pattern of behavior of Sarah Winslow, would eventually be repeated to opposite results in 2021 when the only two women on the board decided to veto the hosting of a debate by the Chapter, on whether abortion was a protected right under the U.S. Constitution Exhibit 6. Because this group of students were defending themselves and their control rather than utilizing controversy to acquire control as they had in 2020, the two women members were pushed out of the board, provoking their making good on threats of publicity, resulting in this incident being widely reported as indicated in Exhibit 6, and the National Organization and defendant Epstein provided support and cover rather than scapegoating of the chapter leadership.

141. During the days after the phone call with Sarah Winslow, the trio gathered votes to remove the plaintiff from his position so as to acquire control over the organization. Once a majority was gathered by agreement, they set out to blackmail and extort the minority to ensure a "unanimous" vote.

142. Due to plaintiff's approval by defendant Epstein and the national organization, they needed a "unanimous" vote, and squeezed the minority so by direct threats to paint anyone who would vote in his behalf or advocate for a moderate step short of his "unanimous" ouster and humiliation, in the same brush as him, and limit their career opportunities at a vital time, prior to hiring for second year firm positions which often become permanent positions.

143. This left supportive board members with no real choice, and they succumbed to a course of action that resulted in deep regret for some, who retreated into the Journal before it too was

captured by the same group. Even their right to speak a word of kindness about the plaintiff was taken away by the Nelms acting on the instruction of defendant Pallaki.

144.   On September 27, 2020, which was also the eve of Yom Kippur, the holiest day of the Jewish Calendar and a day of atonement, Nelms commandeered a chapter Zoom call meant to plan upcoming events for the initial stated purpose of a discussion about the leadership of the Chapter. The plaintiff's gracious agreement to have that discussion with him and anyone who was interested surprised Nelms, and instead of actually starting a discussion, Nelms changed course to a reading a speech by monologue condemning, disparaging and humiliating the Plaintiff in a tone of disrespect and uncollegiality. Nelms menaced the Plaintiff in this speech, and indicated severe consequences beyond merely losing a position at a "club" if he did not go quietly, referring to public humiliation and career destruction.

145.   The plaintiff patiently let Nelms finish his prepared speech, and once it became the plaintiff's turn to speak, Nelms rudely interrupted him again, to invite Sarah Winslow, who was not authorized to join that meeting, to engage in angry tirade. Once again, the plaintiff patiently waited for Sarah Winslow to finish her tirade, and after only speaking for a few moments he was rudely interrupted again by Nelms, who instructed anyone who agreed with the plaintiff or was interested in what he had to say to speak up "NOW" with the last word being emphasized. Having already blackmailed and extorted the minority, no one spoke up and Nelms instructed the rest of the group to leave the meeting, which occurred within a few seconds of silence when he emphasized "NOW".

146.   Nelms suffers from chronic traumatic encephalopathy, which prevented his aspirations of playing football professionally, as he discloses on his public Linkedin page. Among other symptoms, he is prone to "flash-back" and raise on a tangent his missed football career during conversation. Unaware of the root source, the Plaintiff believed this mannerism to be the intentional

humorous expression of a jockish trope, rather than a symptom of a serious condition, and teasingly compared Nelms to the character of Uncle Rico from the film *Napoleon Dynamite*, who still obsesses about his missing of crucial football approximately 25 years later, similarly obsessing over his failure to have a football career.

147.   Since that faux pas early in the first year of law school, and as exacerbated by the evident enjoyment of the law by the Plaintiff as his passion, which grated upon Nelms who was tragically deprived of his own by reason of brain injury, he sought to get even, and inflict his suffering of lost dreams on the plaintiff, among others.

148.   Nelms had many courses of action to effectuate a change in leadership in the board together with the defendant Pallaki and Weinberg, but he chose the most malicious course, which preyed on the patience and good intentions of the plaintiff to maximize humiliation. Furthermore, he sought to create antagonism between the plaintiff and the minority of board members were blackmailed and extorted into their vote, silence and participation in Nelms' twisted and gratuitous ritual of humiliation. Nelms, like defendant Pallaki, wanted the plaintiff to suffer, and feel that he had no friends by so coercing the minority of friendly board members.

149.   The plaintiff refused an opportunity by the national organization to have this dispute, and gross mistreatment adjudicated, as a personal sacrifice to prevent reputational harm to the organization.

150.   Thereafter, Weinberg was announced in an email sent by defendant Pallaki as the president for the remainder of the academic year, who was actually the real power in the chapter. This email also appointed Gary Dreyer, who was not formerly on the board, and whose role in these events is presently unclear, to the former position of Weinberg.

151.   In the next meeting of a seminar attended by the Plaintiff and just one other student,

28

Weinberg, who usually carries a wooden face, was upbeat and frequently smirked at the Plaintiff. This change in mood would reverse course by the next meeting of the seminar and become very dour. In the interim period, defendant Epstein decided to punish Weinberg, and upon information and belief declared to him in a phone call, as he would later to the plaintiff albeit for different reasons, that he will not clerk, as a declaration of fact rather than a refusal to recommend.

152.   In between both of those seminar sessions, defendant Epstein called the plaintiff and asked him who he thought was most responsible for the ugly events which transpired in the chapter. The plaintiff honestly believed at the time that it was Weinberg and not defendant Pallaki, and indicated so to defendant Epstein, without knowing how this information would be used. Thereafter, defendant Epstein brought his full might down upon Weinberg resulting in Weinberg never clerking. Upon information and belief, this was despite defendant Weinberg's excellent grades and distinguished service as an Officer of the United States Air Force, which taken together would ensure a very high degree of competitiveness.

153.   Defendant Epstein chose to only punish and make an example out of one person, for the simple reason that he wanted to maintain control over the organization and protect the plaintiff as an asset of his, without destroying too much of his other assets. This is consistent with his utilitarian values rather than any deontological idea of right or wrong, or individualized proportionality.

154.   The Plaintiff eventually took a leave of absence for the academic year of 2020/2021 due to the worsening in the illness of a family member, an uncertain hiring market and a diminished enjoyment of classes mandatorily taken over the Zoom format unsupported by the intellectual life of law school prior to the Covid-19 pandemic.

<u>Background 2021/2022 Academic Year Sabotage And Defamations</u>

155.   During the absence of the plaintiff for about half of 2020/2021, defendant Pallaki,

abused his role in the chapter, and lied to Peter Redpath and Kate Alcantara at the student division of the national organization by telling them that the plaintiff had transferred to Northwestern University, which was not a T6 school, and was older than 30. Both the falsely stated change of the plaintiff to a non-T6 law school, and being older than 30 would make the plaintiff ineligible for priority investment and attention from the national organization, and defendant students sought to deprive him of this by fraud. They also changed the chapter constitution with a rule that would only affect the plaintiff, and prevent him from holding any position in the future. This action both practically and symbolically cemented the continuing bias and antagonism of the clique on the board against the plaintiff.

156.   The plaintiff eventually clarified the truth of both of these matters, when asked by Peter Redpath about them at the National Lawyers Convention of November 2021. The plaintiff was an NYU Law student and only 25 years old at the time.

157.   Defendant Pallaki and his subordinates defendants Iyer and Garrett, were surprised to see the plaintiff attend Chapter events. At the first dinner, defendant Pallaki taunted the plaintiff about the events of the previous year, and told him that it was surprising to see him. The plaintiff played off prior history as mere politics and was friendly to all.

158.   Defendant Pallaki would thereafter avoid attending any event attended by the plaintiff, which was almost every meeting, even though he was the treasurer, and the real power behind the nominal president, defendant Iyer. Instead he would only attend the few "board and former board only" events which the plaintiff was excluded from, despite being a former board member himself.

159.   Despite being the incoming president of the chapter, defendant Iyer was not permitted by defendant Pallaki, to attend the leadership conference for incoming presidents hosted by the national organization. Defendant Pallaki sent himself instead.

160.   Defendant Pallaki used his presence among approximately 200 other attendees from

almost every law school in the United States at the Student Leadership Conference to spread defamations about the plaintiff in attempt of creating a kind of a viral effect. As a result of these efforts at the Student Leadership Conference, among others, when attending various Federalist Society functions all over the United States, the plaintiff has encountered approximately two dozen people in the years since who attended that same conference whom he never met, yet have strong preconceived notions of him, mostly negative but some very sympathetic from those who could through defendant Pallaki's lies.

161.    Defendant Iyer told the plaintiff, early in this academic year, that defendant Pallaki would ask him if the plaintiff had signed up for an event. The plaintiff signed up for every event, and actually attended almost all of them. Defendant Iyer would also mention things, often out of context and almost as a provocation, about defendant Pallaki, such as where he was going to clerk or what article he was writing with defendant Epstein, but never received any caring or engagement from the plaintiff. The plaintiff was not interested in the past.

162.    Although out of sight and out of mind, defendant Pallaki was not done with the plaintiff. During this academic year, he would spread vile defamations about the plaintiff, such as that the women the plaintiff was occasionally seen on dates with in Manhattan were prostitutes because he could not succeed with women, that the plaintiff was a hard drug user and that the plaintiff had gained weight compared to the first year of law school due to taking psychiatric medications.

163.    All of these vicious defamations were false. The plaintiff has never used or taken hard drugs or recreational drugs of any kind, nor psychiatric medication of any kind. Rather than consort with prostitutes, the plaintiff dated educated women, often in the prime of their professional careers, who sought to and did in fact include him in their lifestyles.

164.    Defendant Pallaki did not want to take the risk of spreading these defamations himself,

31

and so he spread them by agitating a gullible student, Quentin Weinstein, as his messenger, and then feeding him with them. Defendant Pallaki agitated Quentin Weinstein by telling him that the plaintiff was saying equally terrible things about him. In fact, the plaintiff had never met Quentin Weinstein, did not know who he was other than hearing his name mentioned, and had never talked about him to anyone.

165.   Eventually, towards the end of the 2021/2022 academic year, Quentin Weinstein stopped serving defendant Pallaki in this regard after he met the plaintiff for the first time, and realized that the plaintiff did not know who he was and had no opinion of him at all. Thereafter defendant Pallaki continued by a different intermediary.

166.   Besides from defendant Pallaki's individual and more egregious fabrications, the hostile members of the board was generally continuing its sabotage and dirt campaign against the plaintiff, with milder falsehoods for defendant Epstein to believe. These attempts caused defendant Epstein to believe that the plaintiff had to "patch things up" email with the board, despite already doing everything possible and fault laying entirely upon them. A common refrain used by them against the plaintiff was that he was not socially successful or talented.

167.   Nothing could be further from the truth, because outside of the law school, where he did not even attempt to socialize, the plaintiff had the best year in social terms of his life. He enjoyed the social scene of Manhattan including the private social and dining clubs, was invited to sporting events, offered a surefire referral to join the Harmonie Club, and was invited to serve as a formal escort at debutante balls. To cement his friendship with women he had met who were members, and to advance the cause of women, he joined the Women's National Republican Club as a member of the male auxiliary.

168.   In an act of reconciliation, the plaintiff applied to join the board of the chapter in a

32

minor role, and was informed by defendant Iyer that he was not eligible for any role according to the new chapter constitution implemented by the board of 2020/2021, which prevented former presidents from having any role. Defendant Iyer did not have any explanation for why the plaintiff, who evidently was deemed a former president, was not permitted to attend events for former board members either.

169.    The plaintiff took this issue up with the national organization, which instructed defendant Iyer to interview the plaintiff. Regardless of a performative interview, he was not offered a board position, and reached the conclusion that the students in control of the chapter and having taken significant power over defendant Epstein, would continue to undermine and attack him despite him giving them no reason. This was of the key factors that motivated him to plan for his third year of law school elsewhere.

### The Bar Rreview (Social Event) Defamation And Subsequent Cover-Up

170.    On or about April 7, 2022, plaintiff attended a "bar review" party hosted by the NYU Student Bar Association, which was a rare occurrence for him, on the suggestion of some members of the NYU chapter.

171.    Late into the event, at approximately 11PM, Sarah Winslow arrived and saw the Plaintiff talking outside the pub with defendant Garrett. She told the doorman, while in view of high definition security cameras that face outward from the entrance, that the plaintiff had been "creeping" on her earlier that night, despite not having spoken or seen him in a year and a half, or interacting on any matter besides the September 2020 board dispute about providing free links to the Clarence Thomas documentary.

172.    Initially, the doorman turned both the plaintiff and defendant Garrett away, but eventually clarified that only the plaintiff would be refused reentry, due to the above mentioned

fabrication by Sarah Winslow, whom he identified by her specific clothing and eventually also by her physical description of being short and heavy.

173.   The doorman further explained that he did not believe her, and that the Plaintiff could return anytime after that night, but that they had an automatic policy for such situations, and that it only applied to male patrons subject to complaints by female patrons but not the opposite.

174.   Defendant Garrett and the plaintiff, who were standing together, in front of the high definition security cameras that face outward from the entrance, turned to each other and remarked that this was the sort of primae facie discrimination they had been taught about at law school.

175.   Subsequently, on or about April 8, 2022, the plaintiff filed a human rights complaint against the establishment, which was investigated by the New York State Division of Human Rights (NYSDHR), a governmental body that exercises both investigative and adjudicative powers. The Plaintiff notified defendant Garrett that he could expect a call from the New York State Division of Human Rights investigator, who had provided the plaintiff with his number.

176.   In the interim, defendant Garrett, as the designated successor for the position of nominal chapter president, under both the remote counsel of defendant Pallaki, and defendant Iyer as the on-campus leader consulted them as to what should be done. He knew to consult, because he had heard about the events of September 2020 from the key perpetrator defendant Pallaki, and appreciated the role that Sarah Winslow played as a pretext for the coup. He was instructed to do whatever was necessary to continue sabotaging and oppressing the Plaintiff, and protect Sarah Winslow as a former asset of group that took over board, including to provide perjured testimony and obstruct justice, which he did.

177.   The investigation of the NYSDHR was terminated without compulsory discovery or investigation, for the sole reason of defendant Garrett's perjured testimony, which also obstructed

34

justice by interfering with an executive branch state-level investigation. Defendant Garrett denied everything he had witnessed, despite being recorded, and he was rewarded by defendants Pallaki and Garrett by being nominated the new president of the Chapter the following month, and receiving assistance in obtaining a clerkship with the same Ninth Circuit Court of Appeals judge that defendant Pallaki would clerk for prior to him.

Defendant Pallaki's Animus and Motive

178.   Without any intention or wrong doing, the plaintiff unwittingly became a major obstacle for defendant Pallaki both in his ambitions to become defendant Epstein's favored student, particularly for a Supreme Court clerkship, and defendant Pallaki's romantic desires for Isaiah Evans, a recent graduate who was a loyal friend to the plaintiff and a supporter of his within the NYU chapter, for a time.

179.   Defendant Pallaki sought the favor of defendant Epstein, and eventually served as his Research Assistant, writing a law review article together about antitrust and labor law. The plaintiff never interfered with Pallaki's relationship with defendant Epstein, and though he did not know defendant Pallaki well, he only said favorable things about him to the professor by complimenting his intellect and principled adherence to libertarian values. Oftentimes, the plaintiff and defendant Pallaki would be the last two students remaining in defendant Epstein's Zoom classroom in the roughly 10 minutes he hosted for after class questions and discussion.

180.   Defendant Pallaki sought a romantic relationship with Isaiah Evans, who met both the plaintiff and defendant Pallaki while they were first-year students, and he was a third-year student. Isaiah Evans was Treasurer of the NYU Chapter during that year, and was a powerful force in ensuring that the plaintiff would serve as President and defendant Pallaki would serve as Treasurer, and trained defendant Pallaki as his own replacement.

35

181.   Early in their first and third years respectively, Isaiah Evans and the plaintiff quickly formed a friendship over a shared sense of humor and appreciation of fine food. Because of this friendship, and the fact that defendant Pallaki had already presented himself as a hostile competitor to the plaintiff, Isaiah Evans spurned defendant Pallaki's romantic advances, because he did not want to have to choose "between a friend and a lover", as Isiah Evans would later explain, and remained loyal to the plaintiff, for a time.

182.   By the next year, in early September, 2020 during a period of hostility toward the Chapter on the school listserv, Isaiah Evans wrote publicly in support of the plaintiff and the Chapter, and privately told the plaintiff that his loyalty and now-open conservatism was "costing me a lot of sex". The plaintiff appreciated his sacrifice, but did not know that he was also specifically referring to his spurning of advances by defendant Pallaki, and instead just imagined some kind of a general sexual boycott of gay conservatives.

183.   Roughly in the middle of September 2020, defendant Pallaki finally managed to seduce Isaiah Evans, and eventually turned him against the plaintiff, thus depriving the plaintiff of the information and counsel that he relied upon to manage internal politics, and this greatly facilitated the events of 2020 masterminded by defendant Pallaki.

184.   In mid-October 2020, Isaiah Evans called the plaintiff to apologize for giving in to his "hedonism" and spoke of defendant Pallaki visiting him frequently at his apartment, and it was only then that the plaintiff realized this interest of defendant Pallaki, and the role it had played in motivating his personal antagonism, which the plaintiff could not previously understand.

185.   Defendant Pallaki's visible delight at the ousting and humiliation of the plaintiff on September 27, 2020, the eve of Yom Kippur, was evidenced by a huge grin carried throughout the entire proceedings, in which he did not speak. This distinguished him from the rest of the attendees

who had a neutral tone and just wanted to get over the unpleasant business, except for Sarah Winslow, who was visibly angry.

186.   Upon information and belief, defendant Pallaki was raised in a strict Catholic environment, and attended the private Catholic school of St. Ignatius of Cincinnati, Ohio, where he successfully ran for student senate on a joint ticket with Gabriel Mielki, a subsequent prominent organizer of Students for Democratic Socialism and LGBTQ+ activist. Defendant Pallaki returned there later his adult life to instruct "Christian Manhood" program for younger boys. Upon information and belief, he compensates for his failure to live according to the teachings of his religion by reason of his sexual proclivities, through directing hatred towards members of other faiths, particularly Jews, on online message boards and forums.

187.   Through tortious actions against the plaintiff, with their commingled professional and personal motives, Pallaki obtained control over the chapter, and the romantic relationship he sought with Isaiah Evans, but could not succeed in destroying the relationship between the plaintiff and defendant Epstein, which came at the expense of his own Supreme Court recommendation, until the Summer of 2022, where again he puppeteered others to do his dirty work, and bury the plaintiff for good.

188.   The plaintiff suffered immense loss of economic opportunities, scorn, derision, harassment, emotional distress, and anxiety as exemplified by the cruelty of the defendants, who sought all of these harms upon him over multiple years, and despite attempts at reconciliation.

<u>Attempts of plaintiff to Discover Identities of Perpetrators</u>

189.   The plaintiff asked defendant Epstein for information three separate times at the law school during September 2022, by appealing alternatively to his sense of justice, self-interest and

empathy. Nothing worked and defendant Epstein always had the same incredible answer, that the totally false defamation was all the plaintiff's fault because it "would not have happened to anyone else", even as defendant Epstein knew his own students had fabricated and forged the defamations.

190.   Defendant Epstein was so callous and insensitive to the suffering of the plaintiff, and thus not inclined to tell the truth or take any ameliorating steps, that he accentuated and galvanized the reputational harm to the plaintiff by loudly insulting him in front of a large ballroom that included judges, professors and many other students as described in ¶ 58 of the original pro se complaint.

191.   The plaintiff made many attempts to discover who the perpetrators of the online defamations were, who also forwarded the materials in a targeted fashion to the Federalist Society and its affiliates. It was clear to the plaintiff that defendant Epstein knew something, and so he asked him on the August 9, 2022 phone call, followed up by pressing for an answer again by email that same day.

192.   On September 19, 2022 the plaintiff wrote to defendant Epstein that the plaintiff's view from close to the front of the class of defendant Epstein's clay feet was only getting worse. This was a biblical metaphor from Daniel 2:31-35, where in a prophetic dream an otherwise magnificent statute had clay feet that cause it to eventually crumble into ruin.

193.   A few days later, the plaintiff tried again to persuade defendant Epstein to do the right thing, and built on the feet of clay metaphor, with an aspect of self-awareness. On a walk to defendant Epstein's office, the plaintiff asked him if he remembered ABBA, and proceeded to recite a few verses from the groups *Happy New Year* song of 1979:

> "Oh yes, man is a fool
>
> And he thinks he'll be okay

Dragging on, feet of clay

Never knowing he's astray

Keeps on going anyway…"

194.   Defendant Epstein was amused but would not right his course, and would stick to his previous fraudulent cover up for the actions of his former students and current co-defendants.

195.   Defendant Epstein showed a surprising outburst of impatience every time the plaintiff mentioned that the defamation originated from ideological opponents as a mitigating factor. In retrospect it is clear that this is because defendant Epstein already knew it was not so, because he knew it came from his own students, and felt that discussing that camouflage was a waste of time.

196.   The plaintiff then tried to obtain information from defendant Epstein through anger, as was partially effective on August 9, 2022 resulting in the email received. The plaintiff's flagging attendance upset defendant Epstein, and while discussing attendance, the plaintiff turned the tables on defendant Epstein by accusing him of betrayal, covering up for the forgers and defamers, rewarding the guilty while punishing the innocent, and fretting over attendance while perpetrating a monumental wrong himself.

197.   This was too much for defendant Epstein, and rather than provide any specific information he screamed at the plaintiff to get out of his office, although this inarticulate outburst was a kind of an admission.

198.   The plaintiff hoped that defendant Epstein would report him for attendance and allow for a confrontation with the administration. Defendant Epstein did report the plaintiff for attendance, but the law school did nothing, and this inaction communicated information to the plaintiff. The law school knew that any adverse action against the plaintiff would incentivize him to bring a case and obtain discovery against defendant Epstein and the student defendants, because then he would have

nothing to lose, and wanted to avoid this because there was something to conceal.

199.   At the Federalist Society National Lawyers Conference and Student Leadership Conference the plaintiff tried unsuccessfully, to delicately obtain any information from Peter Redpath or Kate Alcantara, or other individuals but was unsuccessful in learning any information about the identities of the perpetrators.

200.   Although the plaintiff suspected that the perpetrators were affiliated with the NYU chapter, he had no proof or identification of any particular individual. Others suspected the same generally but could not provide anything pointing to a particular individual. Some law student attendees and recent graduates from other schools speculated that the massive defamation campaign, which was infamous, as a continuation of the prior infamous struggle, which began in the academic year of 2020/2021, that they referred to as "Team Gideon vs. Team Cabal". Jokingly some of the individuals that discussed this general topic identified a team loyalty, as if it were a sport.

201.   The "cabal" referred to by these students and recent graduates presumably represents the group of board members that ganged up on the plaintiff to oust him from the board in 2020/2021, such as the now-identified defendant Pallaki, and their new recruits such as the now-identified defendants Iyer and Garrett. This commentary was the result of the events of the 2020/2021 academic year becoming infamous in the Federalist Society, with some curious people maintaining an interest in new developments.

202.   A final attempt was made towards the end of the one year provided by the statute of limitations. After exhausting all possible investigative leads, and being deceived by defendant Epstein's deflections away from the student defendants, the plaintiff made one final try to get the truth from defendant Epstein.

203.   On July 28, 2023, defendant Epstein and the plaintiff went to lunch. Defendant Epstein

40

originally insisted on a date that would have been after the statute of limitations for potential defamation claims, but the plaintiff insisted for sometime before July 29, 2023, because he had to return to Ohio for his *pro bono* position.

204.    Over lunch, plaintiff showed him a copy of the original complaint which he had intended to and did file that day, and asked him if he had any corrections or additions to it.

205.    This was the original pro se John Doe complaint, in which plaintiff was completely ignorant of the identities of the defendants, including defendant Epstein. While he knew full well what had happened to him, he had no idea who was responsible.

206.    Defendant Epstein did not offer a single correction or addition, despite knowing full well of the tortious actions, false statements, and the two fake photographs perpetrated by defendants Iyer and Garrett, as well as his own actions.

207.    Defendant Epstein stated that he did not want to be involved in any way, but the plaintiff told him that it was too late, because he was a key witness and so much of the measure of the damages revolves around him.

Conclusion

208. The ongoing campaign of personal destruction by these defendants, wielding their combined power and influence in the rarefied and elite legal world they inhabit, has devastated plaintiff's professional and personal life, resulted in a loss of actual and prospective employment, devastating emotional and physical distress, and the destruction of what was a highly promising legal career. Only this Court can restore that which has been wrongfully and tortiously taken from him, and it is respectfully asked to do so.

## FIRST CLAIM

### (Defamation)

209.   Plaintiff re-alleges paragraphs 1 through 208.

210.   The faked photographs and statements contain false assertions or implications of fact, including the false statements and implications set forth above.

211.   They are defamatory *per se*, in that they falsely accused plaintiff of sexual harassment, and of conduct incompatible with being an honorable member of the legal profession.

212. Defendants either knew, or had reason to know, that many of the allegations of and concerning plaintiff were false, but published them anyway, with constitutional and common-law malice.

213.   The willful actions of defendants Iyer, Pallaki and Garrett, in producing two fake photographs of plaintiff, and then twice presenting them to others as genuine, is conclusive evidence of their malice.

214.   The willful actions of defendant Epstein, in further circulating to others the statements he knew to be false, is conclusive evidence of his malice.

215.   As a consequence of the faked photos and subsequent statements relating to his former employment, plaintiff has also suffered special damages as further set forth below.

216.   The faked photos and subsequent statements constitute defamation *per se* because they (i) falsely accuse plaintiff of committing illegal acts constituting a serious crime, or serious sexual misconduct; (ii) contain allegations that would tend to injure plaintiff in his trade, business, profession or office; (iii) contain allegations by implication from the language employed such that

the reader would understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter, and (iv) by natural consequence would cause plaintiff damages.

217. The defamatory acts described herein have caused special damage to plaintiff, and continue to do so, in that he has suffered and continues to suffer loss of economic opportunities as well as loss of reputation.

218. In addition to the foregoing, plaintiff has suffered, and will continue to suffer, mental pain and anguish, emotional distress, harassment, anxiety, embarrassment and humiliation.

219. Defendants are jointly and several liable for publishing and republishing the defamatory statements and acts described herein, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## SECOND CLAIM

### (Injurious Falsehood; Special Damages)

220. plaintiff re-alleges paragraphs 1 through 220.

221. The above-described fake photographs and statements are false statements and have directly caused plaintiff special damages, due to his loss of the promised clerkship, his loss of the opportunity to become a member of the New York bar, and his entire career prospects.

222. Defendants are jointly and severally liable for the special damages caused plaintiff as a direct result of above-described fake photographs and false statements, and plaintiff is entitled to recover those damages.

223. Defendants acted with actual malice and a criminal state of mind consisting of the intent to harm plaintiff professionally through, among other things, creating and publishing the faked document and subsequent statements which falsely claimed that plaintiff was fired for sexual harassment.

224. Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## THIRD CLAIM

### (Intentional Infliction of Emotional Distress)

225. Plaintiff re-alleges paragraphs 1 through 225.

226. The above-described actions and conduct of the defendants were extreme and outrageous.

227. They are especially extreme and outrageous, because they were actions and conduct of members of the bar, who are expected to conduct themselves according to somewhat higher standards of decency towards their colleagues.

228. The facts and motivations of defendants' action demonstrate their intent to cause, or their indifference to the likelihood of causing, severe emotional distress to the plaintiff.

229. It is not an exaggeration to conclude that the facts and motivations of defendants' action demonstrate their intent to destroy plaintiff's career, and so far they have succeeded.

230. As a result of defendants' conduct, plaintiff has suffered and continues to suffer loss of economic opportunities, scorn, derision, harassment, emotional distress, and anxiety.

231. This claim is not duplicative of the defamation and false statement claims, because the faked photographs and false statements were only part of the defendants' campaign of destruction, and the threats of defendant Epstein–and the lies of the other defendants–are evidence of their malicious intentions and sheer malevolence.

232. Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## FOURTH CLAIM

<u>(False Light and Invasion of Privacy)</u>

233.  Plaintiff re-alleges paragraphs 1 through 232.

234.  This claim is alleged under the laws of the State of New Jersey where plaintiff resided during the events complained of herein.

235.  This claim is not duplicative of the defamation and false statement claims because it redresses the violation of a right of privacy which is not afforded by the State of New York to its citizens, but which pertains to protecting private figures from intrusion into their lives by publicity that places them in a false light.

236.  The above-described fake photographs and statements are false statements that present the plaintiff under a false light to the world, including his immediate neighbors and members of his local community in the State of New Jersey.

237.  This false light exposes the plaintiff to scorn, derision, harassment, emotional distress, anxiety, loss of privacy and excess notoriety in a manner that shocks the conscience and is intolerable in society.

238.  Defendants are jointly and severally liable for compensatory and punitive damages caused plaintiff as a direct result of above-described fake photographs and false statements, and plaintiff is entitled to recover those damages.

239.  Defendants acted with actual malice and with the intent to harm plaintiff through, among other things, creating and publishing the faked photographs and statements which falsely claimed that plaintiff was fired for sexual harassment.

240.  Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

### FIFTH CLAIM

45

**(Civil Conspiracy)**

241.  Plaintiff re-alleges paragraphs 1 through 241.

242.  The four defendants were engaged in a civil conspiracy to defame the plaintiff, and to spread their defamatory accusations and images as widely as possible.

243.  By their joint actions, the four defendants agreed to use their influence with numerous contacts in the community to destroy the plaintiff's reputation and future employability.

244.  The above-described actions demonstrate the defendants' creation and circulation of the defamatory statements and fake photographs to third parties.

245.  The above-described actions allege the overt acts in furtherance of the defendants' agreement, and their intentional participation in the campaign of defamation, as the primary tort underlying the conspiracy.

246.  Defendants are therefore jointly and severally liable for civil conspiracy in furtherance of their intentional defamation of the plaintiff, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## SIXTH CLAIM

**(Fraud against Defendant Epstein)**

247.  Plaintiff re-alleges paragraphs 1 through 247.

248.  Defendant Epstein engaged in fraud and deceit intended to interfere, delay and obstruct the plaintiff's exercise of his legal rights through the actions described above.

249.  For example, he knowingly lied about the identities of defendants Iyer and Garrett as the transmitters of the faked photographs and defamatory statements when he stated to the plaintiff that it was not they who had done so.

250.  He also falsely and deceitfully stated that he did not know which students transmitted

46

the faked photographs and defamatory statements, while at other times he falsely and deceitfully stated that no student transmitted the faked photographs and defamatory statements, and that he did so himself.

251. He fully intended that plaintiff rely upon his false and deceitful statements, because he was protecting both himself and his co-defendants.

252. The plaintiff did actually, and justifiably, rely upon the lies and deceptions of defendant Epstein to his detriment, by delaying plaintiff's investigation to determine and identify the true and proper defendants, until after this Court granted the requested subpoenas and the plaintiff enforced them.

253. Defendant Epstein became fully aware of plaintiff's detrimental reliance, and had a final chance to mitigate the damage caused by his fraud, when plaintiff presented him with the original John Doe complaint hours before it was filed on July 28, 2023.

254. But defendant Epstein chose not to do so.

255. Defendant Epstein is liable for the delay and expense caused by his fraud, and for any loss of legal right or cause of action that is or may have been obstructed or frustrated as a result of his fraud, and plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine.

## SEVENTH CLAIM

### (Tortious Interference with Prospective

### Economic Advantage, against Defendant Epstein)

256. Plaintiff re-alleges paragraphs 1 through 256.

257. Defendant Epstein tortiously interfered with prospective economic advantages earned or reasonably expected by plaintiff when he repeatedly disparaged him to many employers and

prospective employers.

258. Defendant Epstein repeated his disparagement at every possible opportunity to anyone who would listen, including at exclusive gatherings filled with potential employers.

259. As a direct result of his disparagement, plaintiff lost a paid contractor position in the legal field, which was his only active employment.

260. Plaintiff also lost a position with the Manhattan Institute, which he had been offered and had accepted, but had not started.

261. Plaintiff is entitled to compensatory and punitive damages arising therefrom, as the Court and a jury may determine

WHEREFORE, plaintiff demands relief as follows:

1. On his First and Second Claims, a judgment declaring that the statements contained therein which are of and concerning plaintiff are false and defamatory, that the photos are inauthentic fakes, for a preliminary and permanent injunction requiring that the defendants remove the photos and statements from anywhere that they have published them, and compensatory and punitive damages against defendants in such sums as may be awarded by a jury and the Court;

2. On the Third, Fourth, and Fifth compensatory and punitive damages against all defendants jointly and severally, in such sums as may be awarded by a jury and the Court;

3. On his Sixth and Seventh Claims, compensatory and punitive damages against defendant Epstein, in such sums as may be awarded by a jury and the Court.

Together with the costs and disbursements of this action, and such other relief as may be just.

Dated: Vancouver, British Columbia
(Canada) September 27, 2024

Respectfully submitted,

/s/ Gideon Rapaport, *pro se*
GideonRapaportLaw    Outlook.com
(862) 213-0895
  627 1078 Summit Avenue
Jersey City, New Jersey, 07310

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

-------------------------------------------------------------- x

GIDEON RAPAPORT,                                  :
                                                  :         Case No. 1:23-cv-6709 (JGLC)
                           Plaintiff,             :
                                                  :
           - against -                            :         ORAL ARGUMENT REQUESTED
                                                  :
AJAY SRINIVASAN IYER, ZACHARY                     :
GEORGE GARRETT, and RICHARD ALLEN                 :
EPSTEIN,                                          :
                                                  :
                           Defendants.            :
-------------------------------------------------------------- x

# MEMORANDUM OF LAW IN SUPPORT OF
## MOTION BY DEFENDANT RICHARD A. EPSTEIN TO DISMISS
### PLAINTIFF'S FIRST AMENDED COMPLAINT

Jeremy Chase
Nimra H. Azmi
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone:     (212) 489-8230
Fax:       (212) 489-8340
jeremychase@dwt.com
nimraazmi@dwt.com

*Attorneys for Richard A. Epstein*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................................................1

FACTUAL & PROCEDURAL BACKGROUND ..........................................................................2

      A.    The Parties ..............................................................................................................2

      B.    Plaintiff's Kirkland & Ellis Summer Associateship ...............................................2

      C.    The Complaint & Amended Complaint ...................................................................5

ARGUMENT ..................................................................................................................................5

I.      Plaintiff's Claims Are Barred by Section 230 of the Communications Decency Act .........5

II.     The Defamation Claim Must Be Dismissed. ......................................................................7

      A.    Plaintiff Has Not Adequately Pled Any Allegedly Defamatory Statements Made by Professor Epstein ......................................................................................8

      B.    Plaintiff Fails to Plead Professor Epstein Acted with Actual Malice. ..................10

           1.    The Actual Malice Standard of Fault Applies to the Defamation Claim Against Professor Epstein ............................................................10

           2.    Plaintiff Has Failed to Plausibly Plead Actual Malice.............................11

III.    Plaintiff's Other Tort Claims Are Duplicative And Meritless.........................................14

      A.    Plaintiff's Claims for IIED, Tortious Interference, Injurious Falsehood, and False Light Are Duplicative of the Defective Libel Claim...................................14

      B.    Plaintiff's IIED Claim Fails .................................................................................15

      C.    Plaintiff's Tortious Interference Claim Fails ........................................................17

      D.    Plaintiff's Injurious Falsehood Claim Fails ..........................................................19

      E.    New York Does Not Recognize the Tort of False Light. ......................................21

IV.    Plaintiff's Fraud Claim Fails.............................................................................................23

V.     The Civil Conspiracy Claim Fails.....................................................................................24

CONCLUSION..............................................................................................................................25

ii

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Federal Cases**

*Adelson v. Harris*,
973 F. Supp. 2d 467 (S.D.N.Y. 2013)..........................................................................8

*ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*,
2021 WL 1177532 (S.D.N.Y. Mar. 29, 2021) ..............................................................9

*Almeida v. Amazon.com, Inc.*,
456 F.3d 1316 (11th Cir. 2006) ..................................................................................6

*Anyanwu v. Columbia Broad. Sys., Inc.*,
887 F. Supp. 690 (S.D.N.Y. 1995) ............................................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................... 5, 12

*Baiqiao Tang v. Wengui Guo*,
2019 WL 6169940 (S.D.N.Y. Nov. 20, 2019) ....................................................15, 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................... 5, 12

*Berwick v. New World Network Int'l, Ltd.*,
2007 WL 949767 (S.D.N.Y. Mar. 28, 2007) ...............................................8, 21, 22

*Biro v. Condé Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015) ........12, 20

*Bobal v. Rensselaer Polytechnic Inst.*,
916 F.2d 759 (2d Cir. 1990)........................................................................................9

*BYD Co. v. VICE Media LLC*,
2022 WL 598973 (2d Cir. Mar. 1, 2022) ..............................................................12, 13

*Carlson v. Geneva City Sch. Dist.*,
679 F. Supp. 2d 355 (W.D.N.Y. 2010) ......................................................................17

*Chen Gang v. Zhao Zhizhen*,
799 F. App'x 16 (2d Cir. 2020) ................................................................................25

*Chord Assocs. v. Protech 2003-D, LLC*,
2010 WL 3780380 (E.D.N.Y. Sept. 21, 2010) .........................................................15

iii

*Conboy v. AT&T Corp.*,
    241 F.3d 242 (2d Cir. 2001) ............................................................................16

*Conte v. Newsday, Inc.*,
    703 F. Supp. 2d 126 (E.D.N.Y. 2010) .........................................................15, 20

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
    551 F. Supp. 3d 320 (S.D.N.Y. 2021) ..............................................................8

*Daleiden v . Planned Parenthood Fed'n of Am.*,
    2022 WL 1013982 (2d Cir. Apr. 5, 2022) ........................................................8

*Daniels v. St. Luke's-Roosevelt Hosp. Ctr.*,
    2003 WL 22410623 (S.D.N.Y. Oct. 21, 2003) ............................................20, 21

*Dayter v. Ploof*, 2022 WL 18399473 (N.D.N.Y. Dec. 19, 2022),
    *R. & R. adopted*, 2023 WL 346241 (N.D.N.Y. Jan. 19, 2023)..........................9

*Deaton v. Napoli*,
    2019 WL 4736722 (E.D.N.Y. Sept. 27, 2019) ...................................................18

*DeIuliis v. Engel*,
    2021 WL 4443145 (S.D.N.Y. Sept. 27, 2021)...................................................22

*Diario El Pais, S.L. v. Nielsen Co. (U.S.), LLC*,
    2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008) ......................................................20

*DiFowlco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)......................................................................18, 19

*Evliyaoglu Tekstil A.S. v. Turko Textile LLC*,
    2020 WL 7774377 (S.D.N.Y. Dec. 30, 2020) ...................................................18

*Franco v. Diaz*,
    51 F. Supp. 3d 235 (E.D.N.Y. 2014) .................................................................14

*Garrison v. Louisiana*,
    379 U.S. 64 (1964)...........................................................................................12

*Germain v. M & T Bank Corp.*,
    111 F. Supp. 3d 506 (S.D.N.Y. 2015)................................................................10

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974).........................................................................................13

*Gibson v. Craigslist, Inc.*,
    2009 WL 1704355 (S.D.N.Y. June 15, 2009) ....................................................6

*Hengjun Chao v. Mount Sinai Hosp.*,
   476 F. App'x 892 (2d Cir. 2012) ......................................................14

*Henneberry v. Sumitomo Corp. of Am.*,
   415 F. Supp. 2d 423 (S.D.N.Y. 2006).............................................19

*Hodges v. Lutwin*,
   595 F. Supp. 3d 12 (S.D.N.Y. 2022), *aff'd*,
   2023 WL 3362836 (2d Cir. May 11, 2023) ...............................11, 13

*Hollander v. Pressreader, Inc.*,
   2020 WL 2836189 (S.D.N.Y. May 30, 2020) ............................19, 20

*Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*,
   450 F. Supp. 3d 358 (S.D.N.Y. 2020)..............................................24

*James v. DeGrandis*,
   138 F. Supp. 2d 402 (W.D.N.Y. 2001) .............................................17

*Just Play, LLC v. A.S. Plastic Toys Co.*,
   2022 WL 580876 (S.D.N.Y. Feb. 25, 2022)......................................18

*Kesner v. Dow Jones & Co.*,
   515 F. Supp. 3d 149 (S.D.N.Y. 2021)...............................................8

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171 (2d Cir. 2021)..............................................................21

*Knelman v. Middlebury Coll.*,
   570 F. App'x 66 (2d Cir. 2014) ........................................................23

*Leung v. New York Univ.*, 2010 WL 1372541 (S.D.N.Y. Mar. 29, 2010),
   *affirmed in part on relevant grounds*, 580 F. App'x 38 (2d Cir. 2014)....................8

*Levin v. McPhee*,
   917 F. Supp. 230 (S.D.N.Y. 1996), *aff'd*, 119 F.3d 189 (2d Cir. 1997)................14

*Loeb v. New Times Commc'ns Corp.*,
   497 F. Supp. 85 (S.D.N.Y. 1980) .....................................................13

*Marino v. Westfield Bd. of Educ.*,
   2017 WL 216691 (D.N.J. Jan. 18, 2017)...........................................23

*McCollum v. Baldwin*,
   688 F. Supp. 3d 117 (S.D.N.Y. 2023)...............................................13

*McDougal v. Fox News Network, LLC*,
   489 F. Supp. 3d 174 (S.D.N.Y. 2020)...............................................12

v

*Mitan v. A. Neumann & Assocs.*,
    2010 WL 4782771 (D.N.J. Nov. 17, 2010) ...................................................7

*Monge v. Univ. of Pa.*,
    2023 WL 2471181 (E.D. Pa. Mar. 10, 2023).............................................6

*Morin v. Fordham Univ.*,
    2022 WL 4586042 (S.D.N.Y. Sept. 28, 2022)...........................................17

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964).................................................................10, 12

*Navarra v. Marlborough Gallery, Inc.*,
    2012 WL 13210272 (S.D.N.Y. Apr. 4, 2012)...........................................20

*Neal v. Asta Funding, Inc.*,
    2014 WL 3887760 (S.D.N.Y. June 17, 2014) ............................................9

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ..........................................................6

*Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*,
    112 F. Supp. 3d 83 (S.D.N.Y. 2015).....................................................24

*Nova v. Smith*,
    2019 WL 2636817 (N.D.N.Y. June 27, 2019)..........................................17

*Novins v. Cannon*,
    2010 WL 1688695 (D.N.J. Apr. 27, 2010) ...............................................7

*O'Brien v. Alexander*, 898 F. Supp. 162 (S.D.N.Y. 1995),
    *aff'd in part and rev'd in part on other grounds*,
    101 F.3d 1479 (2d Cir. 1996)........................................................14

*Ortiz v. Ardolino*,
    2021 WL 2075714 (E.D.N.Y. May 21, 2021) ...........................................17

*Palin v. N.Y. Times Co.*,
    510 F. Supp. 3d 21 (S.D.N.Y. 2020)....................................................10

*Pedraglio Loli v. Citibank, Inc.*,
    173 F.3d 845 (2d Cir. 1999)...........................................................21

*Peters v. LifeLock Inc.*,
    2014 WL 12544495 (D. Ariz. Sept. 19, 2014)...........................................7

*Printers II, Inc. v. Pros. Publ'g, Inc.*,
    784 F.2d 141 (2d Cir. 1986)...........................................................9

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
   53 F. Supp. 3d 705 (S.D.N.Y. 2014) ................................................. 14

*Sawyer v. Musumeci*, 1997 WL 381798 (S.D.N.Y. July 9, 1997), *aff'd*,
   165 F.3d 14 (2d Cir. 1998) .............................................................. 8

*Schneider v. Pearson Educ., Inc.*,
   2013 WL 1386968 (S.D.N.Y. Apr. 5, 2013) ................................. 24

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ........................................................................ 16

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ................................................................. 12, 13

*Strujan v. Teachers Coll. Columbia Univ.*,
   2010 WL 3466251 (S.D.N.Y. Sept. 3, 2010) ............................... 25

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
   864 F.3d 236 (2d Cir. 2017) ........................................................... 8

*Time, Inc. v. Hill*,
   385 U.S. 374 (1967) ....................................................................... 23

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
   478 F.3d 413 (1st Cir. 2007) ........................................................... 6

*Wexler v. Allegion (UK) Ltd.*,
   2018 WL 1626346 (S.D.N.Y. Mar. 30, 2018) ............................. 14

*Wilson v. Tarricone*, 2013 WL 12084504 (S.D.N.Y. Sept. 26, 2013),
   *aff'd*, 563 F. App'x 864 (2d Cir. 2014) ........................................ 19

*Y.D. v. New York City Dep't of Educ.*,
   2016 WL 698139 (S.D.N.Y. Feb. 19, 2016) ................................. 16

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ........................................................... 6

**State Cases**

*Anas v. Brown*,
   269 A.D.2d 761 (4th Dep't 2000) ................................................. 11

*Banaian v. Bascom*,
   281 A.3d 975 (N.H. 2022) ............................................................... 7

*Barns & Farms Realty, LLC v. Novelli*,
   82 A.D.3d 689 (2d Dep't 2011) ..................................................... 25

*Barrett v. Rosenthal*,
   146 P.3d 510 (Cal. 2006) ............................................................................7

*Bd. of Managers of Chelsea 19 Condo. v. Chelsea 19 Assocs.*,
   73 A.D.3d 581 (1st Dep't 2010) ...............................................................23

*Brancaleone v. Mesagna*,
   290 A.D.2d 467 (2d Dep't 2002) ..............................................................14

*Carvel Corp. v. Noonan*,
   3 N.Y.3d 182 (2004) .................................................................................19

*Freihofer v. Hearst Corp.*,
   65 N.Y.2d 135 (1985) ...............................................................................16

*G.D. v. Kenny*,
   15 A.3d 300 (N.J. 2011)............................................................................22

*Hoyt v. Kaplan*,
   263 A.D.2d 918 (3d Dep't 1999) ..............................................................11

*McGill v. Parker*,
   179 A.D.2d 98 (1st Dep't 1992) ...............................................................25

*Phan v. Pham*,
   105 Cal. Rptr. 3d 791 (Cal. App. 4th 2010).................................................7

*Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP*,
   27 Misc. 3d 1238(A), 910 N.Y.S.2d 765
   (Sup. Ct. N.Y. Cnty. May 28, 2010) ........................................................20

*Pravda v. Cnty. of Saratoga*,
   224 A.D.2d 764 (3d Dep't 1996) ..............................................................25

*Shuman v. N.Y. Mag.*,
   211 A.D.3d 558 (1st Dep't 2022) .............................................................11

*Sutton v. Hafner Valuation Grp., Inc.*,
   115 A.D.3d 1039 (3d Dep't 2014) ............................................................23

*Sw. Invs. Grp., LLC v. JH Portfolio Debt Equities, LLC*,
   169 A.D.3d 1510 (4th Dep't 2019)............................................................24

*Williams v. MLB Network, Inc.*,
   2019 WL 1222954 (N.J. Super. Ct. App. Div. Mar. 14, 2019)................23

**Constitutional Provisions**

U.S. Const. amend. I .................................................................................8, 16

**Federal Statutes**

47 U.S.C. § 230 ................................................................................1, 5, 6, 7

47 U.S.C. § 230(c)(1) .............................................................................5, 6

47 U.S.C. § 230(f)(2) .................................................................................6

**State Statutes**

N.Y. Civil Rights Law § 76-a ....................................................................10

N.Y. Civil Rights Law § 76-a(1)(a) ...........................................................10

N.Y. Civil Rights Law § 76-a(1)(d) ...........................................................10

N.Y. Civil Rights Law § 76-a(2) ................................................................10

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................1, 5, 12, 26

Defendant Professor Richard A. Epstein ("Professor Epstein") respectfully submits this memorandum of law in support of his motion pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing with prejudice the First Amended Complaint ("FAC").

## PRELIMINARY STATEMENT

Plaintiff Gideon Rapaport, a recent graduate of New York University School of Law, brings this lawsuit in an effort to blame someone – *anyone* – for his unrealized career ambitions. Plaintiff believed himself entitled to nothing less than a U.S. Supreme Court clerkship and had cultivated Professor Epstein to clear that starry path for him. Instead, Plaintiff found his summer associate position at Kirkland & Ellis LLP cut short with rumors circulating that he had been fired for sexual harassment. Those rumors were ultimately dispelled, and Plaintiff attended a prestigious summer fellowship with the Federalist Society, graduated from law school, and passed the New York bar exam. But instead of completing the admissions process to the New York bar and finding new employment, Plaintiff has filed this kitchen sink First Amended Complaint claiming that Defendants have derailed his legal career via a purported grand conspiracy to defame him. At least with respect to Professor Epstein, Plaintiff's own allegations fatally undermine each of his claims, and each therefore should be dismissed.

*First*, Plaintiff's claims arising from Professor Epstein forwarding emails are barred by Section 230 of the Communications Decency Act. *Second*, Plaintiff's defamation claim must be dismissed because he has failed to specify Professor Epstein's allegedly libelous statements and he has not alleged any facts that, if true, could establish Professor Epstein acted with actual malice (and indeed affirmatively pleads that he did not). *Third,* Plaintiff's tagalong tort claims for intentional infliction of emotional distress ("IIED"), tortious interference with prospective economic relations ("tortious interference"), injurious falsehood, and false light must be dismissed as duplicative of his defective defamation claim and because he cannot make out the

basic elements of those claims.  **Fourth**, Plaintiff's fraud claim fails as a matter of law because Professor Epstein owed him no fiduciary duty and he has not pled any pecuniary loss.  **Fifth**, Plaintiff's civil conspiracy claim fails because New York does not recognize a claim for "conspiracy to defame" and he has not pled any agreement between the alleged co-conspirators. Accordingly, Plaintiff's FAC must be dismissed with prejudice.

**FACTUAL & PROCEDURAL BACKGROUND**[1]

### A.    The Parties

Plaintiff Gideon Rapaport is a graduate of the New York University School of Law ("NYU Law") and a former summer associate at Kirkland & Ellis LLP ("K&E") in New York. FAC ¶ 1.  He was a student of Professor Epstein, an NYU Law professor and faculty advisor to NYU Law's Federalist Society chapter. *Id.* ¶ 6.  Defendants Ajay Iyer and Zachary Garrett are also NYU Law graduates and former presidents of the NYU Law Federalist Society. *Id.* ¶¶ 2, 4. Iyer was a summer associate at K&E with Plaintiff. *Id.* ¶ 2.

### B.    Plaintiff's Kirkland & Ellis Summer Associateship

Professor Epstein is a legal scholar, member of the Federalist Society, and mentor to NYU Law students. *Id.* ¶ 6.  In that role, he has built a reputation as a respected recommender of law students for judicial clerkships.  *Id.* ¶ 19.  Seeking such a recommendation for himself, Plaintiff strove to cultivate a relationship with Professor Epstein and sought to get Professor Epstein to "take[] a positive interest in assisting plaintiff with his career."  *Id.* ¶¶ 72, 23. Professor Epstein ultimately recommended Plaintiff for the James Kent Academy, a Federalist Society law student summer program.  *Id.* ¶ 20.  Plaintiff believed he was entitled to a "promised—and definite—appellate clerkship, and possibly one with the U.S. Supreme Court."

---

[1] The allegations in the FAC are taken as true solely for purposes of this Motion to Dismiss.

2

*Id.* ¶ 13.

In summer 2022, Plaintiff was a summer associate at K&E, but his time there was cut short for reasons not specified in the FAC.  *Id.* ¶¶ 55-57.  After Plaintiff left K&E, Plaintiff claims Iyer digitally manipulated a photograph of the guard desk in K&E's lobby to suggest a sign was put up barring Plaintiff from entering the building.  *Id.* ¶¶ 35-36.  Iyer allegedly published this altered photograph on Reddit.com and Top-Law-Schools.com, where users speculated Plaintiff had been fired for sexually harassing other K&E employees and/or making racist statements in the office.  *Id.* ¶ 37; *id.* Ex 3.  Plaintiff alleges Garrett then sent unspecified "online materials" to Peter Redpath and Kate Alcantara of the Federalist Society.  *Id.* ¶ 42.

Garrett also is alleged to have presented Professor Epstein with "the fake image and defamatory statements," at the same time he sent it to the Federalist Society.  *Id.* ¶ 45. Plaintiff pleads that Professor Epstein "believ[ed] the authenticity of the faked images and veracity of the defamatory claims," and allegedly became concerned about the impact of Plaintiff's firing on his own credibility as his recommender.  *Id.* ¶¶ 45, 17.  Shortly thereafter, Plaintiff alleges Iyer faked a second photograph of the K&E guard desk depicting the poster with Plaintiff's name and photograph, and sent it to Professor Epstein.  *Id.* ¶ 50.  Iyer and Garrett then attempted to persuade Professor Epstein—who, per the FAC, again believed this photograph to be authentic, *id*. ¶ 17—to become "an unwitting instrument of their civil conspiracy."  *Id*. ¶ 50.  Per the FAC, believing the claims to be authentic, Professor Epstein "forwarded the [unspecified] defamatory statements based upon the fake photographs and in the email" to Otis of the Federalist Society.  *Id*. ¶ 63.

On August 2, 2022, Garrett allegedly emailed Redpath and Alcantara disclosing that he believed that Plaintiff was "fired and banned from entering the building" for "sexually harassing

a practice assistant or an attorney." *Id.* ¶¶ 55-56. Garrett claimed he had "spoke[n] with Richard Epstein about this situation" and Professor Epstein was "understandably very upset by the news and feels that Lee Otis should be made aware, since Gideon is going to be participating in the James Kent Fellowship, for which Professor Epstein wrote Gideon a (complicated) letter of recommendation." *Id.* ¶ 60; *id.* Ex. C. Otis investigated the claims against Plaintiff, *id.* ¶¶ 64-65, 68-69, and permitted Plaintiff to participate in the Fellowship. *Id.* ¶ 70.

After Plaintiff completed the Fellowship, Plaintiff alleges Professor Epstein informed him that he could no longer recommend Plaintiff for a clerkship, he would be removed as a Senior Articles Editor from an NYU law journal, and "he will not associate with the plaintiff anymore, in order to protect his own reputation and his ability to recommend and place students in the future." *Id.* ¶ 71. Plaintiff claims Professor Epstein did not disclose during this telephone call that Garrett and Iyer told him of Plaintiff's purported termination and sexual misconduct allegations nor that Professor Epstein sent "materials" to the Federalist Society. *Id.* ¶ 79.

On July 28, 2023, in a gesture of good will, Professor Epstein invited Plaintiff to lunch. *Id.* ¶ 80. Plaintiff capitalized on this opportunity to demand Professor Epstein review his draft *pro se* complaint in this action. *Id.* Professor Epstein declined and informed Plaintiff he did not want to be involved. *Id.* ¶ 83. In response, Plaintiff threatened Professor Epstein that "it was too late" to disclaim involvement. *Id.* Not taking Professor Epstein's refusal as an answer, Plaintiff "pressed" him again via email. *Id.* ¶ 84. In response, Professor Epstein informed Plaintiff that he had sent "compiled materials to Otis." *Id.* Professor Epstein again advised Plaintiff that pursuing this action further would have a deleterious impact on his career. *Id.*

Plaintiff has since graduated from NYU Law and passed the New York State Bar Exam, but has refused to seek admission to the New York State Bar. *Id.* ¶ 14.

### C.    The Complaint & Amended Complaint

Plaintiff filed the original complaint in this action *pro se* on July 28, 2023 against three John Doe defendants, identified as a Reddit.com user, a Top-Law-Schools.com user, and a current or former NYU Law student.  Dkt. No. 1.  The original complaint brought claims for defamation, defamation by implication, defamation *per se*, false light invasion of privacy, and IIED.  *Id.*  Plaintiff represented by counsel filed the amended and operative complaint on May 24, 2024, adding Professor Epstein as a defendant along with Iyer and Garrett. Dkt. No. 38. Against Professor Epstein, Plaintiff brings claims for defamation, injurious falsehood, IIED, false light invasion of privacy, civil conspiracy, fraud, and tortious interference.  *Id.*  Each of these claims must be dismissed.

## ARGUMENT

The Court should dismiss Plaintiff's FAC with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  When ruling on a Rule 12(b)(6) dismissal motion, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor – but the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"  *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plaintiff's allegations cannot satisfy this standard.

### I.    PLAINTIFF'S CLAIMS ARE BARRED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT

Section 230 of the Communications Decency Act of 1996 ("Section 230"), 47 U.S.C. § 230, bars Plaintiff's defamation claim against Professor Epstein premised on his forwarding defamatory statements provided by Iyer and Garrett to others via email.  Section 230 provides

that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), and that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section," *id.* § 230(e)(3). Together, these provisions ensure that interactive computer service providers and users are immune from liability for allegedly unlawful or harmful material created by third parties.[2] Importantly, Section 230 grants "*immunity from suit* rather than a mere defense to liability." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009) (citation omitted). Courts routinely apply Section 230 on dismissal motions—because immunity would be "effectively lost" if defendants were subject to burdensome and costly discovery and litigation. *Id.*[3]

Section 230 bars suit where (1) the defendant is a user or provider of an interactive computer service; (2) the information at issue was provided by another information content provider; and (3) the claim seeks to treat the defendant as a publisher or speaker of that third party content. *Gibson*, 2009 WL 1704355, at *3. All three elements are present here. Email is an "interactive computer service" and the original authors of the forwarded email and materials are "information content providers" because they allegedly created the content and published it to Professor Epstein via email. 47 U.S.C. § 230(f)(2), (3). Therefore, Professor Epstein, as the user of an interactive computer service, cannot be "treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

The many courts interpreting Section 230 in the context of email forwarding have held that Section 230's immunity from suit applies to this precise situation. *See*, *e.g.*, *Monge v. Univ.*

---

[2] "[C]ourts that have addressed these issues have generally interpreted Section 230 immunity broadly." *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007); *see also*, *e.g.*, *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997).

[3] *See also*, *e.g.*, *Gibson v. Craigslist, Inc.*, 2009 WL 1704355 (S.D.N.Y. June 15, 2009).

6

*of Pa.*, 2023 WL 2471181, at *2 (E.D. Pa. Mar. 10, 2023) (dismissing defamation, false light, and aiding and abetting claims based on email forwarding on Section 230 grounds; "Courts analyzing and applying the CDA have consistently held that distributing, sharing, and forwarding content created and/or developed by a third party is conduct immunized by the CDA."); *Novins v. Cannon*, 2010 WL 1688695, at *2-3 (D.N.J. Apr. 27, 2010) (granting dismissal motion holding Section 230 immunity extends to individuals who republish via the Internet alleged defamatory statements originally made by others in email and internet postings); *Peters v. LifeLock Inc.*, 2014 WL 12544495, at *3 (D. Ariz. Sept. 19, 2014) (dismissing defamation claim at pleadings stage because individual cannot be liable for defamation based on forwarding of defamatory email because of Section 230's liability shield ); *Mitan v. A. Neumann & Assocs.*, 2010 WL 4782771 (D.N.J. Nov. 17, 2010) (defamation claim, premised on forwarding newsletter containing defamatory information preempted by the Section 230); *Phan v. Pham*, 105 Cal. Rptr. 3d 791 (Cal. App. 4th 2010) (forwarding defamatory email—and even adding commentary to it—was immune from liability under Section 230); *Barrett v. Rosenthal*, 146 P.3d 510, 529 (Cal. 2006) (individual who forwards email cannot be liable for defamation because of Section 230 immunity); *cf. Banaian v. Bascom*, 281 A.3d 975, 980 (N.H. 2022) ("That individual users are immunized [under Section 230] from claims of defamation for retweeting content that they did not create is evident from the statutory language.").  Just like the defendants in these myriad cases, Professor Epstein is immune from liability for defamation, false light, IIED, injurious falsehood and any other claim premised on his having allegedly forwarded emails received from others. FAC ¶¶ 63, 84.  Plaintiff's claims fail as a matter of law and should be dismissed.

## II.    THE DEFAMATION CLAIM MUST BE DISMISSED.

Even if the Court were to hold that Section 230 does not apply—it does—Plaintiff's

defamation claim against Professor Epstein is facially deficient and must be dismissed. To state a defamation claim, Plaintiff must plead and prove "(1) a written…defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 169-70 (S.D.N.Y. 2021) (citation omitted). Plaintiff has not and cannot satisfy these elements. Specifically, the FAC fails to identify the allegedly defamatory statements by Professor Epstein. It also not only fails to allege facts that, if true, could establish the statements were made with actual malice, it affirmatively pleads facts precluding that finding.[4]

### A. Plaintiff Has Not Adequately Pled Any Allegedly Defamatory Statements Made by Professor Epstein

Plaintiff has not stated a defamation claim against Professor Epstein because he has not pled the content of the allegedly defamatory statements with the requisite specificity. Federal courts "require that the alleged defamatory statements be pleaded with sufficient specificity to put the defendants on notice." *Berwick v. New World Network Int'l, Ltd.*, 2007 WL 949767, at *11 (S.D.N.Y. Mar. 28, 2007). "Vagueness as to the complained-of conduct is particularly inappropriate when pleading a defamation claim" and "the complaint [must] afford defendant sufficient notice of the communications complained of to enable him to defend himself." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 251 (2d Cir. 2017) (citation omitted). To satisfy such notice, plaintiff must "provide a detailed description of the defamatory statements." *Leung v. New York Univ.*, 2010 WL 1372541, at *8 (S.D.N.Y. Mar. 29, 2010), *affirmed in part on relevant grounds*, 580 F. App'x 38 (2d Cir. 2014). A defamation claim is too

---

[4] Courts in the Southern District favor early dismissal of defamation actions like this one, recognizing that "[b]ecause a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 325-26 (S.D.N.Y. 2021) (quoting *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013)), *aff'd sub nom. Daleiden v . Planned Parenthood Fed'n of Am.*, 2022 WL 1013982 (2d Cir. Apr. 5, 2022).

conclusory to survive where "the complaint does not even identify the statements." *Sawyer v. Musumeci*, 1997 WL 381798, at *2 (S.D.N.Y. July 9, 1997), *aff'd*, 165 F.3d 14 (2d Cir. 1998).

Plaintiff offers only vague allegations that Professor Epstein "forwarded the defamatory statements based upon the fake photographs [sic] and in the email to Lee Otis," FAC ¶ 63, and that he "sent the compiled materials to Otis," *id.* ¶ 84. These threadbare allegations—devoid of specific details identifying *what* allegedly defamatory statements Professor Epstein sent or when he sent them are not enough to put Professor Epstein on notice of the alleged statements. *See, e.g.*, *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 763 (2d Cir. 1990) (affirming dismissal of defamation claim where plaintiff failed to "plead adequately the actual words spoken").

*ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.* is instructive. There, the court rejected similarly bare pleadings where the plaintiff alleged the defendant sent an email "falsely accusing [plaintiff] of fraudulent behavior, lying, and dishonesty" but offered no "specific details regarding such accusations." 2021 WL 1177532, at *25 (S.D.N.Y. Mar. 29, 2021). The court concluded that these barebones allegations were "not sufficiently particularized to sustain a claim for libel." *Id.*; *see also Dayter v. Ploof*, 2022 WL 18399473, at *3 (N.D.N.Y. Dec. 19, 2022), *R. & R. adopted*, 2023 WL 346241 (N.D.N.Y. Jan. 19, 2023) (dismissing libel claim where plaintiff "has not alleged a specific statement made by Defendant").[5] Plaintiff's allegations are even *less* illuminating than the flawed allegations in *ADYB*, claiming only that Professor Epstein "forwarded the defamatory statements" and "sent the compiled materials" to Otis without setting forth what Professor Epstein actually said or when he said it. FAC ¶¶ 63, 84.

---

[5] To the extent Plaintiff claims that his defamation claim is based on Professor Epstein allegedly telling "others" that "plaintiff was frequently absent from his classes," FAC ¶ 88, this claim fails on two additional grounds. **First**, the very next sentence of that paragraph acknowledges the truth of this statement. *Id.* (admitting Plaintiff was "occasionally absent" from Professor Epstein's class); *see Printers II, Inc. v. Pros. Publ'g, Inc.*, 784 F.2d 141, 146 (2d Cir. 1986) ("substantial truth" – not literal truth – is all that is required to defeat defamation claim). **Second**, Plaintiff fails to identify with specificity to *whom* this statement was made, rendering it defective. *See Neal v. Asta Funding, Inc.*, 2014 WL 3887760, at *3 (S.D.N.Y. June 17, 2014) ("complaint must at least identify … the third parties to whom the [defamatory] statements were published") (citation omitted).

Because Plaintiff has failed to plead the content of Professor Epstein's allegedly defamatory statements with any specificity, his defamation claim must be dismissed.[6]

## B.   Plaintiff Fails to Plead Professor Epstein Acted with Actual Malice.

Plaintiff's defamation claim also fails because he has not pled facts that if true could demonstrate that Professor Epstein acted with actual malice, *i.e.*, "with knowledge of its falsity or with reckless disregard of whether it was false."  N.Y. Civ. Rights Law § 76-a(2); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  Plaintiff is subject to the actual malice standard both because the alleged communications pertained to an issue of public interest under New York's Anti-SLAPP Law and because the communications themselves are subject to the common interest privilege.  Once applied, the FAC falls far short of meeting this high burden.

### 1.   The Actual Malice Standard of Fault Applies to the Defamation Claim Against Professor Epstein

Initially, there is no question that the actual malice standard applies here.   ***First,*** Plaintiff's claims are subject to New York's Anti-SLAPP law, N.Y. Civil Rights Law § 76-a, which requires the application of the actual malice standard to cases arising from "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest."  N.Y. Civ. Rights Law § 76-a(1)(a); *see Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 25 (S.D.N.Y. 2020) (federal court sitting in diversity must apply Section 76-a because it is substantive rather than procedural).  The term "public interest" under the Anti-SLAPP Law is "construed broadly, and shall mean any subject other than a purely private matter."  N.Y. Civ. Rights Law § 76-a(1)(d).  Alleged sexual harassment at K&E, one of the largest and most prominent law firms in the world (the presumed subject of the statements at

---

[6] To the extent Plaintiff's defamation claim is based upon Epstein's statements *to Plaintiff*, FAC ¶¶ 70-75, it too would necessarily fail because the alleged statements were communicated only to Plaintiff, not a third party. *Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 538 (S.D.N.Y. 2015) ("Under New York defamation law, publication is a term of art. . . . A defamatory writing is not published if it is read by no one but the one defamed.'") (citations omitted).

issue here), is indisputably an issue of public interest. *Cf. Shuman v. N.Y. Mag.*, 211 A.D.3d 558, 558-59 (1st Dep't 2022) ("sexual harassment" is a matter of "significant public concern").

**Second,** the actual malice standard also applies because Professor Epstein's unspecified statements to Otis, a fellow member of the Federalist Society, are subject to the common interest privilege. The common interest privilege "arises when a person makes a good-faith, bona fide communication upon a subject in which he or she has an interest, or a legal, moral or societal interest to speak, and the communication is made to a person with a corresponding interest." *Hoyt v. Kaplan*, 263 A.D.2d 918, 919 (3d Dep't 1999). It is a qualified privilege that requires only that the parties "have such a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information." *Anas v. Brown*, 269 A.D.2d 761, 762 (4th Dep't 2000). The privilege may be overcome if plaintiff can show defendant acted with actual or common law malice. *See Hoyt*, 263 A.D.2d at 919.

The privilege shields Professor Epstein's forwarding of the "compiled materials" and allegedly "defamatory statements" to Otis. Both Professor Epstein and Otis, as Federalist Society members, shared a concern about misconduct allegations against its Fellowship recipient, particularly since Professor Epstein had recommended Plaintiff for the program. *See, e.g., Hodges v. Lutwin*, 2023 WL 3362836, at *3 (2d Cir. May 11, 2023) (common interest privilege applied to disclosure of sexual misconduct allegations to other members of educational organization ahead of student program); *Hoyt*, 263 A.D.2d at 919 (common interest privilege applies to statements made to membership of professional organization). Thus, to avoid dismissal, both the Anti-SLAPP Law and common interest privilege require Plaintiff to plausibly allege Professor Epstein acted with actual malice. He has not and cannot do so.

### 2.   Plaintiff Has Failed to Plausibly Plead Actual Malice

Plaintiff has failed to meet his burden of pleading facts that could establish the requisite

"actual malice." The U.S. Supreme Court has defined actual malice as publication with "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280. In turn, it has clarified that "reckless disregard" means that the defendant in fact had a "high degree of awareness of . . . probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). Importantly, actual malice is not measured "by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 730-31 (1968). Instead, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 731 (emphasis added).

Following *Twombly* and *Iqbal*, pleading actual malice is a more rigorous burden. To allege actual malice, a plaintiff "must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015). Allegations of actual malice that are no more than "pure speculation" and are "supported not by facts but by only conclusory statements" are insufficient grounds to infer actual malice. *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 185 (S.D.N.Y. 2020); *see also BYD Co. v. VICE Media LLC*, 2022 WL 598973, at *3 (2d Cir. Mar. 1, 2022) ("naked assertions" or "conclusory statements" of actual malice are insufficient to survive a Rule 12(b)(6) motion). Plaintiff's conclusory and contradictory allegations do not meet this high threshold.

Initially, far from pleading that Professor Epstein knew or was reckless as to the falsity of the statements, the FAC pleads that Professor Epstein was "convinced" "into *believing* the authenticity of the faked images and veracity of the defamatory claims" against Plaintiff. FAC ¶ 17 (emphasis added). Elsewhere, the FAC describes Professor Epstein as an "*unwitting*

instrument of their [Iyer's and Garrett's] civil conspiracy." FAC ¶ 50 (emphasis added). These allegations doom Plaintiff's bid to plead actual malice or defamation. *See McCollum v. Baldwin*, 688 F. Supp. 3d 117, 130 (S.D.N.Y. 2023) (finding no actual malice because allegations "suggest[ed] that [defendant] posted what he believed was true").

Even putting aside Plaintiff's allegations that specifically preclude a finding of actual malice, the FAC makes only two deficient attempts at pleading actual malice. ***First***, Plaintiff peppers his FAC with actual malice "buzzwords" that parrot the applicable legal standard and allege in conclusory fashion that Defendants were "willful," "malicious," and "knew" statements to be false without any corresponding facts. *See* FAC ¶¶ 93, 95, 104, 112, 120. Because these allegations are threadbare recitals of the elements of a cause of action, they cannot satisfy his burden to plead actual malice. *See BYD*, 2022 WL 598973, at *3. ***Second***, the FAC alleges, in essence, that Professor Epstein failed to investigate, *i.e.*, he did not contact Plaintiff or K&E to check whether the allegations were true. FAC ¶ 63. But the law is well-settled that actual malice is not "measured by whether a reasonably prudent man … would have investigated before publishing." *St. Amant*, 390 U.S. at 731; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974) ("mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth"). And relatedly, "failure to verify statements with the plaintiff" before publication "do[es] not amount to [actual malice]." *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980). The claim must be dismissed because Plaintiff had not pled any non-conclusory facts that, if true, could establish Professor Epstein acted with actual malice.[7]

---

[7] Nor has Plaintiff made more than "conclusory allegations" or "suspicions" to plead common law malice, *i.e.*, "spite or ill will" that could overcome the common interest privilege. *Hodges v. Lutwin*, 595 F. Supp. 3d 12, 20 (S.D.N.Y. 2022) (citations omitted), *aff'd*, 2023 WL 3362836 (2d Cir. May 11, 2023). Common law malice can defeat the common interest privilege "only if it was the one and only cause for the publication." *Id.* (citation omitted). Plaintiff's sole allegation of common law malice is "Defendants either knew, or had reason to know, that many of the allegations of and concerning plaintiff were false, but published them anyway, with constitutional and common-law malice." FAC ¶ 93. These allegations are conclusory, unspecific to any defendant, and contradict other

## III.    PLAINTIFF'S OTHER TORT CLAIMS ARE DUPLICATIVE AND MERITLESS

### A.    Plaintiff's Claims for IIED, Tortious Interference, Injurious Falsehood, and False Light Are Duplicative of the Defective Libel Claim

This Court must dismiss Plaintiff's IIED, tortious interference, injurious falsehood, and false light claims as impermissibly duplicative of his flawed defamation claim. "New York law considers claims sounding in tort to be defamation claims . . . where those causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his reputation." *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (dismissing redundant tort claims because they "flow[ed] from the effect on [plaintiff's] reputation" caused by allegedly defamatory statements); *see also Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F. Supp. 690, 693-94 (S.D.N.Y. 1995) ("When additional tort claims are aimed at controlling the same speech that is the basis of a libel claim, courts should not entertain the additional claims under less stringent standards."). Accordingly, where a plaintiff tries to dress up a defamation claim as an IIED,[8] tortious interference,[9] injurious falsehood,[10] or false light[11] cause of action to avoid the stringent pleading standard of a libel

---

allegations of the FAC. Plaintiff makes no allegations that Professor Epstein was motivated by ill will, let alone *solely* by ill-will. Instead, he pleads Professor Epstein was motivated by "protect[ing] his reputation." *Id.* ¶ 71. This precludes a finding of common law malice.

[8] *See Levin v. McPhee*, 917 F. Supp. 230, 242-43 (S.D.N.Y. 1996) (emotional distress claim dismissed as duplicative of libel claim) (applying New York law), *aff'd*, 119 F.3d 189 (2d Cir. 1997); *Franco v. Diaz*, 51 F. Supp. 3d 235, 243-44 (E.D.N.Y. 2014) ("an IIED claim should be dismissed when it falls 'within the ambit' of another tort, such as defamation"); *Brancaleone v. Mesagna*, 290 A.D.2d 467, 468-69, (2d Dep't 2002) (dismissing IIED claim as duplicative, holding "plaintiff may properly recover for the alleged emotional distress caused by the defamatory statements under the cause of action for defamation"); *Anyanwu*, 887 F. Supp. at 693 (emotional distress claims that are "essentially defamation claims should not be entertained").

[9] *See, e.g.*, *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 726 (S.D.N.Y. 2014) (tortious interference claim foreclosed because "the entire injury pleaded … flows from the effect of the defamatory comments on Plaintiffs' reputation"); *Wexler v. Allegion (UK) Ltd.*, 2018 WL 1626346, at *8 (S.D.N.Y. Mar. 30, 2018) (tortious interference claim duplicated libel claim, as damages came from harm to plaintiff's reputation).

[10] *See, e.g.*, *O'Brien v. Alexander*, 898 F. Supp. 162, 172 (S.D.N.Y. 1995) (dismissing as duplicative injurious falsehoods claim where claim "relie[d] on the same statements that form the basis of the defamation claim"), *aff'd in part and rev'd in part on other grounds*, 101 F.3d 1479, 1488 (2d Cir. 1996); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 149 (E.D.N.Y. 2010) (where injurious falsehood claim was based on statements in article, it was "dismissed as duplicative of the libel and slander claims").

claim, New York courts dismiss such tagalong claims as duplicative as a matter of course.

Plaintiff makes little effort to distinguish these four tort claims from his meritless defamation claim. For injurious falsehood, Plaintiff pleads outright that his claim is premised on "the above-described fake photographs and statements" which he says are "false statements." FAC ¶ 102. While Plaintiff's IIED claim is vaguely predicated on "the above-described actions and conduct," *id.* ¶ 107, it is apparent that this claim overlaps completely with his defamation claim. And in a futile effort to sidestep dismissal, Plaintiff claims his IIED claim is not duplicative because "the faked photographs and false statements" (the crux of his defamation claim) "were only part of the defendants' campaign of destruction, and the threats of defendant Epstein—and the lies of the other defendants—are evidence of their malicious intentions and sheer malevolence." *Id.* ¶ 112. Yet, Plaintiff fails to enumerate *what other grounds* his IIED claim is based on—because none exist. Last, Plaintiff premises his tortious interference claim on allegations that Professor Epstein disparaged him to employers, prospective employers, and to "anyone who would listen." *Id.* ¶¶ 138-139. Not only is this allegation impermissibly vague, but it makes clear, that once more, it is really just a defamation claim in disguise. As such, each of these claims should be dismissed as duplicative of Plaintiff's facially deficient defamation claim.

### B.    Plaintiff's IIED Claim Fails

Even if Plaintiff's IIED claim were not duplicative of his defamation claim (it clearly is), it would still fail on the merits. Alleging IIED requires showing "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional

---

[11] As discussed *infra*, New York does not recognize false light claims. New York courts also have rejected false light claims brought under another state's law based upon the same facts as a New York defamation claim. *See, e.g.*, *Baiqiao Tang v. Wengui Guo*, 2019 WL 6169940, at *7 (S.D.N.Y. Nov. 20, 2019) (dismissing California false light claim as duplicative of defamation claim under New York law). New York federal courts have also noted that even if New York did recognize the tort, it still would be dismissed as duplicative of a defamation claim. *See Chord Assocs. v. Protech 2003-D, LLC*, 2010 WL 3780380, at *4 (E.D.N.Y. Sept. 21, 2010).

15

distress." *Y.D. v. New York City Dep't of Educ.*, 2016 WL 698139, at *8 (S.D.N.Y. Feb. 19, 2016). As the Second Circuit has held, "The standard for stating a valid claim of intentional infliction of emotional distress is 'rigorous, and difficult to satisfy.'" *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (citation omitted). The IIED claim falls short of this rigorous bar for three reasons: (1) it is barred by the First Amendment; (2) relaying accusations of sexual harassment or other misconduct to higher-ups within an organization (even if the accusations prove false) does not constitute "extreme and outrageous" conduct; and (3) Plaintiff has not pled that Professor Epstein intended to cause him or that he suffered severe emotional distress.

*First*, the U.S. Supreme Court has affirmed that the First Amendment serves as a defense against tort suits "including suits for intentional infliction of emotional distress," which are based on speech that addresses a "matter of public concern" where no viable defamation claim exists. *Snyder v. Phelps*, 562 U.S. 443, 451-53 (2011). The Court has broadly defined such speech to be "fairly considered as relating to any matter of political, social, or other concern to the community," or "is a subject of general interest and of value and concern to the public." *Id.* at 453 (citations omitted). The Court has precluded such claims because determining if speech is "outrageous" necessarily requires a subjective value judgment as to its content. *Id.* at 458. As noted above, an accusation of sexual harassment at the prestigious law firm K&E, FAC ¶ 38, is a matter of public concern, and thus the IIED claim against Professor Epstein is barred.

*Second*, Plaintiff's IIED claim also fails because he does not plead any "extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985). This is because "defamatory statements are generally not sufficiently extreme and outrageous to support an IIED claim." *Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 372-73

(W.D.N.Y. 2010). "Even a false charge of sexual harassment does not rise to the level of outrage required to recover on an intentional infliction of emotional distress claim under New York law." *James v. DeGrandis*, 138 F. Supp. 2d 402, 421 (W.D.N.Y. 2001); *see also Carlson*, 679 F. Supp. 2d at 372-73. *James* is on point. There, the court dismissed an IIED claim because a false accusation that a college soccer coach had improper sexual relationships with students as part of a scheme to have the coach fired and rendered unemployable was insufficiently outrageous. *Id.* at 421. Here, as in *James* and others, passing on an allegedly false sexual harassment accusation is simply not "extreme or outrageous."

*Third*, the FAC fails to make any non-conclusory allegations that Professor Epstein intended for Plaintiff to, and that Plaintiff did, suffer severe emotional distress. At most, Plaintiff's speculative allegations that "defendants' action … demonstrate their intent to cause … severe emotional distress to the plaintiff," FAC ¶ 109, and that Plaintiff suffered "emotional distress" and "anxiety," *id.* ¶ 111, are "formulaic recitation[s] of the elements of the claim" and wholly insufficient. *Ortiz v. Ardolino*, 2021 WL 2075714, at *2 (E.D.N.Y. May 21, 2021). Since the FAC offers no non-conclusory allegations that Professor Epstein intended to harm Plaintiff or that he suffered the necessary severe emotional harm, his IIED claim cannot survive. *See Nova v. Smith*, 2019 WL 2636817, at *5 (N.D.N.Y. June 27, 2019) (dismissing IIED claim where allegations did not show intention to cause plaintiff harm); *Morin v. Fordham Univ.*, 2022 WL 4586042, at *7 (S.D.N.Y. Sept. 28, 2022) (dismissing IIED claim where plaintiff did not establish that he "suffered a level of emotional distress 'so severe that no reasonable [person] could be expected to endure it'") (citation omitted). Plaintiff's IIED claim must be dismissed.

### C.    Plaintiff's Tortious Interference Claim Fails

Plaintiff fails to state a plausible claim for tortious interference, which requires a plaintiff to plead that "(1) the plaintiff had business relations with a third party; (2) the defendant

interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Just Play, LLC v. A.S. Plastic Toys Co.*, 2022 WL 580876, at *4 (S.D.N.Y. Feb. 25, 2022) (citation and internal quotation marks omitted). ***First***, Plaintiff's tortious interference claim fails because he does not "allege what was said … caused [him] to lose business opportunities." *Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *2 (S.D.N.Y. Dec. 30, 2020). Moreover, his "[f]ailure to identify a specific business relationship with a third party is a 'fatal' deficiency to pleading tortious interference." *Deaton v. Napoli*, 2019 WL 4736722, at *8 (E.D.N.Y. Sept. 27, 2019); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 114-15 (2d Cir. 2010) (affirming dismissal where plaintiff failed to describe the third parties with whom she had lost prospective economic relations). Here, Plaintiff only vaguely alleges that Professor Epstein "repeatedly disparaged him to many employers and prospective employers." FAC ¶ 138. But Plaintiff does not identify *what* Professor Epstein allegedly said and to *whom*. For example, Plaintiff pleads that as a result of this alleged disparagement, he lost a "paid contractor position," but does not identify the employer. *Id.* ¶ 140. The only employer Plaintiff names is the Manhattan Institute, *id.* ¶ 141, but even there, Plaintiff does not plead that he lost that job due to Professor Epstein. In short, Plaintiff's tortious interference claim is no more than "an unadorned, the defendant-unlawfully-harmed-me accusation" – which cannot sustain his claim here. *DiFolco*, 622 F.3d at 111 (citation omitted).[12]

   ***Second***, the FAC does not and cannot allege, as it must, that Professor Epstein's sole purpose in informing others of the accusations against Plaintiff was to harm him. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189 (2004). To the contrary, Plaintiff expressly pleads that

---

[12] Plaintiff has also pled that he has still not sought admission for the New York Bar, which is an independent and intervening cause for his apparent failure to find legal employment. FAC ¶ 14.

rather than solely desiring to harm him, Professor Epstein wanted to "protect his own reputation and his ability to recommend and place students in the future." FAC ¶ 71; *see also id.* ¶ 75. Underscoring that Professor Epstein was not spurred by an intent to harm but out of legitimate concern, Plaintiff pleads Professor Epstein "believe[ed] the authenticity of the faked images and veracity of the defamatory claims." *Id.* ¶ 17. For this reason too his claim must be dismissed.

### D. Plaintiff's Injurious Falsehood Claim Fails

Plaintiff has not stated a claim for injurious falsehood against Professor Epstein. To plead injurious falsehood or "trade libel," Plaintiff must allege "(1) falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages." *Wilson v. Tarricone*, 2013 WL 12084504, at *6 (S.D.N.Y. Sept. 26, 2013) (history omitted). Plaintiff has not pled the appropriate type of injury to his business, actual malice, or special damages.

*First*, Plaintiff's alleged injury—to his personal reputation—sounds in defamation, not injurious falsehood. Injurious falsehood is "distinct" from libel, because it is "confined to denigrating the quality of the [plaintiff's] business'[s] goods or services." *Hollander v. Pressreader, Inc.*, 2020 WL 2836189, at *6 (S.D.N.Y. May 30, 2020) (citation omitted). A claim like Plaintiff's that concerns his "integrity," by contrast, sounds in defamation. *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 472 (S.D.N.Y. 2006). An injurious falsehood claim against a lawyer must pertain to statements relating to the lawyer's "quality of the services." *Hollander*, 2020 WL 2836189, at *6. But the quality of Plaintiff's legal services is not at issue here. The FAC does not allege Professor Epstein denigrated Plaintiff's legal skills. Rather, Plaintiff predicates his injurious falsehood claim on statements about his *personal reputation and integrity*, *i.e.*, "that plaintiff was fired for sexual harassment." FAC ¶ 104. Courts have found that a claim based on a statement that a lawyer was fired for sexual harassment sounds in defamation, not injurious falsehood. *Pitcock v. Kasowitz, Benson, Torres*

19

*& Friedman, LLP*, 27 Misc. 3d 1238(A), 910 N.Y.S.2d 765 (Sup. Ct. N.Y. Cnty. May 28, 2010).

**Second**, as set forth in Section II.B., Plaintiff has not plausibly alleged actual malice, which requires this claim's dismissal. *See Diario El Pais, S.L. v. Nielsen Co. (U.S.), LLC*, 2008 WL 4833012, at *7 (S.D.N.Y. Nov. 6, 2008) ("Plaintiffs fail to state a claim for trade libel because their Amended Complaint does not allege facts that render 'plausible' the actual malice element of trade libel"). Plaintiff attempts to avoid dismissal by thinly alleging that Defendants acted with actual malice because they had "intent to harm plaintiff professionally," FAC ¶ 104, but such factually unmoored allegations are not enough. *See Biro v. Condé Nast*, 963 F. Supp. 2d 255, 280 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015).

**Third**, the injurious falsehood claim fails because the FAC has not adequately pled special damages. "The requirement of pleading and proving special damages is applied strictly" and courts dismiss injurious falsehood claims "for failure to allege special damages with the requisite specificity," *Daniels v. St. Luke's-Roosevelt Hosp. Ctr.*, 2003 WL 22410623, at *7 (S.D.N.Y. Oct. 21, 2003), which requires providing an itemization of damages. *See Navarra v. Marlborough Gallery, Inc.*, 2012 WL 13210272, at *8 (S.D.N.Y. Apr. 4, 2012); *Conte*, 703 F. Supp. 2d at 149 ("Plaintiff's allegations of damages of $500,000,000, without any itemization, are insufficient."). Plaintiff falls far short of this strict burden, claiming only that he is "entitled to compensatory and punitive damages" arising from alleged loss of a "promised clerkship," "loss of the opportunity to become a member of the New York bar," and "his entire career prospects." FAC ¶¶ 100, 102, 105. Such vague—and remote—allegations that do not even attempt to set a figure on his alleged damages, let alone itemize, do not suffice. *See Daniels*, 2003 WL 22410623, at *7-8 (citation omitted) (rejecting injurious falsehood claim where plaintiff's special damages were broadly premised "on her loss of employment and salary

therefor," which the court determined to be "not fully and accurately stated, as required under New York law").[13]   In sum, Plaintiff has not met the "strict requirement" of pleading special damages and his injurious falsehood claim must be denied.

### E.    New York Does Not Recognize the Tort of False Light.

Plaintiff's false light claim should be dismissed for the additional reason that it is not recognized in New York.  *See Berwick*, 2007 WL 949767, at *7-8.[14]  Plaintiff cannot avoid this outcome by contending that New Jersey law applies to this (and only this) claim. FAC ¶ 115.

New York law applies to Plaintiff's false light claim, because under the most significant interest test, New York, not New Jersey, bears the most significant interest to it.  *See Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021).  To determine which state has the greatest interest in a false light action, courts weigh "where the statements emanated and were broadcast," "where the activities to which the allegedly defamatory statements refer took place," "where plaintiff suffered the greatest injury," and "the policy interests of the states whose law might apply."  *DeIuliis v. Engel*, 2021 WL 4443145, at *9 (S.D.N.Y. Sept. 27, 2021).  There is only one answer to each of these questions: New York.

The statements emanated from New York. Plaintiff alleges that Defendants Epstein, Garrett, and Iyer cast him in a false light while in New York. *See* FAC ¶¶ 10, 55, 56, 63.  The subject of the allegedly defamatory statements – Plaintiff's alleged conduct at K&E's New York office, *e.g.*, FAC ¶¶ 55, 56, 120 – took place in New York.  And save for a barebones pleading

---

[13] In any case, Plaintiff had no "promised clerkship," as Professor Epstein is a recommender, not a judge.  Further, Plaintiff admits he has not completed his application for admission to the New York bar.  Thus, even taking his allegations as true, Plaintiff—not Professor Epstein—is the cause of his not being a member of the bar and other alleged damages to his career prospects.

[14] *See also Pedraglio Loli v. Citibank, Inc.*, 173 F.3d 845, 845 (2d Cir. 1999) ("[D]istrict court properly dismissed [plaintiff's] 'false light' invasion of privacy claim as not cognizable under New York law."); *Baiqiao Tang*, 2019 WL 6169940, at *6 ("Allegations that a defendant portrayed a plaintiff in a false light, however, are not actionable under New York law.").

that Plaintiff was then "domiciled" in New Jersey,[15] the brunt of his alleged injuries occurred in New York: the alleged damage to his reputation at K&E, FAC ¶ 21, the loss of his relationship with Professor Epstein, *id.* ¶ 72, the loss of his accepted position at the Manhattan Institute, *id.* ¶ 141, his removal as Senior Articles editor from his NYU law journal, *id.* ¶ 71, and the loss of the "opportunity" to be a member of the New York Bar, *id.* ¶ 14, all occurred in New York. The "main import" of the alleged harm to his reputation was with people and entities in New York and there is no alleged "meaningful connection between the alleged torts and [New Jersey] aside from [his] personal residence there." *See Berwick*, 2007 WL 949767, at *7–8.[16] Therefore, New York law applies to his false light claim. Since it is well established that "New York does not recognize as a tort 'false light' invasion of privacy," the claim must be dismissed. *Id.* at *6.

Even if the Court decides that Plaintiff's false light claim is governed by New Jersey law, his claim still fails because his defamation claim fails. *See G.D. v. Kenny*, 15 A.3d 300, 318-19 (N.J. 2011) ("Because G.D.'s arguments in support of his false-light claim are essentially the same as those he advances on his defamation claim, the result can be no different."); *Williams v. MLB Network, Inc.*, 2019 WL 1222954, at *29-30 (N.J. Super. Ct. App. Div. Mar. 14, 2019) (where there is no actionable defamation, a claim for false light based upon the same conduct cannot stand). His false light claim also fails because as set forth in Section II.B, the FAC alleges no facts showing actual malice. *Marino v. Westfield Bd. of Educ.*, 2017 WL 216691, at

---

[15] Plaintiff's pleading of injury in New Jersey is too vague to pass muster. Without any specificity, Plaintiff pleads that he was presented in a false light to "his immediate neighbors and members of his local community in the State of New Jersey," (where he no longer resides). FAC ¶ 117. Nor is it enough that the posts were published to Top-Law-Schools.com and Reddit. *Id.* ¶ 37. In *Berwick*, the Court found that although plaintiffs, who were Pennsylvania residents, alleged internet publication, "conclusory allegations that their reputations were harmed in their home state," without "identify[ing] any person or entity in Pennsylvania who heard or read disparaging remarks about the plaintiffs" were not enough to show detrimental effects in Pennsylvania, especially since all "relevant business dealings were in New York." *Berwick*, 2007 WL 949767, at *7. Plaintiff repeats the exact same error here.

[16] Plaintiff cannot plead that any harm from the alleged false light was felt where the Federalist Society employees are located since he pleads that Redpath and Alcantara "saw through these forgeries and defamatory claims," FAC ¶ 61, and that Otis also did not believe the allegations against him, *id.* ¶¶ 68-69.

*9 (D.N.J. Jan. 18, 2017) (applying actual malice to false light claim where statements involve matter of public concern); *see also Time, Inc. v. Hill*, 385 U.S. 374, 387 (1967) (holding plaintiff alleging the tort of false light must show actual malice).

## IV.    PLAINTIFF'S FRAUD CLAIM FAILS

Plaintiff's fraud claim is premised on Professor Epstein's purported failure to disclose Iyer and Garrett as the "transmitters of the faked photographs and defamatory statements."[17] FAC ¶¶ 130-136.  This claim, however, fails because Professor Epstein had no duty to disclose, and Plaintiff pleads no damages attributable to his purported reliance.

***First***, Professor Epstein did not owe Plaintiff a duty to disclose that Defendants allegedly transmitted the photographs and email.  *See* FAC ¶¶ 130-131.  "An omission or concealment can constitute fraud, but ***only*** where the defendant had a duty to disclose the material fact alleged to be omitted or concealed."  *Sutton v. Hafner Valuation Grp., Inc.*, 115 A.D.3d 1039, 1041 (3d Dep't 2014) (emphasis added).  This duty of disclosure only exists if there is a "confidential or fiduciary relationship."  *Bd. of Managers of Chelsea 19 Condo. v. Chelsea 19 Assocs.*, 73 A.D.3d 581, 582 (1st Dep't 2010).  The Second Circuit has held that educators *do not* owe a fiduciary duty to their students.  *Knelman v. Middlebury Coll.*, 570 F. App'x 66, 68 (2d Cir. 2014).  As Professor Epstein owed Plaintiff no duty to disclose, Plaintiff's fraud claim falls.

***Second***, even if Plaintiff could plead a duty was owed and prove a knowingly false representation or omission of material fact on which he justifiably relied, he does not and cannot plead that "as a result of such reliance [he] sustained pecuniary loss."  *Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 369 (S.D.N.Y. 2020) (citation omitted); *see also Schneider v. Pearson Educ., Inc.*, 2013 WL 1386968, at *5 n.6 (S.D.N.Y. Apr. 5, 2013)

---

[17] Plaintiff alleges that Professor Epstein admitted he sent the compiled materials to Otis.  FAC ¶ 84.  Therefore, his allegation that Professor Epstein had an obligation but failed to disclose that fact is facially meritless. *Id.* ¶ 131.

("damages are an essential element of a fraud claim").  Plaintiff's fraud "injury" appears to be wholly premised on a delay in Plaintiff's discovery of the "true and proper defendants."  FAC ¶ 133.  Critically, Plaintiff does not—and cannot—allege the loss of a single dollar attributable to this injury, or that it would not have occurred absent his conversations with Professor Epstein.  New York's general "out-of-pocket rule" provides that "[d]amages are to be calculated to compensate plaintiffs for what they lost because of the fraud."  *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 108-09 (S.D.N.Y. 2015) (citation omitted).  Here, "plaintiff's pleading is fatally deficient because [it] did not assert compensable damages resulting from defendants' alleged fraud."  *Sw. Invs. Grp., LLC v. JH Portfolio Debt Equities, LLC*, 169 A.D.3d 1510, 1511 (4th Dep't 2019).  Instead, Plaintiff broadly claims "delay and expense," FAC ¶ 136, but these conclusory allegations cannot satisfy his pleading burden.  Moreover, the FAC disclaims damages caused by any so-called delay, admitting that he was able to uncover the "proper Defendants" after enforcing subpoenas.  *Id.* ¶ 133.  In short, Plaintiff has suffered no harm, pecuniary or otherwise, and his fraud claim therefore fails.

## V.    THE CIVIL CONSPIRACY CLAIM FAILS

Plaintiff's civil conspiracy claim is facially meritless for multiple reasons and must be dismissed.  ***First***, the conspiracy claim fails along with the other deficient underlying tort claims.  "[A] cause of action alleging conspiracy to commit a tort stands or falls with the underlying tort."  *Barns & Farms Realty, LLC v. Novelli*, 82 A.D.3d 689, 691 (2d Dep't 2011).  Plaintiff has alleged that defamation is "the primary tort underlying the conspiracy."  FAC ¶ 126.  However, as set forth above, he has failed to plead defamation—or any of his remaining torts.  This on its own is enough to require dismissal of his civil conspiracy claim.

***Second***, New York law does not recognize "conspiracy to defame," FAC ¶ 123, as a cognizable cause of action.  *McGill v. Parker*, 179 A.D.2d 98, 105 (1st Dep't 1992); *Pravda v.*

*Cnty. of Saratoga*, 224 A.D.2d 764, 766 (3d Dep't 1996).  Since Plaintiff acknowledges his civil conspiracy claim is predicated on defamation, FAC ¶ 126, that claim fails as a matter of law.

**Third**, the FAC does not allege any agreement between Professor Epstein and the alleged co-conspirators, Iyer and Garrett.  *See Chen Gang v. Zhao Zhizhen*, 799 F. App'x 16, 19 (2d Cir. 2020) (summary order) (allegation that agreement existed required to allege civil conspiracy). Instead, Plaintiff claims "Epstein had chosen to join with defendants Iyer and Garrett," FAC ¶ 59, and the Defendants, including Professor Epstein, "agreed to use their influence with numerous contacts in the community to destroy the Plaintiff's reputation and future employability." *Id.* ¶ 124.  Such threadbare allegations are not enough.  Plaintiff alleges no action by Professor Epstein that suggests an agreement or "meeting of the minds" with Garrett or Iyer.  Indeed, he pleads the opposite, that Professor Epstein was "an unwitting instrument of [Iyer's and Garrett's] civil conspiracy." *Id.* ¶ 50.  Because a "meeting of the minds" is implausible in the pled circumstances, the civil conspiracy claim fails. *See Strujan v. Teachers Coll. Columbia Univ.*, 2010 WL 3466251, at *4 (S.D.N.Y. Sept. 3, 2010) (dismissing civil conspiracy claim where plaintiff failed to offer "some factual basis supporting a meeting of the minds").

## CONCLUSION

For the foregoing reasons, Professor Epstein respectfully requests that this Court dismiss Plaintiff's First Amended Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: August 12, 2024                                  Respectfully submitted,

                                                                      */s/ Jeremy Chase*
                                                                      Jeremy Chase
                                                                      Nimra H. Azmi
                                                                      DAVIS WRIGHT TREMAINE LLP

1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone:      (212) 489-8230
Fax:        (212) 489-8340
jeremychase@dwt.com
nimraazmi@dwt.com

*Attorneys for Richard A. Epstein*

## CERTIFICATE OF SERVICE

I, Jeremy Chase, hereby certify that on August 12, 2024, a copy of the foregoing document was filed electronically and served by e-mail to all parties of record via ECF.

*/s/ Jeremy Chase*
Jeremy Chase

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

GIDEON RAPAPORT

                                                    Case No. 1:23-cv-06709

                    Plaintiff, *pro se*

                                                    **ORAL ARGUMENT
                                                    REQUESTED**

                    -against-


AJAY SRINIVASAN IYER, ZACHARY GEORGE
GARRETT, RICHARD ALLEN EPSTEIN

                    Defendants.
------------------------------------------------------------------x

## <u>NOTICE OF OPPOSITION TO MOTION</u>

        PLEASE TAKE NOTICE that, upon the annexed Memorandum of Law, Plaintiff Gideon

Rapaport, *pro se*, opposes the Motion of Defendant Richard Allen Epstein to Dismiss this Action before

the Honorable Jessica G. L. Clarke at the United States Courthouse for the Southern District of New

York, 500 Pearl Street, New York, New York.


Dated: Vancouver, British Columbia (Canada)
September 26, 2024


                                Respectfully submitted,


                                        /s/ Gideon Rapaport, *pro se*
                                        GideonRapaportLaw@Outlook.com
                                        (862) 213-0895
                                        #627 1078 Summit Avenue
                                        Jersey City, New Jersey, 07310

## TABLE OF CONTENTS

| | |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| PROCEDURAL BACKGROUND | 2 |
| The Parties | 2 |
| Procedural Background | 3 |
| ARGUMENT | 3 |
| **Defendant Epstein is the Paradigmatic Reckless Tortfeasor** | 3 |
| Defendant Epstein Did Not and Would Not Care Whether the Defamations Were True or False | 3 |
| Defendant Epstein Comprehensively and Repeatedly Explained and Admitted His Callous Reasoning to the Plaintiff and His Indifference as to the Plaintiff's Innocence | 4 |
| Defendant Epstein Punished and Crushed the Plaintiff as if the Defamations Were True Despite Knowing They Were False and His Own Students Perpetrated Them | 4 |
| There is No Possible Standard Other than Actual Malice by 'Reckless Disregard' Evoked by Defendant Epstein's Actions | 5 |
| **Actual Malice is Not the Standard for Any Cause Herein** | 5 |
| A "Public Interest" Matter Must Have a Minimal Basis in Reality to Concern the Public and State Courts Have Rejected "Public Interest" in Similar Cases | 6 |
| Any Defamation Resulting in Any Damages Would Necessarily Be a Public Matter According to Opposing Counsel's Definition | 7 |
| Section 230 is not Applicable to Defendant Epstein's Conduct or the Multiple Legal Bases for His Liability | 8 |
| Defendant Epstein's Liability Is Not Contingent on Being a "Speaker" or "Publisher" Due to His Conspiracy Liability and Vicarious Liability | 8 |
| Alternatively Defendant Epstein is Liable as a Common Law Distributor Per Prior SDNY Precedent | 9 |
| Defendant Epstein's Theory of Section 230 is Absurd, Textually Incorrect and Would Eliminate Most Publication and All Republication Liability in Modern Life | 11 |
| Revenge Pornography Would Be Federally Protected From Civil Action or Injunction By Defendant Epstein's Argument | 13 |
| Defendant Epstein Repeated Defamations By Phone and Verbal Communication | 13 |

| | |
|---|---|
| The Affirmative Defense of Common Interest Privilege Cannot Be Resolved Now and is Inapplicable | 14 |
| Common Interest Privilege is an Affirmative Defense That is Inherently Fact Intensive and is Thus Inappropriate Prior to Discovery | 14 |
| Actual Malice by Reckless Disregard for the Truth Defeats Any Possible Common Interest Privilege | 15 |
| Rather Than a Common Interest Defendant Epstein Had a Common Conflict | 15 |
| Defendant Epstein's Defamation is Pled Correctly Far in Excess of Plausibility | 16 |
| Opposing Counsel Ignores Inconvenient Facts Pleaded and Reasonable Inferences Throughout | 17 |
| Defendant Epstein Should Know Best Who He Talks to and What He Says and Already Admitted in Writing to His Defamation | 17 |
| Defendant Epstein's Tortious Interference is Pled Correctly | 17 |
| Defendant Epstein's Tortious Interference is Plausible in this Case | 18 |
| Defendant Epstein Should Know Best Who He Talks To | 18 |
| Defendant Epstein's Injurious Falsehood is Pled Correctly and Far in Excess of Plausibility | 19 |
| Defendant Epstein's Fraud Is Pled Correctly and Far in Excess of Plausibility | 19 |
| Pecuniary or "Out-of-Pocket" Costs Are Pled | 19 |
| The Federal Rules Do Not Require Pleading of Pecuniary or "Out-of-Pocket" Costs | 19 |
| Fiduciary Duty is Not a Required Element of Defendant Epstein's Fraud Because He Directly Lied Rather Than Fail to Disclose Anything Sua Sponte | 20 |
| Damages by Fraud Through Delay of a Legal Right Are Specifically Recognized By New York Including Nominal Amounts | 21 |
| New Jersey Law Applies to the Properly Pleaded False Light and Invasion of Privacy Claim | 21 |
| The Southern District of New York and Second Circuit Routinely Uphold Such New Jersey Claims Under New Jersey Law | 21 |
| Disbelief of Particular Individuals Mentioned Does Not Reflect Injury With Broad Local Community Who Did Not Investigate the Matter | 22 |
| The Doctrine of Dépeçage Permits Different Law for Different Claims | 23 |
| Opposing Counsel Grossly Misstate the Law of Civil Conspiracy | 24 |
| Civil Conspiracy Can Involve Any Cause of Action | 24 |

| Civil Conspiracy was Properly Pleaded, Conspiracy Liability Discussed in Part C-1 | 24 |
| CONCLUSION | 25 |
| **The Facially Defective Motion to Dismiss Opposed is a Not Responsive to the Pleadings** | 25 |

## TABLE OF AUTHORITIES

**Rules**

Federal Rules of Civil Procedure Rule 8

Federal Rules of Civil Procedure Rule 9

Federal Rules of Civil Procedure Rule 12

**Statutes**

N.Y. Civ. Rights Law § 76-a

28 U.S.C. § 1652 (Rules of Decision Act)

47 U.S.C. § 230(c)(1) (Communications Decency Act)

**Books**

William Shakespeare, *Othello*

Richard A. Epstein, *Cases and Materials on Torts* (12th ed. 2020)

Scalia and Garner, *Reading Law*

**Cases**

N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)

Gertz v. Robert Welch, Inc,. 418 U.S. 323 (1974)

Miller v. Appadurai, 2023, 214 A.D.3d 455, 185 N.Y.S.3d 93

Ezekwo v. NYC HHS, 940 F.2d 775 (2d Cir. 1991)

Huggins v. Moore, 94 N.Y.2d 296, 303, 704 N.Y.S.2d 904, 726 N.E.2d 456 [1999]

Bedard v. La Bier, 20 Misc. 2d 614, 194 N.Y.S.2d 216 (Sup 1959)

Ballantine v. Ferretti, 28 N.Y.S.2d 668 (Sup 1941)

Rosco Trading Co. v. Goldenberg, 182 N.Y.S. 711 (Sup 1920)

Gray v. Heinze, 82 Misc. 618, 144 N.Y.S. 1045 (Sup 1913)

Supreme Specialty Mfg. Co. v. De Muth, 220 A.D. 812, 222 N.Y.S. 334 (1st Dep't 1927)

Avallone v. Bernardi, 276 A.D. 1094, 96 N.Y.S.2d 685 (2d Dep't 1950)

Balabanoff v. Fossani, 192 Misc. 615, 81 N.Y.S.2d 732 (Sup. Ct. 1948)

Lerman v. Flynt Distrib. Co., 745 F.2d 123 (2d Cir. 1984)

Stratton Oakmont, Inc. v. Prodigy Services Company, 23 Media L. Rep. (BNA) 1794 (N.Y. Sup. Ct. 1995)

Cubby, Inc. v. CompuServe, Inc., 776 F.Supp. 135 (SDNY 1991)

INS v. National Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991)

Aronson v. Wiersma, 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985)

Kramer v. Skyhorse Pub., Inc., 45 Misc. 3d 315, 989 N.Y.S.2d 826 (Sup 2014)

Wilcox v. Newark Valley Cent. School Dist., 74 A.D.3d 1558, 904 N.Y.S.2d 523, 258 Ed. Law Rep. 366, 31 IER Cases 468, 2010 N.Y. Slip Op. 04916 (N.Y.A.D. 3 Dept. 2010)

Brach v. Congregation Yetev Lev D'Satmar, Inc., 265 A.D.2d 360, 696 N.Y.S.2d 496 (2d Dep't 1999)

Dillon v. City of New York, 261 A.D.2d 34, 704 N.Y.S.2d 1 (1st Dep't 1999)

Ward v. Klein, 10 Misc. 3d 648, 809 N.Y.S.2d 828 (Sup 2005)

Heydon's Case, 76 Eng. Rep. 637, 638 (K.B. 1584)

Fair Hous. Council v. Roommates.com, LLC, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc)

F.T.C. v. Accusearch Inc., 570 F.3d 1187, 1195 (10th Cir. 2009).

SBT Holdings, LLC v. Town Of Westminster, 547 F.3d 28 (1st Cir. 2008)

Michael Grecco Prods., Inc. v. RADesign, Inc., 112 F.4th 144 (2d Cir. 2024)

Clark v. Hanley, 89 F.4th 78, 93–94 (2d Cir. 2023)

In Re: Nine West LBO Sec. Litig., 87 F.4th 130, 144 (2d Cir. 2023)

Diorio v. Ossining Union Free School Dist., 96 A.D.3d 710, 946 N.Y.S.2d 195 (2d Dep't 2012)

Konowitz v. Archway School Inc., 65 A.D.2d 752, 409 N.Y.S.2d 757 (2d Dep't 1978)

La Liberte v. Reid, 966 F.3d 79, 85 (2nd Cir. 2020)

Palin v. New York Times Co., 940 F.3d 804, 809 (2nd Cir. 2019)

Elias v. Rolling Stone, LLC, 872 F.3d 97, 104 (2nd Cir. 2017)

Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245-246 (2002)

Thome v. Alexander & Louisa Calder Foundation, 70 A.D.3d 88, 890 N.Y.S.2d 16 (1st Dep't 2009)

N. State Autobahn, Inc. v. Progressive Ins. Grp. Co., 102 A.D.3d 5, 953 N.Y.S.2d 96 (2012)

Gilliam v. Richard M. Greenspan, P.C., 17 A.D.3d 634, 635, 793 N.Y.S.2d 526).

Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)

Guaranty Trust Co. v. York, 326 U.S. 99 (1945)

Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999)

Gray v. Richmond Bicycle Co., 167 N.Y. 348, 60 N.E. 663 (1901)

Andres v. LeRoy Adventures, Inc., 201 A.D.2d 262, 607 N.Y.S.2d 261 (1st Dep't 1994)

Indosuez v. Barclays Bank PLC, 181 A.D.2d 447, 580 N.Y.S.2d 765 (1st Dep't 1992)

Junius Const. Co. v. Cohen, 257 N.Y. 393, 178 N.E. 672 (1931)

Stambovsky v. Ackley, 169 A.D.2d 254, 572 N.Y.S.2d 672 (1st Dep't 1991)

Lawrence v. Houston, 172 A.D.2d 923, 567 N.Y.S.2d 962 (3d Dep't 1991)

Garnett v. Hudson Rent-A-Car, 276 A.D.2d 524, 714 N.Y.S.2d 302 (2d Dep't 2000)

Catalanello v. Kramer, 18 F. Supp. 3d 504 (S.D.N.Y. 2014)

Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir.1999), 166 F.3d

Machleder v. Diaz, 801 F.2d 46, 51–52 (2d Cir.1986)

Adelson v. Harris, 973 F.Supp.2d 467, 476 (S.D.N.Y.2013)

Condit v. Dunne, 317 F.Supp.2d 344, 353 17

Reeves v. Am. Broad. Co., 719 F.2d 602, 605 (2d Cir.1983)

Federal Housing Finance Agency v. Ally Financial Inc., Fed. Sec. L. Rep. (CCH) P 97235, 2012 WL 6616061 (S.D.N.Y. 2012). Dépeçage is a term that one court noted means "dismemberment" in French

Schwartz v. Twin City Fire Ins. Co., 492 F. Supp. 2d 308 (S.D. N.Y. 2007)

Schwartz v. Twin City Fire Ins. Co., 539 F.3d 135 (2d Cir. 2008)

2002 Lawrence R. Buchalter Alaska 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co., 96 F. Supp. 2d 182 (S.D.N.Y. 2015)

United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198  (S.D.N.Y. 2002)

McGill v. Parker, 179 A.D.2d 98, 582 N.Y.S.2d 91 (1st Dept. 1992)

ACR Sys., Inc. v. Woori Bank, No. 14 CIV. 2817 (JFK), 2018 WL 1757019 (S.D.N.Y. Apr. 10, 2018)

See also Cohen Brothers Realty Corp. v. Mapes, 181 A.D.3d 401, 119 N.Y.S.3d 478 (1st Dep't 2020).

**PRELIMINARY STATEMENT**

The key to understanding this matter, especially as it pertains to the significant role of Defendant Epstein, is understanding his motivations, which carry through to how he presents his own "Preliminary Statement" and "Factual & Procedural Background".

If he were to be believed, defendant Epstein is simply an innocent bystander, an "anyone" per Motion to Dismiss (MTD) page 1, who was randomly brought in to a case he had no connection to by a law student who felt "entitled to nothing less than a U.S. Supreme Court clerkship" *Id*. The rampant inclusion of extraneous facts, and the inversions and ignorances of the facts of the First Amended Complaint (FAC), where it was merely claimed that defendants Iyer and Garrett *believed* the Plaintiff would clerk there, providing their motive, all reveal a desperate need to hide an opposite truth.

Simply put, defendant Epstein would do, and in fact did, anything up to and including perpetrate fraud and subsequent tortious interference to protect his power as the most prolific contemporary clerkship "recommender". Defendant Epstein is the one who is exceedingly "entitled", not only to one clerkship but to the control of many of them. Furthermore, he believes himself to be entitled to wield the power of life and death over the careers of his students, and build them up or tear them down for whatever reason and by whatever means he wishes. Usually, just a refusal from him or a word is enough, but in this case he was compelled to go to great lengths, and break the law, to destroy an innocent young person's life. He did so in order to cover up, and avoid having to admit his bad call of recommending defendants Iyer and Garret, who started this malicious plot, to the Supreme Court of Alabama and the Ninth Circuit Court of Appeals respectively.

His motive is not only selfish, but also cold and calculating in an inhuman way, because it was he who pushed the Plaintiff into this dangerous and high-profile contest, and then threw him under the bus at the first sign of trouble, only to perform a cover-up and join with the original conspirators, who are now his co-defendants. Shockingly, defendant Epstein now claims that because the Plaintiff was forced to leave his community in New Jersey unlicensed, unemployed and destitute as a result of

defendant Epstein's defamations, fraud and tortious interference, that the Plaintiff is not entitled to claim compensation for that local harm because he no longer lives in his former community MTD page 22 footnote 15. To add further insult, defendant Epstein also declares that the Plaintiff refuses to find employment *Id.*, even as he defends himself from accusations of getting the Plaintiff fired from two jobs of academic natures at think-tanks that were JD-advantaged, through his tortious interference.

Whether he was communicating the defamatory materials to Lee Otis, as he admitted in writing, or taking all other actions to make good on his declaration "that Plaintiff will not have a federal clerkship, will not serve as Senior Article Editor of the Journal of Law and Liberty and that he will limit his association with Plaintiff …" FAC ¶¶ 71, 73 incorporating Original Complaint (OC) ¶ 48, defendant Epstein was executing a career death-warrant, as he found himself entitled to do, despite knowing the falsehood of the defamations, and that his students forged them. He simply did not care.

## PROCEDURAL BACKGROUND

### The Parties

Plaintiff and non-movant to this motion, Gideon Rapaport is a former employee of the law firm of Kirkland & Ellis LLP, and a graduate of the New York University School of Law. He is a citizen of Canada, and was lawfully admitted to the United States at the time of the filing of the original complaint as a nonresident alien, and that is his current status as well.

Defendant and movant of this motion to dismiss Richard Allen Epstein is a professor of law at the New York University School of Law, where he also serves as the faculty advisor to the Federalist Society chapter, and the Journal of Law and Liberty. He is a U.S. Citizen. Defendant Epstein is a member of the bar of the State of California.

Defendant and movant to a separate motion to dismiss, Ajay Srinivasan Iyer is an employee of Kirkland & Ellis LLP, and a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2021/2022. He is a U.S. Citizen. Defendant Iyer is a member of the bar of the State of New York.

Defendant and movant to a separate motion to dismiss, Zachary George Garrett is a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2021/2022. He is a U.S. Citizen. On information and belief, defendant Garrett is not a member of the bar of any jurisdiction.

<u>Procedural Background</u>

This case began as a John Doe suit, filed *pro se* on July 28, 2023. On December 11, 2023, subpoenas ducus tecum were granted by this Court for the purpose of identifying the Doe defendants to be served upon Kirkland & Ellis LLP (Kirkland & Ellis) and the Federalist Society of Law and Public Policy (the Federalist Society), and one employee of each. On March 15, 2024, the Doe defendants were identified by their true names as a result of these subpoenas. On May 24, 2024 the First Amended Complaint (FAC) was filed, and was served upon the defendants. By August 16, 2024, all defendants had filed motions to dismiss, with defendants Iyer and Garrett doing so through the same counsel.

## ARGUMENT

"Good name in man and woman, dear my lord, Is the immediate jewel of their souls…"

Shakespeare's *Othello* as quoted in
Richard A. Epstein, *Cases and Materials on Torts* at 923 (12th ed. 2020)

A. **Defendant Epstein is the Paradigmatic Reckless Tortfeasor**

1. **Defendant Epstein Did Not and Would Not Care Whether the Defamations Were True or False**

Actions speak even louder than words, and defendant Epstein's words and actions rhyme perfectly. Actual malice requires acting "with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Defendant Epstein's "reckless disregard" is not only plausible, but provable by any standard as a result of his unchanged course of action both prior to and *after* learning that the defamations were entirely false and supported by forged 'evidence'. Rather than undoing some of the negative treatment, or at least stopping to wreak havoc upon the life and career of the Plaintiff, defendant Epstein

continued unphased on his goal of maximum limitation, isolation and destruction of the Plaintiff and his career.

### 2. Defendant Epstein Comprehensively and Repeatedly Explained and Admitted His Callous Reasoning to the Plaintiff and His Indifference as to the Plaintiff's Innocence

The FAC ¶¶ 71,73 refers to the phone call of August 9, 2022, and incorporates the description of the original complaint (OC) ¶ 48, in which defendant Epstein told the Plaintiff that "despite the forgery and falsity of the allegations, that Plaintiff will not have a federal clerkship, will not serve as Senior Article Editor of the Journal of Law and Liberty and that he will limit his association with Plaintiff … [and] he believed that it was not beneficial for the fellowship to be associated with the Plaintiff, even considering the forgery and the falsity of the defamatory allegations…" He simply did not care about truth or falsehood.

It could not be more clear, far in excess of the plausibility required in pleading, as a result of defendant Epstein's own conduct FAC ¶¶ 18, 24-25, and his thorough explanation of his self-interested and utilitarian reasoning to the Plaintiff, that he simply did not care whether the defamations were true or not. In his own mind, defendant Epstein was not warning or seeking an investigation of, or even considering the veracity of the allegations as most people would and as Lee Otis, Peter Redpath or Kate Alcantara actually did FAC ¶¶ 42-44, 61. Defendant Epstein had already decided his entire course of action independent of the truth, as he would later explain in the phone call and multiple subsequent communications on this topic. The allegation alone, whether true or false, and indeed even after being proved false, was sufficient to justify his destructive course of action, which included forwarding the materials as support for his crushing of the Plaintiff's career, as he did to Lee Otis, and admitted to doing so in writing FAC ¶ 84.

### 3. Defendant Epstein Punished and Crushed the Plaintiff as if the Defamations Were True Despite Knowing They Were False and His Own Students Perpetrated Them

Even if rather than fraudulently and defamatorily persuade defendant Epstein of their

defamation's veracity, defendants Iyer and Garrett had immediately persuaded him of its falsehood, defendant Epstein would have continued, on the same course of action, including sending the compiled materials to Otis. Just as he was not affected by her eventual persuasion of him of the truth, which is that the defamations were fabricated out of whole cloth and supported by forged evidence.

Defendant Epstein discovered at some point between his first learning of the defamations and July 28, 2023, when during a lunch he was provided and did actually read FAC ¶¶ 80-83 the entirety of the John Doe OC that defendant Iyer at least, and possibility also defendant Garrett were the forgers, as a result of the disparity in the wrinkles between both versions FAC ¶¶ 41, 46-47 Exhibits 1 & 2, and that they were both the defamers. He refused to volunteer information that would identify the Doe students, whom he knew to be defendants Iyer and Garrett, as supported by Exhibit 3, and continued to protect them. His cover-up started at least as early as August 9, 2022, when, after being pressed by email on the matter of who sent the materials pursuant to the phone call, he simultaneously admitted his own culpability and perpetrated fraud by writing that he "was responsible" to the exclusion of the others FAC ¶ 84, and shifting attention himself thus drawing the investigation away from defendants Iyer and Garrett, whom he knew to have had compiled and sent the defamatory materials, and did not withdraw their clerkships as he did the Plaintiff's.

4. **There is No Possible Standard Other than Actual Malice by 'Reckless Disregard' Evoked by Defendant Epstein's Actions**

Because knowledge of falsity and forgery did not dissuade defendant Epstein, there is no possible conclusion other than that his conduct exceeds negligence. Negligence is founded on a theory that one would not proceed on a course of action, including sending the defamatory materials, if one met the standard of care and *would* have found the defamations to be false. According to his own subsequent actions, and his explanation of prior actions, he would have sent them anyway, because he had no regard for the truth or falsity of the defamations FAC ¶¶ 71,73 incorporating OC ¶ 48.

B. **Actual Malice is Not the Standard for Any Cause Herein**

**1. A "Public Interest" Matter Must Have a Minimal Basis in Reality to Concern the Public and State Courts Have Rejected "Public Interest" in Similar Cases**

Much in the same way that even a very large defamation cannot, as a matter of law, turn a private figure into a public figure for the purposes of defamation law *Gertz v. Robert Welch, Inc,*. 418 U.S. 323 (1974), neither can a purely fabricated defamation result in "public interest" protection. The public matter standard can only be properly applied to protecting speech pertaining to an issue of public discussion or interest, even as broadly as New York law provides in Section 76-a of the New York Civil Rights Law, that existed prior to and other than the defamation standing alone.

Simply put, the defendants in this matter cannot claim the public matter protection because absent their defamation, there would have been no matter at all, public or private, to discuss. There must be *something*, rather than *nothing*, for them to discuss as a "public matter" and here there was nothing prior to the conduct of defendants because they fabricated this "matter" from whole cloth.

Because the defamations of defendant Epstein were communicated privately, only Section 76-a(1)(a)(2) can affect his standard of liability by raising it to actual malice. This clause covers "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition." and explicitly incorporates the "constitutional right of free speech" as the standard for identifying what conduct is thus protected. Defamation, especially one fabricated out of whole cloth by the defamer, is not related to the constitutional right of free speech "freedom of speech has its limits; it does not embrace certain categories of speech, including defamation" and there is no "constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-350 (1974).[1]

Following the reasoning above, state courts have not interpreted Section 76-a so broadly, in *Miller v. Appadurai*, 2023, 214 A.D.3d 455, 185 N.Y.S.3d 93 a letter emailed to an NYU dean and

---

[1] Furthermore, the constitutional rights to free speech and petition are terms of art related to communications citizens make to their government, not communications between third parties about private matters. That such communications reference "matters of public concern" does not convert them into constitutionally protected expressions. *Ezekwo v. NYC HHS*, 940 F.2d 775 (2d Cir. 1991).

provost by faculty members requesting discipline against another professor containing a variety of serious allegations relating to hate speech and intimidation, including arising from class conduct, were not found to involve a "public interest" and were deemed to be a "purely private matter". As counsel for the unsuccessful defendants and eventual respondent-appellant's, this same Mr. Jeremy Chase's practically identical arguments were rejected by both the trial and appellate divisions in that case. Alleged hate speech and intimidation taking place before classes full of students at a prestigious university may interest society in the same way that completely fabricated allegations of sexual harassment at a high profile law firm may interest society MTD page 16, but this is not enough. In *Miller*, the court found that "[a]lthough the Letter touched on topics of public interest, those topics were not its focus. Rather, the Letter was an internal complaint about the behavior of a fellow employee. Under these circumstances, its content was not within the sphere of public interest". The arguments by defendant Epstein relating to his premature assertion of the common interest privilege in the private email he sent and other communications he made would tend to support this conclusion MTD page 11. The *Miller* court cited a case from before the statutory amendment *Huggins v. Moore*, 94 N.Y.2d 296, 303, 704 N.Y.S.2d 904, 726 N.E.2d 456 [1999] in support of its reasoning despite acknowledging that the new standard applied, and again with an audacious "See generally". Leave to appeal the *Miller* decision to the New York Court of Appeal was denied to Mr. Chase's clients[2].

## 2. Any Defamation Resulting in Any Damages Would Necessarily Be a Public Matter According to Opposing Counsel's Definition

Any other application of the public matter protection, such as the one that Opposing Counsel advocates, would result in every possible defamation being a public matter and gaining the highest level of protection, because defamation inherently involves the reputation of a plaintiff before other people, who are part of the public. Furthermore, any false statement about someone can only cause

---

2 Perhaps this is an open rebellion against the state legislature by the state courts, but a judiciary is the final determinant of how the law must be applied to the facts of any case, and the main thrust of the Erie Doctrine is that the decisions of state courts are also substantive law for the purposes of the Rules of Decision Act 28 U.S.C. § 1652 requiring the application of state law by federal courts in diversity cases, and this struggle between the branches may explain the desperately overbroad and sweeping textual definitions provided by the legislature.

injury, which is a requirement of any non *per se* defamation, if what was falsely communicated about them is something the public cares about. *Per se* defamation, operating much like the *res ipsa loquitor* burden-shifting rule of the common law, presumes that certain subjects of defamation automatically result in harm to an individual facing the public[3].

It is very illustrative, that the *per se* causes of defamation, which do not require actual injury, are all matters that are inherently of high public interest, and precisely things that people tend to discuss and gossip about most. These are falsehoods 1) about the commission of a serious crime 2) relating to business, trade or profession, 3) imputing infection by a loathsome (venereal) disease 4) imputing unchastity to a woman. A misapprehension of the public matter protection as Opposing Counsel suggests would place two core elements of New York law in diametric opposition to each other.

### C. <u>Section 230 is not Applicable to Defendant Epstein's Conduct or the Multiple Legal Bases for His Liability</u>

#### 1. Defendant Epstein's Liability Is Not Contingent on Being a "Speaker" or "Publisher" Due to His Conspiracy Liability and Vicarious Liability

A close reading of the FAC will identify that rather than resting on defendant Epstein's status as a "speaker" or a "publisher", defendant Epstein's liability rests on principles of vicarious liability and of conspiracy. Although defendant Epstein *also* sent the materials himself, his liability may be found in instructing others to do so, and of covering-up their actions, which was his main overt and knowing act of joining defendants Iyer and Garrett's civil conspiracy.

Anyone who joins a civil conspiracy, in performing an overt act and with knowledge, becomes liable at a minimum for the injury per the extent of their knowledge and the extent to which their overt actions in support of the conspiracy are united with the aims that produced that same injury[4]. Liability

---

3It is very illustrative, that the *per se* causes of defamation, which do not require actual injury, are all matters that are inherently of high public interest, and precisely things that people tend to discuss and gossip about most. These are falsehoods 1) about the commission of a serious crime 2) relating to business, trade or profession, 3) imputing infection by a loathsome (venereal) disease 4) imputing unchastity to a woman. A misapprehension of the public matter protection as Opposing Counsel suggests would place two core elements of New York law in diametric opposition to each other.
4*Bedard v. La Bier*, 20 Misc. 2d 614, 194 N.Y.S.2d 216 (Sup 1959); *Ballantine v. Ferretti*, 28 N.Y.S.2d 668 (Sup 1941)

may also apply retroactively for subsequent joiners of the conspiracy[5]. By covering-up the actions of defendants Garrett and Iyer by fraud FAC ¶¶ 74,79, and preventing their identification, but for the enforcement of subpoenas FAC ¶ 85, defendant Epstein joined with defendants Iyer and Garrett to make all their inflicted injury permanent through incapability of being remedied by any court.[6]

Defendant Epstein also cannot avoid liability due to his vicarious liability. The detailed arguments made by defendant Epstein in prematurely asserting the common interest privilege with defendants Iyer and Garrett MTD page 11, demonstrate the vicarious liability he has for sending the materials, and the control he had over defendants Iyer and Garrett in a hierarchical organization, as they sought his approval as admitted in Exhibit 3. While the common interest itself is nowhere supported in the FAC for the purposes of privilege, the communication and instruction of defendant Epstein to defendants Iyer and Garrett to send these materials is directly and literally demonstrated by Exhibit 3 for the purposes of liability[7].

### 2. Alternatively Defendant Epstein is Liable as a Common Law Distributor Per Prior SDNY Precedent

The common law has an obvious and uncontroversial category of "distributor" for the manner of defamation injury caused by defendant Epstein. A common law distributor for the purposes of defamation law is one who distributes the libels created or published by others. This is one step removed from being a "speaker" who originates the information, while also being one step removed from being a "publisher" who joins with a speaker to publish their information, and has editorial input.

The third category, that of a distributor, is a mainstay of New York law in the defamation context, and was distinctly deliberated upon for the first time in *Balabanoff v. Fossani*, 192 Misc. 615, 81 N.Y.S.2d 732 (Sup. Ct. 1948), whose ruling was informed by a national common law consensus on this issue and found that "the authorities are in accord in holding that it is a good defense for a vendor

---

[5]*Rosco Trading Co. v. Goldenberg*, 182 N.Y.S. 711 (Sup 1920*); Gray v. Heinze,* 82 Misc. 618, 144 N.Y.S. 1045 (Sup 1913)
[6]*Supreme Specialty Mfg. Co. v. De Muth*, 220 A.D. 812, 222 N.Y.S. 334 (1st Dep't 1927); *Avallone v. Bernardi*, 276 A.D. 1094, 96 N.Y.S.2d 685 (2d Dep't 1950).
[7]Vicarious liability has not only been recognized in the context of formal employment, but also in any situation when a principal instructs an agent, as defendant Epstein instructed defendants Garrett and Iyer.

to show that he had no knowledge of the libelous matter contained in a newspaper and that no extraneous facts existed to have put him on guard". It is important to note that this issue is presented as a defense, and contemplates "extraneous facts [existing] to have put him on guard", and thus it is inherently premature to resolve at the pleading stage because no absence of "extraneous facts" can be established at this time, nor is anticipatory pleading to prove such a non-existence defeating this defense required or possible absent discovery.

Distributors are subject to a less demanding standard of care than speakers and publishers, but one which defendant Epstein clearly is liable under as a result of his paradigmatic reckless disregard for the truth in this matter See Part A-1 through A-4, and his personal interest in this matter combined with his familiarity with all personalities involved. In *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123 (2d Cir. 1984) the Second Circuit applied the actual malice standard to that corporate distributor defendant, which was deliberately organized separately from a jurisdictionally-shielded sister publishing corporation.

Prior to the passage of Section 230, which was a response to a dramatic ruling by the state courts of New York in *Stratton Oakmont, Inc. v. Prodigy Services Company*, 23 Media L. Rep. (BNA) 1794 (N.Y. Sup. Ct. 1995) as further elaborated upon in Part C-3, the state courts of New York and the SDNY applying state law in diversity cases had the right idea in invoking distributor liability as demonstrated by *Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135 (SDNY 1991).

In *Cubby*, the SDNY protected a computer service for distributing news materials from an electronic library that it hosted by holding it to be "distributor", rather than a publisher or speaker, and finding on the facts of that case that it met the low standard of care required of a distributor. Defendant Epstein does not meet even the low standard of care required of a distributor, as elaborated in Part A1 through A-4. This approach is still available to this Court, because the foreclosure of "publisher" treatment per *Stratton Oakmont* by Section 230 does not affect "distributor" treatment per *Cubby*.

Even the advent of modern communications technology cannot do away with the importance of

the distributor category, because there is always the possibility that a speaker or publisher will create something lawful and non-tortious in one geographical location or social context, and that a tortfeasor distributor will come along and "distribute" it to a different geographical location or a different social context, in which it may be tortious or even illegal. This is a common and juridically accepted truth not only in the law of defamation, which recognizes that a statement can be defamatory in one context although not another[8], but also in the context of data privacy, medical privacy and revenge pornography See Part C-4. Section 230 does not and cannot provide a blanket immunity for actual distributors in all of these contexts as defendant Epstein suggests it does.

### 3. Defendant Epstein's Theory of Section 230 is Absurd, Textually Incorrect and Would Eliminate Most Publication and All Republication Liability in Modern Life

Defendant Epstein claims that Section 230 provides a kind of a roving immunity that attaches to any defamation merely because it was transmitted using the internet anytime in the past prior to being transmitted over the internet again. This fails as a matter of the text of the statute,  it's purpose, and basic logic. Beginning with the text, a look at all of the relevant titles and caption leading to 47 U.S.C. 230(c)(1), reveals that they all contradict this absurd interpretation. Titles are a permissible source of meaning, and more relevantly here scope, even to the furthermost textualism of the late J. SCALIA who approvingly quoted his colleague J. STEVENS in *Reading Law* at Chapter 35 "[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text." *INS v. National Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991).

The title of the statute is the "*Communications Decency Act*". The title provided for Section 230 is "*Protection for private blocking and screening of offensive material*". The subsection caption for 230(c) is "*Protection for 'Good Samaritan' blocking and screening of offensive material*" and finally clause 230(c)(1)'s caption is "*Treatment of publisher or speaker*", in contrast to it's twin 230(c)(2),

---

8    *Aronson v. Wiersma*, 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985); *Kramer v. Skyhorse Pub.*, Inc., 45 Misc. 3d 315, 989 N.Y.S.2d 826 (Sup 2014); *Wilcox v. Newark Valley Cent. School Dist.*, 74 A.D.3d 1558, 904 N.Y.S.2d 523, 258 Ed. Law Rep. 366, 31 IER Cases 468, 2010 N.Y. Slip Op. 04916 (N.Y.A.D. 3 Dept. 2010); *Brach v. Congregation Yetev Lev D'Satmar, Inc.*, 265 A.D.2d 360, 696 N.Y.S.2d 496 (2d Dep't 1999); *Dillon v. City of New York*, 261 A.D.2d 34, 704 N.Y.S.2d 1 (1st Dep't 1999); *Ward v. Klein*, 10 Misc. 3d 648, 809 N.Y.S.2d 828 (Sup 2005)

which is *Civil Liability*". 230(c)(2) bestows liability protection only for actions that "… restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing… whether or not such material is constitutionally protected…"

If the analysis is carried beyond the text into the realm of purpose, such as by applying the ancient and venerable "Mischief Rule" that may be traced back to *Heydon's Case*, 76 Eng. Rep. 637, 638 (K.B. 1584), the same result is reached.

Section 230 of the Communications Decency Act was passed specifically to remedy the "mischief" of internet platforms, including websites, being deemed speakers for hosting content, or publishers for taking "content moderation" steps. *Stratton Oakmont, Inc. v. Prodigy Services Company* was the case which developed the laws of New York in that direction, and provoked the legislation of Section 230, as has been recognized by the 9th and 10th Circuit Courts of Appeal *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc); F.T.*C. v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).[9]

The purpose, as implied by defendant Epstein, could not have been to magnify the amounts of harmful and indecent content on the internet by giving every user the infantile defense of pointing to another, potentially anonymous or non-existent user and saying "they did it first", resulting in total federal immunity[10].

The specific mischief cured, and motive for the passage of Section 230 as part of the Communications Decency Act, was the treatment of website owners as "publishers" of all remaining content on their websites after they exercised editorial control such as by removing offensive or

---

[9] The tailoring of Section 230 to this *moderation-results-in-publisher-liability* problem, is also evident from all of the titles and captions above 230(c)(1) and the text parallel to it in 230(c)(2). Clearly any website that removes harmful or obscene content cannot also be expected to do a thorough check of the truth or falsehood of anything posted by users instantly, and so Congress had to act in that regard.

[10] Rather than a *casus omissus* gap in state law justifying a broad reading of a federal statute to resolve a real problem, the law of defamation provides rich and balanced doctrines flowing from state courts, and as adjusted by state legislatures, regulating such situations. This is precisely the situation in which an effect of preemption, which rightfully invokes a high level of scrutiny of a federal statute should ensure that mischief is not created by legislation taken woefully out-of-context. There exist many state law doctrines, including the public interest protection that can raise the standard, and can thus weed out the cases that contradict the widely-accepted policy goals of facilitating communication and discussion on the internet, without federally immunizing devastating private attacks such as those that gave rise to this action.

obscene content. Now defendant Epstein claims that it provides a blanket immunity for defamation to forward and repeat any defamatory material with federal protection as long as someone else did it first.

### 4. Revenge Pornography Would Be Federally Protected From Civil Action or Injunction By Defendant Epstein's Argument

Revenge pornography that does not necessarily involve child pornography or advertising prostitution would gain absolute immunity from civil action or injunction under Section 230 if argument of defendant Epstein are to be accepted. For example, if Jane Roe sends John Doe pornographic materials of herself for his private possession, utilizing any digital device, and as an act of revenge or exploitation John were to later post those materials for the instant access of billions of people he would have a federal absolute immunity defense[11] . All John would have to do, is demonstrate at the motion to dismiss stage that Jane sent the materials to him using an "interactive computer service" aka any digital device or digital network, and he could never be treated in a civil matter as being the "publisher" or "speaker" despite actually making the previously private pornographic materials available to potentially billions of people. This example can also demonstrate the obvious validity and role of the "distributor category" established by common law as discussed in Part C-2, and the absurdity of the argument opposed discussed in Part C-3.

### 5. Defendant Epstein Repeated Defamations By Phone and Verbal Communication

The career-destroying course of action taken by defendant Epstein and reinforced by his subsequent fraud, raises the obvious inference that in order to support his sweeping declaration to the Plaintiff that the Plaintiff "will not have a federal clerkship, will not serve as Senior Article Editor of the Journal of Law and Liberty and that he will limit his association with Plaintiff …" FAC ¶¶ 71,73 incorporating Original Complaint (OC) ¶ 48 he utilized other means of communication such as phone and in-person conversations in the relevant weeks and months that ensued.

### D. __The Affirmative Defense of Common Interest Privilege Cannot Be Resolved Now and is Inapplicable__

---

11 Including from even suit itself to be resolved at the earliest stage of litigation as identified on MTD page 6

1.  **Common Interest Privilege is an Affirmative Defense That is Inherently Fact Intensive and is Thus Inappropriate Prior to Discovery**

The applicable standard for considering whether an affirmative defense may be deliberated upon at the motion to dismiss stage, prior to discovery and when the movant is not permitted to contradict the factual allegations of the complaint, forecloses the consideration of a common interest privilege at this stage. The standard requires "(1) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (2) those facts suffice to establish the affirmative defense with certitude" *SBT Holdings, LLC v. Town Of Westminster*, 547 F.3d 28 (1st Cir. 2008). Neither of these is possible at this time. First, there is sparse reference or detail as to the common interest that defendant Epstein must establish in order to establish the definitive assertion of the privilege, including it's scope and significance. He was merely referred to as a recommender and a faculty advisor, and there is nothing in the FAC that identifies him as an employee, or an individual having any duty, fiduciary or otherwise to the Federalist Society. At the same time, as defendant Epstein has argued here that as a matter of law MTD, he does not have a fiduciary duty with his students, which is a category that would also include defendants Iyer and Garrett. The only interest that defendant Epstein has in common with his former students defendants Iyer and Garrett is that between co-conspirators and now co-defendants.

There are ample facts to be established negating any possible affirmative defense of common interest privilege, but consideration of this issue is premature. In *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144 (2d Cir. 2024) the Second Circuit reiterated "[t]he pleading requirements of the Federal Rules of Civil Procedure do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." *Clark v. Hanley*, 89 F.4th 78, 93–94 (2d Cir. 2023) (internal quotation marks and citation omitted). In fact, "[p]laintiffs are under *no obligation* to plead facts supporting or negating an affirmative defense in the complaint." *In Re: Nine West LBO Sec. Litig.*, 87 F.4th 130, 144 (2d Cir.

2023) (original emphasis).

Secondly, the facts do not establish the affirmative defense itself, as there is not a single fact alleged raising even any inference that defendant Epstein made these communications in good faith, or for the interest of others, as opposed to with a reckless disregard for the truth and the sole benefit of himself as described in Part A-1 through A-4.

### 2. Actual Malice by Reckless Disregard for the Truth Defeats Any Possible Common Interest Privilege

Actual malice such as by reckless disregard for the truth defeats the common interest privilege, even if it was applicable in this case or for consideration prior to discovery, and reckless disregard for the truth is crystal clear in this case as discussed in Part A-1 through A-4 pursuant to allegations of the FAC. According to *Diorio v. Ossining Union Free School Dist.*, 96 A.D.3d 710, 946 N.Y.S.2d 195 (2d Dep't 2012) "[I]f the plaintiff can demonstrate that the defendant made the allegedly false statement with "malice," the privilege may be dissolved. To establish the "malice" necessary to defeat the privilege, the plaintiff may *show* either common-law malice, i.e., "spite or ill will," or may show "'actual malice,'" i.e., knowledge of falsehood of the statement or reckless disregard for the truth" (citations omitted and emphasis added). See also *Konowitz v. Archway School Inc.*, 65 A.D.2d 752, 409 N.Y.S.2d 757 (2d Dep't 1978).

### 3. Rather Than a Common Interest Defendant Epstein Had a Common Conflict

Upon the limited amount of facts alleged in the complaint which may tend to involve the Common Interest Privilege at all, and which are insufficient for deliberation of this issue as explained in Part D-1, it is indicated that defendant Epstein had a common conflict rather than a common interest with the parties in relation to whom he claims this privilege. This is particularly true of the Federalist Society and Lee Otis, and is evidenced by the diversion of courses of action actually taken in the wake of the false defamations. Instead of any consideration of the Federalist Society, Defendant Epstein was only interested in protecting his own reputation as a "recommender" as alleged in the FAC ¶¶ 19,62,

rather than the truth, as is also repeated enthusiastically by defendant Epstein's MTD page 21. This is why he did not investigate the allegations himself, and continued in his destructive course of action even after discovering the utter falsehood of the defamations and forgeries. On the other hand, Lee Otis, who he claims to have a common interest with, investigated the matter, cared about the truth, and re-included the Plaintiff in the program FAC ¶ 70, as emphasized by defendant Epstein's own MTD.

E. **Defendant Epstein's Defamation is Pled Correctly Far in Excess of Plausibility**

1. **Opposing Counsel Ignores Inconvenient Facts Pleaded and Reasonable Inferences Throughout**

In considering a motion to dismiss pursuant to Rule 12(b)(6), the District Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."[12] This also includes defamation cases, despite the over-broad and spurious statement of MTD page 8 and footnote 4, that compares this case to litigation about genuine issues of public interest and policy debate with First Amendment implications, as opposed to the circumstances herein of private communications resulting in private destruction and suffering.

The Constitution does not embrace defamation. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245-246 (2002) ("freedom of speech has its limits; it does not embrace certain categories of speech, including defamation"), nor does it recognize a "constitutional value in false statements of fact.") *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-350 (1974).

Far from just being *plausible*, it is even highly likely that defendant Epstein is liable for defamation, as confirmed by his own written admission of responsibility FAC ¶ 84 and being mentioned in an email internal to conspiracy through an admission against co-conspirators Exhibit 3. Claims made by Defendant Epstein in his MTD strain any credibility beyond their breaking point, including his claims that he is unaware of what he is alleged to have communicated, despite some of these materials, such as the second forgery and content from online threads being included in the record

---

12*La Liberte v. Reid*, 966 F.3d 79, 85 (2nd Cir. 2020) (citing *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2nd Cir. 2019) ((quoting *Elias v. Rolling Stone*, LLC, 872 F.3d 97, 104 (2nd Cir. 2017))

as Exhibits 2 & 3. He was aware enough when he admitted in writing, and failed to avail himself of the opportunity to motion for a more definite statement per Rule 12(e), or continue to discovery. Rather he filed a highly specific and creative motion motion to dismiss, with the addition of many extraneous facts, that also claims he is not on notice as to what he is alleged to have done MTD page 8.

   2. **Defendant Epstein Should Know Best Who He Talks to and What He Says and Already Admitted in Writing to His Defamation**

Defendant Epstein's arguments in his MTD should not be taken seriously. He would have it that no claim against him could be plausible unless someone followed him with a dictaphone and a GPS tracker keeping track of all of his statements, defamatory or otherwise and where he makes them.

Defendant Epstein knew precisely what conduct he was admitting to by email FAC ¶ 84, and what conduct he was covering up by his campaign of fraud, which persists until now, and became most obvious when he was faced with the Original Complaint, containing only Does, and refused to undo or mitigate the harm of his previous frauds by telling the truth even as he was faced with the direct consequence of the fraud FAC ¶¶ 80-84,86.

   F. <u>**Defendant Epstein's Tortious Interference is Pled Correctly**</u>

   1. **Defendant Epstein's Tortious Interference is Plausible in this Case**

Tortious interference with a beneficial relationship involves (1) a prospective business relationship with a third party, (2) the defendant's interference with that relationship, (3) undertaken with the sole purpose of harming the plaintiff or by wrongful means, and (4) causing injury to the plaintiff *Thome v. Alexander & Louisa Calder Foundation*, 70 A.D.3d 88, 890 N.Y.S.2d 16 (1st Dep't 2009). Defendant Epstein continued in his destruction of the Plaintiff's career as it began with fellowships, journals and clerkships and simply graduated it to other employment after he brought this case FAC ¶¶ 71,73,84 also incorporating Original Complaint (OC) ¶ 48. He obsessively disparaged the Plaintiff to all who would listen in his circle, which included the employers of the Plaintiff FAC 138-140. Defendant Epstein later publicly presented research, prepared with assistance from a research

assistance, on the same topic that the Plaintiff was hired to research, but never given the opportunity to

actual start working. The video recording of that lecture has since been removed from the internet after

the filing of the FAC.

### 2. Defendant Epstein Should Know Best Who He Talks To

Defendant Epstein's arguments in his MTD should not be taken seriously. He would have it that

no claim against him could be plausible unless someone followed him with a dictaphone and a GPS

tracker keeping track of all of his statements, defamatory or otherwise and where he makes them. The

full context of defendant Epstein's conduct as revealed to Plaintiff by the Plaintiff's former employers

referencing defendant Epstein's comments require discovery, including through depositions.

### G. Defendant Epstein's Injurious Falsehood is Pled Correctly and Far in Excess of Plausibility

"To establish a claim for injurious falsehood, plaintiff must demonstrate that defendant

maliciously made false statements with the intent to harm plaintiff, or made such statements recklessly

and without regard to their consequences, and that a reasonably prudent person would have or should

have anticipated that damage to the plaintiff would result."[13]

As a result of the injurious falsehoods trafficked, acted upon and covered up by defendants

Epstein, with a reckless disregard for the truth as discussed in Part A, alleged by the First Amended

Complaint and supported by Exhibits 1 through 3, the Plaintiff has not been able to find gainful

professional employment, face the character and fitness committee of the bar absent risk of permanent

professional injury and has suffered a broad slew of other harms as properly pleaded throughout the

First Amended Complaint as supported by Exhibits 1 through 3 including losing two jobs FAC ¶ 29 a

paying Bradley fellowship FAC ¶ 71,73 incorporating OC ¶ 48.

### H. Defendant Epstein's Fraud Is Pled Correctly and Far in Excess of Plausibility

#### 1. Pecuniary or "Out-of-Pocket" Costs Are Pled

---

13 *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 102 A.D.3d 5, 953 N.Y.S.2d 96 (2012) citing *Gilliam v. Richard M. Greenspan*, P.C., 17 A.D.3d 634, 635, 793 N.Y.S.2d 526).

The FAC extensively discusses the process of investigating and identifying the John Does that were numbered in the original complaint, and it is the direct lies and cover-up of defendant Epstein that give rise to the fraud claim against him. As a part of the investigative process, expedited discovery for subpoenas duces tecum was sought from, and granted by this Court, solely for the purpose of identifying the Does. The FAC ¶¶ 85,133 specifically mentions these subpoenas, that may be judicially noticed as they came from this court. These subpoenas, and the significant expenses relating to serving them, were only necessary because of defendant Epstein's fraud, and resulting obstruction of the Plaintiff's investigation into the proper identities of the Does[14].

## 2. The Federal Rules Do Not Require Pleading of Pecuniary or "Out-of-Pocket" Costs

Federal pleading rules apply even when considering state law causes of actions are litigated in federal court as per the Erie Doctrine *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). This sometimes requires an analysis of whether a rule is substantive as a rule of decision per Erie and the Rules of Decision Act, or a procedural rule. The requirement to plead out-of-pocket costs is a creature of state procedure as developed by state courts, as whether or not it is pled is not outcome determinative *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945), and so it does not transfer into federal court. This is a separate question from whether or not out-of-pocket costs must *eventually* be proven as a substantive matter, which they will be at trial. The FAC ¶ 136, alleges these in the complaint as "expenses", a term that necessarily refers to out-of-pocket costs, which are also specified in the section above, and is sufficient for federal pleading[15].

Inapplicability of state procedures aside, the *nature* of the damages arising from fraud, whether out-of-pocket or not, are not one of the particular elements that must be pled as a heightened requirement provided by Rule 9(b) for other elements of fraud.

---

14 Furthermore, in order to investigate the identity of the Does, by giving defendant Epstein a last opportunity to come clean and give up on his cover-up, the Plaintiff incurred the expenses of travel to and from the lunch meeting, and paid for his own meal.

15 Inapplicability of state procedures aside, the *nature* of the damages arising from fraud, whether out-of-pocket or not, are not one of the particular elements that must be pled as a heightened requirement provided by Rule 9(b)

### 3. Fiduciary Duty is Not a Required Element of Defendant Epstein's Fraud Because He Directly Lied Rather Than Fail to Disclose Anything *Sua Sponte*

Opposing Counsel fails to correctly appreciate the nature of the fraud claim clearly and plausibly alleged against defendant Epstein. Defendant Epstein is not accused of fraud by breach of a fiduciary duty but rather for plain "fraud", which does not require a fiduciary duty. "Under New York law, the elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999).

Defendant Epstein could have remained silent, even as suspicious as that would be, or not responded to emails, when faced with questions regarding the defamations perpetrated against the Plaintiff, but he did not, resulting in liability for fraud *Gray v. Richmond Bicycle Co.*, 167 N.Y. 348, 60 N.E. 663 (1901). Because of his fear that the Plaintiff would succeed to identify defendants Iyer and Garrett if not interfered with, he had to defraud and frustrate the private investigation of the Plaintiff by lying and covering up for them. As alleged FAC ¶ 75, his motive was that the discovery of their actions, and his involvement with them would reflect poorly upon him, and also expose him to liability as a co-defendant.

Although defendant Epstein took responsibility on himself, as he wrote FAC ¶ 84, he only did so in order to deflect and conceal the identities of his students who forged and disseminated the defamations, and who tricked him for a time, until he became aware of what happened joined with them to cover up. This was concealment by partial disclosure, and a classic fraud by half-truth which is recognized by the laws of New York as a particularly pernicious form of fraud, especially in this context of trust that existed between the Plaintiff and defendant Epstein. *Andres v. LeRoy Adventures, Inc.*, 201 A.D.2d 262, 607 N.Y.S.2d 261 (1st Dep't 1994); *Indosuez v. Barclays Bank PLC*, 181 A.D.2d 447, 580 N.Y.S.2d 765 (1st Dep't 1992).

Such a fraud by partial disclosure does not require any fiduciary duty. If a person chooses to

speak, they must not suppress or conceal any facts within their knowledge that would qualify what they choose to say. *Junius Const. Co. v. Cohen*, 257 N.Y. 393, 178 N.E. 672 (1931) as cited by *Stambovsky v. Ackley*, 169 A.D.2d 254, 572 N.Y.S.2d 672 (1st Dep't 1991). Even at its narrowest possible holding, *Junius Const. Co.* is applicable here because defendant Epstein's fraudulent partial disclosure and half-truth of what he actually said was related as closely as possible to what was fraudulently concealed. Defendant Epstein wrote he was responsible, when he knew that defendants Iyer and Garrett were responsible for the defamation and the actions the Plaintiff was asking about as well, thus the concealed information was both of the same type and on the subject, which is the most overlap that could ever be.

4. **Damages by Fraud Through Delay of a Legal Right Are Specifically Recognized By New York Including Nominal Amounts**

As alleged in the FAC ¶ 136, the fraud claim against defendant Epstein contains a component of damages resulting from the delay of the Plaintiff from exercising his legal rights specifically because the John Doe defendants could not be identified as a result of his fraud, such damages in delay of a legal right are recognized under New York law *Lawrence v. Houston*, 172 A.D.2d 923, 567 N.Y.S.2d 962 (3d Dep't 1991). Nominal amounts are also permissible *Garnett v. Hudson Rent-A-Car*, 276 A.D.2d 524, 714 N.Y.S.2d 302 (2d Dep't 2000).

I. **New Jersey Law Applies to the Properly Pleaded False Light and Invasion of Privacy Claim**

1. **The Southern District of New York and Second Circuit Routinely Uphold Such New Jersey Claims Under New Jersey Law**

In *Catalanello v. Kramer*, 18 F. Supp. 3d 504 (S.D.N.Y. 2014) the court found that the domicile of the Plaintiff in New Jersey, and the harm being suffered there was dispositive, regardless of none of the tortious actions took place there, other than the appearance of the tortious material.

The *Catalanello* court evaluated many precedents and found that "Discouraging defamation is a conduct regulating rule," and thus "the situs of the tort[] should control." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir.1999), 166 F.3d at 545; see *Machleder v. Diaz*, 801 F.2d 46, 51–52 (2d Cir.1986)

(affirming application of New Jersey law to defamation and false-light invasion of privacy claims on the ground that New Jersey "has the most significant relationship with the occurrence and with the parties"). "'[T]he locus of the tort is where the plaintiff suffered injury.'"[16]. Thus, in a defamation action, "'often the Court can resolve the choice of law analysis ... simply by observing the state of plaintiff's domicile and presuming that the publication injured him in that state.'"[17]

The taking of the Plaintiff's image and using it to create the two forgeries Exhibits 1 & 2 to present him, by spreading these materials far and wide, as someone who was fired for sexual harassment and banned from an office building where he formerly worked Exhibit 3, accompanied by an obsessive and intrusive discussion of the Plaintiff's mannerisms, habits, personality and beliefs are the paradigmatic example of the false light invasion of privacy tort if there ever was one.

### 2. Disbelief of Particular Individuals Mentioned Does Not Reflect Injury With Broad Local Community Who Did Not Investigate the Matter

Defendant Epstein's claims that there was no injury as a result of false-light invasion of privacy, because certain individuals, particularly himself, Peter Redpath and Kate Alcantara and Lee Otis eventually did not believe in these defamations MTD page 22 and footnote 16. These are all individuals that this claim is irrelevant to, because none of them even live in New Jersey or are part of the local community that this cause of action uniquely protects[18].

This erroneous attempted defense also underscores the meaningful difference between defamation and false light invasion of privacy, and forecloses any deeming of them to be duplicative in this matter. Because the latter protects an individual in their local community not only from distortions that may be technically false as a defamation is, but also the unwanted attention that such a "public matter" may bring upon them. Because the claim addresses a different harm both as a matter of type

---

16 *Adelson v. Harris*, 973 F.Supp.2d 467, 476 (S.D.N.Y.2013) (quoting *Condit v. Dunne*, 317 F.Supp.2d 344, 353

17 *Id*. (quoting *Condit*, 317 F.Supp.2d at 353); see also Lee, 166 F.3d at 545 (in a defamation case, "'the state of the plaintiff's domicile will usually have the most significant relationship to the case,' and its law will therefore govern") (quoting *Reeves v. Am. Broad. Co.*, 719 F.2d 602, 605 (2d Cir.1983)) (All other bracketed comments are original to the court).

18 Furthermore, they are unrepresentative of the potential harm of false light and invasion of privacy because they have the unique incentive and background knowledge to successfully investigate the defamations and other statements otherwise leading to the claim.

and geography, it cannot be duplicative under these facts[19].

### 3. The Doctrine of Dépeçage Permits Different Law for Different Claims

Dépeçage is a relevant doctrine in the consideration of different claims each under their relevant sources of law as a horizontal matter such as with multiple state laws or national laws, as is practiced vertically by including both state and federal causes of action in a single case. While the rest of the causes should be tried under New York law, due to their injuries and harms focusing there as defendant Epstein contends, false light invasion of privacy should be tried under the laws of New Jersey because it only protects the Plaintiff in his local community, which is New Jersey, and is only provided by the laws of New Jersey. Even if a similar protection was offered by New York, the Plaintiff could not avail himself of it there. His local community was not in New York, and so New Jersey's false light and invasion of privacy tort protects a purely local interest from which out of state harm was directed to.

New York embraces dépeçage as a choice-of-law doctrine.[20] The doctrine of dépeçage recognizes that in a single action different states may have different degrees of interest with respect to different operative facts and elements of a claim *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 75 (E.D. N.Y. 2000). The rules of one system are applied to regulate certain issues arising from a transaction while the law of another system is applied to a different issue[21].  Under this choice-of-law technique, a court may separate a part of the case into different portions and apply one body of law to one portion while applying a different body of law to other portions.

Because false light invasion of privacy governs the inherently local, and community impacts of the undue amounts of attention that false portrayal brings upon a private person, New Jersey is the best

---

19Defendant Epstein has only cited other cases where there was no difference in the type of harm or geography, and where neither claim was properly alleged. At FAC ¶ 117,118 it is properly pleaded that "[t]his false light exposes the plaintiff to scorn, derision, harassment, emotional distress, anxiety, loss of privacy and excess notoriety in a manner that shocks the conscience and is intolerable in society.

20 *Federal Housing Finance Agency v. Ally Financial Inc.*, Fed. Sec. L. Rep. (CCH) P 97235, 2012 WL 6616061 (S.D.N.Y. 2012). Dépeçage is a term that one court noted means "dismemberment" in French *Schwartz v. Twin City Fire Ins. Co.*, 492 F. Supp. 2d 308 (S.D. N.Y. 2007), judgment aff'd, 539 F.3d 135 (2d Cir. 2008)

21 *2002 Lawrence R. Buchalter Alaska 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co.*, 96 F. Supp. 2d 182 (S.D.N.Y. 2015); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198 (S.D. N.Y. 2002)

and only source of law and geographic area for damages arising from false light invasion of privacy.

The Plaintiff does not claim that all of the causes of action brought should be tried under the laws of New Jersey, as would be most favorable to him, but merely the only one that must and should be according to every relevant standard.

### J.  **Opposing Counsel Grossly Misstate the Law of Civil Conspiracy**

#### 1.  Civil Conspiracy Can Involve Any Cause of Action

Under New York law, "[t]o establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and, (4) resulting damage or injury."[22]

The woefully out of context citation *McGill v. Parker,* 179 A.D.2d 98, 582 N.Y.S.2d 91 (1st Dept. 1992) provided by opposing counsel is of a case in which defamation did not actually occur because there was no communication to a third party, and thus could not be pleaded, resulting in no underlying tort to support a claim of civil conspiracy. The quoted portion merely stands for the proposition that a conspiracy to defame absent an actual defamation is not a standalone tort, in the way that civil conspiracy to commit any tort is never a standalone tort, not that a civil conspiracy can never attach to defamation.

#### 2.  Civil Conspiracy was Properly Pleaded, Conspiracy Liability Discussed in Part C-1

Exhibit 3 provides the best possible support for plausibility of a civil conspiracy imaginable, as it references the discussions and collaborations between all three defendants in a manner that will even be admissible per the Federal Rules of Evidence as an admission against co-conspirators, granting and exception to the hearsay rule. This exhibit also manifests an overt action in furtherance of the conspiracy by defendant Garrett, and in agreement with the instructions of defendant Epstein as deliberated upon jointly with defendant Iyer, and had the second version of the forgery, Exhibit 2

---

[22] *ACR Sys., Inc. v. Woori Bank*, No. 14 CIV. 2817 (JFK), 2018 WL 1757019 (S.D.N.Y. Apr. 10, 2018) See also *Cohen Brothers Realty Corp. v. Mapes*, 181 A.D.3d 401, 119 N.Y.S.3d 478 (1st Dep't 2020).

attached to it. Furthermore, Exhibit 3 references prior discussions and defamations relating to this matter even before the instant overt act, indicating a notable extent of familiarity and cooperation.

Furthermore, the thoroughly described and well-supported fraud allegations against defendant Epstein, who refused to come clean and tell the truth even when presented with the basic facts of this case as outlined in the original complaint also support the existence of a conspiracy. A cover-up is the hallmark of any conspiracy, as it is obvious that the defendants must protect each other from being caught lest any be thoroughly investigated, or be incentivized to testify against the others, resulting in all getting caught. This was defendant Epstein's incentive in taking the great risk of committing fraud to frustrate the Plaintiff's private investigation of these facts.

## CONCLUSION

### The Facially Defective Motion to Dismiss Opposed is a Not Responsive to the Pleadings

The motion opposed is simply not responsive to the core allegations of the pleadings, and does not respect the proper standards and practices by which it must be evaluated, which provide that facts alleged by the Plaintiff must be accepted as true, and that all reasonable inferences be drawn in the Plaintiff's favor. This is both as a result of ignoring the core allegations of the pleadings and the injection of facts unsupported threadbare conclusions by the defendants requesting this extraordinary and juridically disfavored dismissal with prejudice at the pleading stage. These deficiencies are demonstrated throughout this memorandum in opposition, not to mention a properly liberal reading and construction of the pleadings accompanied by dispositive evidence, and require for this motion to dismiss to be denied, and for parties to conduct discovery, and develop and submit evidence.

Dated: Vancouver, British Columbia (Canada)
September 26, 2024

Respectfully submitted,

/s/ Gideon Rapaport, *pro se*
GideonRapaportLaw@Outlook.com
(862) 213-0895
#627 1078 Summit Avenue
Jersey City, New Jersey, 07310

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------- x

GIDEON RAPAPORT,                           :
                                           :        Case No. 1:23-cv-6709 (JGLC)
                    Plaintiff,             :
                                           :
          - against -                      :        ORAL ARGUMENT REQUESTED
                                           :
AJAY SRINIVASAN IYER, ZACHARY              :
GEORGE GARRETT, and RICHARD ALLEN          :
EPSTEIN,                                   :
                                           :
                    Defendants.            :
------------------------------------------------- x

**DEFENDANT EPSTEIN'S REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF HIS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Jeremy Chase
Nimra H. Azmi
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone:      (212) 489-8230
Fax:        (212) 489-8340
jeremychase@dwt.com
nimraazmi@dwt.com

*Attorneys for Richard A. Epstein*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 1

I.    Plaintiff's Claims are Barred by Section 230 Immunity ............................ 1

II.    Plaintiff Fails to State a Defamation Claim ........................................... 3

III.    Plaintiff Has Not Alleged His Remaining Tort Claims ........................... 6

    A.    Plaintiff Has Not Pled Tortious Interference. ................................... 6

    B.    Plaintiff Has Not Pled Injurious Falsehood. .................................... 7

    C.    Plaintiff's False Light Claim Cannot Stand. .................................... 7

    D.    Plaintiff Has Not Satisfied the Standard for Alleging Fraud. ............ 8

    E.    Plaintiff's Civil Conspiracy Claim Cannot Survive .......................... 9

CONCLUSION .................................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andres v. LeRoy Adventures, Inc.,*
201 A.D.2d 262 (1st Dep't 1994) .............................................. 9

*Aristocrat Plastic Surgery, P.C. v. Silva,*
206 A.D.3d 26 (1st Dep't 2022) .............................................. 5

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ......................................................... 7, 9

*Banque Indosuez v. Barclays Bank PLC,*
181 A.D.2d 447 (1st Dep't 1992) .............................................. 9

*Bd. of Managers of Chelsea 19 Condo. v. Chelsea 19 Assocs.,*
73 A.D.3d 581 (1st Dep't 2010) .............................................. 9

*Berwick v. New World Network Int'l, Ltd.,*
2007 WL 949767 (S.D.N.Y. Mar. 28, 2007) .................................. 3, 8

*Catalanello v. Kramer,*
18 F. Supp. 3d 504 (S.D.N.Y. 2014) .......................................... 8

*Cole v. Blackwell Fuller Music Publ'g, LLC,*
2018 WL 4680989 (S.D.N.Y. Sept. 28, 2018) .................................. 7

*Coleman v. Grand,*
523 F. Supp. 3d 244 (E.D.N.Y. 2021) ......................................... 5

*DiFolco v. MSNBC Cable L.L.C.,*
622 F.3d 104 (2d Cir. 2010) ................................................. 7

*Doe v. Spencer,*
2024 WL 915554 (M.D. Tenn. Mar. 4, 2024) ................................... 3

*Editor's Pick Luxury LLC v. Red Points Sols. SL,*
2023 WL 6385993 (S.D.N.Y. Sept. 29, 2023) .................................. 6

*Erdman v. Victor,*
2021 WL 2481254 (S.D.N.Y. June 17, 2021) ................................... 6

*Evliyaoglu Tekstil A.S. v. Turko Textile LLC,*
2020 WL 7774377 (S.D.N.Y. Dec. 30, 2020) ................................... 7

*Faulkner v. City of* Yonkers,
    105 A.D.3d 899 (2d Dep't 2013)........................................11

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019)...........................................3

*Goldman v. Reddington*,
    2021 WL 4099462 (E.D.N.Y. Sept. 9, 2021) ........................5

*Guan N. v. NYC Dep't of Educ.*,
    2013 WL 67604 (S.D.N.Y. Jan. 7, 2013) ...........................2

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ...............................................4

*Hodges v. Lutwin*,
    2023 WL 3362836 (2d Cir. May 11, 2023) ..........................6

*Hoyt v. Kaplan*,
    263 A.D.2d 918 (3d Dep't 1999) ...................................6

*Ingris v. Drexler*,
    2015 WL 1472657 (D.N.J. Mar. 30, 2015).........................8

*Inspired Cap., LLC v. Conde Nast*,
    2018 WL 6173712 (S.D.N.Y. Nov. 26, 2018), *aff'd,* 803 F. App'x 436 (2d Cir. 2020).........10

*Junius Const. Co. v. Cohen*,
    257 N.Y.393 (1931) ...............................................9

*Lawrence v. Houston*,
    172 A.D.2d 923 (1991) ...........................................10

*Leung v. New York Univ.*,
    2010 WL 1372541 (S.D.N.Y. Mar. 29, 2010) ......................4

*McGill v. Parker*,
    179 A.D.2d 98 (1st Dep't 1992) ..................................11

*Miller v. Appadurai*,
    214 A.D.3d 455 (1st Dep't 2023) .................................5

*Miller v. Holtzbrinck Publishers*,
    L.L.C., 377 F. App'x 72 (2d Cir. 2010) .........................10

*Murphy v. Onondaga Cnty.*,
    2022 WL 819281 (N.D.N.Y. Mar. 18, 2022) .......................11

iii

*Oparaji v. Atl. Container Line*,
  2008 WL 4054412 (S.D.N.Y. Aug. 28, 2008) ........................................................2

*Shiamili v. Real Estate Group of NY, Inc.*,
  17 N.Y.3d 281 (2011) ........................................................................................3

*Shuman v. N.Y. Mag.*,
  211 A.D.3d 558 (1st Dep't 2022) ......................................................................5

*Tongring v. Bronx Cmty. Coll. of City Univ. of New York Sys.*,
  2014 WL 463616 (S.D.N.Y. Feb. 4, 2014) ........................................................6

*Travis v. Daily Mail*,
  78 Misc. 3d 1218(A) (Civ. Ct. N.Y. Cty. 2023) ................................................5

*Ventures, LLC v. Ultimate One Distrib. Corp.*,
  2014 WL 1311979 (E.D.N.Y. Mar. 28, 2014) ..................................................10

*Zeran v. America Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) .............................................................................3

**Statutes**

N.Y. Civ. Rights Law § 76-a *et seq* ........................................................................4, 5

**Other Authorities**

Rule 9(b) ....................................................................................................................9

## INTRODUCTION

Defendant Richard Epstein's Motion demonstrated that Plaintiff's FAC suffers from numerous incurable defects.[1] *First*, Professor Epstein is immune under Section 230 from claims based on alleged forwarding of email communications. *Second*, Plaintiff's defamation claim fails because he does not specify any purportedly defamatory statements by Professor Epstein and pleads no facts that could establish – and indeed, pleads facts undermining – that Professor Epstein acted with actual malice. *Third*, Plaintiff's tag-along tort claims fail both with his defective defamation claim and on their own merits. *Fourth*, Plaintiff's fraud claim fails because Professor Epstein owed Plaintiff no duty to disclose facts, Plaintiff did not rely on Professor Epstein's purported representations, and Plaintiff suffered no pecuniary loss. *Fifth*, his conspiracy claim fails because he does not plead any agreement by Professor Epstein or a viable underlying tort.

Instead of addressing the FAC's multiple defects, Plaintiff contends that well-settled law does not apply to him; that Professor Epstein bears the onus to *guess* at what he is claimed to have said about Plaintiff; that what Plaintiff believes the law *should be* overrides what the law *is*; and that the Court may consider unpled "facts" and legal theories. In short, the Opposition cannot and does not rectify the FAC's myriad defects. At bottom, this lawsuit is about a law student who did not achieve his own outsized career ambitions and is now concocting half-baked conspiracy theories blaming his classmates and once-favored professor for his shortcomings. This does not a cause of action make. This action must be dismissed with prejudice.

## ARGUMENT

### I.    PLAINTIFF'S CLAIMS ARE BARRED BY SECTION 230 IMMUNITY.

---

[1] This Reply uses the abbreviations from Defendant Epstein's Motion to Dismiss (Dkt. No. 51) ("Mot."). It also incorporates and adopts, as relevant, the arguments advanced by Defendant's Iyer and Garrett in their Motion to Dismiss memorandum of law (Dkt. No. 54) and Reply.

Section 230 bars the tort claims grounded in Professor Epstein's alleged forwarding of emailed materials from Iyer and Garrett. Professor Epstein set forth case after case holding that the precise conduct at issue here – forwarding a third-party's email – falls squarely within the scope of Section 230 immunity. Mot. at 5-6 (collecting cases). Plaintiff's meritless arguments as to why Section 230 does not apply should not be countenanced.

**First,** Plaintiff's series of faulty arguments against dismissal have no bearing on Section 230 defense. Plaintiff now claims that in addition to the email, Professor Epstein defamed him telephonically and in-person (*i.e.*, non-internet defamations). But the only such communication the Opposition identifies is a conversation solely between the two of them. Opp. at 20; *see also* Mot. at 10, n.6. Then, he bizarrely argues that a "close reading" of the FAC shows the defamation claim against Professor Epstein is *not only* predicated on his status as a "speaker" or "publisher," but on "conspiracy" or "vicarious liability."[2] Opp. at 15. This argument too is beside the point. Professor Epstein argues that Section 230 immunizes him from liability *for claims based on his forwarding of email communications*. Mot. at 5-6. Plaintiff's claims inherently treats Professor Epstein as the speaker or publisher of those forwarded statements. His half-hearted attempt to shoehorn Professor Epstein into liability for statements of others via conspiracy or vicarious liability principles is irrelevant to the Section 230 argument.

**Second**, Plaintiff claims that Section 230 is inapplicable because Professor Epstein is a "common law distributor." Opp. at 16-17. But courts have, for decades, interpreted Section 230's definition of "publisher" as including "distributors," thus eliminating distributor liability in the

---

[2] "Vicarious liability for defamation requires an agency relationship between the defendant and the maker of the defamatory statement." *Guan N. v. NYC Dep't of Educ.*, 2013 WL 67604, at *24 (S.D.N.Y. Jan. 7, 2013). An agency relationship exists where one authorizes another to act on their behalf and under their control. *Oparaji v. Atl. Container Line*, 2008 WL 4054412, at *11 (S.D.N.Y. Aug. 28, 2008) (history omitted). Far from showing that Iyer and Garrett allegedly acted against Plaintiff under Professor Epstein's "direction" or "control," the SAC alleges Iyer and Garrett *duped* Professor Epstein. FAC ¶¶ 17, 50. Nor does the "common interest privilege"—asserted as to Professor Epstein's communications with Otis—support the notion that Garrett and Iyer were his agents. *See* Mot. at 11.

online context.  *See Shiamili v. Real Estate Group of NY, Inc.*, 17 N.Y.3d 281, 288–289 (2011) ("national consensus" Section 230 immunizes distributors); *see also Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331–334 (4th Cir. 1997).[3]

## II.    PLAINTIFF FAILS TO STATE A DEFAMATION CLAIM

Notwithstanding Section 230, Plaintiff still fails to adequately plead defamatory, non-email-based statements by Professor Epstein or *any* facts that if true could establish actual malice. Each deficiency mandates dismissal.

Professor Epstein's moving brief established that the FAC fails to satisfy the *in haec verba* requirement to put Professor Epstein on notice of the statements in suit.  Mot. at 8-10; *Berwick v. New World Network Int'l, Ltd.*, 2007 WL 949767, at *11 (S.D.N.Y. Mar. 28, 2007).  Tellingly, the Opposition makes no effort to clarify what Professor Epstein allegedly said or to whom he said it. Instead, Plaintiff appears to rely on (1) a sense of defamation in the air, (2) haughty platitudes like Professor Epstein "should know best who he talks to and what he says," and (3) vague suggestions that Professor Epstein "admitted in writing to his defamation" without identifying the specific writing.  Opp. at 24.  He even claims that the legal requirement that Plaintiff plead the defamatory words complained of would require him to "follow [Professor Epstein] with a dictaphone and a GPS tracker."  *Id.*  But the Federal Rules do not require Professor Epstein to intuit the basis for Plaintiff's claims nor do they allow Plaintiff to survive dismissal based on surmise.  Plaintiff must satisfy the pleading standards and "provide a detailed description of the defamatory statements."

---

[3] Plaintiff makes two further meritless arguments against Section 230.  *First*, he claims Professor Epstein's Section 230 argument would immunize revenge pornography. Opp. at 20. Plaintiff is wrong.  *See Doe v. Spencer*, 2024 WL 915554, at *3 (M.D. Tenn. Mar. 4, 2024) (history omitted) (Section 230 did not immunize "legal liability for disclosing sexually explicit pictures…"). Further, Section 230 does not immunize intellectual property violations, and the conduct plaintiff describes would be subject to a copyright lawsuit. *See* Section 230(e)(2).  *Second*, Plaintiff also claims, without supporting case law, that Section 230 immunizing email forwarding from state tort liability is "absurd," "textually incorrect," and an "infantile defense," even though courts around the country have held exactly that. *Compare* Opp. at 18-19 *with* Mot. at 6-7. Plaintiff may disagree with how courts apply Section 230, but he offers no substantive rejoinder or authority to the contrary. Plaintiff's bombast cannot overcome well-established law

*Leung v. New York Univ.*, 2010 WL 1372541, at *8 (S.D.N.Y. Mar. 29, 2010). He has not.

Next, Plaintiff devotes much of his Opposition to attempting to avoid the actual malice standard.[4] But the actual malice standard—merely an alternative basis for dismissal—governs here under both the Anti-SLAPP Law and the common interest privilege.

***First***, the Anti-SLAPP Law requires applying the actual malice standard to cases arising from "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a(1)(a)(2). It construes "public interest" "broadly" to "mean any subject other than a purely private matter." *Id.* § 76-a(1)(a)(2)(d).[5] Sexual harassment accusations—like those allegedly forwarded to Otis concerning Plaintiff's alleged conduct at K&E—are classic matters of public interest. *See Shuman v. N.Y. Mag.*, 211 A.D.3d 558, 558-59 (1st Dep't 2022); *Goldman v. Reddington*, 2021 WL 4099462, at *3-4 (E.D.N.Y. Sept. 9, 2021); *Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021); *Travis v. Daily Mail*, 78 Misc. 3d 1218(A), at *3 (Civ. Ct. N.Y. Cty. 2023).

Not one of Plaintiff's arguments holds water. Plaintiff argues the FAC alleged the statements in suit were "fabricated," and therefore cannot be of public interest. Opp. at 13. But denying the statements' veracity does "not bear on the analysis of whether these are matters of public concern." *Shuman*, 211 A.D.3d at 559. All libel plaintiffs deny the truth of the statements

---

[4] The definitive lack of actual malice is punctuated by Plaintiff's acknowledgement that Professor Epstein *believed* the harassment allegations' "veracity" when he allegedly forwarded emails to the Federalist Society, and that Otis could not persuade "him of the truth" afterwards. Opp. at 11-12; FAC ¶¶ 17, 50. Otherwise, Plaintiff appears to confuse common law malice with actual malice and argues that Professor Epstein bore him ill-will, perpetuated random perceived slights, did not like him, and disassociated from Plaintiff to protect his own reputation. Opp. at 10-11. However, the "actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). And "motive in publishing" statements "cannot provide a sufficient basis for finding actual malice." *Id.* at 665.

[5] Plaintiff make a spurious argument that the Anti-SLAPP Law's broad construction of "public interest" is somehow inequitable and would conflict with the rules on "defamation per se." Opp. at 14-15. This is nonsense. Regardless of the equities, the legislature chose to define "public interest" broadly and keyed it to the actual malice standard with full knowledge of the defamation per se rules.

4

in suit. If mere denials of the truth could transform a statement into one of purely private concern, the Anti-SLAPP Law would never apply. That is not the law.

Plaintiff's citation to *Miller v. Appadurai*, 214 A.D.3d 455 (1st Dep't 2023) is inapposite. There, the Court ruled an internal workplace complaint about a professor's treatment of a student was a private matter. *Id.* at 456. By contrast, the supposed sexual harassment allegations against Plaintiff occurred in a different workplace and were freely discussed in online public fora. FAC ¶ 37. As alleged, Professor Epstein simply notified an external colleague of these allegations because he had earlier recommended Plaintiff. Far from an internal workplace complaint, the allegations were of public interest and discussion to which the actual malice standard applies.

**Second**, even if the Anti-SLAPP law *does not* apply, the actual malice standard still would, because the alleged communications to Otis are subject to the common interest privilege. Professor Epstein recommended Plaintiff to the James Kent Academy and thus had a duty to disclose relevant information about him. *See Hodges v. Lutwin*, 2023 WL 3362836, at *3 (2d Cir. May 11, 2023) (privilege applied to disclosure of sexual misconduct claims to members of educational organization ahead of student program). Despite Plaintiff's claims to the contrary, the FAC establishes the common interest privilege on its face by pleading Professor Epstein is the "faculty advisor to the Federalist Society chapter," FAC ¶¶ 6, 25, and that he recommended Plaintiff for the Academy. *Id.* ¶ 45. This shows his "legal, moral or societal interest," *Hoyt v. Kaplan*, 263 A.D.2d 918, 919 (3d Dep't 1999), in disclosing to Otis the accusations against Plaintiff.[6]

Plaintiff's argument that the common interest privilege cannot be raised on a motion to dismiss is also incorrect. *See Erdman v. Victor*, 2021 WL 2481254, at *2 (S.D.N.Y. June 17, 2021).

---

[6] Plaintiff misconstrues Professor Epstein's argument and seems to believe that Professor Epstein is invoking the common interest privilege as to his *students*. He is not. He is instead invoking it as to his communications with Otis.

Lack of privilege is an element of defamation and plaintiff's burden to plead. *Id.* (applying privilege and dismissing defamation claim). Since the privilege's application is apparent from the FAC's face, the Court can certainly make this determination on a motion to dismiss. *See*, *e.g.*, *id.*; *Hodges*, 2023 WL 3362836, at *1 (affirming 12(b)(6) dismissal of complaint based on common interest privilege and plaintiff's failure to plead malice); *Editor's Pick Luxury LLC v. Red Points Sols. SL*, 2023 WL 6385993, at *3 (S.D.N.Y. Sept. 29, 2023); *Tongring v. Bronx Cmty. Coll. of City Univ. of New York Sys.*, 2014 WL 463616, at *7 (S.D.N.Y. Feb. 4, 2014). For all of these reasons, Plaintiff's defamation claim must be dismissed.

### III.    PLAINTIFF HAS NOT ALLEGED HIS REMAINING TORT CLAIMS

Plaintiff's remaining claims all suffer from numerous fatal defects. The Opposition does not attempt to refute (and thus concedes) that his IIED, tortious interference, injurious falsehood, and false light claims must be dismissed as duplicative of his meritless defamation claim. *See* Mot. at 14-15; *see also Cole v. Blackwell Fuller Music Publ'g, LLC*, 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018). As for the claims he addresses on the merits (he does not respond to the IIED arguments), Plaintiff's ill-founded arguments cannot salvage them.

### A.    Plaintiff Has Not Pled Tortious Interference.

Professor Epstein's moving brief made clear that Plaintiff's tortious interference claim fails because it does not identify what Professor Epstein purportedly said, to whom he said it, or that it caused Plaintiff any loss. These failures mandate dismissal. *See Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *2 (S.D.N.Y. Dec. 30, 2020); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 114-15 (2d Cir. 2010). Instead of fixing these errors, the Opposition parrots the FAC's vague conclusions that Professor Epstein disparaged him "to all who would listen in his circle," Opp. at 24, still without identifying what was said or to whom. As with his defamation claim, Plaintiff grumbles that meeting the pleading standard would require a "Dictaphone" and

"GPS," and that "Professor Epstein should know best" the facts. *Id*. at 24. But "Defendant knows what he did to me," does not satisfy the pleading burden, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). Plaintiff's clear-cut failure here requires dismissal with prejudice.

### B.    Plaintiff Has Not Pled Injurious Falsehood.

Plaintiff has not made out his injurious falsehood claim, because he has not pled an injury to his *business*, actual malice, or special damages. *See* Mot. at 19-21. Rather than addressing these legal arguments in opposition, Plaintiff broadly recites his grievances without legal citation, affirming his blatant pleading failures. Opp. at 25. This claim too must be dismissed.

### C.    Plaintiff's False Light Claim Cannot Stand.

Plaintiff's vague invocation of a "New Jersey community" is an obvious ploy to avoid that New York – the state with the most significant interest in Plaintiff's claims – does not recognize false light claims. While Plaintiff avers his prior residence in New Jersey mandates applying New Jersey law, the conduct described occurred at K&E's New York office, Professor Epstein resides in New York, and Plaintiff's reputation was purportedly impacted in the NYU Law community and at New York-based entities. *See* FAC ¶¶ 21, 72, 141. Accordingly, the "main import" of the alleged harm was with New York people and entities. *See Berwick*, 2007 WL 949767, at *7–8.

Plaintiff's sole case in support, *Catalanello v. Kramer*, 18 F. Supp. 3d 504 (S.D.N.Y. 2014), is readily distinguishable. There, (1) New Jersey law applied to all claims, not just false light, and (2) the defendant was *not* a New York resident, tilting the scale in favor of New Jersey law. *Id.* at 512-13. Here, however, Professor Epstein is a New York resident and it is not apparent how *his* conduct (i.e., forwarding an email to a non-New Jersey resident) could have impacted Plaintiff's reputation in New Jersey. Opp. at 29. But even under New Jersey law, Plaintiff's false light claim fails because sending a single email believing it contains true information cannot plead

7

false light. *See* Mot. at 22; *Ingris v. Drexler*, 2015 WL 1472657, at *4 (D.N.J. Mar. 30, 2015) ("it is not an invasion of the right of privacy…to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons."). In short, New York law does not cognize false light and even under New Jersey law, he fails to state a claim.

### D. Plaintiff Has Not Satisfied the Standard for Alleging Fraud.

Plaintiff has failed to satisfy Rule 9(b) or even *Iqbal*'s plausibility standard in setting out his fraud claim, and it must be dismissed.

*First*, both Plaintiff and Professor Epstein agree that Professor Epstein owed him no fiduciary duty, an admission that alone warrants dismissal, since a fiduciary duty is required for a fraud by concealment claim. *Bd. of Managers of Chelsea 19 Condo. v. Chelsea 19 Assocs.*, 73 A.D.3d 581, 582 (1st Dep't 2010). But to avoid dismissal, Plaintiff attempts to recast his fraud claim as one for "fraud by half truth," a theory that does *not* require a fiduciary duty, but that plainly does not correspond to the facts alleged. Plaintiff's cited cases involve defendants making affirmative representations to induce an action by the plaintiff, but omitting material facts that would transform the affirmative representations' import. *See*, *e.g.*, *Junius Const. Co. v. Cohen*, 257 N.Y.393 (1931) (disclosure of two incumbrances on property to buyer but not a third that destroyed value of land constitutes fraud). That is not what happened here. Plaintiff just vaguely pleads that Professor Epstein "attempted to cover up" Iyer and Garrett's identities by claiming ignorance and not "offer[ing] a single correction or addition" to his complaint when presented with it hours before filing. *See* FAC ¶¶ 74, 82, 130, 131.[7] He does *not* plead he believed Professor

---

[7] Plaintiff's cited cases do not stand for what he suggests. In *Andres v. LeRoy Adventures, Inc.*, 201 A.D.1d 262, 262 (1st Dep't 1994), the fraud claim was dismissed and the decision did not address "fraud by half truth." And *Banque Indosuez v. Barclays Bank PLC*, 181 A.D.2d 447, 447 (1st Dep't 1992) does not deal simply with pleading ignorance— rather, defendant's employee affirmatively marked an overdraft as "under review," while in another document, demanded repayment. This "under review" designation was deemed a "half-truth," but is nothing like the issues here.

Epstein's alleged statements or omissions, that he was deceived, or that he relied on Professor Epstein's purported statements or omissions. Rather, Plaintiff states he filed his lawsuit *hours* after meeting with Professor Epstein. FAC ¶¶ 80-83, 134. At most, his allegations approximate a fraud by concealment claim *sans* fiduciary duty—not a fraud by half truth. But that is not enough. Because Plaintiff admits Professor Epstein did not owe him a fiduciary duty, dismissal is required.

**Second**, Plaintiff's argument that pecuniary damages or "out-of-pocket" costs are not required to plead fraud in federal court, Opp. at 26, is contradicted by a litany of federal court cases granting dismissal motions for failure to plead pecuniary damages. *See*, *e.g.*, *Miller v. Holtzbrinck Publishers*, L.L.C., 377 F. App'x 72, 74 (2d Cir. 2010); *Inspired Cap., LLC v. Conde Nast*, 2018 WL 6173712, at *5 (S.D.N.Y. Nov. 26, 2018), *aff'd,* 803 F. App'x 436 (2d Cir. 2020). Nor can Plaintiff satisfy this element by relying on the (unpled) expenses of serving court-issued subpoenas, Opp. at 26,[8] when the alleged fraud occurred on the last day before the statute of limitations expired and just hours before he filed the original complaint, FAC ¶ 80, meaning that he was already intending to use subpoenas to "uncover" Defendants' identities. To allow anticipated litigation expenses to satisfy this element would render the pecuniary damages component of a fraud claim a nullity.[9] Plaintiff's fraud claim fails.

### E.     Plaintiff's Civil Conspiracy Claim Cannot Survive.

Civil conspiracy requires the plaintiff to allege "a cognizable tort, coupled with an

---

[8] Plaintiff cannot satisfy out-of-pocket damages by complaining, *inter alia*, he had to pay for his own lunch both as a matter of law, and because he did not plead it. Opp. n. 4.

[9] Plaintiff claims that he can plead pecuniary damages through "delay of a legal right." There was no delay caused by Professor Epstein. Plaintiff, of his own accord, filed his original complaint shortly before the expiration of his statute of limitations and waited three months to seek permission to file third party subpoenas. Dkt. No. 11. Nor is *Lawrence v. Houston*, 172 A.D.2d 923 (1991) relevant. There, plaintiffs claimed a misrepresentation delayed them in obtaining legal counsel, resulting in failure to properly obtain and preserve evidence, which could impact the outcome at trial. *Id.* at 925. Here, Plaintiff was and is proceeding without counsel and the alleged omission occurred on the day he filed the complaint, negating any claim of a delay caused by Professor Epstein. Nor can nominal damages satisfy this element as he has not even sought nominal damages in his FAC. Opp. at 28.

agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement." *Faulkner v. City of* Yonkers, 105 A.D.3d 899, 900-01 (2d Dep't 2013). The FAC does not allege that Professor Epstein *ever* reached an agreement with Iyer and Garrett; rather it alleges that Professor Epstein acted as "an *unwitting* instrument of [Iyer and Garrett's] civil conspiracy," rendering any claim of a "meeting of the minds" illusory. FAC ¶ 50. And while Plaintiff claims his Exhibit 3 "provides the best possible support for plausibility of a civil conspiracy imaginable," Opp. at 32, Exhibit 3 does *not* show any agreement by Professor Epstein. Instead, it only shows Garrett told Redpath and Alcantara that he informed Professor Epstein of the allegations, that Professor Epstein was "very upset," and that he felt Otis should be told. FAC Ex. 3. Nothing shows that Professor Epstein issued any instruction, any agreement to a conspiracy, or that he believed the allegations against Plaintiff to be false. Garrett did not even copy Professor Epstein on the email.

There is likewise no merit to Plaintiff's circular argument that Professor Epstein's denial of a conspiracy evidences a conspiracy.[10] *See* Opp. at 32. Nor is there merit to Plaintiff's argument that Professor Epstein's declining to assist him with his Complaint or identify Iyer and Garrett constitutes fraud, *i.e.*, an overt act in furtherance of a conspiracy he never is alleged to have joined. In short, Plaintiff fails to allege any underlying tort, *see Murphy v. Onondaga Cnty.*, 2022 WL 819281, at *17 (N.D.N.Y. Mar. 18, 2022), a critical failure that requires dismissal.

## CONCLUSION

For the foregoing reasons and for those set forth in the Motion to Dismiss, Defendant Epstein respectfully requests that the Amended Complaint be dismissed with prejudice.

---

[10] So too is his argument that Professor Epstein committed the underlying tort of defamation (Count 1) because he *conspired* to commit defamation after any defamatory statements were made (Count 5). *McGill v. Parker*, 179 A.D.2d 98, 105 (1st Dep't 1992) (there is no separate tort of "conspiracy to libel").

Dated: October 31, 2024    Respectfully submitted,

*/s/ Jeremy Chase*
Jeremy Chase
Nimra H. Azmi
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone:    (212) 489-8230
Fax:    (212) 489-8340
jeremychase@dwt.com
nimraazmi@dwt.com

*Attorneys for Richard A. Epstein*

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
GIDEON RAPAPORT,

                              Plaintiff,                    Case No.: 1:23-cv-06709 (JGLC)

            -against-

AJAY SRINIVASAN IYER,
ZACHARY GEORGE GARRETT, and
RICHARD ALLEN EPSTEIN,

                              Defendants.
----------------------------------------------------------X

**DEFENDANTS AJAY SRINIVASAN IYER AND
ZACHARY GEORGE GARRETT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

BACKGROUND .......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.      The Amended Complaint Does Not Relate Back To The Original Complaint
          And Therefore All Claims In The Amended Complaint Against Defendants Iyer
          And Garrett Are Untimely. ............................................................................ 3

    II.     Rapaport's Claims For Intentional Infliction Of Emotional Distress, Civil
          Conspiracy, And Injurious Falsehood Fail As A Matter Of Law. ................ 6

          A.     Rapaport fails to allege facts plausibly showing a claim of intentional
                   infliction of emotional distress. ......................................................... 6

          B.     Rapaport fails to allege facts plausibly showing a civil conspiracy. ............... 9

          C.     The injurious falsehood claim fails because it is duplicative of the
                   defamation claim, and Rapaport has not, and cannot, plead special
                   damages. ......................................................................................... 12

    III.    Rapaport's Defamation Claims Are Untimely And Do Not Meet The
          Plausibility Standard. ................................................................................... 14

          A.     The complaint's exhibits contradict Rapaport's claims that the online
                   posts were defamatory. ................................................................... 15

          B.     The conversations with the Federalist Society and Defendant Epstein
                   are time barred, protected by the common interest privilege, and do not
                   plausibly allege fault. ..................................................................... 17

    IV.    Rapaport's Claims Are Governed By New York Law And Thus He Cannot
          Bring A False Light Claim Under New Jersey Law. .................................... 21

CONCLUSION ........................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*Andino v. Cummins,*
  No. 12-CV-852, 2014 WL 860350 (W.D.N.Y. Mar. 5, 2014) ................................................. 11

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................................................... 2, 11

*Baiqiao Tang v. Wengui Guo,*
  No. 17-cv-9031 (JFK), 2019 WL 6169940 (S.D.N.Y. Nov. 20, 2019) ................................... 23

*Baram v. Doe,*
  No. 23-cv-1758 (ER), 2024 WL 232319 (S.D.N.Y. Jan. 22, 2024) ......................................... 4

*Barrow v. Wethersfield Police Dep't,*
  66 F.3d 466 (2d Cir. 1995) .................................................................................................... 5

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................................................................. 2

*Bender v. City of New York,*
  78 F.3d 787 (2d Cir.1996) ................................................................................................. 6, 7

*Chord Assocs., LLC v. Protech 2003-D, LLC,*
  No. 07-cv-5138, 2010 WL 3780380 (E.D.N.Y. Sept. 21, 2010) ........................................... 23

*Cojocaru v. City Univ. of New York,*
  No. 19-cv-5428 (AKH), 2020 WL 5768723 (S.D.N.Y. Sept. 28, 2020) ................................. 18

*Conte v. Cnty. of Nassau,*
  596 F. App'x 1 (2d Cir. 2014) ............................................................................................... 4

*Cunningham v. Sec. Mut. Ins. Co.,*
  689 N.Y.S.2d 290 (3d Dep't 1999) ....................................................................................... 7

*Daniels v. St. Luke's-Roosevelt Hosp. Ctr.,*
  No. 02-cv-9567 (KNF), 2003 WL 22410623 (S.D.N.Y. Oct. 21, 2003) ........................... 13, 14

*Elson v. Consol. Edison Co. of N.Y., Inc.,*
  641 N.Y.S.2d 294 (1st Dept. 1996) ....................................................................................... 7

*Frederique v. Cnty. of Nassau,*
  No. 11-cv-1746 (WDW), 2014 WL 12841638 (E.D.N.Y. May 22, 2014) ........................ 4, 5, 6

*Ganske v. Mensch,*
  480 F. Supp. 3d 542 (S.D.N.Y. 2020) ................................................................................. 14

*Grayson v. Ressler & Ressler,*
  271 F. Supp. 3d 501 (S.D.N.Y. 2017) ................................................................... 12, 13, 19, 20

ii

*Grove Press, Inc. v. Angleton*,
 649 F.2d 121 (2d Cir. 1981) ............................................................................. 12

*Henry v. Fox News Network LLC*,
 629 F. Supp. 3d 136 (S.D.N.Y. 2022) ........................................................... 21

*Hirsch v. Arthur Andersen & Co.*,
 72 F.3d 1085 (2d Cir. 1995) ............................................................................. 3

*Kasada, Inc. v. Access Capital, Inc.*,
 No. 01-cv-8893 (GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ................ 12

*Kesner v. Dow Jones & Co., Inc.*,
 515 F. Supp. 3d 149 (S.D.N.Y. 2021) ...................................................... 10, 11

*Kinsey v. N.Y. Times Co.*,
 991 F.3d 171 (2d Cir. 2021) ........................................................................... 22

*Kling v. World Health Org.*,
 532 F. Supp. 3d 141 (S.D.N.Y. 2021) ............................................................. 6

*Koulkina v. City of New York*,
 559 F. Supp. 2d 300 (S.D.N.Y. 2008) ........................................................... 17

*Krupski v. Costa Crociere S.p.A.*,
 560 U.S. 538 (2010) .......................................................................................... 5

*M+J Savitt, Inc. v. Savitt*,
 No. 08-cv-8535 (DLC), 2009 WL 691278 (S.D.N.Y. Mar. 17, 2009) ............... 8

*Matusovsky v. Merrill Lynch*,
 186 F. Supp. 2d 397 (S.D.N.Y. 2002) ........................................................... 17

*O'Brien v. Alexander*,
 898 F. Supp. 162 (S.D.N.Y. 1995) ................................................................. 13

*Palin v. N.Y. Times Co.*,
 940 F.3d 804 (2d Cir. 2019) ........................................................................... 14

*Prince v. Intercept*,
 634 F. Supp. 3d 114 (S.D.N.Y. 2022) ...................................................... 21, 22

*Pruiss v. Bosse*,
 912 F. Supp. 104 (S.D.N.Y. 1996) ................................................................. 18

*Purnell v. Diesso*,
 No. 94-cv-4361 (RPP), 1996 WL 37770 (S.D.N.Y. Jan. 31, 1996) ................. 18

*Quintanilla v. WW Int'l, Inc.*,
 541 F. Supp. 3d 331 (S.D.N.Y. 2021) ............................................................. 9

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014) ............................................................... 6, 7, 8, 9

*Sacerdote v. N.Y. Univ.*,
    9 F.4th 95 (2d Cir. 2021) ............................................................................................. 2

*Seltzer v. Bayer*,
    709 N.Y.S.2d 21 (1st Dep't 2000) ............................................................................ 7

*Sesto v. Slaine*,
    171 F. Supp. 3d 194 (S.D.N.Y. 2016) ....................................................................... 7

*Stuto v. Fleishman*,
    164 F.3d 820 (2d Cir. 1999) ....................................................................................... 7

*Swan v. Boardwalk Regency Corp.*,
    969 A.2d 1145 (N.J. Super. Ct. App. Div. 2009) ..................................................... 4

*Thorsen v. Sons of Norway*,
    996 F. Supp. 2d 143 (E.D.N.Y. 2014) ..................................................................... 18

*TufAmerica, Inc. v. Diamond*,
    968 F. Supp. 2d 588 (S.D.N.Y. 2013) ............................................................... 3, 15

*Walther v. Maricopa Int'l Inv., Corp.*,
    No. 97-cv-4816 (HB), 1998 WL 689943 (S.D.N.Y. Sept. 30, 1998) ...................... 19

*Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C.*,
    523 N.Y.S.2d 875 (2d Dep't 1988) .......................................................................... 12

*Watson v. NY Doe 1*,
    439 F. Supp. 3d 152 (S.D.N.Y. 2020) ............................................................... 17, 20

**Rule**

Fed. R. Civ. P. 15 ............................................................................................................ 5

## INTRODUCTION

Through this lawsuit, Plaintiff Gideon Rapaport levels serious accusations at Defendants Ajay Iyer and Zachary Garrett.  Rapaport believes Iyer and Garrett were jealous of him and engaged in a conspiracy to ruin Rapaport's professional life by creating forged photographs of him, and by spreading a rumor that Rapaport was fired from his position as a summer associate at Kirkland & Ellis, LLP, because of sexual harassment.  However, Rapaport fails to plead facts supporting any of these accusations.  Indeed, the internet threads that Rapaport points to and attaches to his complaint did not even include any photographs or information that would otherwise identify Rapaport as the subject of the rumors being discussed.  Moreover, even if Rapaport had alleged facts supporting his claims, his claims are all time barred.

To be sure, if this case proceeds, Defendants will demonstrate that Rapaport's accusations are entirely false.  But the Court need not get that far, as the first amended complaint advances no viable claims, and binding precedent requires this Court to dismiss Rapaport's claims.

## BACKGROUND

Plaintiff Gideon Rapaport, a recent graduate of New York University School of Law, filed a *pro se* complaint on July 28, 2023, alleging that three John Doe Defendants started an "internet hoax" and engaged in "character assassination" by accusing him of being fired from his summer position at Kirkland & Ellis, LLP.  Compl. ¶¶ 6–8 (ECF No. 1).  The events described in the complaint took place one year earlier—in late July and early August 2022.  *Id.* ¶¶ 6, 10, 15.

About four months after filing his initial complaint, in late November 2023, Rapaport sought discovery to obtain information about the identities of the John Does.  Pl.'s Ltr. Mots. (ECF Nos. 10, 11).  Six months after that, Rapaport filed his first amended complaint, replacing the John Doe Defendants with the current Defendants, including Defendants Iyer and Garrett, who were

also students at New York University School of Law.  First Am. Compl. ¶¶ 2, 4 (ECF No. 38) ("FAC").

In this complaint, Rapaport brings a host of claims, including defamation, injurious falsehood, intentional infliction of emotional distress, false light and invasion of privacy, and civil conspiracy. *Id.* ¶¶ 90–127.  According to Rapaport, Iyer and Garrett were jealous of him (¶ 33), and they acted out of that jealousy by creating a fake image purporting to show that Rapaport was barred from entering the offices of Kirkland & Ellis, where Rapaport had been working for the summer (¶ 35), and by circulating that fake photograph to various individuals and posting it online (¶¶ 37, 42, 45).  Rapaport also alleges that Iyer and Garrett presented these materials to representatives of the Federalist Society in advance of Rapaport's participation in the James Kent Academy. *Id.* ¶¶ 34, 42.  Although Rapaport nonetheless participated in the James Kent Academy (¶ 70), he claims that the circulation of this photograph and related statements about reports of sexual harassment led Rapaport not to seek admission to the New York bar.  *Id.* ¶ 14.

## ARGUMENT

Rapaport's amended complaint does not come close to carrying his burden to allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Rather, dismissal is appropriate because Rapaport's allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, (2007).

While the Court must accept as true the complaint's factual allegations, it must also "disregard conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Sacerdote*, 9 F.4th at 107 (internal alteration omitted) (quoting *Twombly*, 550 U.S. at 555).  And, when assessing the sufficiency of a complaint's allegations, the Court may consider any documents a plaintiff attaches to his complaint. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d

1085, 1092 (2d Cir. 1995). Moreover, if those documents contradict the factual allegations, as they do here, courts do not take the factual allegations as true. *See TufAmerica, Inc. v. Diamond,* 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013).

Applying these standards, the Court should dismiss Rapaport's claims against Defendants Iyer and Garrett. *First*, Rapaport's claims are all time barred. *Second*, Rapaport fails to allege all required elements for his claims for injurious falsehood, intentional infliction of emotional distress, and civil conspiracy, including that he suffered any cognizable or quantifiable damages. *Third*, for his defamation claim, Rapaport's allegations are time barred and they do not cross the plausibility line, as the complaint's exhibits contradict his allegations. *Finally*, Rapaport's attempt to bring a New Jersey claim for false light fails, as all the events alleged in the complaint took place in New York, including Rapaport's alleged professional injuries, and New York does not recognize a false light claim.

For these reasons, the Court should dismiss all of Rapaport's claims with prejudice.

## I. The Amended Complaint Does Not Relate Back To The Original Complaint And Therefore All Claims In The Amended Complaint Against Defendants Iyer And Garrett Are Untimely.

The clearest reason to dismiss Rapaport's claims is that they are time barred. Rapaport complains about events that allegedly occurred in July and August 2022. His original complaint, filed in July 2023, did not name any defendants. *See* Compl. In fact, it was not until May 24, 2024—nearly two years after the alleged underlying events—that Rapaport first named Defendants Iyer and Garrett. *See* FAC. As such, the amended complaint was filed far outside the one-year statute of limitations applicable to each of Rapaport's claims, and, because that complaint does not relate back to the original complaint, those claims are untimely.

As an initial matter, each of Rapaport's claims against Defendants Iyer and Garrett is subject to a one-year statute of limitations. *See Conte v. Cnty. of Nassau*, 596 F. App'x 1, 5 (2d

Cir. 2014) (explaining that defamation, injurious falsehood, and intentional infliction of emotional distress all have a one-year statute of limitations); *Swan v. Boardwalk Regency Corp.*, 969 A.2d 1145, 1155 (N.J. Super. Ct. App. Div. 2009) (explaining that a false light claim based on defamatory comments has a one-year statute of limitations); *Baram v. Doe*, No. 23-cv-1758 (ER), 2024 WL 232319, at *10 (S.D.N.Y. Jan. 22, 2024) (explaining that civil conspiracy is not a standalone tort and thus "a cause of action alleging conspiracy to commit a tort stands or falls with the underlying tort.").

The allegedly unlawful conduct included in the amended complaint took place at the end of July and beginning of August 2022.  *See* FAC ¶¶ 35, 40, 42, 47, 52, 54, 65.  Thus, the statute of limitations expired in or around July 2023, which is when Rapaport filed his initial complaint.  *See* Compl.  At that time, Rapaport claims that he "was completely ignorant of the identities of the defendants[.]"  FAC ¶ 81.  It was only months later, after "enforc[ing] the subpoenas which the Court had issued," that Rapaport "learn[ed] the identities of the John Does who had been the original defendants[.]"  *Id.* ¶ 85.  Even then, Rapaport waited until May 24, 2024, to file his amended complaint—almost one year beyond the statute of limitations.

This delay is fatal to Rapaport's claims.  In this Circuit, "['[John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued."  *Frederique v. Cnty. of Nassau*, No. 11-cv-1746 (WDW), 2014 WL 12841638, at *4 (E.D.N.Y. May 22, 2014).  Thus, a plaintiff can only substitute John Does with new parties outside of the statute of limitations if the amended complaint meets "all of the specifications of the relation back statute," which is Federal Rule of Civil Procedure 15(c).  *Id.*  Rapaport cannot do so.

One such specification is that the later-added party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii). The Second Circuit has interpreted this rule "to preclude relation back for amended complaints that add new defendants, where the newly added defendants were not named originally because the *plaintiff did not know their identities*." *Frederique*, 2014 WL 12841638, at *4 (emphasis added) (citing *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995), *modified*, 74 F.3d 1366 (2d Cir. 1996) (per curiam)). That is because not knowing the identities of the defendants "cannot be characterized as a mistake." *Barrow*, 66 F.3d at 470.[1]

As Rapaport concedes, he "had no idea who was responsible" when he filed his original complaint, and he thus relied on John Does. FAC ¶ 81. Under *Barrow*, Rapaport's replacing the John Does with Defendants' names nearly two years after the underlying events allegedly occurred cannot be characterized as a mistake, and therefore the amended complaint cannot relate back to the original complaint.

Moreover, Rapaport cannot evade this authority by claiming that "defendants withheld identifying information or unreasonably delayed in producing such information." *Frederique*, 2014 WL 12841638, at *6 (quotation marks omitted). For one, the Second Circuit has not expressly endorsed, or even recognized, this exception to the relation-back rule, and even if it had, it only applies when the plaintiff seeks identification information *before* the statute of limitations

---

[1] The Supreme Court later addressed this provision of Rule 15(c) in *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010). But that case did not address the question in *Barrow* about replacing "John Does" with named defendants. Thus, as numerous courts in this circuit have recognized, the Supreme Court did not overrule or even alter the holding in *Barrow*. *See Frederique*, 2014 WL 12841638, at *5 (collecting cases and noting that even after *Krupski*, the Second Circuit has invoked *Barrow*).

5

ends.  *Id.*  Here, Rapaport waited until November 2023 to seek the Defendants' identities, which was several months beyond the conclusion of the statute of limitations in July 2023.

Under the Second Circuit's *Barrow* decision, Rapaport's amended complaint does not relate back, and his claims are therefore untimely.  Accordingly, the Court should dismiss all of Rapaport's claims against Iyer and Garrett.  And, because he cannot fix this error with any amendment, the dismissal of the entire amended complaint should be with prejudice.  *Kling v. World Health Org.*, 532 F. Supp. 3d 141, 154 (S.D.N.Y. 2021) ("[D]ismissal with prejudice is appropriate when 'the flaws in pleading are incurable.'").

## II.    Rapaport's Claims For Intentional Infliction Of Emotional Distress, Civil Conspiracy, And Injurious Falsehood Fail As A Matter Of Law.

Even if the Court concludes that Rapaport's claims relate back to the original complaint, they must still be dismissed because Rapaport fails to plead the elements required for his claims of intentional infliction of emotional distress, civil conspiracy, and injurious falsehood.  He alleges no extreme and outrageous conduct, no agreement or conspiratorial conduct, and no specific damages necessary for any of these claims.  These deficiencies require dismissal.

### A.    Rapaport fails to allege facts plausibly showing a claim of intentional infliction of emotional distress.

The tort of intentional infliction of emotional distress ("IIED") has four elements: "(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."  *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014) (citing *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir.1996)).  Rapaport comes up short at each turn.

First, the "threshold for conduct that is 'extreme and outrageous'" is high, and "New York courts have found liability for intentional infliction of emotional distress 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

6

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Id.*
(first quoting *Bender*, 78 F.3d at 790, then *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)).
For example, one New York appellate court found "extreme and outrageous" conduct in a
complaint where an employee alleged that his employer knew of his mental-health condition yet
subjected him to eight hours of threatening interrogation while showing him a gun and denying
him food. *Elson v. Consol. Edison Co. of N.Y., Inc.*, 641 N.Y.S.2d 294, 294-95 (1st Dept. 1996).
In that case, the office security officers even intimidated the plaintiff into escorting them "to his
home to conduct a search" for drugs. *Id.* at 294.  Conversely, courts have found allegations not to
satisfy the "extreme and outrageous" standard even where a defendant allegedly dumped cement,
lighted cigarettes, and eggs on the plaintiff's property and threatened to paint a swastika on his
house. *Seltzer v. Bayer*, 709 N.Y.S.2d 21, 23 (1st Dep't 2000).  Nor was it sufficient for an IIED
claim when a defendant was alleged to have wrongfully accused a plaintiff of arson, even
submitting false statements under oath. *Cunningham v. Sec. Mut. Ins. Co.*, 689 N.Y.S.2d 290, 291
(3d Dep't 1999).

Further, "defamatory statements generally cannot constitute the extreme and outrageous
behavior required for an intentional infliction of emotional distress claim." *Restis*, 53 F. Supp. 3d
at 729 (collecting cases).  And, when the alleged extreme conduct "falls within the ambit of another
tort," the IIED claim fails.  *Id.*  That is why "[c]ourts in this Circuit consistently dismiss [IIED]
claims where plaintiff alleges no facts beyond those necessary to sustain another tort claim."  *Id.*
In short, courts routinely dismiss IIED claims because it is a "highly disfavored cause of action"
that "is almost never successful." *Sesto v. Slaine*, 171 F. Supp. 3d 194, 201–02 (S.D.N.Y. 2016)
(quotation marks omitted).

Applying these rules, a judge in this district dismissed an IIED claim where the plaintiffs alleged that the defendants engaged in a "name and shame" campaign via press releases and social media posts to destroy plaintiffs' reputations and interfere with their careers. *Restis*, 53 F. Supp. 3d at 709. The court held that the allegedly defamatory comments about plaintiffs' illicit business dealings with Iran could not constitute "extreme and outrageous conduct." *Id.* at 729. Moreover, even if such statements sufficed, the IIED claim relied on the same facts as the other tort claims and thus had to be dismissed. *Id.*

Similarly, in *M+J Savitt, Inc. v. Savitt*, the court dismissed an IIED claim that was based on allegations that the plaintiff had engaged in sexual misconduct in the workplace. No. 08-cv-8535 (DLC), 2009 WL 691278, at *14 (S.D.N.Y. Mar. 17, 2009). Specifically, the plaintiff was accused in front of a group of coworkers of "f*****g the bookkeeper." *Id.* The court held that "while offensive," the comments were not so outrageous as to satisfy the "extreme and outrageous conduct" element. *Id.* Further, the IIED claim was doomed because the comments were "within the ambit of [the] claim for defamation[.]" *Id.*

This case is no different. Rapaport does not allege any extreme or outrageous conduct. Rather, he merely alleges that Defendants made statements about rumors that Rapaport's summer position with Kirkland & Ellis had been cut short due to reports of sexual harassment. While such rumors and comments may be offensive, they do not constitute "extreme and outrageous conduct." And they are "within the ambit" of and indistinguishable from Rapaport's defamation and other tort claims. *Id.* Perhaps recognizing as much, Rapaport makes a half-hearted effort to differentiate this claim, baldly stating that the allegedly defamatory statements "were only part of the defendants' campaign of destruction[.]" FAC ¶ 112. Beyond this perfunctory statement, however,

there is no way to read the allegations supporting the IIED claim as distinguishable from Rapaport's other claims.

Accordingly, Rapaport cannot satisfy the first requirement for an IIED claim, and even if he could, the claim would nonetheless fail because it is duplicative of other claims.

Second, Rapaport's IIED claim fails because he has not plausibly alleged that Iyer and Garrett possessed any "intent to cause severe emotional distress," let alone that Rapaport has suffered any actual emotional distress. *Restis*, 53 F. Supp. 3d at 729. Instead, Rapaport relies exclusively on the conclusory statement that Defendants acted with "intent to cause … severe emotional distress[.]" FAC ¶ 109. But "merely reciting" the legal standard will not do. *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 352 (S.D.N.Y. 2021). Moreover, the communications Rapaport attaches to his amended complaint undermine his claim of any such intent. For instance, when Defendant Garrett contacted representatives of the Federalist Society, he merely referenced "his understanding" of what occurred and noted that he "cannot confirm" the rumor about sexual harassment. FAC, Ex. 3. Those are hardly words of someone acting with an "intent to cause severe emotional distress." But even if they were, Rapaport again relies only on legal conclusions when attempting to satisfy the emotional-distress requirement. *See, e.g.*, FAC ¶¶ 89, 99, 109 (cursory reference to "emotional distress" without any factual support).

For each of these reasons, Rapaport's IIED claim fails and should be dismissed.

**B.    Rapaport fails to allege facts plausibly showing a civil conspiracy.**

Rapaport's civil conspiracy claim fares no better. In his amended complaint, Rapaport relies on the vague allegation that "[t]he three defendants were engaged in a civil conspiracy to defame the plaintiff[.]" FAC ¶ 123. To survive a motion to dismiss on such a claim, however, Rapaport must adequately plead the following elements: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in

the furtherance of a plan or purpose; and (4) resulting damage or injury." *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 191 (S.D.N.Y. 2021) (quotation marks omitted).

Rapaport's claim fails at the start, as he does not plausibly allege any agreement between the three Defendants to defame him. Instead, Rapaport alleges that Defendants Iyer and Garrett were "motivated by professional jealousy" and began a "plan to destroy the life and end the career of the plaintiff by defamation and forgery." FAC ¶¶ 32–33. But he fails to allege a single fact supporting the notion that Iyer and Garrett made any agreement concerning this alleged plan. Rather, Rapaport alleges that Iyer created a fake photograph that he posted online, and then Garrett presented that photograph to staff at the Federalist Society and Professor Epstein. *Id.* ¶¶ 35, 37, 42, 45. The only thread possibly tying Iyer and Garrett together is the statement that "[t]he publication of the forgery and defamatory claims were intended to coincide with the presence of defendant Garrett at the Federalist Society Student Leadership Conference[.]" *Id.* ¶ 40. But even Rapaport's use of the passive voice cannot obscure the fact that Rapaport fails to allege that *anyone*—let alone a Defendant—intended the events to coincide. Rapaport's assumption that Garrett and Iyer were working together is merely conjecture.

Rapaport does not attempt to mask this conjecture—the amended complaint admits that he does not know how or if the Defendants were working together. For example, in one paragraph, Rapaport alleges Garrett acted in furtherance of the conspiracy when he called Rapaport. *Id.* ¶ 51. But in the next paragraph, Rapaport states that the call was "*perhaps* at the prompting of defendant Epstein or the Student Division of the Federalist Society[.]" *Id.* ¶ 52 (emphasis added). Of course, the Federalist Society is not a Defendant in the action, and there is no alleged connection between Iyer and this phone call other than the threadbare recital that the call was part of the conspiracy.

Elsewhere, Rapaport alleges that Defendant Epstein chose "to join with defendants Iyer and Garrett" for unknown reasons. *Id.* ¶¶ 59, 62. But here again, Rapaport never alleges any sort of agreement between these three defendants. Instead, he simply speculates that "[b]y th[e] time" of early August 2022, Epstein had joined Iyer and Garrett. *Id.* ¶ 59.

These sparse allegations give no rise to any inference of an agreement. Rather, they suggest that if Defendants took any of the alleged actions, they did so with independent motives. *See Kesner*, 515 F. Supp. 3d at 192 (dismissing conspiracy claim where the complaint "does not come close to pleading enough factual matter (taken as true) to suggest that an agreement was made, *i.e.*, ... provide some factual context suggesting that the parties reached an agreement, not facts that would be merely consistent with an agreement." (cleaned up)). Such conjecture cannot save Rapaport's claim. *See Iqbal*, 556 U.S. at 678.

Because there is no alleged agreement, Rapaport also fails to plead the second and third elements of the claim—acts in furtherance of the agreement in which the Defendants intentionally participated. Even taking Plaintiff's allegations as true, the story is: (1) Iyer faked photographs of Rapaport and posted them online; (2) Garrett presumably saw these and shared them with those he thought would be concerned, including Defendant Epstein; and (3) Epstein was concerned about the photographs and statements and acted to protect his reputation. Even assuming these allegations are true, collecting various discrete events falls short of plausibly alleging any conspiratorial conduct. *See Andino v. Cummins*, No. 12-CV-852, 2014 WL 860350, at *8 (W.D.N.Y. Mar. 5, 2014) (dismissing conspiracy claim where the plaintiff only pointed "to a series of otherwise discrete actions" and failed to "assert any joint action or agreement by defendants or provide details of time and place where defendants allegedly conspired").

Finally, Plaintiff also fails to allege the fourth element of conspiracy—injury and damages. As discussed further below, Rapaport's alleged damages are purely speculative, as he alleges only that Defendants interfered with and harmed his future career prospects.  *See* FAC ¶¶ 77, 124.  The amended complaint lacks *any* allegations to support that statement.  Rapaport has not identified a single way in which his career prospects have been harmed, beyond his own decision not to seek admission to the New York bar.  *Id.* ¶ 14.  But self-inflicted harm cannot satisfy this requirement. *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981) ("The damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt acts.")

Because Rapaport fails to adequately allege a single element of this claim, it must be dismissed.

### C.    The injurious falsehood claim fails because it is duplicative of the defamation claim, and Rapaport has not, and cannot, plead special damages.

Injurious falsehood is a tort similar to defamation that "consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Kasada, Inc. v. Access Capital, Inc.,* No. 01-cv-8893 (GBD), 2004 WL 2903776, at *15 (S.D.N.Y. Dec. 14, 2004) (quoting *Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C.,* 523 N.Y.S.2d 875, 877 (2d Dep't 1988)).  The difference between defamation and injurious falsehood is that the former "impugns the basic integrity" of plaintiff while the latter "denigrat[es] the quality of the plaintiff's business's good or services." *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 518–19 (S.D.N.Y. 2017) (emphasis omitted from second quote) (quotation marks omitted).

Given the similarity between the torts, courts routinely dismiss injurious falsehood claims that are duplicative of a defamation claim.  *See O'Brien v. Alexander*, 898 F. Supp. 162, 172

(S.D.N.Y. 1995), *aff'd*, 101 F.3d 1479 (2d Cir. 1996) (collecting cases). This is especially true when a claim for injurious falsehood is based on the same statements as the defamation claim, and the damages sought for the two claims are the same. *Id.*

These rules require dismissal of Rapaport's claim for injurious falsehood at the outset. Rapaport states that his defamation claim is based on the "faked photographs" and accompanying statements, which allegedly caused lost career opportunities and harmed his reputation. FAC ¶¶ 91, 98. Rapaport's injurious falsehood claim is nearly identical, listing "[t]he above-described fake photographs and statements" as the cause of the loss of "his entire career prospects." FAC ¶ 102. Because there is no difference between his defamation claim and injurious falsehood claim, the Court should dismiss the latter claim.

Further, even if Rapaport's claim were not duplicative, he cannot meet the elements for injurious falsehood. To prove a claim of injurious falsehood, a plaintiff must show: "(1) falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages." *Grayson*, 271 F. Supp. 3d at 518–19. The last element, special damages, requires concrete and quantifiable losses. *Id.* And here, it requires dismissal.

At the motion-to-dismiss stage, Rapaport "must plead facts demonstrating that *actual losses* were caused by the alleged tortious act." *Id.* at 519 (emphasis added). Further, Rapaport "must also plead the *amount* of special damages with specificity." *Id.* (emphasis added). When a plaintiff alleges special damages based on loss of employment, he must provide a specific amount of compensation lost. *Daniels v. St. Luke's-Roosevelt Hosp. Ctr.,* No. 02-cv-9567 (KNF), 2003 WL 22410623, at *8 (S.D.N.Y. Oct. 21, 2003) (dismissing claim for injurious falsehood because the plaintiff did not plead specific special damages). The mere assertion that the plaintiff lost his job is not enough. *Id.*

Here, Rapaport failed to plead any special damages. The complaint lists no specific or even general amount of damages, and Rapaport states only that the Defendants' conduct allegedly caused the "loss of the promised clerkship, his loss of the opportunity to become a member of the New York bar, and his entire career prospects." FAC ¶ 102. Indeed, Rapaport does not even mention basic details about his damages, like what type of clerkship he was allegedly promised, what judge that clerkship was with, or when the clerkship would take place. Nor does Rapaport state that he applied for membership to the New York bar and was rejected. Rapaport simply decided not to apply for membership. Every alleged damage, summed up by Rapaport's claim about the ruin of "his entire career prospects," is pure speculation. Thus, "the claim must be dismissed because the plaintiff has failed to allege special damages with sufficient particularity." *Daniels*, 2003 WL 22410623, at *8.

## III. Rapaport's Defamation Claims Are Untimely And Do Not Meet The Plausibility Standard.

Rapaport similarly fails to allege facts plausibly showing defamation. And several of the allegedly defamatory statements cannot give rise to a cause of action because they are time barred.

To survive a motion to dismiss, a plaintiff must sufficiently allege the following elements: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Further, "New York courts encourage the resolution of defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Ganske v. Mensch*, 480 F. Supp. 3d 542, 551 (S.D.N.Y. 2020).

Here, Rapaport alleges that the following statements by either Defendant Iyer or Defendant Garrett were defamatory: (1) Defendant Iyer posting a fake photograph of Rapaport along with

14

statements that he was fired for sexual harassment and banned from the New York office of Kirkland & Ellis on Reddit.com and Toplawschools.com, *see* FAC ¶¶ 37–38; (2) Defendant Garrett presenting these online materials to employees of the Federalist Society, *id.* ¶¶ 42, 54–56; (3) Defendant Garrett presenting the same materials to Professor Epstein, *id.* ¶ 45; and (4) Defendant Iyer sending a second fake photograph to Defendant Garrett and Professor Epstein, *id.* ¶ 50. Rapaport has not plausibly alleged the elements for defamation for any of these statements, and the statements to the Federalist Society and Defendant Epstein were mentioned for the first time in the amended complaint and are therefore untimely.

### A. The complaint's exhibits contradict Rapaport's claims that the online posts were defamatory.

For the allegation that Iyer posted a photograph and made various statements on Reddit.com and Toplawschools.com, the complaint's exhibits contradict that claim. And, when exhibits contradict the factual allegations, it is the exhibits' contents that win the day. *See TufAmerica,* 968 F. Supp. 2d at 592.

For one, neither of the forum threads Rapaport attached to his complaint suggests that *any* photograph was included. *See* ECF 38-3. And neither thread mentions Rapaport by name. Moreover, there is no basis for inferring that Iyer posted anything on either thread. Each of these facts is fatal to the plausibility of Rapaport's claim.

In the Reddit thread, the initial post is by a user named "Isa931," and the post is entitled "Anyone wanna spill the tea on the summer at Kirkland NY that got fired?" ECF No. 38-3 at 3. Another user named "Throaway9219749936" responds: "Can confirm that he is in fact banned from the building- security had a picture of him in the lobby. Also the bar where the last event of the summer was had a picture of him as well to make sure he didn't come back." *Id.* at 4. Then another user named "BrownComic" states: "Guy also sexually harassed an attorney." *Id.* at 5.

This conversation contradicts Rapaport's allegations in multiple ways. Again, there is no indication that anyone posted a photo of Rapaport on this thread, much less that Defendant Iyer did so. No one even mentions Rapaport by name, further suggesting that there is no photo or any other way to identify that Rapaport is the subject of this conversation.

Moreover, the first post asks about a summer associate, and then multiple users engage in a conversation about that associate. Two different users mention that the summer associate was banned from the building, and a third user notes that he was fired for sexual harassment. *Id.* at 3–5. And Rapaport does not allege that Iyer made any of these statements, let alone that he created numerous anonymous accounts on Reddit and then engaged in a fake conversation with himself. *See* FAC ¶ 38 (alleging only that the photo was "accompanied by false and defamatory statements"). The Reddit thread thus contradicts: (1) the assertion that Iyer posted a photograph; and (2) the implication that Iyer made false statements concerning why Rapaport was fired and that he was banned from Kirkland & Ellis's New York office.

The same is true for the thread on Toplawschools.com. Like the Reddit thread, there is no suggestion of a picture being posted or Rapaport being named or identified by a photo. Rather, the conversation begins with a user inquiring about a summer associate who got fired. ECF No. 38-3 at 7. Someone responds that "the guy apparently harassed his PA," *id.*, and then other users reference the security photo that they allegedly saw. ECF No. 38-3 at 11, 13. Once again, no post mentions Rapaport by name and no post suggests that there is a photo posted on the thread. Further, the face of the exhibit suggests that the conversation occurred between multiple users, none of which is clearly or inferentially Defendant Iyer.

Rapaport's defamation claim is doomed by these contradictions between the complaint's allegations and the exhibits' contents. To state a claim for defamation, "a complaint must 'identify

adequately who actually made the allegedly [defamatory] statements, when they were made and to whom they were communicated.'" *Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 160 (S.D.N.Y. 2020). While Rapaport alleges that Iyer posted a fake photo on these websites and possibly made accompanying defamatory statements, the exhibits from these websites contradict that allegation.

When exhibits to the complaint contradict the allegations in the complaint, "such allegations cannot survive a motion to dismiss[.]" *Koulkina v. City of New York,* 559 F. Supp. 2d 300, 329 (S.D.N.Y. 2008). The Court should therefore reject Rapaport's defamation claim based on the internet threads attached to the complaint. *See Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (explaining that "a court may consider documents attached to the complaint as exhibits," and "[i]f a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss.").

**B.    The conversations with the Federalist Society and Defendant Epstein are time barred, protected by the common interest privilege, and do not plausibly allege fault.**

The remaining allegedly defamatory statements all fail for three additional reasons. First, they are time barred, as Rapaport included those statements for the first time in his amended complaint. Second, even if the claims were timely, they are all covered by the common-interest privilege, which a plaintiff can overcome only with a showing of actual malice. Third, Rapaport has failed to plead actual malice, or even negligence, and therefore Rapaport has failed to plead the fault element for these statements.

1. The statements Defendants Iyer and Garrett made to the Federalist Society and Professor Epstein are all time barred. In his original complaint, Rapaport does not mention any of these communications. Rather, the original complaint is premised on the internet posts and a Title IX complaint. *See* Compl. ¶¶ 6–9, 23–27. These new communications do not relate back to the original complaint.

Under the relation-back doctrine of Rule 15(c), "[c]ourts in this district have held that defamation claims do not relate back to a prior pleading where they allege 'new instances of defamation.'" *Cojocaru v. City Univ. of New York*, No. 19-cv-5428 (AKH), 2020 WL 5768723, at *4 (S.D.N.Y. Sept. 28, 2020) (quoting *Pruiss v. Bosse*, 912 F. Supp. 104, 106 (S.D.N.Y. 1996)). Each publication of a defamatory statement "gives rise to a separate cause of action and does not relate back to an earlier publication." *Purnell v. Diesso*, No. 94-cv-4361 (RPP), 1996 WL 37770, at *2 (S.D.N.Y. Jan. 31, 1996).

In his amended complaint, Rapaport notes for the first time two conversations between Defendant Garrett and employees of the Federalist Society—an in-person conversation occurring on July 29, 2022, and an email dated August 2, 2022. FAC ¶¶ 42, 54. Rapaport also alleges that Defendant Garrett communicated with Defendant Epstein around the end of July 2022, and that Defendant Iyer emailed Professor Epstein in the same timeframe. FAC ¶¶ 45, 50. Rapaport filed his amended complaint discussing these conversations and emails on May 24, 2024—well beyond the one-year statute of limitations. *See supra* Part I. These statements all give rise to separate causes of action for defamation and do "not relate back" to any earlier publication. *Purnell*, 1996 WL 37770, at *2. Thus, Rapaport cannot pursue a defamation claim based on any of the conversations Iyer and Garrett had with either the Federalist Society or Defendant Epstein.

2. Even if these statements are not time barred, they are all protected under the common interest privilege. New York recognizes a common interest privilege for defamation and defamation *per se* "when the allegedly defamatory statement is made between persons who share a common interest in the subject matter." *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 173–74 (E.D.N.Y. 2014). The privilege applies to "members of a group or organization." *Walther v.*

*Maricopa Int'l Inv., Corp.*, No. 97-cv-4816 (HB), 1998 WL 689943, at *2 (S.D.N.Y. Sept. 30, 1998) (collecting cases).

When the privilege applies, it "protects a defendant from liability unless he made the statements at issue *solely* with malice." *Grayson*, 271 F. Supp. 3d at 514–15. And "[p]laintiffs cannot plead malice simply by conclusorily labeling the statements so." *Id.* at 515; *accord id.* (allegations of malice "based on 'surmise, conjecture, and suspicion' are insufficient."). Rather, a plaintiff must "plead facts suggestive enough to warrant discovery." *Id.* (quotation marks omitted).

The common interest privilege applies to the statements Defendant Garrett made to the Federalist Society and any communications between the three Defendants. Rapaport notes that all Defendants are involved with the Federalist Society—Defendants Iyer and Garrett served as the Federalist Society chapter presidents for NYU School of Law. FAC ¶¶ 2, 4. And Defendant Epstein "serves as the faculty advisor to the Federalist Society chapter." *Id.* ¶ 6. Aside from the internet posts, Rapaport alleges only that the defamatory statements were shared among Federalist Society members—either between the three Defendants or between Defendant Garrett and employees of the Federalist Society. *See Id.* ¶¶ 42, 45, 50, 54–56.

All these members and employees of the same organization have a "common interest in the subject matter," *Grayson*, 271 F. Supp. 3d at 514–15, as Rapaport was also a member of the Federalist Society. Indeed, the email Rapaport attached to his complaint from Defendant Garrett to employees of the Federalist Society lays out this common interest very clearly. Defendant Garrett explains that he shared the information about Rapaport with Defendant Epstein, who "feels that Lee Otis [of the Federalist Society] should be made aware, since Gideon is going to be participating" in a fellowship put on by the Federalist Society "for which Professor Epstein wrote Gideon a (complicated) letter of recommendation." ECF No. 38-3 at 2.

19

Because the common interest applies to all the communications between the Defendants and between Defendant Garrett and the Federalist Society, Rapaport must allege that Defendants Iyer and Garrett acted *solely* with malice.  But Rapaport concedes that he does not know *why* Defendants Garrett and Iyer made these statements—he simply guesses that they "were apparently motivated by professional jealousy."  FAC ¶ 33.  This conclusory assertion is insufficient to plead actual malice.  *See Grayson*, 271 F. Supp. 3d at 514–15.  And it overlooks the obvious fact that these various individuals, each of whom is involved with the Federalist Society, was merely acting out of a concern for how rumors about Plaintiff Rapaport may impact the organization.  Of course, as Rapaport acknowledges in his first amended complaint, he suffered no harm from Defendant Garrett's statements to the Federalist Society, as he nonetheless participated in the James Kent Academy.  *See* FAC ¶ 70.

3.  In fact, Rapaport's allegations cannot even meet the lower level of fault—negligence— for the communications between Defendant Garrett and the Federalist Society.  *See Watson*, 439 F. Supp. 3d at 160.  Rapaport claims that Defendant Garrett made two defamatory statements to employees of the Federalist Society.  FAC ¶ 54.  Those statements were that Rapaport was fired for sexual harassment and banned from Kirkland & Ellis's New York office.  *Id.* ¶¶ 55–56.  Here again, Rapaport failed to plead the fault element of defamation for either of these statements.

As to the first statement concerning sexual harassment, Defendant Garrett did not even assert its truth.  Instead, he said that he could not "confirm the sexual harassment claim specifically[.]"  ECF No. 38-3 at 2.  Further, Defendant Garrett references the internet threads as his basis for suggesting that Rapaport may have been fired for sexual harassment.  *Id.*  As noted above, it is unclear who made that statement.  Rapaport does not allege that the statement originated with Iyer or Garrett.  He says only that Iyer allegedly posted a fake photograph about

20

Rapaport's being banned from the building, and in the next paragraph of the complaint, Rapaport suggests that the photo was "accompanied by false and defamatory statements that the plaintiff was fired for sexual harassment[.]" FAC ¶ 38. Rapaport does not explicitly assert that Iyer made that statement, and the internet thread undermines the inference that Iyer made such a statement, as it shows that multiple users were engaged in a conversation about a summer associate in New York. *See supra* Part III.A. Nevertheless, there is no allegation connecting Defendant Garrett to the creation of that statement. There is also no allegation that Defendant Garrett knew or should have known the statement was false. Rapaport has therefore failed to plausibly plead that Defendant Garrett made this statement negligently.

In sum, Rapaport's defamation claim cannot stand—it is untimely and contradicted by the amended complaint's exhibits. Accordingly, the Court must dismiss this claim.

## IV. Rapaport's Claims Are Governed By New York Law And Thus He Cannot Bring A False Light Claim Under New Jersey Law.

Finally, Rapaport asserts a claim under New Jersey law for "False Light and Invasion of Privacy" because he lived in New Jersey at the time of the events mentioned in the complaint. FAC ¶¶ 114–21. But Rapaport's claims are governed by the laws of New York, and New York does not recognize a claim for false light. *See Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 151–52 (S.D.N.Y. 2022).

While there is a "a presumptive rule that the law of [the] plaintiff's domicile applies" to a defamation claim or claims, like false light, that are analogous to defamation, that rule does not apply when the allegedly defamatory statements are made in multiple states or nationally. *Prince v. Intercept*, 634 F. Supp. 3d 114, 132 (S.D.N.Y. 2022). Courts consider online statements to be made nationally, *id.*, and thus the alleged defamatory statements in the complaint were made nationally. FAC ¶¶ 37, 42.

For these types of statements, a court must determine whether another state has a more significant relationship to the defamation claim than the state of the plaintiff's domicile. *Prince*, 634 F. Supp. 3d at 132. That determination requires the court to "weigh all the factors that might impact on the interests of various states in the litigation including, [1] where the plaintiff suffered the greatest injury; [2] from where the statements emanated and were broadcast; [3] where the activities to which the allegedly defamatory statements refer took place; and [4] the policy interests of the states whose law might apply." *Id.* at 133 (internal alterations omitted) (citing *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 177 (2d Cir. 2021)).

Each of those factors weighs in favor of applying New York law here. Rapaport's alleged injuries to his reputation and inability to be admitted to the bar (factor 1) are happening in New York, as that is where Rapaport intends to practice law. FAC ¶ 14. Further, for factor 2, many of the alleged defamatory statements were either online (and thus not in any particular state) or made to Defendant Epstein, who is located in New York. Indeed, all parties met and interacted in New York at NYU Law School, and the events surrounding Rapaport's position at Kirkland & Ellis took place in New York. Thus, factor 3 (where the activities took place) also supports applying New York law. Finally, factor 4 (policy interests) favors New York, as the state "has strong policy interests in regulating the conduct of its citizens[.]" *Prince*, 634 F. Supp. 3d at 133 (quoting *Kinsey*, 991 F.3d at 177).

The only connection to New Jersey is that Rapaport happens to live there. Thus, this Court should apply New York law to Rapaport's false light claim and dismiss it because no such claim exists in New York.

Finally, even if Rapaport could bring a New Jersey false-light claim, that claim would nonetheless fail because it is completely duplicative of his defamation claim. As discussed above,

22

in reference to the injurious falsehood claim, New York courts dismiss privacy-related torts that are just a repackaging of a plaintiff's defamation claim. *See Chord Assocs., LLC v. Protech 2003-D, LLC*, No. 07-cv-5138, 2010 WL 3780380, at *4 (E.D.N.Y. Sept. 21, 2010). This is true even for false-light claims under another state's law. *See Baiqiao Tang v. Wengui Guo*, No. 17-cv-9031 (JFK), 2019 WL 6169940, at *7 (S.D.N.Y. Nov. 20, 2019) (dismissing California false-light claim because it was duplicative of New York defamation claim). Accordingly, even if the Court found that Rapaport could bring this one New Jersey claim, it should dismiss the claim as an impermissible reformulation of the defamation claim.

## CONCLUSION

Rapaport's amended complaint must be dismissed because it advances no viable claims against Defendants Iyer and Garrett. Indeed, each claim fails for either being time barred or due to Rapaport's failure to plausibly allege facts showing the required elements. The Court should therefore dismiss Rapaport's amended complaint in its entirety. And it should do with prejudice, as Rapaport has already amended his complaint once, and there is nothing he can do to cure the defects described in this motion, especially the lack of timeliness.

August 16, 2024

Respectfully submitted,

*/s/ Brian J. Field*
Brian J. Field* (D.C. Bar No. 985577)
Cristina Martinez Squiers* (Texas Bar No. 24093764)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
Email: bfield@schaerr-jaffe.com
Email: csquiers@schaerr-jaffe.com

*Admitted *pro hac vice*

*Counsel for Defendants
Ajay Srinivasan Iyer and
Zachary George Garrett*

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

GIDEON RAPAPORT

|  | Case No. 1:23-cv-06709 |
|---|---|
| Plaintiff, *pro se* | **ORAL ARGUMENT REQUEST** |
| -against- | |
| AJAY SRINIVASAN IYER, ZACHARY GEORGE GARRETT, RICHARD ALLEN EPSTEIN | |
| Defendants. | |

-----------------------------------------------------------------x

## **NOTICE OF OPPOSITION TO MOTION**

PLEASE TAKE NOTICE that, upon the annexed Memorandum of Law, Plaintiff Gideon

Rapaport, *pro se*, opposes the Motion of Defendants Ajay Srinivasan Iyer and Zachary George Garrett

to Dismiss this Action before the Honorable Jessica G. L. Clarke at the United States Courthouse for

the Southern District of New York, 500 Pearl Street, New York, New York.


Dated: Vancouver, British Columbia (Canada)
September 26, 2024


Respectfully submitted,


/s/ Gideon Rapaport, *pro se*
GideonRapaportLaw@Outlook.com
(862) 213-0895
#627 1078 Summit Avenue
Jersey City, New Jersey, 07310

## TABLE OF CONTENTS

| | |
|---|---|
| **PRELIMINARY STATEMENT** | **1** |
| **PROCEDURAL BACKGROUND** | **2** |
| The Parties | **2** |
| Procedural Background | **2** |
| **FACTUAL BACKGROUND** | **3** |
| Defendants Iyer and Garrett Forged and Created the Defamations Rather Than Merely Repeated Them | **3** |
| Defendant Iyer is the Only Person Who Could Have Created and Posted the First Forgery Online | **4** |
| The Contents and Context of the Forged Images Are Defamatory | **4** |
| The Creation of the Second Forgery and Direct Communication of it to the Federalist Society Required Removal of First Forgery from the Internet Proves the Conspiracy of Defendants Iyer and Garrett | **4** |
| Defendants Iyer and Garrett Were Maliciously Persistent by Creating Second Forgery After the First Was Rejected and Continued to Push Defamations on the Federalist Society | **5** |
| The Exhibit 3 Email and Materials Reveal Previous Defamations, the Agreement to the Conspiracy and Defendants Iyer and Garrett's Early Need to Cover Up the First Version of the Forgery | **6** |
| The Plaintiff's Diligent Efforts to Discover the Identities of the Initially Unknown Perpetrators Was Thwarted by Defendant Epstein's Fraud | **7** |
| **ARGUMENT** | **8** |
| **The Motion of Defendants Iyer and Garret is Not Even Responsive to the Factual Allegations of the First Amended Complaint** | **8** |
| **Glaring Omissions Raise Serious Doubt as to Whether Opposing Counsel Even Read the Pleadings They Reference** | **8** |
| **A Pattern of Intermittent and Contextual Amnesia Pervades Defendants' Memorandum that Selectively References Facts Elsewhere Denied to Exist** | **10** |
| **Anticipatory Pleading by Plaintiff to Affirmative Defenses Such as the Statute of Limitations or Possible Common Interest Privilege is Not Required or Proper** | **11** |
| **Consideration of the Statute of Limitations Arguments Raised Are Premature and Factually Unsupported** | **11** |
| **Consideration of the Common Interest Privilege Arguments Raised Are Premature and** | **12** |

| | |
|---|---|
| **Factually Unsupported** | |
| **Incidentally, Pleading as to Defendant Epstein's Fraud Establishes Relating Back Per FRCP Rule 15(c)(1)(a) with CPLR 1024 & 203 as "the Law That … Allows Relation Back"** | 12 |
| **Defendant Epstein's Fraud Was Committed to Undermine Plaintiff's Diligent Efforts to Identify Defendants Iyer and Garrett** | 12 |
| **New York Law Applies Through FRCP Rule 15(c)(1)(a) and Specifically Allows for Suits to Be Brought Against Does and Relate-Back Later** | 13 |
| **Even if Not Premature or Irrelevant the Common Interest Privilege Cannot Protect Forgers and Originators of Defamation** | 15 |
| **Defendants Iyer and Garrett Had Actual Malice Because They Knew Their Forgeries and Fabricated Defamations Were False Resulting in Actual Malice** | 15 |
| **Exceptional Persistence and Repetition of Defamation Defeats Common Interest Privilege** | 16 |
| **Defamation and Defamation Per Se are Properly Pleaded** | 17 |
| **Injurious Falsehood is Properly Pleaded** | 18 |
| **Civil Conspiracy is Properly Pleaded** | 19 |
| **Defendants Iyer and Garrett Only Cite Cases That Did Not Find a Civil Conspiracy Did not Allege or Show by Exhibits Showing Communications** | 19 |
| **The Conspiracy is Obvious, Evidenced by Exhibit 3 and Easily Inferred by Actions** | 20 |
| **Intentional Infliction of Emotional Distress is Properly Pleaded and is Non Duplicative** | 21 |
| **Intentional Infliction of Emotional Distress is Contextual and Involved Standards of the Community** | 21 |
| **Defendants Iyer and Garrett Cannot Expect That Two Independently Valid Claims Both Be Dismissed Because They Are Overlap Thus Denying All Recovery** | 22 |
| **New Jersey Law Applies to the Properly Pleaded False Light and Invasion of Privacy Claim** | 23 |
| **The Southern District of New York and Second Circuit Routinely Uphold Such Properly Pleaded New Jersey Claims Under New Jersey Law** | 23 |
| **Defendants Iyer and Garrett Incorrectly Assume That One State's Laws Must Govern All Claims and Ignore the Doctrine of Dépeçage** | 24 |
| **CONCLUSION** | 25 |
| **The Facially Defective Motion to Dismiss Opposed is a Not Responsive to the Pleadings** | 25 |

**TABLE OF AUTHORITIES**

**Rules**

Federal Rules of Civil Procedure Rule 8

Federal Rules of Civil Procedure Rule 9

Federal Rules of Civil Procedure Rule 12

Federal Rules of Civil Procedure Rule 15

New York Civil Practice Rules § 203

New York Civil Practice Rules § 1024

New Jersey Rules of Court 4:26

**Statutes**

N.Y. Civ. Rights Law § 76-a

28 U.S.C. § 1652 (Rules of Decision Act)

47 U.S.C. § 230(c)(1) (Communications Decency Act)

**Books**

Scalia and Garner, *Reading Law*

**Music**

Odetta Holmes, *Run On*

Elvis Presley, *Run On*

**Cases**

Michael Grecco Prods., Inc. v. RADesign, Inc., 112 F.4th 144 (2d Cir. 2024)

Clark v. Hanley, 89 F.4th 78, 93–94 (2d Cir. 2023)

In Re: Nine West LBO Sec. Litig., 87 F.4th 130, 144 (2d Cir. 2023)

Medina v. Seiling, No. 14- CV-6034 (VSB) 2018 WL 1603857 (S.D.N.Y. 2018)
Ceara v. Deacon, 68 F. Supp. 3d 402, 410 (S.D.N.Y. 2014)

Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013)

Justin v. Orshan, 14 A.D.3d 492, 788 N.Y.S.2d 407, 408 (2d Dep't 2005)

Maurro v. Lederman, 7 Misc.3d 863, 795 N.Y.S.2d 867, 870–71 (Sup.Ct. Richmond Cnty.2005)

Bumpus v. N.Y.C. Transit Auth., 66 A.D.3d 26, 883 N.Y.S.2d 99, 104 (2d Dep't 2009)

Victor Auto Parts, Inc. v. Cuva, 148 Misc.2d 349, 560 N.Y.S.2d 269, 271 (Sup.Ct. Monroe Cnty.1990);

Wilson v. 30 Broad St. Assocs., L.P., 178 Misc.2d 257, 679 N.Y.S.2d 521, 522 (Civ.Ct.N.Y.Cnty.1998)

Harris v. N. Shore Univ. Hosp. at Syosset, 16 A.D.3d 549, 792 N.Y.S.2d 148, 149 (2d Dep't 2005);

Luckern v. Lyonsdale Energy Ltd., 229 A.D.2d 249, 654 N.Y.S.2d 543, 545–46 (4th Dep't 1997)

Farrell v. Votator Div. Of Chemetron Corp, 62 N.J. at 115, 122

Frederique v. Cnty. of Nassau, No. CV 11-1746(WDW), 2014 WL 12841638 (E.D.N.Y. 2014)

Diorio v. Ossining Union Free School Dist., 96 A.D.3d 710, 946 N.Y.S.2d 195 (2d Dep't 2012)

Lebowitz v. Fieldston Travel Bureau, Inc., 181 A.D.2d 481, 581 N.Y.S.2d 302, 303 (1st Dep't 1992)

Konowitz v. Archway School Inc., 65 A.D.2d 752, 409 N.Y.S.2d 757 (2d Dep't 1978)

N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)

Ashcroft v. Iqbal, 556 U.S. 662 at 679 (2009)

Biro v. Conde Nast, 883 F.Supp.2d 441, 456 (S.D.N.Y. 2012)

Palin v. New York Times Company, 940 F.3d 804, 809 (2nd Cir. 2019)

Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 176 (2nd Cir. 2000)

Fairstein v. Netflix, Inc., 553 F.Supp.3d 48, 62 at 63 (S.D.N.Y. 2021)

Chau v. Lewis, 771 F.3d 118, 127 (2nd Cir. 2014)

Kimmerle v. N.Y. Evening Journal, Inc., 262 N.Y. 99, 102, 186 N.E. 217 (1933)

Frechtman v. Gutterman, 115 A.D.3d 102, 104, 979 N.Y.S.2d 58 (2014)
Laguerre v. Maurice, 192 A.D.3d 44, 50, 138 N.Y.S.3d 123 (2020)

Palin v. New York Times Co., No. 22-558 (2nd Cir. 2024)

Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co., 7 A.D.2d 441, 184 N.Y.S.2d 58 (1st Dep't 1959)

Holy Spirit Ass'n for Unification of World Christianity v. New York State Congress of Parents and Teachers, Inc., 95 Misc. 2d 548, 408 N.Y.S.2d 261 (Sup 1978)

N. State Autobahn, Inc. v. Progressive Ins. Grp. Co., 102 A.D.3d 5, 953 N.Y.S.2d 96 (2012)

Gilliam v. Richard M. Greenspan, P.C., 17 A.D.3d 634, 635, 793 N.Y.S.2d 526).

ACR Sys., Inc. v. Woori Bank, No. 14 CIV. 2817 (JFK), 2018 WL 1757019 (S.D.N.Y. Apr. 10, 2018)

Cohen Brothers Realty Corp. v. Mapes, 181 A.D.3d 401, 119 N.Y.S.3d 478 (1st Dep't 2020).

Seltzer v. Bayer, 709 N.Y.S.2d 21, 23 (1st Dep't 2000)

Elson v. Consol. Edison Co. of N.Y., Inc., 641 N.Y.S.2d 294, 294-95 (1st Dept. 1996)

Cunningham v. Sec. Mut. Ins. Co., 689 N.Y.S.2d 290, 291 (3d Dep't 1999)

M+J Savitt, Inc. v. Savitt No. 08-cv-8535 (DLC), 2009 WL 691278 (S.D.N.Y. 2009)

Mitchell v. Giambruno, 35 A.D.3d 1040, 826 N.Y.S.2d 788 (3d Dep't 2006)

Catalanello v. Kramer, 18 F. Supp. 3d 504 (S.D.N.Y. 2014)

Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999)

Machleder v. Diaz, 801 F.2d 46, 51–52 (2d Cir. 1986)

Adelson v. Harris, 973 F.Supp.2d 467, 476 (S.D.N.Y. 2013)

Condit v. Dunne, 317 F.Supp.2d 344, 353 (S.D.N.Y. 2004)

Reeves v. Am. Broad. Co., 719 F.2d 602, 605 (2d Cir.1983)

*Federal Housing Finance Agency v. Ally Financial Inc.*, Fed. Sec. L. Rep. (CCH) P 97235, 2012 WL 6616061 (S.D.N.Y. 2012)

French Schwartz v. Twin City Fire Ins. Co., 492 F. Supp. 2d 308 (S.D.N.Y. 2007)

French Schwartz v. Twin City Fire Ins. Co., 539 F.3d 135 (2d Cir. 2008)

Simon v. Philip Morris Inc., 124 F. Supp. 2d 46, 75 (E.D. N.Y. 2000)
2002 Lawrence R. Buchalter Alaska 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co., 96 F. Supp. 2d 182 (S.D.N.Y. 2015)

United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198 (S.D.N.Y. 2002)

## PRELIMINARY STATEMENT

Defendants Iyer and Garrett join once again to plumb the depths of dishonesty together in support of their joint motion to dismiss and skirt the limits of perpetrating frauds on this Court, as they have already deceived their co-defendant Epstein, the Federalist Society and the world at large.

Because they cannot contend with the First Amended Complaint ("FAC"), which identified them as two of the Does named by the Original Complaint ("OC"), nor with the damning exhibits which include two of their forgeries Exhibits 1 & 2 and a defamatory email Exhibit 3 that provides immense clarity into the nature of their conspiracy and their prior, manifest and subsequent tortious conduct, they must respond to a complaint of their own creative invention and hope for the best.

In order to effectuate this deception, they alternate between gross misrepresentations of the FAC in token references on one hand while making broad sweeping statements that ignore clearly pleaded facts and allegations on the other. Incredibly, they go so far as to contradict their own memorandum of law on multiple occasions when it addresses the pleaded facts and allegations by boldly stating elsewhere that no such pleading was made at all.

Some of these improprieties cannot even be explained by them not properly reading the pleadings, because this amnesia to inconvenient facts and exhibits is selective and contextual.

In terms of the exhibits so damning of their gambit of evading accountability, they ignore the obvious meaning of there being two different versions of a forgery supposedly depicting a physically printed poster Exhibits 1 & 2, and ludicrously present to this Court that two PDF files generated by defendant Garrett from excerpts of two websites on August 1, 2022, are a true and ultimate testament of everything that is or ever was on the internet, even as these digital files was marked up by defendant Garrett himself in furtherance of this conspiracy and tortious conduct.

1

For these reasons, their joint motion to dismiss should not even be taken seriously as it contains nothing other than concealment or twisting beyond comprehension of the facts alleged against them and premature legal arguments that the Court cannot properly resolve at this early pleading stage.

## PROCEDURAL BACKGROUND

### The Parties

Plaintiff and non-movant to this motion, Gideon Rapaport is a former employee of the law firm of Kirkland & Ellis LLP, and a graduate of the New York University School of Law. He is a citizen of Canada, and was lawfully admitted to the United States at the time of the filing of the original complaint as a nonresident alien, and that is his current status as well.

Defendant and movant to this motion to dismiss, Ajay Srinivasan Iyer is a current employee of Kirkland & Ellis LLP, and a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2021/2022. He is a U.S. Citizen. Defendant Iyer is a member of the bar of the State of New York.

Defendant and movant to this motion to dismiss, Zachary George Garrett is a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2021/2022. He is a U.S. Citizen. On information and belief, defendant Garrett is not a member of the bar of any jurisdiction.

Defendant and movant to a separate motion to dismiss Richard Allen Epstein is a professor of law at the New York University School of Law, where he also serves as the faculty advisor to the Federalist Society chapter, and the Journal of Law and Liberty. He is a U.S. Citizen. Defendant Epstein is a member of the bar of the State of California.

### Procedural Background

This case began as a John Doe suit, filed *pro se* on July 28, 2023. On December 11, 2023, subpoenas ducus tecum were granted by this Court for the purpose of identifying the Doe defendants to

2

be served upon Kirkland & Ellis LLP and the Federalist Society of Law and Public Policy, and one employee of each. On March 15, 2024, the Doe defendants were identified by their true names as a result of these subpoenas. On May 24, 2024 the First Amended Complaint was filed, and was served upon the defendants. By August 16, 2024, all defendants had filed motions to dismiss, with defendants Iyer and Garrett doing so through the same counsel.

## FACTUAL BACKGROUND

### Defendants Iyer and Garrett Forged and Created the Defamations Rather Than Merely Repeated Them

Defendants Iyer and Garrett are the original source of the forgeries and defamations leading to this civil action. They did not merely repeat or discuss these statements, they are the originators and have always been alleged to be, even before they were known to be the perpetrators by their true names. Defendant Iyer utilized his access granted by employment at Kirkland & Ellis to covertly take both pictures of the security desk that would be the basis for his two forgeries utilizing digital image manipulation techniques FAC ¶¶ 35,47. The second version Exhibit 2 was more sophisticated than the first version Exhibit 1, because it resolved the unnatural smoothness of the Plaintiff's face on a page that was otherwise thoroughly wrinkled, and was necessary because that obvious defect in the first version caused some to disbelieve it. The online posts were a simultaneous way of multiplying the damage, forcing the organization and others to act as a result of public pressure, and disguise the origins of the forgeries and defamation as coming from anonymous internet users further masked as an ideologically motivated attack FAC ¶ 39.

Defendants Iyer and Garrett, each in different physical locations and social contexts, spread the same defamatory rumors that the Plaintiff was fired for sexual harassment, with defendant Garrett taking primarily responsibility for communicating the online defamations to the Federalist Society due to his presence at the Student Leadership Conference as an incoming chapter president FAC ¶ 40.

3

<u>Defendant Iyer is the Only Person Who Could Have Created and Posted the First Forgery Online</u>

Exhibit 3 identifies defendant Iyer as the source of the second forgery Exhibit 2 "see the attached photo ("Security Desk Photo") taken by Ajay Iyer at Kirkland & Ellis's New York location at 601 Lexington Avenue on Thursday" and the two forgeries are identical in all respects except for the critical difference of the second allowing wrinkles on the physical page to affect the digitally superimposed image of the Plaintiff's face and text. The digital layers imposed upon the first, daytime, and second, nighttime, pictures of the security desk are exceptionally identical other than that in the second forgery they were 'blended' or 'multiplied' with the underlying real picture to allow the wrinkles and creases of the page to be seen through the digitally imposed layer. Still, this was just a matter of blending the colors of underlying bright and dark spots, and could not simulate the uneven curvature of the page, as evident by the letter "G" of "Gideon" whose shape is not distorted at all by that thoroughly wrinkled area of the page Exhibit 2. Although the "warp text" function of common digital image manipulation software can and did skew the text overall to compensate for the non-perpendicular angle between the camera and the physical page, it must do so as defined by the four corners of the page, and cannot account for local unevenness caused by wrinkles.

<u>The Contents and Context of the Forged Images Are Defamatory</u>

Both defamatory forgeries contain the same text, the image of the Plaintiff's face, depicted in the context of a notice posted at a security desk FAC ¶ 35:

DO NOT ADMIT

GIDEON RAPAPORT

KIRKLAND AND ELLIS

<u>The Creation of the Second Forgery and Direct Communication of it to the Federalist Society Required Removal of First Forgery from the Internet Proves the Conspiracy of Defendants Iyer and Garrett</u>

4

Because any comparison between the first forgery and the second forgery would alert any minimally cautious individual that they are both fake, the first forgery had to be removed from the internet by defendants Iyer and Garrett in order to prevent such comparison. This was done sometime on or after July 31, 2022 per the Student Leadership Conference referenced in Exhibit 3, and sometime on or before August 1, 2022 which is when the Exhibit 3 excerpts were made into PDFs as indicated by time stamp. This is a very tight timeline, and raises a very strong inference far beyond mere plausibility, especially in the absence of any conceivable other reason for someone to remove the first forgery at all, or specifically at that time.

After the first version was removed, Defendant Garrett excerpted and marked up the contents of two online discussion threads into PDFs and sent the second forgery prepared by defendant Iyer, presented as one which Iyer took himself Exhibit 3. There is no reason to believe either intuitively or according to either the Original or First Amended Complaint that only two online discussion threads ever existed, or that the FAC necessarily references either of the two excerpted by defendant Garrett as the original source of the defamation. Rather, the thread with the post containing both the image and defamations, whose contents were erased and replaced by the time of defendant Garrett's email by a single period "." was not excerpted by defendant Garrett because this would draw attention to the removal of a different version previously seen and disbelieved by Redpath, Alcantara and others.

<u>Defendants Iyer and Garrett Were Maliciously Persistent by Creating Second Forgery After the First Was Rejected and Continued to Push Defamations on the Federalist Society</u>

Defendants Iyer and Garret's attempts to defame the Plaintiff to the Federalist Society, and ensure his ejection from a fellowship program were persistent and multiple. According to Defendant Garrett's August 2, 2022 email Exhibit 3, he had already raised these issues to defendant Epstein, who is the faculty adviser for NYU, and to Peter Redpath and Kate Alcantara of the Student Division during

5

the student leadership conference prior to that email. "As I mentioned to you over the weekend…" Exhibit 3.

Defendant Garrett was insistent through the email, despite already notifying three relevant people associated with the organization, that the forgeries and defamations also reach Lee Otis, who was in charge of the Faculty Division. As Defendant Garrett wrote "I don't know Lee Otis, though, so I'm sharing with you two Professor Epstein's concerns" Exhibit 3. There is no non-malicious reason indicated or even feasible for defendant Garrett's insistence, especially after notifying three influential people within the organization more than capable of dealing with the situation. His reference of defendant Epstein by name is also suspicious, because defendant Epstein was perfectly capable of communicating, and did in fact communicate, with Lee Otis on his own, as he later admitted in writing FAC ¶¶ 63-64, 84. Defendant Garrett even begged Peter Redpath and Kate Alcantara to forward the defamatory materials to Lee Otis "If you feel Lee Otis should know, could you please notify her? If not, I understand. I simply felt it would be more appropriate to come from one or both of you rather than myself."

After receiving the materials from defendant Epstein, Lee Otis then interviewed defendant Iyer as a purported witness due to his concurrent employment at the New York office of Kirkland & Ellis, where he lied to support his own forgeries and defamations FAC ¶ 64.

The Exhibit 3 Email and Materials Reveal Previous Defamations, the Agreement to the Conspiracy and Defendants Iyer and Garrett's Early Need to Cover Up the First Version of the Forgery

The Exhibit 3 email begins with a reference to prior defamations by defendant Garrett "As I mentioned to you over the weekend [July 29 to 31 2022], my understanding is that Gideon Rapaport was fired … for sexually harassing a practice assistant or an attorney". The email continues with another defamatory statement "I do know that Gideon was fired and banned from entering the building" that is immediately supported by evidence provided by defendant Iyer "see the attached

6

photo … taken by Ajay Iyer". This contact necessitates not only communication between defendants Iyer and Garrett, but also the action of defendant Iyer in "taking" the second forged picture, while simultaneously removing the first forgery posted online. The only explanation for why defendant Iyer would have "taken" and sent the second forgery specifically to defendant Garrett, out of all of the people in the world, is some degree of cooperation and common purpose between the two, these actions speak louder than any possible words.

The Exhibit 3  email is an overt act, and a particularly significant one, that by incorporating the materials forged by defendant Iyer and received directly from him, and transmitting them in furtherance of the common aim of defaming the Plaintiff clearly manifests cooperation.

<u>The Plaintiff's Diligent Efforts to Discover the Identities of the Initially Unknown Perpetrators Was</u>
<u>Thwarted by Defendant Epstein's Fraud</u>

The Plaintiff's diligent efforts to discover the identities of the tortfeasors who destroyed his career prospects and his relationship with his favorite professor, defendant Epstein, led to repeated inquiries of defendant Epstein, who responded with fraud to cover up for defendants Iyer and Garrett. Defendant Epstein lied by phone "about not knowing which members of the New York University Federalist Society Chapter sent the defamatory statements and fakes to the Federalist Society, the manner by which he himself learned about the defamatory statements and fakes, and his own role in sending these materials himself and instructing others to do so" FAC ¶ 79 and subsequently in writing when he declared himself as the sender of the materials with the fraudulent omission and deceit by half-truth to cover up that defendants Iyer and Garrett had done so as well FAC ¶ 84. These diligent efforts of the Plaintiff were well directed, because defendant Epstein actually did know, as demonstrated by Exhibit 3 because he was communicating with and receiving materials from defendants Iyer and Garrett.

7

## ARGUMENT

"You may throw a rock, and hide your hand
Working in the dark against your fellow man
But sure as God has made the day and the night
What you do in the dark will be brought to light"

*Run On*, a Traditional American Folk Song
as performed by Odetta Holmes or alternatively Elvis Presley

### A. The Motion of Defendants Iyer and Garret is Not Even Responsive to the Factual Allegations of the First Amended Complaint

#### 1. Glaring Omissions Raise Serious Doubt as to Whether Opposing Counsel Even Read the Pleadings They Reference

In referencing the Original Complaint for the purposes of claiming that it did not identify defendants Iyer and Garrett by their actions for the purposes of "relating back", they simply ignore OC ¶ 21 which alleges that "Defendants timed the publication and *forwarding* of the anonymous internet posts very closely to the start of the James Kent Summer Academy in order to prevent the Plaintiff's attendance at the latest possible time so as to deny him the opportunity to marshal sufficient facts to prove the falsehood of the hoax, and thereby cause him direct and specific injury" (emphasis added).

Instead of contending with the actual pleadings, defendants Iyer and Garrett claim on MTD page 17  that "[t]he statements Defendants Iyer and Garrett made to the Federalist Society and Professor Epstein are all time barred. In his original complaint, *Rapaport does not mention any of these communications. Rather, the original complaint is premised on the internet posts and a Title IX complaint*. See Compl. ¶¶ 6–9, 23–27." (emphasis added). They cited a grand total of 9 different paragraphs of the Original Complaint, both before and after the relevant paragraph 21, which clearly identified them for sending the email Exhibit 3, which forwarded the defamatory materials and was itself disclosed pursuant to a subpoena, and was exactly as described in OC ¶ 21.

8

If the Federalist Society could identify defendants Iyer and Garrett as the John Does based on nothing other than the Original Complaint, how is it that the actual perpetrators themselves, who should know best for themselves who they are and what they did, could not be provided with adequate notice or sufficient identification by that same pleading? This attempt at deception should strain the credibility of the defendants' request for a dismissal beyond the breaking point.

The highly specific identification by the Plaintiff in his Original Complaint of the actions and methods of the Does should have easily put defendants Iyer and Garrett on notice. Without even knowing who the perpetrators were, the Plaintiff understood their *modus operandi* as manifest in the facts eventually specified by Exhibit 3. That email showed that the defamation was meant to coincide with the presence of defendant Garrett at the Student Leadership Conference, and which was sprung on the Federalist Society just days before the fellowship was supposed to begin, giving the least possible amount of time for the truth to be found and the harm mitigated.

Another highly inconvenient aspect of the pleadings to defendants Iyer and Garrett, is the specific explanation for reason and precise timing of the removal of the first version of the defamatory forged image Exhibit 1. They simply ignore these allegations made in FAC ¶ 46 and instead engage in a laughable charade meant to convince the Court that the one true and final testament of all that exists or ever existed on the internet relating to this case was captured by defendant Garrett in his PDF excerpts of two online threads shown in Exhibit 3. These excerpts prepared by defendant Garrett are an exhibit, or "proof" of nothing other than what he himself sent, based on a snapshot in time that could have been edited in ways that go beyond his evident highlighting, and may omit anything inconvenient to his tortious and conspiratorial aims. Defendants Iyer and Garrett ridiculously pretend that no other threads could have existed on the internet, because this is their only way of trying to cope with the insurmountable weight of the specific allegations that they originated the forgeries and defamations, as supported by the true meaning of the Exhibits, including Exhibit 3.

9

Rather than serving to "contradict" the allegations of the First Amended Complaint, the selective snapshot in time forwarded by defendant Garrett confirms the conspiracy and cooperation with defendant Iyer, because he waited to excerpt and forward these materials after defendant Iyer had erased the original post, supplied him with an improved second forgery shifted the focus away from where the first forgery had been by excluding that online thread from his compilation.

Exhibit 1, the first and less sophisticated forgery, was the one posted online and defendants Iyer and Garrett simply cannot ignore its existence by pretending that because it had been removed from an online thread that defendant Garrett chose not to make an excerpt of, it never existed at all.

Defendants Iyer and Garrett also fail to appreciate specific statements made relating to the harm throughout the First Amended Complaint. They claim that even the type of clerkship lost by the Plaintiff as a result of their defamations and the conduct of defendant Epstein was not specified despite it being specified as an "appellate" clerkship with a potential follow-up "with the U.S. Supreme Court" FAC ¶ 13 procured by defendant Epstein, who is accurately described as "an important source of recommendations of law students for clerkships in Federal District Courts, Courts of Appeals and the U. S Supreme Court" FAC ¶ 19.

### 2. A Pattern of Intermittent and Contextual Amnesia Pervades Defendants' Memorandum that Selectively References Facts Elsewhere Denied to Exist

Defendants Iyer and Garrett also affirmatively deny the existence of core aspects of the pleadings after paying lip service in acknowledgment of the allegations against them elsewhere. An example of this is with the origination and forgery of the defamations that they acknowledge in other parts but dissonantly claim that the Plaintiff "merely alleges that Defendants made statements about rumors" MTD page 18. This is an incredulous way to describe the forgeries of Exhibit 1 & 2, and the alleged *origination* of these rumors including through the posting and subsequent strategic removal of

10

the online posts. Such an internal conflict cannot be explained by failing to properly read the pleading and must be willful deception.

Throughout their memorandum, defendants Iyer and Garrett also almost totally ignore the existence of two forgeries, except for a few token references, and never engage with what this means for their culpability, especially because the first appeared online with the defamatory posts and the second was admitted to have been "taken" by defendant Iyer. As shown above, they try to play off the claims against them as arising from "statements about rumors". The two forgeries also highlight their conflict of interest, and the impossibility of ethically representing both of them, because while defendant Garrett is more clearly caught in the communication of the defamations, defendant Iyer is clearly caught as the actual forger the second version, as defendant Garrett's writings in Exhibit 3 identify him, and almost definitely the forger of the first version too.

### B. <u>Anticipatory Pleading by Plaintiff to Affirmative Defenses Such as the Statute of Limitations or Possible Common Interest Privilege is Not Required or Proper</u>

#### 1. Consideration of the Statute of Limitations Arguments Raised Are Premature and Factually Unsupported

In *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144 (2d Cir. 2024) the Second Circuit reiterated "[t]he pleading requirements of the Federal Rules of Civil Procedure do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." *Clark v. Hanley*, 89 F.4th 78, 93–94 (2d Cir. 2023) (internal quotation marks and citation omitted). In fact, "[p]laintiffs are under *no obligation* to plead facts supporting or negating an affirmative defense in the complaint. *In Re: Nine West LBO Sec. Litig.*, 87 F.4th 130, 144 (2d Cir. 2023)" (original emphasis).

The Second Circuit specifically stated that "the complaint did not need to allege, plausibly or otherwise, that the claim was timely. [plaintiff's] complaint could have therefore survived [defendant's]

11

motion to dismiss even without its allegations about [plaintiff's] general level of diligence or the date it discovered [defendant's] infringement. Because [plaintiff's] did offer those allegations, the district court was correct to consider whether they rendered it clear from the face of the complaint that the claims were time barred. But as described, they did not." *Michael Grecco Prods., Inc.*

In this case, diligent efforts were clearly pleaded, incidentally to another claim, as further described in Part C-1. These pleadings were not meant to anticipate any statute of limitations defense, but rather to state a claim against defendant Epstein for the fraud he repeatedly perpetrated against the Plaintiff to thwart identification of defendants Iyer and Garrett as the perpetrators.

## 2. Consideration of the Common Interest Privilege Arguments Raised Are Premature and Factually Unsupported

The same rule discussed in Part B-1 establishes that there is no obligation to plead anticipating affirmative defenses, and also applies to the Common Interest Privilege prematurely asserted by defendants Iyer and Garrett. Furthermore, this privilege is deeply fact intensive and rather than mere operation of law, involves factual circumstances that must establish its relevance and applicability, and is not supported at all by the pleadings. Critically, this privilege is a qualified one, and even its valid assertion is no absolute bar because it may be defeated by actual malice. See Part C-2.

## C. Incidentally, Pleading as to Defendant Epstein's Fraud Establishes Relating Back Per FRCP Rule 15(c)(1)(a) with CPLR 1024 & 203 as "the Law That … Allows Relation Back"

### 1. Defendant Epstein's Fraud Was Committed to Undermine Plaintiff's Diligent Efforts to Identify Defendants Iyer and Garrett

Upon being asked about the involvement of others defendant Epstein, who responded with fraud to cover up for defendants Iyer and Garrett. Defendant Epstein lied by phone "about not knowing which members of the New York University Federalist Society Chapter sent the defamatory statements and fakes to the Federalist Society, the manner by which he himself learned about the defamatory statements and fakes, and his own role in sending these materials himself and instructing others to do

12

so" FAC ¶ 79. After being pressed again about the identity of the perpetrators defendant Epstein

perpetrated fraud again, in writing, he declared himself as the sender of the materials with a fraudulent

omission and deceit by half-truth to cover up that defendants Iyer and Garrett had done so as well FAC

¶ 84. Even if not connected to or used to infer culpability on the part of defendant Epstein, it clearly

demonstrates diligent efforts on the part of the Plaintiff to learn who the perpetrators were, and that

these efforts were accurately directed to a person who had actual knowledge but chose to become a co-

conspirator and thus a co-defendant.

### 2. New York Law Applies Through FRCP Rule 15(c)(1)(a) and Specifically Allows for Suits to Be Brought Against Does and Relate-Back Later

Rule 15 of the Federal Rules of Civil Procedure at (c)(1) specifically provide that "An

amendment to a pleading relates back to the date of the original pleading when … (A) the law that

provides the applicable statute of limitations allows relation back;" All of the claims in this case arise

under and have their statutes of limitations provided by the laws of the State of New York and the State

of New Jersey. Both of these laws specifically allow for suits to be brought while claims are timely

against John Does and for the Does to be discovered later.

NY CPLR §1024 specifically provides "*Unknown parties*. A party who is ignorant, in whole or

in part, of the name or identity of a person who may properly be made a party, may proceed against

such person as an unknown party by designating so much of his name and identity as is known. If the

name or remainder of the name becomes known all subsequent proceedings shall be taken under the

true name and all prior proceedings shall be deemed amended accordingly." (title italicized)

NY CPLR § 203 provides at (f) "*Claim in amended pleading*. A claim asserted in an amended

pleading is deemed to have been interposed at the time the claims in the original pleading were

interposed, unless the original pleading does not give notice of the transactions, occurrences, or series

of transactions or occurrences, to be proved pursuant to the amended pleading." (title italicized)

13

The state courts of New York have interpreted these sections to require "diligent efforts" to be conducted during the timely period, sometimes also expressed as "due diligence". However this standard is low, and this District, in applying the state precedents have found the mere allegation by a plaintiff that he sent a few inquiries by letter to a government department *Medina v. Seiling*, No. 14-CV-6034 (VSB) 2018 WL 1603857 (S.D.N.Y. 2018), or a single contacting of a responsible official demanding the full identity of defendants to be sufficient *Ceara v. Deacon*, 68 F. Supp. 3d 402, 410 (S.D.N.Y. 2014). At this stage, all facts pleaded are to be accepted as true, with all reasonable inferences being made in favor of the Plaintiff. Only if defendants Iyer and Garrett will be able to factually prove at the summary judgment stage that there is no genuine dispute of fact as to whether or not the Plaintiff made diligent efforts to identify the perpetrators, and that no reasonable jury could find that he did, then denial of relating-back would proper. Because of the diligent efforts made with respect to defendant Epstein, incidentally pleaded to the fraud claim against him in Part C-1 it will be impossible for them to do so.

In *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) the Second Circuit recognized that asides from Rule 15(c)(1)(C) "Mistake" correction of identities, "the New York Civil Practice Law and Rules ("CPLR") creates a special procedure for claims alleged against John Doe defendants" and that "New York courts have interpreted this section to permit John Doe substitutions *nunc pro tunc*."[1].

The Second Circuit instructs that "[t]o take advantage of § 1024, a party must meet two requirements. See *Justin v. Orshan*, 14 A.D.3d 492, 788 N.Y.S.2d 407, 408 (2d Dep't 2005); *Maurro v. Lederman*, 7 Misc.3d 863, 795 N.Y.S.2d 867, 870–71 (Sup.Ct. Richmond Cnty.2005). First, the party must "exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name." *Bumpus*, 883 N.Y.S.2d at 104; see also *Harris v. N. Shore Univ. Hosp. at Syosset*, 16 A.D.3d

---

1 See *Bumpus v. N.Y.C. Transit Auth.*, 66 A.D.3d 26, 883 N.Y.S.2d 99, 104 (2d Dep't 2009); *Victor Auto Parts, Inc. v. Cuva*, 148 Misc.2d 349, 560 N.Y.S.2d 269, 271 (Sup.Ct. Monroe Cnty.1990); *Wilson v. 30 Broad St. Assocs.*, L.P., 178 Misc.2d 257, 679 N.Y.S.2d 521, 522 (Civ.Ct.N.Y.Cnty.1998)

14

549, 792 N.Y.S.2d 148, 149 (2d Dep't 2005); *Justin*, 788 N.Y.S.2d at 408; *Luckern v. Lyonsdale Energy Ltd.*, 229 A.D.2d 249, 654 N.Y.S.2d 543, 545–46 (4th Dep't 1997). Second, the party must describe the John Doe party "in such form as will fairly apprise the party that [he] is the intended defendant."[2]

If the Federalist Society could identify defendants Iyer and Garrett based on the Original Complaint, surely they could have done appraised themselves of the accusations against them.

Relating back is even easier under the laws of New Jersey, which may very well have the most liberal policy of any state or jurisdiction in the world in terms of allowing relating back against John Doe defendants through its "Fictitious Defendant Rule" N.J.R. 4:26-4. interpreted the degree of specificity required as being interpreted liberally so as to achieve the purposes of individual justice *Farrell v. Votator Div. Of Chemetron Corp*, 62 N.J. at 115, 122.

The extensive discussion of *Frederique v. Cnty. of Nassau*, No. CV 11-1746(WDW), 2014 WL 12841638 (E.D.N.Y. 2014) by defendants Iyer and Garrett is simply irrelevant because that magistrate judge order did not contemplate Rule 15(c)(1)(A) relating back, and only contemplated Rule 15(c)(1)(C) "mistake" relating back and a judicially crafted doctrine that allows for the statute of limitation to be tolled under equitable principles if defendants wrongfully resist discovery to ensure a plaintiff's claims become time barred during litigation. None of these are required or particularly relevant in this case because the laws of New York and New Jersey provide John Doe relating back mechanisms as a clear matter of law.

D. **Even if Not Premature or Irrelevant the Common Interest Privilege Cannot Protect Forgers and Originators of Defamation**

1. **Defendants Iyer and Garrett Had Actual Malice Because They Knew Their Forgeries and Fabricated Defamations Were False Resulting in Actual Malice**

According to *Diorio v. Ossining Union Free School Dist.*, 96 A.D.3d 710, 946 N.Y.S.2d 195 (2d Dep't 2012) "[I]f the plaintiff can demonstrate that the defendant made the allegedly false statement

---

2 *Bumpus*, 883 N.Y.S.2d at 104; see also *Lebowitz v. Fieldston Travel Bureau, Inc.*, 181 A.D.2d 481, 581 N.Y.S.2d 302, 303 (1st Dep't 1992).

with "malice," the privilege may be dissolved. To establish the "malice" necessary to defeat the privilege, the plaintiff may *show* either common-law malice, i.e., "spite or ill will," or may show "'actual malice,'" i.e., knowledge of falsehood of the statement or reckless disregard for the truth" (citations omitted and emphasis added). See also *Konowitz v. Archway School Inc.*, 65 A.D.2d 752, 409 N.Y.S.2d 757 (2d Dep't 1978).

Actual malice requires acting "with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). As is thoroughly alleged throughout the First Amended Complaint, and supported by the dispositive Exhibits 1 through 3, defendants Iyer and Garrett knew, and had to have known, that their forgeries were false, and that the defamations that they themselves fabricated out of whole cloth were false. This is the clearest and most plausibly pleading of actual malice possible, and is evidenced by dispositive exhibits.

### 2. Exceptional Persistence and Repetition of Defamation Defeats Common Interest Privilege

The remarkable persistence of defendants Iyer and Garrett, as identified by Exhibit 3, exceeds any possible common interest privilege that could be. After providing notice to three influential persons, who could accurately be described as "deciders" within the organization, defendant Epstein as faculty adviser, and the director and deputy director of the Student Division, continued their defamations when not getting the result they wanted initially as if they were taking a case on appeal. Defendants Iyer and Garrett are not "deciders" themselves, and even if they did not forge and fabricate themselves, and thus know the contents of their communications to be false, their privilege ended with their notification of three "deciders" of the Federalist Society the first time, and subsequent pleading and lobbying as evidenced by Exhibit 3 cannot be privileged.

16

### E. __Defamation and Defamation *Per Se* are Properly Pleaded__

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662 at 679 (2009).

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F.Supp.2d 441,  456 (S.D.N.Y. 2012). Under New York law, to recover on a claim of defamation, a plaintiff must establish the following elements: (1) publication without privilege or authorization to a third party of a (2) false and (3) defamatory statement of and concerning the plaintiff, (4) with the requisite fault, and (5) special damages or *per se* actionability.12 See, e.g., *Palin v. New York Times Company*, 940 F.3d 804, 809 (2nd Cir. 2019); *Celle v. Filipino Reporter Enters.*, Inc., 209 F.3d 163,  176 (2nd Cir. 2000). A statement is defamatory if it exposes an individual "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism,  degradation or disgrace, or ... induce[s] an evil opinion of one in the minds of right thinking persons, and … deprive[s] one of their confidence and friendly intercourse in society."[3]. A statement is defamatory on its face (defamation *per se*) when it "suggests improper performance of one's professional duties or unprofessional conduct."[4]

It is obvious that defamations falsely accusing someone of being fired for sexual harassment, which is extremely unprofessional conduct, is defamation *per se* under two headings both of injuring a person in their trade or occupation and of falsely accusing them of committing a serious crime as has been thoroughly discussed throughout the entire First Amended Complaint as summarized by the Factual Background section herein, and manifest in Exhibits 1 through 3.

---

3*Fairstein v. Netflix, Inc.*, 553 F.Supp.3d 48, 62 at 63 (S.D.N.Y. 2021) (citing *Chau v. Lewis*, 771 F.3d 118, 127 (2nd Cir. 2014) (quoting *Kimmerle v. N.Y. Evening Journal, Inc.*, 262 N.Y. 99, 102, 186 N.E.  217 (1933))

4*Fairstein*,  553 F.Supp.3d at 63 (citing and quoting *Frechtman v. Gutterman*, 115 A.D.3d 102, 104,  979 N.Y.S.2d 58 (2014) (further quotation omitted)); see also *Laguerre v. Maurice*, 192  A.D.3d 44, 50, 138 N.Y.S.3d 123 (2020) ("A statement is defamatory *per se* if it …  tends to injure the plaintiff in her or his trade, business, or profession....").

17

Furthermore, the general claims of defendants Iyer and Garrett that defamation is a disfavored tort, or that resolution at the motion to dismiss case is favored, beyond being prejudicial, also clearly fly in the face of recent precedent from *Palin v. New York Times Company*, 940 F.3d 804, 809 (2nd Cir. 2019). The vindication of the pleading standards and access to justice demonstrated that such cases, even involving public figures which this Plaintiff is not, are to be treated equally to other cases, and was recently reinforced by new law in *Palin v. New York Times Co.*, No. 22-558 (2nd Cir. 2024).

## F. <u>Injurious Falsehood is Properly Pleaded</u>

Although injurious falsehood is sometimes wrongly thought of as a twin of defamation, perhaps due to in other cases being improperly confused or pleaded, it has its origins as a prototypical and specific form of primae facie tort, and developed according to similar reasoning but prior to primae facie tort *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.*, 7 A.D.2d 441, 184 N.Y.S.2d 58 (1st Dep't 1959); *Holy Spirit Ass'n for Unification of World Christianity v. New York State Congress of Parents and Teachers, Inc.*, 95 Misc. 2d 548, 408 N.Y.S.2d 261 (Sup 1978). Some have gone so far so as to suggest that injurious falsehood is actually a sibling or form of primae facie tort, which would place it on an evolutionary branch very far from defamation. To further illustrate how torts may differ in origin and character, extortion or the utterance of a threat also involves speech, as does common law trademark infringement, yet they can all still be very different from each other.

Based on the shared principle that unjustified and malicious harm should not be tolerated in society, primae facie tort regulates harmful true statements, in relatively rare circumstances where the tortfeasor has the sole malicious intent of injuring the plaintiff when making a true statement. Injurious falsehood, as alleged here, regulates false statements that cause injury by malice, and the inherent falsehood of the statement broadens the scope by providing that while malice may be necessary, it need not be the sole motive.

18

"To establish a claim for injurious falsehood, plaintiff must demonstrate that defendant maliciously made false statements with the intent to harm plaintiff, or made such statements recklessly and without regard to their consequences, and that a reasonably prudent person would have or should have anticipated that damage to the plaintiff would result." *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 102 A.D.3d 5, 953 N.Y.S.2d 96 (2012) citing *Gilliam v. Richard M. Greenspan, P.C.,* 17 A.D.3d 634, 635, 793 N.Y.S.2d 526).

As a result of the injurious falsehoods trafficked by defendants Iyer and Garrett with actual malice as the forgers and originators, alleged by the First Amended Complaint and supported by Exhibits 1 through 3, the Plaintiff has not been able to find gainful professional employment, face the character and fitness committee of the bar absent risk of permanent professional injury and has suffered a broad slew of other harms as properly pleaded throughout the First Amended Complaint supported by Exhibits 1 through 3 including loss of a paying Bradley fellowship FAC ¶ 71,73 incorporating OC ¶ 48.

### G. Civil Conspiracy is Properly Pleaded

#### 1. Defendants Iyer and Garrett Only Cite Cases That Did Not Find a Civil Conspiracy Did not Allege or Show by Exhibits Showing Communications

Under New York law, "[t]o establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and, (4) resulting damage or injury."[5]

Exhibit 3, even without any inference from actions which occurred necessarily by the actions of defendants Iyer and Garrett shows as plausible all of these elements. Defendants Iyer and Garrett cooperated, initially with defendant Garrett communicating the first round of defamations at the Student Leadership Conference that were posted online by Defendant Iyer, but when this didn't work,

---

[5] *ACR Sys., Inc. v. Woori Bank*, No. 14 CIV. 2817 (JFK), 2018 WL 1757019 (S.D.N.Y. Apr. 10, 2018) See also *Cohen Brothers Realty Corp. v. Mapes*, 181 A.D.3d 401, 119 N.Y.S.3d 478 (1st Dep't 2020).

19

defendant Iyer created the second forgery, and out of all people in the world, he sent it to defendant Garrett, who then  the such as the creation and dissemination of the two forgeries Exhibits 1 & 2, and removal of the first and less sophisticated forgery Exhibit 1 on either July 31, 2022 or August 1, 2022.

Following defendants Iyer and Garret's logic, it is hard to imagine what *could* qualify as a conspiracy, especially considering that Exhibit 3 is effectively a confession, and an admission against co-conspirators that references communications between them.

### 2.  The Conspiracy is Obvious, Evidenced by Exhibit 3 and Easily Inferred by Actions

Exhibit 3 provides the best possible support for plausibility of a civil conspiracy imaginable, as it references the discussions and collaborations between all three defendants in a manner that will even be admissible per the Federal Rules of Evidence as an admission against co-conspirators, granting and exception to the hearsay rule. This exhibit also manifests an overt action in furtherance of the conspiracy by defendant Garrett, and in agreement with the instructions of defendant Epstein as deliberated upon jointly with defendant Iyer, and had the second version of the forgery, Exhibit 2 attached to it. Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662 at 679 (2009), and it does not take much imagination or none other than obvious inferences to be made to find that defendants Iyer and Garrett collaborated.

The only alternative to the explanation of conspiracy at this stage, is that defendant Iyer, who forged both versions of the defamatory image, tricked defendant Garrett into doing his dirty work, and that Garrett's participation was as a result of beind deceived by Iyer, who sent him the second forgery directly while admitting it to be of his own taking, knowing that he would forwarded it to the Federalist Society and others. This alternative possibility, which was not alleged by the complaint, is the only innocent explanation for defendant Garrett's conduct, and could have been considered by this court per the reasoning of *Twombley* and *Iqbal* which make an exception for innocent explanations confounding

20

allegations of conspiracy, but it was not raised by defendants Iyer and Garrett because of their obvious conflict of interest, and the impossibility of any counsel ethically representing both of them in this matter, as was argued in the Plaintiff's Motion to Disqualify Opposing Counsel of September 14, 2024.

**H.** **Intentional Infliction of Emotional Distress is Properly Pleaded and is Non Duplicative**

### 1. Intentional Infliction of Emotional Distress is Contextual and Involved Standards of the Community

While it is true that it is hard to quantify exactly what conduct rises to the level of intentional infliction of emotional distress, it is clear that it involves consideration of both the depraved intent of the perpetrator and the particular susceptibility of the victim to the contemplated emotional distress.

While it is fitting that defendants Iyer and Garrett place themselves in the comparative ballpark of people who dumped cement, lighted cigarettes, and eggs on [a] plaintiff's property and threatened to paint a swastika on his house *Seltzer v. Bayer*, 709 N.Y.S.2d 21, 23 (1st Dep't 2000) and subjected [a vulnerable plaintiff] to eight hours of threatening interrogation while showing him a gun and denying him food. *Elson v. Consol. Edison Co. of N.Y., Inc.*, 641 N.Y.S.2d 294, 294-95 (1st Dept. 1996), they clearly exceeded those inflictions both in their depraved intent and in the emotional suffering caused.

The intentional infliction of emotional distress here is much more severe than the cases cited. It is obvious, and easily inferred from both the First Amended Complaint and the Original Complaint brought *pro se* written by the Plaintiff himself which may be noticed as a testament of his suffering, that the Plaintiff would have preferred to have any of those things happen to him, rather than the injury and subsequent suffering that defendants Iyer and Garrett tailored especially to destroy his life, career prospects and relationships with his favorite law professor and a non profit he was deeply involved with. The Plaintiff would have also prefer to be falsely accused, even by perjured testimony, of arson as they cite from *Cunningham v. Sec. Mut. Ins. Co.*, 689 N.Y.S.2d 290, 291 (3d Dep't 1999), or embarrassed at work by being accused of "f*****g the bookkeeper." in front of colleagues as they cite

21

from *M+J Savitt, Inc. v. Savitt* No. 08-cv8535 (DLC), 2009 WL 691278 (S.D.N.Y. 2009), because this occurring at work would at least mean that he had a job, and does not necessarily imply any criminal, wrongful or harassing conduct towards the bookkeeper due to the possibility left open of the relationship being consensual. Furthermore, in that case the bookkeeper was apparently an outside contractor or service provider rather than a coworker or employee.

The conduct of defendants Iyer and Garrett, as part of a thorough campaign of destruction, is best compared to a case where intentional infliction of emotional distress was found in *Mitchell v. Giambruno*, 35 A.D.3d 1040, 826 N.Y.S.2d 788 (3d Dep't 2006) where, for approximately two years, the neighbors conducted a campaign of lewd comments and intimidation directed at a same-sex couple and their lifestyle, both in private and public. This is similar to what the Plaintiff has been suffering. The repeated nature of the long list of torts, including the intrusive depiction of the Plaintiff's private habits, mannerisms and beliefs FAC ¶ 38, repetitions of the defamations beyond 2022, and the recent tortious interference resulting in the loss of two good jobs FAC ¶ 29 makes the similarity quite striking. Arguably, the suffering of the plaintiffs in *Mitchell v. Giambruno* is less because they did not lose their employment and entire career prospects as a result of the tortious conduct of those defendants.

### 2. Defendants Iyer and Garrett Cannot Expect That Two Independently Valid Claims Both Be Dismissed Because They Are Overlap Thus Denying All Recovery

Defendants Iyer and Garrett also argue throughout, resulting in internal inconsistency, that because two causes of action in anyway overlap, either due to arising from the same conduct or damages, that both should be denied. At most, if such arguments were taken to be persuasive just one should be denied as duplicative, but now is not the time for doing so because this would deny to the Plaintiff the ordinary benefit of pleading in the alternative per Rule 8(a)(3), especially prior to having the benefit of discovery.

This internal inconsistency is particularly noticeable in terms of damages. While ignoring the *per se* exemption from showing special damages resulting from defamatory remarks injuring the trade of profession of the Plaintiff, defendants Iyer and Garrett instead claim that only special damages are recoverable, and simultaneously claim that the extreme emotional harm suffered by the Plaintiff is duplicative of the injury resulting from defamation, suddenly ignoring their "special damages" (that also have an improperly invented pecuniary requirement thrown in by them for good measure).

## I. New Jersey Law Applies to the Properly Pleaded False Light and Invasion of Privacy Claim

### 1. The Southern District of New York and Second Circuit Routinely Uphold Such Properly Pleaded New Jersey Claims Under New Jersey Law

In *Catalanello v. Kramer*, 18 F. Supp. 3d 504 (S.D.N.Y. 2014) the court found that the domicile of the Plaintiff in New Jersey, and the harm being suffered there was dispositive, regardless of none of the tortious actions took place there, other than the appearance of the tortious material.

The *Catalanello* court evaluated many precedents and found that "Discouraging defamation is a conduct regulating rule," and thus "the situs of the tort[] should control." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir.1999), 166 F.3d at 545; see *Machleder v. Diaz*, 801 F.2d 46, 51–52 (2d Cir.1986) (affirming application of New Jersey law to defamation and false-light invasion of privacy claims on the ground that New Jersey "has the most significant relationship with the occurrence and with the parties"). "'[T]he locus of the tort is where the plaintiff suffered injury.'" *Adelson v. Harris*, 973 F.Supp.2d 467, 476 (S.D.N.Y.2013) (quoting *Condit v. Dunne*, 317 F.Supp.2d 344, 353 (S.D.N.Y.2004)). Thus, in a defamation action, "'often the Court can resolve the choice of law analysis ... simply by observing the state of plaintiff's domicile and presuming that the publication injured him in that state.'" Id. (quoting *Condit*, 317 F.Supp.2d at 353); see also *Lee*, 166 F.3d at 545 (in a defamation case, "'the state of the plaintiff's domicile will usually have the most significant

23

relationship to the case,' and its law will therefore govern") (quoting *Reeves v. Am. Broad. Co.*, 719

F.2d 602, 605 (2d Cir.1983)) (All other bracketed comments are original to the court).

The taking of the Plaintiff's image and using it to create the two forgeries Exhibits 1 & 2 to

present him, by spreading these materials far and wide, as someone who was fired for sexual

harassment and banned from an office building where he formerly worked Exhibit 3, accompanied by

an intrusive discussion of the Plaintiff's mannerisms, habits, personality and beliefs are the

paradigmatic example of the false light invasion of privacy if there ever was one. FAC ¶ 117,118.

2. **Defendants Iyer and Garrett Incorrectly Assume That One State's Laws Must Govern All Claims and Ignore the Doctrine of Dépeçage**

Dépeçage is a relevant doctrine in the consideration of different claims each under their relevant

sources of law as a horizontal matter such as with multiple state laws or national laws, as is practiced

vertically by including both state and federal causes of action in a single case. While the rest of the

causes should be tried under New York law, due to their injuries and harms focusing there as

defendants Iyer and Garrett contend, false light invasion of privacy should be tried under the laws of

New Jersey because it only protects the Plaintiff in his local community, which is New Jersey, and is

only provided by the laws of New Jersey. Even if a similar protection was offered by New York, the

Plaintiff could not avail himself of it there, because his local community was not in New York, and so

New Jersey's law protects a purely local interest from which out of state harm was directed to.

New York embraces dépeçage as a choice-of-law doctrine *Federal Housing Finance Agency v.*

*Ally Financial Inc.*, Fed. Sec. L. Rep. (CCH) P 97235, 2012 WL 6616061 (S.D.N.Y. 2012). Dépeçage is

a term that one court noted means "dismemberment" in *French Schwartz v. Twin City Fire Ins. Co.*, 492

F. Supp. 2d 308 (S.D. N.Y. 2007), judgment aff'd, 539 F.3d 135 (2d Cir. 2008). The doctrine of

dépeçage recognizes that in a single action different states may have different degrees of interest with

respect to different operative facts and elements of a claim *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d

24

46, 75 (E.D. N.Y. 2000). The rules of one system are applied to regulate certain issues arising from a transaction while the law of another system is applied to a different issue[6] Under this choice-of-law technique, a court may separate a part of the case into different portions and apply one body of law to one portion while applying a different body of law to other portions.

Because false light invasion of privacy governs the inherently local, and community impacts of the undue amounts of attention that false portrayal brings upon a private person in their neighborhood, New Jersey is the best and only source of law and geographical boundary of damages arising from false light invasion of privacy. The Plaintiff does not claim that all of the causes of action brought should be tried under the laws of New Jersey, as would be most favorable to him, but merely the only one that must and should be according to every relevant standard, which is false light invasion of privacy.

## CONCLUSION

### The Facially Defective Motion to Dismiss Opposed is a Not Responsive to the Pleadings

The motion opposed is simply not responsive to the core allegations of the pleadings, and does not respect the proper standards and practices by which it must be evaluated, which provide that facts alleged by the Plaintiff must be accepted as true, and that all reasonable inferences be drawn in the Plaintiff's favor. This is both as a result of ignoring the core allegations of the pleadings and the injection of facts unsupported threadbare conclusions by the defendants requesting this extraordinary and juridically disfavored dismissal with prejudice at the pleading stage. These deficiencies are demonstrated throughout this memorandum in opposition, not to mention a properly liberal reading and construction of the pleadings accompanied by dispositive evidence, and require for this motion to dismiss to be denied, and for parties to conduct discovery, and develop and submit evidence.

---

[6] *2002 Lawrence R. Buchalter Alaska 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co.*, 96 F. Supp. 2d 182 (S.D.N.Y. 2015); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198 (S.D.N.Y. 2002)

Dated: Vancouver, British Columbia (Canada)
September 26, 2024

Respectfully submitted,

/s/ Gideon Rapaport, *pro se*
GideonRapaportLaw@Outlook.com
(862) 213-0895
#627 1078 Summit Avenue
Jersey City, New Jersey, 07310

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GIDEON RAPAPORT,

                   Plaintiff,                  Case No.: 1:23-cv-06709 (JGLC)

     -against-

AJAY SRINIVASAN IYER,
ZACHARY GEORGE GARRETT, and
RICHARD ALLEN EPSTEIN,

                   Defendants.
-----------------------------------------------------------X

**DEFENDANTS AJAY IYER AND ZACHARY GARRETT'S
REPLY IN SUPPORT OF MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 2

    I.     Rapaport's Claims Are Time Barred. ..................................................... 2

          A.     Rapaport's claims do not relate back under state law. ..................... 4

          B.     The court should resolve the issue of timeliness now .................... 12

    II.    The First Amended Complaint Fails to State a Claim. .............................. 13

          A.     Rapaport's defamation claim fails. ................................................ 13

          B.     Rapaport fails to identify special damages and thus cannot maintain a claim for injurious falsehood. .......................................................... 16

          C.     There is no plausible civil conspiracy........................................... 17

          D.     Rapaport's subjective feelings cannot sustain a claim for intentional infliction of emotional distress......................................................... 19

          E.     The fact that Rapaport resides in New Jersey is not enough to save the claim for false light and invasion of privacy. ................................... 20

    III.   The Court Should Deny Leave to Amend the Complaint Again. .............................. 21

CONCLUSION................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)........................................................................................................... 13

*Barrett v. City of Newburgh,*
   No. 13-cv-4118 (NSR), 2017 WL 1102672 (S.D.N.Y. Mar. 23, 2017) ..................................... 8

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)........................................................................................................... 13

*Bumpus v. N.Y. City Transit Auth.,*
   88 N.Y.S.2d 99 (2d Dep't 2009)................................................................................... 5, 6, 9

*Catalanello v. Kramer,*
   18 F. Supp. 3d 504 (S.D.N.Y. 2014) .................................................................................. 20

*Ceara v. Deacon,*
   68 F. Supp. 3d 402 (S.D.N.Y. 2014) ............................................................................... 6, 10

*Clark v. Hanley,*
   89 F.4th 78 (2d Cir. 2023) ................................................................................................ 12

*Cooper v. City of New York,*
   No. 17-cv-1517 (NGG/RLM), 2019 WL 3642996 (E.D.N.Y. Aug. 5, 2019) ............................ 4

*Daniels v. St. Luke's-Roosevelt Hosp. Ctr.,*
   No. 02-cv-9567 (KNF), 2003 WL 22410623 (S.D.N.Y. Oct. 21, 2003) ................................ 17

*Drug Rsch. Corp. v. Curtis Publ'g Co.,*
   7 N.Y.2d 435 (N.Y. 1960) ................................................................................................ 17

*Fisher v. Cnty. of Nassau,*
   No. 10-cv-0677 (JS/ETB), 2011 WL 4899920 (E.D.N.Y. Oct. 13, 2011) ...................... 5, 9, 11

*Frederique v. Cnty. of Nassau,*
   No. 11-cv-1746 (WDW), 2014 WL 12841638 (E.D.N.Y. May 22, 2014)............................. 3, 4

*Ganske v. Mensch,*
   480 F. Supp. 3d 542 (S.D.N.Y. 2020) ............................................................................... 14

*Grayson v. Ressler & Ressler,*
   271 F. Supp. 3d 501 (S.D.N.Y. 2017) ............................................................................... 16

*In re Merrill,*
   No. 19-cv-6002 (LJL), 2021 WL 827190 (S.D.N.Y. Mar. 4, 2021)...................................... 15

*JCG v. Ercole,*
   No. 11-cv-6844 (CM/JLC), 2014 WL 1630815 (S.D.N.Y. Apr. 24, 2014) ....................... 3, 12

*Kennedy v. City of New York,*
   No. 12-cv-4166 (KPF), 2015 WL 6442237 (S.D.N.Y. Oct. 23, 2015)..................................... 3

*M+J Savitt, Inc. v. Savitt*,
    No. 08-cv-8535 (DLC), 2009 WL 691278 (S.D.N.Y. 2009)................................... 19

*Medina v. Seiling*,
    No. 14-cv-6034 (VSB), 2018 WL 1603857 (S.D.N.Y. Mar. 29, 2018) ............................... 3, 5

*Michael Grecco Prods., Inc. v. RADesign, Inc.*,
    112 F.4th 144 (2d Cir. 2024) ................................................................... 12

*Netzer v. Continuity Graphic Assocs., Inc.*,
    963 F. Supp. 1308 (S.D.N.Y. 1997) ....................................................... 19

*Nkansah v. United States*,
    No. 18-cv-10230 (PAC/SLC), 2021 WL 5493214 (S.D.N.Y. Nov. 23, 2021)........................ 22

*Nusantara Found. Inc. v. U.S. Dep't of State*,
    486 F. Supp. 3d 737 (S.D.N.Y. 2020) .................................................... 18

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ................................................................ 14

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) ............................................................... 23

*Sesto v. Slaine*,
    171 F. Supp. 3d 194 (S.D.N.Y. 2016) ................................................... 14

*Simon v. Philip Morris Inc.*,
    124 F. Supp. 2d 46 (E.D.N.Y. 2000) .................................................... 21

*Strada v. City of New York*,
    No. 11-cv-5735 (MKB), 2014 WL 3490306 (E.D.N.Y. July 11, 2014).................................. 11

*Temple v. New York Cmty. Hosp.*,
    933 N.Y.S.2d 321 (2d Dep't 2011) ................................................... 8, 12

*Todaro v. Siegel Fenchel & Peddy, P.C.*,
    No. 04-cv-2939 (JS/WDW), 2009 WL 3150408 (E.D.N.Y. Sept. 25, 2009) ...................... 11

*Valentin v. Dinkins*,
    121 F.3d 72 (2d Cir. 1997) ................................................................. 6

*Ventillo v. Falco*,
    No. 19-cv-3664 (PMH), 2020 WL 7496294 (S.D.N.Y. Dec. 18, 2020)........................... 2, 15

*Walker v. Hormann Flexon, LLC*,
    59 N.Y.S.3d 614 (3d Dep't 2017).......................................................... 5

*Westcon Grp., Inc. v. CCC Techs., Inc.*,
    No. 19-cv-02303 (PMH), 2022 WL 4134578 (S.D.N.Y. Sept. 12, 2022)........................... 15

*Whiteside v. Hover-Davis, Inc.*,
    995 F.3d 315 (2d Cir. 2021) ............................................................... 12

iii

*Williams v. United States*,
   No. 07-cv-3018 (RJS/THK), 2010 WL 963474 (S.D.N.Y. Feb. 25, 2010) ............................ 12

*Wood v. Mike Bloomberg 2020, Inc.*,
   343 F.R.D. 470 (S.D.N.Y. 2023) ........................................................................................ 22

**Rules**

Fed. R. Civ. P. 15 ................................................................................................................ 3, 4, 21

N.Y. C.P.L.R. § 1024 ........................................................................................................ 4, 9, 11, 12

N.Y. C.P.L.R. § 203 .................................................................................................................... 4

**Other Authorities**

Compl.,
   *Rapaport v. Epstein, et al.,* No. 1:24-cv-07439-JGLC
   (S.D.N.Y. Sept. 27, 2024), ECF No. 1 .............................................................................. 1, 11

Def.'s Mot. for Rule 11 Sanctions Against Pl. Rapaport & Pl.'s Former
   Counsel Richard A. Altman & the Law Off. of Richard A. Altman,
   *Rapaport v. Finkelman,* No. 1:24-cv-05942-JGLC (S.D.N.Y. Oct. 21, 2024),
   ECF Nos. 20–22 ..................................................................................................................... 21

*Merriam-Webster Dictionary* ........................................................................................................ 11

Christopher G. Stevenson,
   *Depecage: Embracing Complexity to Solve Choice-of-Law Issues,*
   37 Ind. L. Rev. 303 (2003) ............................................................................................... 21

## INTRODUCTION

Plaintiff Gideon Rapaport levels unfounded allegations against Defendants Ajay Iyer and Zachary Garrett.  He accuses them of defaming him with forged documents and participating in a "cabal" intent on blocking him from a clerkship and removing him from a leadership position in the student chapter of the Federalist Society at New York University School of Law.  But Rapaport fails to back up those harmful accusations with any supporting allegations.  Rather, after Iyer and Garrett explained in their motion to dismiss the various reasons why Rapaport's claims fail, Rapaport responded by flippantly stating that his claims were "obvious" and should therefore be permitted to proceed.  The Federal Rules of Civil Procedure require far more, and Rapaport's unwillingness to defend his accusations confirms that his claims against Iyer and Garrett must be dismissed.

Additionally, despite already amending his complaint once, Rapaport requests leave to do so again.  The Court should deny that request, as Rapaport's proposed second amended complaint confirms that he does not seek to amend his complaint to bolster the sufficiency of his claims.  Rather, he seeks to add more implausible and malicious statements about Defendants and a host of others, including those he now accuses of RICO and antitrust violations in a newly filed lawsuit.  *See* Compl., *Rapaport v. Epstein, et al.,* No. 1:24-cv-07439-JGLC (S.D.N.Y. Sept. 27, 2024), ECF No. 1.  Of course, that is not a valid basis for granting leave to amend.  But even if the proposed additions were relevant to Rapaport's claims, leave should still be denied because he does not explain why he delayed until now to include allegations he could have included from the outset.

Accordingly, the Court should dismiss Rapaport's claims against Iyer and Garrett and deny leave to amend.

## ARGUMENT

As Defendants Iyer and Garrett previously demonstrated, the clearest reason to dismiss Rapaport's claims is that each claim is time barred. *See* Defs.' Mem. in Supp. of Mot. to Dismiss at 3–6 ("MTD") (ECF No. 54). In his opposition, Rapaport fails to provide any meaningful rebuttal to this fact. *See generally* Pl.'s Opp'n ("Opp'n") (ECF No. 79).

However, even if Rapaport's claims against Iyer and Garrett were timely, they must still be dismissed for failure to state a claim. MTD at 6–23. In response, Rapaport largely ignores this point, repeatedly insisting that his claims should proceed because he finds them "obvious." *See, e.g.*, Opp'n at 17, 20, 21. That will not do, and the Court should dismiss Rapaport's claims against Iyer and Garrett for failure to state a claim. In doing so, the Court should also deny Rapaport's motion for leave to amend as the proposed second amended complaint fails to cure any of these defects.

## I.     Rapaport's Claims Are Time Barred.

As noted, Rapaport's claims are time barred. MTD at 3–6. In his opposition, Rapaport fails to show otherwise, and he instead largely concedes the issue. *See Ventillo v. Falco*, No. 19-cv-3664 (PMH), 2020 WL 7496294, at *12 (S.D.N.Y. Dec. 18, 2020) (when a plaintiff fails to respond to a defendant's argument on a motion to dismiss, the point is conceded). For one, Rapaport does not contest Defendants' showing that the allegedly unlawful conduct occurred in July and August 2022. MTD at 4; *see generally* Opp'n. Rapaport also concedes that each claim is subject to a one-year statute of limitations. MTD at 3–4; *see generally* Opp'n. As such, the limitations period indisputably expired in or around July 2023, and the first amended complaint was filed outside that period. *See* First Am. Compl. ("FAC") (ECF No. 38). Rapaport also does not respond to Defendants' showing that he was unaware of their identities at the time of the original complaint. MTD at 4; *see generally* Opp'n.

With those concessions in place, Rapaport concedes that the first amended complaint cannot relate back under Federal Rule of Civil Procedure 15(c)(1)(C). Indeed, under Rule 15(c)(1)(C), relation back is unavailable when "'the newly added defendants were not named originally because the plaintiff did not know their identities.'"[1] MTD at 5 (emphasis omitted) (quoting *Frederique v. Cnty. of Nassau*, No. 11-cv-1746 (WDW), 2014 WL 12841638, at *4 (E.D.N.Y. May 22, 2014)). And, as Defendants further demonstrated, Rapaport also cannot satisfy Rule 15(c)(1)(C) because he failed to look diligently for their identities. MTD at 3–6.

Rather, Rapaport's lone argument is that the first amended complaint relates back under Rule 15(c)(1)(A), which looks to whether the "applicable statute of limitations allows relation back." Opp'n at 13–15. Under this Rule, Rapaport argues that the Court should analyze the timeliness of his claims under New York and New Jersey law. *Id.* at 13–14. But that is a distinction without a difference, as the authority Rapaport identifies poses the same question as Rule 15(c)(1)(C): Did Rapaport undertake sufficient efforts during the limitations period to identify Defendants' names? The answer is clearly "no," and Rapaport's proposed second amended complaint does not change that fact, as it fails to allege that he *ever* asked about the Defendants' identities. Accordingly, the claims are time barred, and the proposed second amended complaint does nothing to save those claims.

---

[1] Rapaport incorrectly argues (at 15) that Rule 15(c)(1)(C) is irrelevant here. But courts routinely analyze the relation-back issue under both parts of Rule 15. *See, e.g.*, *Medina v. Seiling*, No. 14-cv-6034 (VSB), 2018 WL 1603857, at *6 (S.D.N.Y. Mar. 29, 2018); *JCG v. Ercole*, No. 11-cv-6844 (CM/JLC), 2014 WL 1630815, at *13 (S.D.N.Y. Apr. 24, 2014), *report and recommendation adopted*, 2014 WL 2769120 (S.D.N.Y. June 18, 2014); *Kennedy v. City of New York*, No. 12-cv-4166 (KPF), 2015 WL 6442237, at *4 (S.D.N.Y. Oct. 23, 2015).

**A.      Rapaport's claims do not relate back under state law.**

In New York, relation back is permitted when a plaintiff satisfies the requirements of either

N.Y. C.P.L.R. §§ 203(c) or 1024.[2]  *See Cooper v. City of New York*, No. 17-cv-1517 (NGG/RLM),

2019 WL 3642996, at *19 (E.D.N.Y. Aug. 5, 2019) ("New York law allows relation back when

either N.Y. C.P.L.R. §§ 203 or 1024 are satisfied."), *aff'd*, No. 22-2792-cv, 2024 WL 1107923 (2d

Cir. Mar. 14, 2024).  To satisfy either standard, Rapaport must show diligence.  But the record

shows only Rapaport's indolence.

As to Section 203, it provides that a "claim asserted in an amended pleading is deemed to

have been interposed at the time the claims in the original pleading were interposed, unless the

original pleading does not give notice [of the events] to be proved pursuant to the amended

pleading."  N.Y. C.P.L.R. § 203(f).  This rule "closely tracks Rule 15(c)(1)(C)," and thus when a

"[p]laintiff cannot meet the requirements of Rule 15(c)(1)(C), they also cannot satisfy section

203."  *Cooper*, 2019 WL 3642996, at *19.  As noted above, Rapaport has conceded that he cannot

satisfy Rule 15(c)(1)(C).  Indeed, Rapaport admits that he did not know Defendants' identities at

the time he filed his original complaint, which is fatal to relation back under Rule 15(c)(1)(C).  *See*

FAC ¶ 81 ("This was the original *pro se* John Doe complaint, in which plaintiff was completely

ignorant of the identities of the defendants."); *Frederique*, 2014 WL 12841638, at *4.  Rapaport

thus cannot rely on Section 203 to show that the first amended complaint relates back.

That leaves only Section 1024, which requires Rapaport to demonstrate diligence.  Under

that provision, a plaintiff who sues a John Doe defendant must satisfy three requirements:

> *First,* the plaintiff must diligently seek the unknown defendant's identity prior to
> the expiration of the statute of limitations. *Second,* the plaintiff must file a timely
> complaint that fairly apprises the party that she is the intended defendant. *Third,*
> the plaintiff must identify and serve the previously-unknown defendant within 120

---

[2] As demonstrated in Part II(E) below, New Jersey law is irrelevant here.

> days of his filing suit. The 120–day period may be lengthened upon good cause shown or in the interest of justice. If a plaintiff meets these requirements, then the limitations period is tolled between the filing of his complaint and the day he serves the proper defendant.

*Fisher v. Cnty. of Nassau*, No. 10-cv-0677 (JS/ETB), 2011 WL 4899920, at *4 (E.D.N.Y. Oct. 13, 2011) (cleaned up) (citing *Bumpus v. N.Y. City Transit Auth.*, 88 N.Y.S.2d 99, 103–04 (2d Dep't 2009)); *accord Walker v. Hormann Flexon, LLC*, 59 N.Y.S.3d 614, 615 (3d Dep't 2017).  Rapaport argues (at 14–15) that he satisfies the first two requirements, but he ignores the third.  However, Rapaport cannot satisfy any of them.

*First*, Rapaport suggests (at 14) that the standard for diligence "is low" and that he exercised diligence in seeking Iyer's and Garrett's identities based on a few conversations with Defendant Epstein in which he claims Epstein lied about Iyer's and Garrett's involvement.  Once again, Rapaport is wrong on the law and facts.

As to the law, Rapaport errs in claiming that the diligence standard is low, which is likely why he fails to cite any authority saying as much.  *See* Opp'n at 14.  Instead, Rapaport points to a case where, according to him, the court found due diligence after a plaintiff sent just "a few inquiries" to the government to ascertain the defendant's identity.  Opp'n at 14 (citing *Medina v. Seiling*, No. 14-cv-6034 (VSB), 2018 WL 1603857, at *7 (S.D.N.Y. Mar. 29, 2018)).  But the *Medina* plaintiff did not send just "a few inquiries."  Rather, the plaintiff sent an inquiry about the defendant's identity "at least once a month" for almost *two years*.  *Medina*, 2018 WL 1603857, at *7 (emphasis omitted).  The plaintiff also submitted a records request to the police department, made "numerous requests" to the criminal court that oversaw his case, and made "numerous requests" to the law library where he was incarcerated.  *Id.*  Rapaport has not come close to exercising the same level of diligence.

Rapaport next relies on a case where, according to him, the court found diligence based on "a single contacting" of a person with knowledge of the John Doe's identity. Opp'n at 14 (citing *Ceara v. Deacon*, 68 F. Supp. 3d 402 (S.D.N.Y. 2014)). Once again, Rapaport mischaracterizes the authority. In *Ceara*, while the plaintiff made an inquiry to the Inspector General for the identity of the defendant, he had also previously filed a grievance about the matter to the state police who had the Inspector General investigate the matter. *Ceara*, 68 F. Supp. 3d at 404. Moreover, the *Ceara* plaintiff filed his complaint sufficiently before the limitations period ran so that the court could issue a *Valentin* order during the limitations period directing the New York State Attorney General to disclosure of the defendant's identity within 60 days.[3] *Id.* Neither *Medina* nor *Ceara* suggests that diligence is a "low" standard, and each underscores Rapaport's lack of diligence, which requires dismissal. *See Bumpus*, 883 N.Y.S.2d at 104 ("Any failure to exercise due diligence to ascertain the Jane Doe's' name subjects the complaint to dismissal as to that party.")

Unlike the numerous attempts of the plaintiff-prisoners to identify the defendants in *Medina* and *Ceara*, Rapaport, a graduate from a top law school, points to a scattering of conversations with Defendant Epstein as evidence of his diligence. For the first conversation, which allegedly occurred on August 9, 2022, and shortly after the events complained of in the amended complaint, Rapaport characterizes it as an "uninterrupted and prepared monologue" wherein Epstein told Rapaport that his "career was destroyed." FAC ¶¶ 70–71. Although Rapaport insists that Epstein "attempted to cover up" the identities of Iyer and Garrett, *id.* ¶ 75, there is no indication in the complaint or elsewhere that Rapaport even asked about their names. In fact,

---

[3] When Rapaport attempts to compare himself to the *pro se* plaintiff in *Ceara*, he also ignores that the plaintiff there was incarcerated, and he thus had substantially fewer tools at his disposal to identify the defendant. *See Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir. 1997) (noting that for an incarcerated plaintiff, "it is hard to see what investigative tools would be at his disposal to obtain further information" about a defendant's identity).

Rapaport's claim that this was an "uninterrupted and prepared monologue," *id.* ¶ 70, undermines any inference that he sought the Defendants' identities, as he apparently had no opportunity in this conversation to ask any questions.

That same day, Rapaport allegedly communicated with Epstein by email, where Epstein allegedly stated that "he had sent the compiled materials to Otis, and warned plaintiff not to pursue the matter further[.]" *Id.* ¶ 84. Once again, this allegation makes no reference to any steps Rapaport took to learn Defendants' identities.

Rapaport then did nothing for nearly one year, when he allegedly had lunch with Epstein on July 28, 2023—the day before the limitations period expired. *Id.* ¶ 80. Here again, however, Rapaport does not allege that he asked Epstein any questions about Defendants' identities. He simply asked whether Epstein had "any corrections or additions" to his draft complaint. *Id.* And, although Rapaport accuses Epstein (again) of covering up Defendants' identities, the complaint alleges that Epstein simply "stated that he did not want to be involved in any way." *Id.* ¶ 83. The complaint does not allege that Rapaport asked Epstein during this conversation about Defendants' identities.

These are the only conversations Rapaport identifies as allegedly aimed at learning Defendants' identities prior to the running of the limitations period. But none of them demonstrates any diligence, as Rapaport fails to allege that he *ever* asked about Defendants' identities. Moreover, Rapaport then waited *months* before seeking any discovery from either Epstein or the Federalist Society, and he then waited several *more* months—nearly a year after the limitations period expired—to file the first amended complaint. *See* MTD at 5–6.

Rapaport's lack of diligence is confirmed by the fact that courts have consistently found even greater efforts to be insufficient to demonstrate diligence. For example, a New York appellate

court held that a complaint should have been dismissed as untimely where a plaintiff sought discovery before the statute of limitations ran, yet "failed to promptly seek further discovery" after receiving "less than adequate" responses. *Temple v. New York Cmty. Hosp.*, 933 N.Y.S.2d 321, 323 (2d Dep't 2011). And another court in this district held that even when the plaintiff claimed that the defense counsel was "stonewalling" her "efforts to identify 'John Doe,' she could have timely pursued alternative avenues for obtaining discovery." *Barrett v. City of Newburgh*, No. 13-cv-4118 (NSR), 2017 WL 1102672, at *6 (S.D.N.Y. Mar. 23, 2017), *aff'd*, 720 F. App'x 29 (2d Cir. 2017). The *Barrett* court further noted that the plaintiff "continued to serve all discovery requests on the same—allegedly uncooperative—counsel," which demonstrated a lack of diligence. *Id.* In this light, Rapaport's scant conversations (a year apart) with Epstein are a far cry from the diligent efforts required by New York law.

Further, nothing in Rapaport's proposed second amended complaint alters this analysis. Aside from the information described above, Rapaport simply states that he sought information from Epstein "three separate times at the law school during September 2022." Second Am. Compl. ("SAC") SAC ¶ 189 (ECF No. 78). Even then, Rapaport still does not allege that he *ever* asked Epstein about which students were involved in the alleged events. Rather, Rapaport claims that he wrote Epstein about biblical metaphors and tried to "persuade defendant Epstein to do the right thing" by citing lyrics from an ABBA song. SAC ¶¶ 192–93. That clearly does not show a diligent effort to learn Defendants' identities. Also, while Rapaport contends that Epstein deceived him in those conversations, Rapaport also alleges that Epstein only stated that this situation was Rapaport's fault. *Id.* ¶ 189. It is unclear how that alleged statement is deceptive or a roadblock to Rapaport's ascertaining the Defendants' identities through alternative means.

Rapaport also now alleges that he attempted "to delicately obtain any information from Peter Redpath or Kate Alcantara, or other individuals," which Rapaport claims was "unsuccessful." SAC ¶ 199. Once again, Rapaport fails to identify a single detail of those conversations, and his "delicately obtain" language suggests that he made no explicit effort to ascertain the Defendants' identities.

Thus, Rapaport cannot meet the first requirement of Section 1024, as he failed at each turn to exercise diligence. For that reason alone, Rapaport's claims should be dismissed with prejudice, as he has now filed three complaints, each of which makes clear that he did not diligently seek Defendants' identities. *See Bumpus*, 883 N.Y.S.2d at 104 ("Any failure to exercise due diligence to ascertain the 'Jane Doe's' name subjects the complaint to dismissal as to that party.").

*Second*, Rapaport also cannot satisfy the second requirement of Section 1024—that he "file a timely complaint that fairly apprises the party that she is the intended defendant." *Fisher*, 2011 WL 4899920, at *4 (cleaned up). All Rapaport says for this element is that Iyer and Garrett should have been on notice based on Exhibit 3 to the first amended complaint, and that "[i]f the Federalist Society could identify defendants Iyer and Garrett based on the Original Complaint, surely they could have done [sic] appraised themselves of the accusations against them." Opp'n at 8–9, 15. These arguments also fail.

Most obviously, they fail because Exhibit 3 was not attached to the original complaint. And, in any event, that exhibit is an email from Garrett to Peter Redpath and Kate Alcantra, none of whom is mentioned in the original complaint. The only person mentioned in the original complaint from the Federalist Society is Lee Otis, and Rapaport admits that, as early as August

2022, he knew Epstein was the one who spoke to Lee Otis. FAC ¶ 84. This would thus provide no notice to Iyer or Garrett.[4]

Relatedly, Rapaport's suggestion that the Federalist Society could identify Iyer and Garrett is irrelevant and misplaced. Rather, the Federalist Society produced documents a year and several months after the events and following a subpoena. The Federalist Society's responding to a specific discovery request says nothing about whether Rapaport's original complaint "fairly apprised" Iyer or Garrett that they were the intended defendants, especially considering that Iyer and Garrett deny all allegations of fraud, forgery, or other wrongdoing in Rapaport's complaint.

Moreover, the original complaint discussed numerous issues involving the targeted defendants, including Title IX complaints and people "experiment[ing] with a few different fictional victim characters" to promote a sexual harassment claim. Compl. ¶¶ 23, 30 (ECF No. 1). The amended complaint, naming Iyer and Garrett, discusses none of this, as these are actions unrelated to them. So, it is unclear how Iyer and Garrett were supposed to be on notice that they were the intended defendants.

Muddying the waters further, Rapaport's proposed second amended complaint, as well as his new lawsuit accusing a large group of people of RICO and antitrust violations, undermines any notion that Iyer and Garrett should have been on notice. According to Rapaport, he was actually harmed by a large group of NYU students—a "cabal"—that collectively sought to deprive him of an elite clerkship. SAC ¶¶ 29, 201. Rapaport also now alleges that other female students, not

---

[4] Consider, in contrast, the notice given through the John Doe complaint in *Ceara*, 68 F. Supp. 3d at 411–12. In that case, the complaint stated that the defendant had been working in a specific location in a specific correctional facility on the date of the underlying incident. The complaint further included the name of the defendant's brother, and it described the underlying incident in detail. With this information, the court concluded that it sufficiently put the defendant on notice of the allegations. *Id.* at 411–12 (concluding that the original complaint "describe[d] with particularity the date, time, and location of the alleged … incident").

Defendants, accused him of sexual harassment.[5]  SAC ¶ 171 ("She told the doorman, while in view of high definition security cameras that face outward from the entrance, that the plaintiff had been 'creeping' on her earlier that night.").  Considering the growing list of people Rapaport claims "engage[d] in illegal and even criminal activity to obtain power, gang up on each other, especially through student organizations, file false reports and complaints and engage in forgery and fraud on a brazen and massive scale," it is unclear how Iyer and Garrett would have been on notice that the original complaint concerned them.  *See* Compl. ¶ 22, *Rapaport v. Epstein, et al.,* No. 1:24-cv-07439-JGLC (S.D.N.Y. Sept. 27, 2024), ECF No. 1.  Rapaport thus fails the second requirement of Section 1024.

*Third*, Rapaport plainly cannot satisfy Section 1024's final requirement, which is likely why he ignores it.  This element requires a plaintiff to identify and serve the previously unknown defendant within 120 days of filing suit.  *See Fisher*, 2011 WL 4899920, at *4.  Rapaport did not identify and serve Iyer or Garrett until he filed his first amended complaint in May 2024—nine months (roughly 270 days) after filing his original complaint.  Rapaport does not even attempt to justify his delay.  When a plaintiff fails to meet this requirement and does "not seek a good cause or interest of justice extension," courts dismiss the complaint as untimely.  *See id.* at *4; *see also Strada v. City of New York*, No. 11-cv-5735 (MKB), 2014 WL 3490306, at *5 (E.D.N.Y. July 11, 2014) (collecting cases).

---

[5] As Rapaport's proposed second amended complaint confirms, it is not entirely unreasonable that someone would find Rapaport's statements to be inappropriate.  After all, he informed Defendant Epstein that he was traveling to Finland because of the "AAA-grade shiksas over there although the cuisine is not very good, and they are at a premium compared to the Slavic variety."  SAC, Ex. 4; *see also Shiksa, Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/shiksa (last visited Oct. 30, 2024) (a disparaging term for "a non-Jewish girl or woman"); *see also Todaro v. Siegel Fenchel & Peddy, P.C.*, No. 04-cv-2939 (JS/WDW), 2009 WL 3150408 (E.D.N.Y. Sept. 25, 2009) (noting that "'Shiksa' is used often as a disparaging term referring to a non-Jewish girl or woman").